# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

```
-------------------------------------------------------x
                                      :
In re                                 :         Chapter 11
                                      :
SOUTHERN AIR                          :         Case No. 12-12690  (   )
HOLDINGS, INC., et al.,               :
                                      :         Joint Administration Requested
            Debtors.¹                 :
                                      :
-------------------------------------------------------x
```

## DECLARATION OF DANIEL J. MCHUGH IN SUPPORT OF
## THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Daniel J. McHugh, hereby declare, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.        I am President and Chief Executive Officer of Southern Air Holdings, Inc. ("Holdings").  I am familiar with the day-to-day operations, business, and financial affairs of Holdings and its affiliated debtors, as debtors and debtors in possession (collectively, the "Debtors").

2.        As of the date hereof (the "Petition Date"), each of the Debtors has filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  To enable the Debtors to operate effectively and minimize potential adverse effects from the commencement of their chapter 11 cases, the Debtors have requested certain relief in "first day" motions and applications filed with the Bankruptcy Court

---

¹ The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: (i) Southern Air Holdings, Inc., 6605; (ii) Cargo 360, Inc., 4233; (iii) Southern Air Inc., 2187; (iv) Air Mobility Inc., 3824; (v) 21110 LLC, 3761; (vi) 21111 LLC, 8100; (vii) 21221 LLC, 1567; (viii) 21550 LLC, 8103; (ix) 21576 LLC, 6341; (x) 21590 LLC, 8105; (xi) 21787 LLC, 0617; (xii) 21832 LLC, 7893; (xiii) 23138 LLC, 7192; (xiv) 24067 LLC, 6360; (xv) 46914 LLC, 0322; (xvi) Aircraft 21255, LLC, 5500; (xvii) Aircraft 21380, LLC, 1753; and (xviii) CF6-50, LLC, 9733.  The address for all Debtors is 117 Glover Avenue, Norwalk, Connecticut  06850.

(collectively, the "First Day Papers").  The First Day Papers, described more fully below, seek, among other things, to (a) obtain postpetition debtor in possession financing, (b) ensure the continuation of the Debtors' cash management system and other business operations without interruption, (c) preserve valuable relationships with suppliers and customers, (d) maintain employee morale and confidence, and (e) establish certain administrative procedures that will promote a seamless transition into chapter 11.  This relief is critical to the Debtors' restructuring efforts.

3.    I submit this Declaration in support of the Debtors' voluntary petitions and First Day Papers.  Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Paper.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion based upon my experience and knowledge, and/or information provided to me in reports concerning the operations and financial affairs of the Debtors.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this Declaration on behalf of the Debtors.

4.    This Declaration is intended to provide a summary overview of the Debtors and these chapter 11 cases.  Sections I through IV of this Declaration provide a description of the Debtors' businesses, corporate history and organizational structure, prepetition indebtedness and lease obligations, and the circumstances giving rise to the commencement of these chapter 11 cases.  Part V summarizes the First Day Papers and the relief they seek, which the Debtors believe is crucial to their successful reorganization.

## I.    The Debtors' Businesses

5.    Southern Air Inc. ("Southern Air"), the Federal Aviation Administration ("FAA") certificated, indirect subsidiary of Holdings, is an experienced provider of long-haul,

2

wide-body air cargo transportation services.  Southern Air operates a fleet of eleven aircraft, including four Boeing 777s, four Boeing 747-400s, and three Boeing 747-200s.  Southern Air's staff and flight operations are positioned around the world to facilitate global operations for both governmental and commercial customers.  Holdings is the direct or indirect parent company of the other Debtors.

6.    As of the Petition Date, the Debtors employed approximately 611 full-time employees.  For the twelve months ended July 31, 2012, the Debtors' unaudited and consolidated financial statements reflected revenues of approximately $428.2 million and a net loss of $159.8 million.  As of July 31, 2012, the Debtors' unaudited and consolidated financial statements reflected assets totaling approximately $206.9 million and liabilities totaling approximately $486.5 million.

7.    The Debtors' fleet and operational network support two primary lines of business:  Governmental air cargo transportation services and commercial air cargo transportation services.

## A.    Governmental Air Cargo Transportation Services

8.    Southern Air provides air cargo transportation services to the United States government through participation in the Civil Reserve Air Fleet ("CRAF"), a program in which commercial air carriers pledge aircraft to the Department of Defense ("DOD") for times of national emergency in exchange for government airlift contracts in times of peace.  The government places CRAF participants into one or more "segments" based on the characteristics and capability of the participant's fleet.  CRAF participants typically form cooperative teams with other commercial air carriers to diversify fleet characteristics and capabilities and pool mobilization value ("MV") points, which allows them to bid on government contracts more efficiently and effectively.  The Debtors belong to the "Patriot Team."  The Debtors generate

revenue from government services through the fulfillment of missions.  The number of missions awarded to the Patriot Team depends on the amount of MV points credited to the team under its contract with the United States Transportation Command (the "USTC"), which directly corresponds to the total number and type of aircraft the Patriot Team has committed to the CRAF program.  Missions awarded to the Patriot Team under the USTC contract are allocated to individual team members in accordance with an allocation agreement among the Patriot Team members.  The Debtors also provide air cargo transportation services to the United Kingdom Ministry of Defence under a charter services agreement with Chapman Freeborn Airchartering Limited.

9.    Governmental services accounted for approximately 43.5% of the Debtors' revenue for the twelve months ended July 31, 2012.  Missions awarded to Southern Air as a result of its participation in the CRAF program account for approximately 98.1% of such revenues.

**B.    Commercial Air Cargo Transportation Services**

10.    Southern Air also provides air cargo transportation services to a variety of commercial customers.  The Debtors provide the bulk of their commercial services pursuant to aircraft, crew, maintenance, and insurance contracts ("ACMI Contracts"), in which the Debtors provide the customer with an aircraft and crew, and cover the cost of maintaining and insuring the aircraft, in exchange for a fee paid for each "block hour" of service provided to the customer. In 2011, Southern Air entered into profitable, long-term ACMI Contracts with DHL Worldwide Express ("DHL") for the use of the Boeing 777 aircraft operated by Southern Air.  The Debtors' relationship with DHL is the cornerstone of their commercial air cargo transportation business and flights for DHL are an increasingly significant component of the Debtors' overall business.

4

11.     The Debtors also provide commercial services under crew, maintenance, and insurance contracts ("CMI Contracts") and on-demand charter contracts ("Charter Contracts").  CMI Contracts operate in the same manner as ACMI Contracts, except that the customer, not the Debtors, provides the aircraft.  Under Charter Contracts, the Debtors provide the customer with an aircraft and crew, and cover not only the cost of maintenance and insurance, but also all other necessary operating costs, including fuel, in exchange for an increased fee.  Customers often prepay the Debtors for the services Southern Air renders under ACMI Contracts, CMI Contracts, and Charter Contracts.

12.     Commercial air cargo transportation services accounted for approximately 56.5% of the Debtors' revenue for the twelve months ended July 31, 2012.  Services for DHL are responsible for approximately 63.8% of such revenues.

## II.    History and Organizational Structure

13.     The Debtors' origin dates back to 1947 and the creation of Southern Air Transport in Miami, Florida.  Southern Air was incorporated in Delaware on March 4, 1999 and operates under an FAA Air Carrier Certificate, dated November 19, 1999.  Southern Air continues the business started by Southern Air Transport, providing dependable international air cargo transportation services at competitive prices.

14.     Holdings was incorporated in Delaware on July 19, 2007.  In a series of transactions that took place on September 6, 2007, Oak Hill Capital Partners II, L.P. ("OHCP") acquired majority ownership of Southern Air through the merger of Southern Air and its existing subsidiaries with an OHCP portfolio company named Cargo 360, Inc. ("Cargo 360").  As of the Petition Date, Oak Hill Cargo 360, LLC ("Oak Hill Cargo 360") is Holdings' controlling shareholder and owns 97.95% of the issued and outstanding common stock, 100% of the issued and outstanding Series A preferred stock of Holdings, and 100% of the issued and outstanding

5

Series B preferred stock of Holdings.  Oak Hill Cargo 360 is wholly and indirectly owned by

OHCP.  As the controlling shareholder, Oak Hill Cargo 360 appoints three of the five members

of the Holdings board of directors.  Oak Hill Cargo 360 is not a debtor in these chapter 11 cases.

15.    Today, the Debtors are headquartered at 117 Glover Avenue, Norwalk,

Connecticut.  Each of the other Debtors is a wholly-owned, direct or indirect subsidiary of

Holdings and all of the Debtors are incorporated in Delaware.  The following chart illustrates the

Debtors' corporate structure:



16.    Because the Debtors are privately held corporations with no publicly

traded debt, they are not subject to the information disclosure requirements of the Securities

6

Exchange Act of 1934, as amended.  Accordingly, none of the Debtors file annual, quarterly, or current reports or any other information with the Securities and Exchange Commission.

### III.    Prepetition Indebtedness and Lease Obligations

17.    The Debtors' significant prepetition indebtedness includes secured financing obligations in the amount of approximately $288 million and trade debt in the amount of approximately $31.1 million.  In addition, the Debtors are the lessee under a number of aircraft operating leases.  The Debtors' secured debt and lease obligations are described below.

### A.    CIBC Credit Agreement

18.    As of the Petition Date, Cargo 360 was party to that certain Credit Agreement, dated September 6, 2007 (the "CIBC Credit Agreement"),[2] by and between Cargo 360, as borrower, various financial institutions and other persons from time to time parties thereto (the "Prepetition Lenders"), and Canadian Imperial Bank of Commerce, New York Agency ("CIBC"), as a Prepetition Lender and the administrative agent (the "Prepetition Agent").  The CIBC Credit Agreement, as amended, provides for (a) a revolving credit facility (the "Revolver"), letters of credit, and swingline facilities in the maximum aggregate amount of $50 million and (b) a term loan facility (the "Term Loan") in the amount of $250 million.  The Revolver and swingline loans mature on January 6, 2015.  Certain Prepetition Lenders agreed to extend the maturity date of their Term Loans to September 6, 2015.  The Term Loan of the non-extending Prepetition Lenders mature on the original maturity date of September 6, 2013.

19.    Each direct subsidiary of Cargo 360 is a guarantor of the CIBC Credit Agreement pursuant to that certain Subsidiary Guaranty, dated September 6, 2007.[3]  Holdings is

---

[2] The description herein of the CIBC Credit Agreement is for informational purposes only and is qualified in its entirety by the actual terms of the CIBC Credit Agreement.

[3] Southern Air, GmbH ("SA Germany"), a non-Debtor subsidiary of Southern Air, is not party to the aforementioned Subsidiary Guaranty.

US_ACTIVE:\44081904\12\71907.0006

a guarantor of the CIBC Credit Agreement pursuant to that certain Holdings Guaranty and

Pledge Agreement, dated September 6, 2007 (the "Holdings Guaranty and Pledge").  To secure

the payment and performance of all obligations under the CIBC Credit Agreement, Cargo 360

and each of its subsidiaries entered into that certain Pledge and Security Agreement, dated

September 6, 2007, pursuant to which they granted CIBC, as Prepetition Agent, a continuing

security interest in substantially all of their assets, subject to certain specific exclusions.[4]  In

addition, pursuant to the Holdings Guaranty and Pledge, Holdings granted CIBC, as Prepetition

Agent, a continuing security interest in, among other things, all its equity interests in its

subsidiaries.

## B.    Aircraft Operating Leases

20.    Boeing 777 Aircraft.  As of the Petition Date, Southern Air leases four

Boeing 777F aircraft (the "777 Aircraft") pursuant to that certain (a) Aircraft Operating Lease

Agreement, dated as of February 5, 2010, between Southern Air, as Lessee, and Wells Fargo

Bank Northwest, N.A., solely in its capacity as owner trustee ("Owner Trustee"), as Lessor, with

respect to Serial Number 37986, (b) Aircraft Operating Lease Agreement, dated as of February

5, 2010, between Southern Air, as Lessee, and Owner Trustee, as Lessor, with respect to Serial

Number 37987, (c) Aircraft Operating Lease Agreement, dated as of August 5, 2011, between

Southern Air, as Lessee, and Owner Trustee, as Lessor, with respect to Serial Number 37988,

and (4) Aircraft Operating Lease Agreement, dated as of August 5, 2011, between Southern Air,

as Lessee, and Owner Trustee, as Lessor, with respect to Serial Number 37989 (collectively, the

"777 Leases").  Oak Hill Aircraft Acquisition LLC ("OHAA" and together with OHCP and OH

---

[4] SA Germany is not party to the aforementioned Pledge and Security Agreement; however, pursuant to the terms of the Pledge and Security Agreement, Southern Air pledged 65% of the capital securities it holds in any foreign subsidiary.

US_ACTIVE:\44081904\12\71907.0006

Cargo, the "Oak Hill Entities") is the beneficial owner of two of the 777 Aircraft and manages

(and, upon the satisfaction of certain conditions, has the option to purchase, the membership

interests in) the entity that holds the beneficial interests in the other two 777 Aircraft.  As of the

Petition Date, each of the 777 Leases has a term of twelve years.

21.    Boeing 747-400 Aircraft.  As of the Petition Date, Southern Air leases

four Boeing 747-400 aircraft pursuant to:  (a) that certain Aircraft Operating Lease Agreement,

dated as of July 2, 2012, between Southern Air and Owner Trustee, with Aquila Aircraft Leasing

Limited, a company incorporated in Ireland, as the beneficial owner of the aircraft (the "DVB

26562 Lease"); (b) that certain Aircraft Operating Lease Agreement, dated as of December 21,

2011, between Southern Air and Owner Trustee, with Eagle Aircraft Leasing Limited, a

company incorporated in the Cayman Islands, as the beneficial owner of the aircraft (the "KV

Aviation 27602 Lease"); (c) that certain Lease Agreement, dated as of October 17, 2011,

between Southern Air and Owner Trustee, with Aircastle Investment Holdings 2, a Bermuda

company, as the beneficial owner of the aircraft (the "Aircastle 27068 Lease"); and (d) that

certain Lease Agreement, dated as of October 7, 2011, between Southern Air and Owner Trustee,

with Aircastle Investment Holdings 2, a Bermuda company, as the beneficial owner of the

aircraft (the "Aircastle 27044 Lease" and together with the DVB 26562 Lease, the KV Aviation

27602 Lease, and the Aircastle 27068 Lease, the "747-400 Leases").  As of the Petition Date, the

DVB 26562 Lease has a remaining term of two years and each of the KV Aviation 27602 Lease,

the Aircastle 27068 Lease, and the Aircastle 27044 Lease has a remaining term of eight years.

22.    Boeing 747-200 Aircraft.  As of the Petition Date, Southern Air leases

each of the Boeing 747-200 aircraft it operates pursuant to lease agreements with its affiliated

Debtor Air Mobility, Inc. ("Air Mobility").  In exchange for use of the aircraft, Southern Air

US_ACTIVE:\44081904\12\71907.0006

makes periodic non-cash lease payments to Air Mobility, which are then recorded as matching

loss and gain entries in the general ledger for Southern Air and Air Mobility, respectively.  As

discussed in more detail below, Southern Air plans to cease operating any Boeing 747-200

aircraft by the end of 2012.

## IV.    Events Leading to Chapter 11

### A.    Generally

23.    The reduction of United States military personnel in Afghanistan, as well

as the upcoming automatic and mandatory budget cuts pursuant to Congressional sequestration,

led to an unexpected and significant reduction in DOD spending on air cargo transportation

services in the last two financial quarters.  As a result of the sharp decline in government

demand, revenues generated by the Debtors' governmental air cargo business have declined

precipitously in the second and third financial quarters of 2012.  The Debtors' revenue from

governmental business in the second financial quarter of 2012 was $44.9 million, approximately

34% less than anticipated for this period under the Debtors' 2012 budget.  In addition, the

Debtors' current forecast for all revenues from government business in 2012 is only $156

million, approximately 37.2% less than anticipated for this line of business under the Debtors'

2012 budget.

24.    The Debtors' loss of significant revenues from its governmental air cargo

business has been compounded by an already stagnant international freight market, which is a

direct result of the worst global economy in decades and a generally negative economic outlook.

Indeed, 2012 is expected to be the fifth consecutive year in which there is no net growth in

demand for air cargo services.  At the same time, excess air cargo capacity in the market for

ACMI services (the "ACMI Market") has negatively affected demand, exerting downward

pressure on rates and guaranteed block hours under ACMI Contracts.

US_ACTIVE:\44081904\12\71907.0006

25.     As a result of the contraction in the Debtors' governmental business and the increasingly price-competitive nature of the Debtors' commercial business, the Debtors' air cargo capacity is underutilized.  Moreover, these market forces have also reduced the rates lessors can charge under aircraft operating leases, leaving the Debtors to operate their business under aircraft leases that are generally above current market rates.  Consequently, the Debtors' liquidity has rapidly eroded over the past several months due to the combined effect of fleet underutilization and above-market lease obligations.

**B.     <u>Recent Financial Results</u>**

26.     On a consolidated basis, the Debtors' revenues increased from approximately $363.5 million in the twelve months ended July 31, 2011 to approximately $428.2 million in the twelve months ended July 31, 2012.  Despite growth in the Debtors' top line, on a consolidated basis, the Debtors' net loss for the twelve months ended July 31, 2012 was approximately $159.8 million, an increase from a net loss of approximately $53.5 million in the twelve months ended July 31, 2011.

**C.     <u>Restructuring Initiatives – Operational</u>**

27.     Starting in 2010, Southern Air sought to reposition itself within the ACMI Market by modernizing and refocusing its fleet.  This process began with the delivery of the first two Boeing 777 aircraft in 2010 and accelerated with the execution of long-term ACMI Contracts with DHL for the use of these aircraft in 2011.  Southern Air's strategic plan involved restructuring its operations around a smaller, more cost and fuel efficient fleet that would perform reliable, low-cost, low-risk services to select customers, namely the government and DHL, which has identified Boeing 777 aircraft as its preferred air cargo platform.  The recent decline in government demand, however, has increased the significance of Southern Air's positive relationship with DHL.  Revenues from DHL-related services provide the foundation

US_ACTIVE:\44081904\12\71907.0006

from which Southern Air can opportunistically pursue growth opportunities with select commercial customers and/or the government.

28.     A critical step in the Debtors' operational restructuring has been the elimination of the less cost-efficient, less fuel-efficient, and less reliable Boeing 747-200 aircraft from its operating fleet.  Even before the abrupt market changes and resulting deterioration of the Debtors' liquidity described above, Southern Air had planned to retire the last of the Boeing 747-200 aircraft from its operations by the second half of 2013.  In light of recent events, however, Southern Air accelerated its retirement schedule and will cease flying all Boeing 747-200 aircraft by the end of 2012.  Retiring the Boeing 747-200 aircraft dictates a reduction in the workforce previously devoted to the operation and maintenance of those aircraft.  To that end, Southern Air began the corresponding downsizing of its labor force in late August 2012 and anticipates that this process will continue over the next few months.

## D.    Restructuring Initiatives – Financial

29.     As the Debtors' financial performance continued to deteriorate and liquidity pressures worsened during the third financial quarter of 2012, it became evident that the Debtors' secured debt and certain lease obligations must be restructured to address the situation. To that end, the Debtors approached CIBC, the Prepetition Agent under the CIBC Credit Agreement, to discuss the Debtors' financial condition and immediate liquidity issues and to explore potential restructuring scenarios.  The Debtors also approached OHCP, as the ultimate parent of both the Debtors and OHAA, to apprise them of the Debtors' situation and to explore potential restructuring scenarios.  The Debtors quickly realized that an out-of-court restructuring was not feasible due to their rapidly deteriorating liquidity position, and determined that the best way to protect the interests of all stakeholders and preserve the value of their enterprise as a going-concern would be the commencement of cases under the Bankruptcy Code.

US_ACTIVE:\44081904\12\71907.0006

30.      To pursue an orderly in-court restructuring, the Debtors would need an immediate infusion of liquidity to fund operations during the pendency of these chapter 11 cases. Thus, prior to the Petition Date, the Debtors and Zolfo Cooper surveyed various sources of postpetition debtor in possession financing.  Together, the Debtors and Zolfo Cooper, LLC ("Zolfo Cooper") contacted four top-tier lenders who have historically been active in the debtor in possession financing market as well as two strategic sources of investment.

31.      Each of these parties declined to submit a proposal to provide financing in light of, among other things, the Debtors' current secured debt obligations, the limited amount of traditional asset-based loan collateral in the Debtors' operations, the current state of the ACMI Market, and the fact that the Prepetition Lenders likely would not consent to any debtor in possession financing facility that primed their prepetition liens (*i.e.*, a non-consensual priming fight would be required).  Zolfo Cooper and the Debtors also inquired whether the parties were willing to provide debtor in possession financing on an unsecured or junior basis and all of the parties declined.

32.      The Debtors engaged in extensive arms' length and good faith negotiations with CIBC, certain Prepetition Lenders, and the Oak Hill Entities regarding a comprehensive financial restructuring that would bridge the Debtors' short-term lack of liquidity, reduce the Debtors' lease obligations, and significantly reduce the amount of debt on the Debtors' consolidated balance sheet.  These negotiations led to the execution of a Support Agreement on September 28, 2012, attached as Exhibit 1 hereto, among the Debtors, the Consenting Lenders (as defined in the Support Agreement), and the Oak Hill Entities, whereby the parties agreed to, among other things, the following:

US_ACTIVE:\44081904\12\71907.0006

(a) *Commencement of the Chapter 11 Cases.* The Debtors' financial restructuring would be effectuated through cases under chapter 11 of the Bankruptcy Code.

(b) *The DIP Credit Agreement.* The commencement of chapter 11 cases would be subject to the execution and delivery of a debtor in possession credit agreement (the "DIP Credit Agreement") with CIBC, as agent, and certain of the Consenting Lenders (the "DIP Lenders"). The DIP Credit Agreement provides for a superpriority priming new money delayed draw term loan facility in the principal amount of $25 million; $12.5 million to be made available upon entry of an interim order authorizing postpetition financing ("Interim DIP Order") and the balance to be made available upon entry of a final order ("Final DIP Order"). The DIP Credit Agreement further provides for a roll-up of $37.5 million of the prepetition secured debt of the Prepetition Lenders that entered into the DIP Credit Agreement, and a payment or other distribution to such Prepetition Lenders equal to 5% of the total equity value of the reorganized Debtors, distributable pursuant to the Plan (described in more detail below).

(c) *The 1110 Stipulation.* The Debtors would enter into and seek approval of the stipulation with the Oak Hill Entities (the "1110 Stipulation"), in which Southern Air agreed, pursuant to section 1110(a)(2)(A) of the Bankruptcy Code, to perform all of its obligations under the 777 Leases, without assuming such leases. In return, the Oak Hill Entities agreed to make certain payments with respect to the 777 Leases (collectively, the "OHAA Payments"), which will provide additional needed liquidity to the Debtors during the pendency of their chapter 11 cases. The OHAA Payments include (i) payments aggregating $10 million (in 12 installments of $833,333.33), (ii) the use, if commercially reasonable, of the Oak Hill Entities' $1.925 million deposit with Boeing to satisfy the Debtors' obligations to Boeing, (iii) and additional monthly payments totaling $2 million annually for five years, provided that the Debtors have made the

current monthly payments in accordance with the 777 Leases.  The Interim DIP Order and Final

DIP Order will expressly provide that OHAA Payments actually received by the Debtors during

their chapter 11 cases will constitute superpriority administrative expense claims of OHAA

against the Debtors, ratable with, secured by the same collateral as, and with the same priority as,

the liens under the DIP Credit Agreement and claims under section 364 of the Bankruptcy Code.

(d)  *The Plan and Disclosure Statement.*  The Debtors would file a plan of

reorganization ("Plan") and accompanying disclosure statement ("Disclosure Statement") in

accordance with the Plan term sheet attached as Exhibit B to the Support Agreement within ten

business days of the Petition Date.

(e)  *Support Obligations.*  Subject to certain conditions, the Consenting Lenders

and the Oak Hill Entities will support approval of the Disclosure Statement and confirmation of

the Plan, and will not support or vote to accept any plan of reorganization not proposed or

supported by the Debtors.

(f)  *Milestones.*  The parties' obligations under the Support Agreement may be

terminated in the event that certain milestones have not been achieved within a negotiated

timeline.

## V.    Summary of First Day Papers

33.    Concurrent with the filing of their chapter 11 petitions, the Debtors have

filed the First Day Papers, which the Debtors believe are necessary to enable them to operate in

chapter 11 with minimum disruption.  The Debtors respectfully request that the relief requested

in each of the First Day Papers be granted as such relief is a critical element in stabilizing and

facilitating the Debtors' operations during the pendency of these chapter 11 cases.  A description

of the relief requested and the facts supporting each of the First Day Papers is set forth below:

US_ACTIVE:\44081904\12\71907.0006

A. **Motion of Debtors for an Order Directing Joint Administration of Chapter 11 Cases Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure**

34. By this motion, the Debtors request, pursuant to Bankruptcy Rule 1015(b) and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), that the Court enter an order directing joint administration of the Debtors' chapter 11 cases. Joint administration of these cases will save the Debtors and their estates substantial time and expense by removing the need to prepare, replicate, file, and serve duplicative notices, applications, and orders. Further, joint administration will relieve the Court of entering duplicative orders and maintaining duplicative files and dockets. Accordingly, I believe that joint administration of the Debtors' chapter 11 cases is in the best interests of the Debtors, their estates and all parties in interest, and should be granted in all respects.

B. **Motion of Debtors for an Order (I) Authorizing Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Priority, (III) Authorizing Use of Cash Collateral and Approving Adequate Protection, and (IV) Modifying the Automatic Stay Pursuant to Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rule 4001**

35. By this Motion (the "DIP Motion"), the Debtors seek authority to obtain postpetition financing and related relief. The Debtors' proposed financing includes new money loans, roll-up loans, the use of use of cash collateral of the Prepetition Lenders (the "Cash Collateral"), and, additionally, the OHAA Payments described above.

36. The Debtors' financing pursuant to the DIP Credit Agreement (the negotiation of which is described more fully above) consists of a senior secured, super-priority term loan facility in an aggregate principal amount of $25 million (the "DIP Facility"). Funds under the DIP Facility will be made available to the Debtors in two tranches: $12.5 million upon entry of the Interim DIP Order and $12.5 million upon entry of the Final DIP Order. Those

US_ACTIVE:\44081904\12\71907.0006

Prepetition Lenders that opted to participate in the DIP Facility have the right to roll-up, on a one and one-half to one dollar basis, their pro rata share of $37,500,000 of the principal amount of the prepetition loans made to the Debtors under the CIBC Credit Agreement.  At the Debtors' election, interest under the DIP Facility shall accrue: (a) on Loans other than Roll-Up Loans, either at a (i) fluctuating base rate plus 7.00% per annum, or (ii) LIBO Rate (with a 2.50% LIBOR floor) plus 8.00% per annum; and (b) on Roll-Up Loans, either at a (i) fluctuating base rate plus 4.00% per annum, or (ii) LIBO Rate (with a 1.00% LIBOR floor) plus 5.00% per annum.  Upon the occurrence and continuation of an event of default by the Debtors, the Debtors shall pay the applicable rate plus a 2% per annum default premium on all amounts then outstanding.

37.    To address their working capital needs and fund their reorganization efforts, the Debtors require the use of Cash Collateral.  The DIP Documents and the 1110 Stipulation authorize the Debtors to use Cash Collateral in which the Prepetition Agent may have an interest.  The proceeds of the DIP Facility, coupled with the use of the Cash Collateral (consistent with the Approved Budget) will provide the Debtors with the capital necessary to operate their businesses, pay their employees, maximize value, and successfully reorganize under chapter 11.

38.    The Debtors have agreed to provide the Prepetition Lenders with the following, as adequate protection for any diminution in value of their interests in the prepetition collateral:  (i) grant of valid, perfected and enforceable security interests, (ii) grant of administrative expense claims, (iii) payment of all reasonable professional fees and expenses payable to the Prepetition Agent under the CIBC Credit Agreement, and (iv) continued provision to the Prepetition Agent of financial and other reporting relating to the Debtors' businesses.

US_ACTIVE:\44081904\12\71907.0006

39.     In addition, the Debtors' postpetition financing includes the OHAA Payments described above.  Together, they will make available approximately $13.33 million to the Debtors immediately upon entry of the Interim DIP Order, pending this Court's entry of the Final DIP Order.  Upon entry of the Final DIP Order, the remainder of the DIP Financing will be available to the Debtors.  This funding should allow the Debtors to meet their administrative obligations during these chapter 11 cases in accordance with the Approved Budget.

40.     Pursuant to the DIP Credit Agreement, the Debtors are obligated to pay a fee in cash equal to 1.5% of the stated principal amount of each Lender's loans.  In addition, the Debtors are obligated to make a cash payment equal to 5% of the total equity value of the reorganized Debtors (payable pursuant to the Plan), which payment is earned upon entry of the Interim DIP Order and payable as a superpriority administrative expense claim at the earliest of (i) confirmation of any plan of reorganization, (ii) sale of all or substantially all of the Debtors' assets, or (iii) conversion of any of the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, calculated differently in each case.  In the case of confirmation of a plan, at the Debtors' election, such payment may be made in the form of equity in the reorganized Debtors.  Moreover, the Debtors are obligated to pay certain fees including, an arrangement fee, an agency Fee, and one or more escrow fees.

41.     As explained in greater detail above, the Debtors' deteriorating liquidity position precipitated the filing of these chapter 11 cases.  The capital-intensive nature of the Debtors' businesses requires uninterrupted access to substantial liquidity.  Thus, despite certain Prepetition Lenders consent to the Debtors' use of cash collateral, the Debtors require additional liquidity to operate effectively while in chapter 11.  Absent the funds provided by the DIP Facility, there is a significant risk the Debtors will be unable to continue as a going concern and

US_ACTIVE:\44081904\12\71907.0006

will be compelled to cease all operations.  The harm to the Debtors' estates and its creditors, were this to occur, is self-evident.

42.    As also explained in greater detail above, the Debtors, with the assistance of Zolfo Cooper, explored various sources of postpetition debtor in possession financing, including four top-tier lenders who have previously participated in the debtor in possession financing market, as well as two strategic investment sources.  Under the circumstances, however, the Debtors were unable to obtain financing.  Zolfo Cooper and the Debtors also inquired whether certain parties would be willing to provide debtor in possession financing on an unsecured or junior basis and all of the parties declined.  Consequently, the Debtors engaged in extensive arms' length and good faith negotiations with CIBC, certain of the Prepetition Lenders, and OHAA regarding a comprehensive financial restructuring and these negotiations culminated in the execution of the Support Agreement and the DIP Credit Agreement.

43.    The DIP Credit Agreement provides for certain Liens, which prime certain prepetition liens relating to the CIBC Credit Agreement.  The majority of the Prepetition Lenders consented to the priming of their liens.  As mentioned previously, the Debtors were unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1), or under section 364(a) by affording the potential lender administrative expense priority.  The Debtors' attempts to obtain postpetition financing in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1) were also unsuccessful.  Without granting priming liens, pursuant to section 364(d), the Debtors were unable to obtain postpetition financing or other financial accommodations from any alternative lender or group of lenders on more favorable terms and conditions than those for which approval is sought in the DIP Motion.

US_ACTIVE:\44081904\12\71907.0006

The Debtors believe that the circumstances of these cases require the Debtors to obtain financing under sections 364(c) and (d) of the Bankruptcy Code.

44.     The Debtors believe they have negotiated the best terms available to obtain the funding they need to preserve their assets over the course of their chapter 11 cases. The pricing of the Roll-Up Loans is favorable, as the interest rate is consistent with the terms of the CIBC Credit Agreement.  The interest rate on the new money loans is within the range of market rates and fair and reasonable in light of the credit profile of the Debtors, the nature and extent of the Collateral, and the business risks associated with the Debtors' operational restructuring.  The adequate protection provided to the Prepetition Lenders is likewise fair and reasonable and appropriate under the circumstances.  Accordingly, the DIP Facility reflects the exercise of the Debtors' sound business judgment.

45.     The relief requested in the DIP Motion contemplates a modification of the automatic stay (the "Automatic Stay") imposed by section 362 of the Bankruptcy Code (to the extent applicable) to (a) permit the Debtors to grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (b) permit the DIP Lenders to exercise, upon the occurrence and during the continuance of an event of default and after five business days' notice thereof, all rights and remedies under the DIP Credit Agreement; and (c) implement the terms of the Interim DIP Order and the Final DIP Order.  Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

46.     The Debtors have an urgent and immediate need for cash to continue to operate.  Currently, the Debtors do not have sufficient funds with which to operate their

US_ACTIVE:\44081904\12\71907.0006

businesses on a going forward basis.  Absent authorization from the Court to obtain secured

credit, as requested, on an interim basis pending the Final Hearing, the Debtors will be

immediately and irreparably harmed.  The availability of interim loans under the DIP Facility

will provide necessary assurance to the Debtors' vendors, employees, and clients of the Debtors'

ability to meet their near-term obligations.  Failure to meet these obligations and to provide these

assurances likely would have a long-term negative impact on the value of the Debtors'

businesses, to the detriment of all parties in interest.  The interim relief requested in the DIP

Motion is necessary to preserve and maintain the going concern value of the Debtors and

facilitating their reorganization efforts.  Accordingly, I believe that prompt approval of the relief

requested in the DIP Motion is critical to the Debtors' successful reorganization.

47.    Based on the foregoing, I believe that the relief requested in the DIP

Motion is in the best interests of the Debtors and their estates and all parties in interest, and

should be granted in all respects.

**C.    Motion of Debtors for (I) Authority to (A) Continue Their Existing
Cash Management System, (B) Maintain Existing Bank Accounts and
Business Forms, and (C) Continue Existing Intercompany Funding
Arrangements, and (II) An Extension Time to Comply with and
<u>Waiver of the Requirements of Section 345(b) of the Bankruptcy Code</u>**

48.    By this Motion (the "<u>Cash Management Motion</u>"), the Debtors request,

modification of the *Operating Guidelines and Reporting Requirements for Chapter 11 Debtors

and Trustees* ("<u>U.S. Trustee Guidelines</u>") maintained by the United States Trustee for the District

of Delaware, pursuant to sections 105(a), 345(b), and 363(c) of the Bankruptcy Code and

Bankruptcy Rules 6003 and 6004, for (i) authority to (a) continue their existing Cash

Management System, (b) maintain business forms and existing Bank Accounts located at the

Banks, and (c) continue their existing intercompany funding arrangements, and (ii) an extension

of time to comply with and waiver of section 345(b) of the Bankruptcy Code.  The Debtors also

US_ACTIVE:\44081904\12\71907.0006

respectfully request that the Court authorize the Banks to (a) continue to charge the Debtors the

Bank Fees and (b) charge-back returned items to the Bank Accounts, whether such items are

dated before, on, or after the Petition Date.

49.     Prior to the Petition Date and in the ordinary course of their business,

Southern Air and its subsidiaries utilized a centralized cash management system to collect funds

generated by its operations and disburse those funds to satisfy the obligations required to operate

the businesses (the "Cash Management System").  The Cash Management System is managed,

for the most part, by Southern Air.   Southern Air maintains control over the administration of all

of the Debtors' existing bank accounts (the "Bank Accounts") located at various banks (the

"Banks").  Southern Air has historically acted as a central banker for its affiliates, aggregating

excess cash and advancing money to cover expenses.  The Debtors' Cash Management System

consists of fourteen (14) domestic Bank Accounts maintained at three (3) different domestic

Banks.

50.     The Cash Management System enables the Debtors to meet their operating

needs, centrally control and monitor corporate funds, ensure cash availability and liquidity,

comply with the requirements of their financing agreements, reduce administrative expenses by

facilitating the movement of funds, and enhance the development of accurate account balances.

In addition to these benefits, the Cash Management System further provides the Debtors with the

ability to quickly create status reports on the location and amount of funds, thereby allowing

management to track and control such funds.  The controls are crucial given that the Debtors'

business generates revenue and expenses both within the United States and abroad.  Although the

Debtors have operations in geographically dispersed locations, the Cash Management System is

designed to be efficient and easily managed.  For example, all of the Debtors' operating expenses

are paid through one main operating account (the "Operating Account") at JPMorgan Chase

Bank, N.A. ("Chase").  The Cash Management System has been organized around the principal

functions of collection and disbursement.  These functions and the Debtors' other accounts are

explained in greater detail below.

51.     Cash Collection.  All incoming customer funds, including payments under

government contracts and any prepayments under commercial contracts, are received by wire or,

on occasion, check and deposited into a collection account maintained at Chase and referred to as

the "Air Chase Checking Account" (the "Collection Account").  The Collection Account

maintains a minimum balance of $10,000 and all amounts in excess are immediately transferred

from the Collection Account to the Operating Account.  Southern Air monitors the Collection

Account multiple times each day to ensure that necessary amounts are transferred to the

Operating Account.

52.     Cash Disbursement.  The Operating Account disburses funds to cover,

among other things, the following expenses:  aircraft and equipment rental payments,

maintenance and repairs, fuel, aircraft insurance, interest and principal payments under the CIBC

Credit Agreement (defined below), any reimbursement obligations to non-Debtor affiliates,

payroll, and general travel costs.   The Debtors pay the majority of their vendor obligations by

wire transfer of immediately available funds or, in limited circumstances, by check.

Additionally, on a semimonthly basis, monies from the Operating Account are transferred to a

payroll account maintained at Chase (the "Payroll Account").  The Debtors determine the

amount to transfer to the Payroll Account by estimating the Debtors' payroll liability, including

an estimate of applicable tax obligations.  Once actual taxes are calculated and payroll expenses

are paid, any excess amounts (ordinarily a few thousand dollars) remain in the Payroll Account.

The Payroll Account handles the disbursements for employee related expenses, including payroll, payroll withholding, and payments related to employee benefits. Most payroll expenses are automatically disbursed from the Payroll Account in accordance with the terms of the employees' direct deposit arrangements. However, in a few instances, the Debtors' employees receive conventional payroll checks

53.    Other Accounts. The Debtors' main savings account, referred to as the "751 account" (the "751 Savings Account"), is also maintained at Chase. The 751 Savings Account is funded by excess cash from the Operating Account. In the event that the Operating Account balance exceeds certain thresholds determined in the Debtors' sole discretion, such excess amounts are allocated to the 751 Savings Account. As of the Petition Date, the 751 Savings Account has a $15,000 balance. In addition, the Debtors have a money market account maintained at Chase, which has a zero ($0.00) balance as of the Petition Date, and a savings account established solely to secure legacy office space in Seattle, Washington, held in the name of the Cargo 360 and maintained at Wells Fargo Bank Northwest, N.A. ("Wells Fargo").

54.    As part of the Cash Management System, the Debtors have five (5) legacy accounts maintained at Chase (the "Legacy Accounts"), four (4) of which hold deposits securing the Debtors' ability to land aircraft at Los Angeles International Airport, Houston Intercontinental Airport, San Francisco International Airport, and Miami International Airport. The Debtors have deposited funds in the remaining Legacy Account as collateral required by SITA, a key provider of communications and information technology in connection with the scheduling and routing of the Debtors' aircraft.

55.    The Debtors have issued approximately 530 active credit cards (collectively, the "Credit Cards") to crewmembers, loadmasters, technical representatives, and

US_ACTIVE:\44081904\12\71907.0006

other employees that the Debtors deemed appropriate.  The Credit Cards are linked to a single

certificate of deposit account maintained at Chase, in which the Debtors advanced $700,000 to

serve as collateral securing their obligations under the Credit Cards ("Credit Card Collateral

Account").  In the week leading up to the Petition Date, Chase advised the Debtors that it had

reduced their aggregate spending limit from $1.8 million to $700,000, matching the amount of

collateral the Debtors posted.

56.    Letters of Credit.  The CIBC Credit Agreement established, among other

things, a facility pursuant to which the Debtors could obtain letters of credit, up to a maximum

amount of $10 million (the "Letter of Credit Facility").  The funds available under the Letter of

Credit Facility were intended to assist with refinancing certain outstanding debt held by the

Debtors, provide ongoing working capital, and provide for the Debtors' other general corporate

purposes.  As of the Petition Date, the Debtors have borrowed $4 million under the Letter of

Credit Facility.  The borrowed funds were used to provide two (2) standby letters of credit each

in the amount of $2 million (together, the "Letters of Credit") to cover security deposit

obligations under certain 777 Leases.

57.    Intercompany Transactions.  In the ordinary course of business, Southern

Air conducts transactions with Air Mobility, a co-Debtor, and with SA Germany (the

"Intercompany Transactions"), resulting in intercompany receivables and payables (the

"Intercompany Claims").  The Intercompany Claims are satisfied through either the

disbursement of cash or corresponding general ledger entries in the respective entities' books.

58.    As referenced above, Southern Air and Air Mobility entered into certain

aircraft lease agreements pursuant to which Mobility leases certain Boeing 747-200 aircraft to

Southern Air in exchange for periodic non-cash rent payments.  To account for the lease

transactions between Southern Air and Air Mobility, matching loss and gain entries are recorded

in the general ledger for Southern Air and Air Mobility, respectively.  Southern Air and Air

Mobility have also entered into that certain Management Services Agreement, dated January 1,

2009 (the "Air Mobility Service Agreement"), pursuant to which Southern Air provides certain

management services to Air Mobility in exchange for the non-cash payment of fees and costs by

Air Mobility.  Because Air Mobility has no employees of its own, all management-related

operations, including, without limitation, operational management and strategic consulting,

accounting, negotiating contracts, structuring corporate transactions, financial reporting, tax

compliance, cash management, technical support, and regulatory compliance, are performed by

employees of Southern Air.  The Air Mobility Service Agreement provides that Air Mobility

shall compensate Southern Air for costs incurred in connection with providing these services,

including maintaining the Cash Management System on behalf of Air Mobility.  To account for

the management service transactions between Southern Air and Air Mobility, matching gain and

loss entries are recorded in the general ledger for Southern Air and Air Mobility, respectively.

The Intercompany Transactions between Air Mobility and Southern Air are critical to both

Southern Air and Air Mobility's operations.

      59.    With respect to SA Germany, Southern Air and SA Germany entered into

that certain Service Agreement, dated April 1, 2012 (the "GmbH Service Agreement"), whereby

SA Germany provides various business related services on behalf of Southern Air.  The GmbH

Service Agreement provides, in pertinent part, that SA Germany will, among other things,

introduce Southern Air to the German market, maintain and develop existing business

relationships and acquire new business contacts for Southern Air, market the services and

products offered by Southern Air and its affiliates, oversee Southern Air's operations in

US_ACTIVE:\44081904\12\71907.0006

Germany, and provide such other services as agreed between Southern Air and SA Germany.  In exchange, Southern Air (a) fully reimburses SA Germany for costs incurred in providing services and (b) pays SA Germany a service fee equal to 7% of the costs incurred.  SA Germany is reimbursed and compensated from funds in the Operating Account.  The services provided by SA Germany in accordance with the GmbH Service Agreement are essential to the Debtors' presence in Germany which develops and preserves the critical customer relationship with DHL.

60.    The Debtors maintain records of all Intercompany Transactions and, therefore, are able to ascertain, trace, and account for the Intercompany Transactions.  Discontinuation of the Intercompany Transactions would disrupt the Cash Management System and related administrative controls to the Debtors' detriment because the Debtors would no longer be able to properly allocate costs and fees among the applicable Debtor entities.

61.    Bank Fees.  In the ordinary course, the Banks charge, and the Debtors pay, honor, or allow the deduction from the appropriate Bank Accounts, certain service charges and other fees, costs and expenses (collectively, the "Bank Fees").  The Bank Fees currently average $2,000 per month to Chase.  To the extent the balance in the Bank Accounts are lower than a threshold amount established by the applicable Bank, the Debtors may incur fees for wire transfers, clearing checks, automated clearing house transfers, and the like.  To date, the Debtors have managed to avoid many Bank Fees by maintaining a sufficient balance in the Bank Accounts maintained with Chase.

62.    U.S. Trustee Guidelines.  Strict enforcement of the U.S. Trustee Guidelines in these chapter 11 cases would severely disrupt the ordinary financial operations of the Debtors by reducing efficiencies and creating unnecessary expenses.

US_ACTIVE\44081904\12\71907.0006

63.    Absent the relief requested in the Cash Management Motion, the Debtors would be unable to effectively and efficiently maintain their financial operations, which would cause significant harm to the Debtors and their estates and creditors.  By avoiding the disruption and delay to the Debtors' payroll, disbursement, and collection activities that would result from closing the Bank Accounts and opening new accounts, and preserving business continuity, all parties in interest, including employees, vendors, customers, and creditors, will be best served by the relief requested in the Cash Management Motion.  Granting the relief requested would provide the Debtors, their business operations, and all parties in interest, with considerable benefits.  Based on the foregoing, I believe that maintenance of the Cash Management System and the relief requested in the Cash Management Motion is in the best interests of the Debtors and their estates and all parties in interest, and should be granted in all respects.

**D.    Motion of Debtors for Entry of an Order Authorizing (I) the Fuel Suppliers to Apply Prepetition Prepayments and Credits to the Debtors' Prepetition and Postpetition Obligations Under Fuel Supply Arrangements, (II) the Debtors to Pay Prepetition Amounts Owed to Fuel Suppliers, (III) the Debtors to Honor, Perform, and Exercise Their Rights and Obligations Under Fuel Supply Arrangements, and (IV) Financial Institutions to Honor and Process Related Checks and Transfers Pursuant to Sections 105(a), 363, and 553 of the Bankruptcy Code**

64.    By this motion (the "Fuel Supply Motion"), the Debtors request, pursuant to sections 105(a), 362, 363, and 553 of the Bankruptcy Code, entry of an order authorizing (a) modification of the automatic stay imposed by section 362 of the Bankruptcy Code, to the extent required, to permit the Fuel Suppliers (as defined below) to apply prepetition prepayments and credits to the Debtors' prepetition and postpetition obligations under the Fuel Supply Arrangements (as defined below); (b) the Debtors to pay any prepetition outstanding fuel-related obligations owed to the Fuel Suppliers; and (c) the Debtors to continue honoring, performing, and exercising their rights and obligations (whether prepetition or postpetition) under the Fuel

Supply Arrangements; *provided*, *however*, that the honoring, performing, or exercising of those rights and obligations shall not give rise to administrative expense or assumption of any executory contract solely as a result of the entry of an order granting the Fuel Supply Motion.

65.     Fuel is a necessity in the Debtors' businesses.  The Debtors purchase virtually all of their fuel from two primary suppliers and, based on purchases in the last year, the Debtors' average monthly fuel expense is approximately $11.1 million.  Pursuant to the terms of the Debtors' governmental and commercial contracts, the majority of the Debtors' fuel-related costs are ultimately borne, directly or indirectly, by their customers.

66.     <u>Government-Related Fuel Expenses</u>.  As described above, the Debtors provide the United States government with international air cargo transportation services through the CRAF program.  The Debtors' governmental services are governed by their arrangement with the USTC.  Specifically, Southern Air is a member of the CRAF program "Patriot Team," which is party to a contract with the USTC (the "<u>USTC Contract</u>") pursuant to which Southern Air provides governmental services at the direction of the air component of the USTC, Air Mobility Command ("<u>AMC</u>").

67.     For all government missions directed by AMC under the USTC Contract, the Debtors are obligated to use a government-approved fuel provider.  Accordingly, the Debtors obtain the majority of their fuel for governmental services from the Defense Logistics Agency – Energy ("<u>DLA-Energy</u>").  The terms of the Debtors' fuel purchases from DLA-Energy are governed by that certain Fuel Purchase Agreement, dated July 21, 2011, between Southern Air and DLA-Energy (the "<u>DLA-Energy Agreement</u>").  Pursuant to the terms of the DLA-Energy Agreement, the Debtors are obligated to pay fuel costs incurred within thirty (30) days of receipt of an invoice issued by the Defense Finance and Accounting Service ("<u>DFAS</u>" and, together

with the USTC and DLA-Energy, the "Government Fuel Suppliers").  In turn, the Debtors seek

reimbursement from the USTC for actual fuel costs incurred in accordance with the terms of the

USTC Contract.  As of the Petition Date, the Debtors have an outstanding payable to DFAS for

approximately $7.3 million of fuel and fuel-related expenses.  DFAS has advised the Debtors

that the DLA-Energy Agreement will not be renewed on October 1, 2012 and DLA-Energy will

not provide the Debtors with fuel after that date, unless the Debtors' outstanding fuel bill has

been paid and the Debtors' account brought current on or before September 30, 2012.

        68.    The Debtors reconcile actual and contractual fuel costs with the USTC on

a monthly basis with an approximately two-month lag time (the "USTC Reconciliation").  The

Debtors' actual fuel costs are included in the calculation of the applicable USTC contract rate in

effect at the time, and each month, the USTC compares the actual fuel prices the Debtors paid

for AMC-directed missions during the previous month with the fuel rate assigned under the

USTC Contract for such period.  The USTC Reconciliation procedure is designed to protect the

Debtor and the government from significant market fluctuations in the price of fuel.  To the

extent the average price per gallon paid by the Debtors exceeds the rate assigned under the

USTC Contract, the USTC reimburses the difference to the Debtors, and, in instances where the

Debtors paid less than the rate assigned under the USTC Contract, the Debtors compensate the

USTC.  As of the Petition Date, the Debtors owe the USTC approximately $40,000 in prepetition

amounts.

        69.    In the event that AMC requests that the Debtors provide services in a

location where DLA-Energy is unable to provide fuel, the Debtors are permitted to use an

approved non-governmental third-party supplier.  In such instances, and if practicable, the

Debtors utilize the same third-party supplier that provides fuel for the Debtors' commercial services.

70.     On or about September 19, 2012, the USTC advised the Debtors that because of their fuel debt and outstanding monthly fuel report submissions, the USTC would, unless paid, begin to withhold the Debtors' revenues from missions flown under the USTC Contract, up to the full amount owed to the Government Fuel Suppliers.  As stated above, governmental services accounted for approximately 43.5% of the Debtors' revenue for the twelve months ended July 31, 2012, and missions awarded to Southern Air as a result of its participation in the CRAF program accounted for approximately 98.1% of such revenues.  Any disruption to the Debtors' ability to obtain revenue from government missions under the USTC Contract would be detrimental to the Debtors' continued operation as a going concern and would jeopardize the Debtors' ability to successfully reorganize.

71.     Commercial-Related Fuel Expenses.  Under Charter Contracts, and in some circumstances under ACMI Contracts, the Debtors must purchase fuel and incur fuel-related expenses directly.  The Debtors obtain virtually all of their fuel for commercial services from World Fuel Service ("WFS" and, together with the Government Fuel Suppliers, the "Fuel Suppliers").  The terms and conditions governing the Debtors' purchase of commercial fuel supply are set forth in that certain Agreement for Fuel Management Services, dated June 1, 1999, between Hudson General LLC and Southern Air, and ultimately assigned to WFS (as amended, the "WFS Fuel Supply Agreement and, together with the DLA-Energy Agreement and the USTC Contract, the "Fuel Supply Arrangements").  Pursuant to the WFS Fuel Supply Agreement, the Debtors have agreed to provide WFS with advance notice of any fuel purchase requests and pay in advance.  In the ordinary course, the Debtors typically provide WFS with at least two days'

notice of any fuel purchase requests.  The WFS Fuel Supply Agreement further provides that

WFS will, in turn, serve as an intermediary, negotiating on the Debtors behalf with pre-approved

reputable suppliers for the purchase of fuel at destinations designated by the Debtors.

72.    In accordance with the WFS Fuel Supply Agreement, the Debtors pay

WFS in advance for into-plane fueling services and the fuel purchased at cost, as well as, an

additional fixed service fee corresponding to the volume of fuel purchased (collectively, the

"WFS Fuel Costs").  WFS provides the Debtors with a weekly accounting of the gallons of fuel

delivered and the cost thereof.  The Debtors' weekly prepayments to WFS on account of the

WFS Fuel Costs average approximately $880,000.  In the event that the Debtors re-route a

scheduled trip, the Debtors' advance payments to WFS are reconciled against the Debtors' actual

fuel usage and WFS is compensated for the overage.  If, after reconciliation, the Debtors are

owed a credit, WFS retains the credit and applies it to the Debtors' subsequent fuel purchases.

Although the reconciliations fluctuate significantly, on average, the Debtors usually expend an

additional $50,000 as a result of flight re-routing.  As of the Petition Date, the Debtors believe

that they do not owe any prepetition amounts to WFS.  Out of an abundance of caution, however,

the Debtors seek authority to pay prepetition amounts up to $100,000 that may be owed to WFS

due to contingencies in the Debtors' scheduled operations.

73.    An uninterrupted fuel supply for the Debtors' fleet of aircraft is critical to

the preservation and protection of the Debtors' estates, and ultimately, to furthering the Debtors'

reorganization efforts.  It is fundamental to the Debtors' operations that they are able to continue

performing under the Fuel Supply Arrangements.  Failure to perform under the Fuel Supply

Arrangements may result in reputational harm in the industry and diminish the probability of the

Debtors' businesses successfully continuing as a going concern.  The Debtors risk losing

approximately 44% of their revenue if they are unable to honor obligations and pay the

outstanding amounts owed to the Government Fuel Suppliers.  Loss of the revenue stream

generated through government missions under the USTC Contract could be fatal to the Debtors'

businesses and their opportunity for reorganization.  Moreover, the Government Fuel Suppliers

cannot be replaced, and WFS cannot be replaced quickly on similar terms and conditions.  In

addition, different fuel suppliers may impose a higher service charge per gallon of fuel, thus

subjecting the Debtors to greater and more volatile fuel costs.  Even if the Debtors decreased fuel

purchases as a result of these chapter 11 cases, the Debtors' ready access to fuel is paramount to

servicing their customers and preserving their going concern value.  Thus, satisfaction of the

approximately $7.4 million in prepetition obligations under the Fuel Supply Arrangements is

necessary for maintaining an uninterrupted fuel supply.  Furthermore, the proposed postpetition

debtor in possession credit facility accounts for the Debtors' payment of all prepetition and

postpetition fuel-related costs.

     74.  In addition, as part of their cash management system, the Debtors maintain

accounts at certain Banks.  The Debtors pay for fuel with funds drawn or transferred from these

accounts.  Accordingly, the Debtors also seek entry of an order authorizing and directing Banks

to receive, process, honor and pay any check or electronic fund transfer from the Debtors'

accounts to the extent that such checks or transfers relate to the Debtors' fuel-related obligations

owed to the Fuel Suppliers, whether such checks were presented before or after the Petition Date.

The Debtors further seek authority to issue new postpetition checks or effect new electronic fund

transfer requests on account of such obligations to replace any prepetition checks or electronic

fund transfer requests that may have been dishonored or rejected as a result of the

commencement of these chapter 11 cases.  The Debtors also request that the Banks and any third

US_ACTIVE:\44081904\12\71907.0006

party receiving payment from the Debtors be authorized and directed to rely on the

representations of the Debtors as to which payments are authorized by the requested relief.

76.    Based on the foregoing, I believe that the relief requested in the Fuel

Supply Motion is in the best interests of the Debtors, their estates, and all parties in interest and

should be granted in all respects.

**E.    Motion of Debtors for Authority to Pay Prepetition Obligations
of Certain Critical Vendors, Foreign Creditors, Possessory Lien Holders,
and Priority Vendors Pursuant to Sections 105(a), 361, 363(b), 503(b)(9),
507(a)(2), and 542 of the Bankruptcy Code**

76.    By this motion (the "Critical Vendors Motion"), the Debtors request,

pursuant to sections 105(a), 361, 363(b), 503(b)(9), 507(a)(2), and 542 of the Bankruptcy Code,

that the Court enter interim and final orders authorizing the Debtors to (a) pay all or a portion of

the prepetition claims (the "Critical Vendor Claims") owing vendors providing goods and

services that are essential to the Debtors' business operations (the "Critical Vendors"), (b) pay or

honor certain prepetition obligations to foreign vendors and/or suppliers (the "Foreign

Creditors"), (c) pay undisputed prepetition claims of certain claimants (the "Possessory Lien

Holders") that are secured by possessory liens on the Debtors' assets (the "Possessory Lien

Claims"), and (d) pay prepetition claims arising from vendors' delivery of goods to the Debtors

in the ordinary course of business within 20 days before the Petition Date (the "Priority Vendor

Claims").

77.    Critical Vendors.  After a thorough analysis of the Debtors' master vendor

files and open accounts payable systems, the Debtors concluded that certain vendors provide

essential goods and services, the loss of which would lead to a disruption in the Debtors'

businesses.  Moreover, without payment, it is likely that many of the Critical Vendors will either

refuse or be unable to continue providing essential goods and services to the Debtors.  In many

instances, the Critical Vendors are the sole source of essential goods or services.  Impairment or delay in the supply of the essential goods and/or services would seriously hinder the Debtors' ability to meet customer requirements on a timely basis and would cause immediate and irreparable harm to the Debtors' businesses.

78.     The Debtors provide specialized air cargo transportation services in the highly technical and regulated civil aviation industry.  Moreover, the Debtors frequently operate in remote locations throughout the world where there are generally few, if any, alternative vendors.  As a result, finding replacement vendors for essential goods and services would be a lengthy process, potentially compromising the Debtors' businesses and resulting in significant expense to the Debtors' estates.  The Debtors would be unfamiliar with their new vendors and, thus, the quality of the goods and services provided may suffer.  In some cases, the delay in finding replacement vendors may have irreversible consequences.  In addition, the Debtors could be forced to pay a premium for replacement goods and services if the Debtors' existing terms with Critical Vendors are more favorable than those offered by other suppliers.

79.     The Critical Vendors generally fall into (but are not limited to) four categories:  (a) aircraft parts suppliers and maintenance service providers; (b) flight training providers; (c) airport fees and ground handling service providers; and (d) flight navigation systems providers.

(a)     *Aircraft Parts Suppliers and Maintenance Service Providers*. To meet FAA and original equipment manufacturer ("OEM") requirements, and to maintain safety standards, flight schedules, and on-time performance, the Debtors must be able to replace or repair aircraft parts and make on-the-spot repairs to aircraft on little or no notice.  Any disruption in the flow of parts or services would result in immediate and substantial economic harm to the

35

Debtors.  Additionally, the Debtors' relationship with their parts suppliers and maintenance

service providers is subject to many mandatory layers of oversight and control by the FAA,

OEMs, and the Debtors' engineers.  Thus, the Debtors' options for parts suppliers and

maintenance service providers are limited.  The Debtors have developed their relationships with

these maintenance service providers and aircraft parts suppliers in locations throughout the

world.  They have come to rely on the high quality and priority service they receive, all on

competitive terms.  Consequently, it is essential to the Debtors' operations to maintain their

relationships with these maintenance service providers and aircraft parts suppliers.

      (b)    *Flight Training Providers*.  Continuous and rigorous training of pilots is

essential to maintaining safe ongoing operations.  To comply with FAA regulations, the Debtors'

pilots must obtain initial qualifications and receive continuous proficiency training.  The Debtors

use specialized products, devices, and facilities to meet federal requirements and assure that all

pilots perform at the highest level of competency.  If the Debtors are unable to procure the

appropriate training services, more and more pilots would lose their FAA authorization to fly,

which would have a severe impact on the Debtors' businesses.

      (c)    *Airport Fees and Ground Handling Services*.  The Debtors ability to

access airports in the United States is dependent upon their payment of certain fees to the

airport's owner and/or operator.  In addition, after the Debtors' aircraft have landed at an airport,

they require a wide range of services known as "ground handling services."  These services

include, among other things, maneuvering the aircraft once it has landed, placing "chocks" when

the aircraft has reached its parking location, providing power to the aircraft while it is parked, as

well as the supply of ramps, stairways, and any other equipment necessary to service the aircraft.

Notably, ground handling services also include the loading and unloading of cargo from the

US_ACTIVE:\44081904\12\71907.0006

Debtors' aircraft.  At most domestic airports used by the Debtors, ground handling services are provided by one or a limited number of vendors.  Failure to pay airport fees and ground handling service providers would significantly impede the Debtors' ability to gain necessary access to airports, which would result in substantial injury to the Debtors' businesses.

(d)    *Flight Navigation Systems Providers.*  The Debtors use several systems, services, or products central to flight operations.  Each provider of these services or products is, by and large, a monopoly vendor.  For example, virtually all domestic airlines rely on a single provider of frequencies for ground-to-ground and ground-to-plane voice and data communications.  The communication capabilities are essential to the provision of weather updates and facilitating communication between the cockpit and ground services, forming an essential link between pilots and central dispatch.  The loss of this communication capability would violate FAA regulations and cripple the Debtors' businesses and their restructuring efforts.  The Debtors cannot afford to risk such a loss of service.  Similarly critical to the Debtors' flight operations are flight charts detailing approach routes and other essential information regarding flight plans that are updated regularly.  The FAA requires flight manuals, which include updated flight charts, aboard every flight.  As aircraft communications and up-to-date flight charts are indispensable components of flight operations, the Debtors need assurance that the flow of these services and products will be unaffected by the commencement of these chapter 11 cases.

80.    Based on their substantial experience in the air cargo industry, the Debtors believe that the goods and services supplied by the Critical Vendors are at competitive rates and terms, and continuation of business on the same or better terms will further ensure the preservation of the Debtors' businesses during the reorganization.  Although the Debtors hope

37

and expect to be able to assure a continuing postpetition supply of goods and services by consensual negotiation with the Critical Vendors, the Debtors recognize that their fiduciary duties bind them to consider and plan for those vendors that may refuse to provide future goods or services unless their prepetition claims are paid.  The Critical Vendors are so essential to the Debtors' businesses that the lack of any of their particular goods and services, even for a short time, will outweigh the cost of payment of the prepetition claims of the Critical Vendors.

81.     The Debtors estimate the maximum amount needed to pay the prepetition claims of Critical Vendors is approximately $2.2 million (the "Critical Vendor Claims Cap").  To receive the vital goods and services that they require from the Critical Vendors to continue being successful as reorganized entities and request that a fund of $1.0 million be made available to the Debtors immediately to prevent a disruption in operations before a final hearing is held on the relief requested in the Critical Vendors Motion.  The Critical Vendor Claims Cap derives from the analysis set forth above and reflects the amount the Debtors estimate they would be required to pay to ensure the continued supply of critical goods and services.  The proposed DIP Credit Agreement accounts for the Debtors' estimation of Critical Vendor Claims.  The Critical Vendor Claims Cap represents approximately 7% of the Debtors' approximately $31.1 million in trade claims and represents the Debtors' best estimate as to how much must be paid to such creditors to ensure the continued provision of critical goods and services.  The Debtors will endeavor to pay less than the requested amount.

82.     Foreign Creditors.  The Debtors' conduct the majority of their operations in foreign airspace and, as a result, incur obligations to numerous foreign creditors who, among other things, provide various goods, services, permits, licenses, and rights to the Debtors, including, without limitation, the following (together, the "Foreign Creditors"):  (a) access to

foreign airspace and airports, (b) maintenance services and parts suppliers, (c) ground handling

services, (d) flight communications and data services, and (e) foreign taxes and fees.

(a)     *Access to Foreign Airspace and Airports.*  The Debtors' international

operations rely upon their ability to access foreign airspace and foreign airports.  Before each

flight, the Debtors apply for and obtain permits from foreign governmental or quasi-

governmental agencies to operate within a particular country's foreign airspace.  The Debtors are

charged a fee based upon the rate set by the applicable foreign government for the type of

aircraft and amount of time spent in its airspace.  In addition, the Debtors must pay airport fees to

a variety of foreign governmental agencies.  The Debtors are required to remain current on their

payment obligations to these foreign governmental authorities and other Foreign Creditors to,

among other things, obtain the permits necessary to access foreign airspace and operate within

foreign air traffic control systems.  Without this ability, the Debtors would be forced to suspend

all international operations, which would significantly hamper the Debtors' reorganization

efforts.

(b)     *Maintenance Services and Parts Suppliers.*  The Debtors rely on Foreign

Creditors to service their aircraft at various international airports because it is impractical and

uneconomical to staff maintenance facilities and/or store parts at all of the international airports

at which the Debtors operate.  For example, as part of the maintenance of their aircraft

throughout the world, the Debtors regularly borrow or purchase parts from foreign third parties

and employ foreign individuals to perform both routine "line maintenance" and scheduled

"heavy maintenance."  Without continued access to these maintenance services and parts

suppliers at various locations throughout the world, the Debtors would be forced to cease a

substantial portion of their international operations.  Additionally, the Debtors' failure to pay

these foreign maintenance and parts providers could result in the seizure of the Debtors' aircraft and/or related equipment.

(c)    *Ground Handling Services*.  Similar to domestic services, certain Foreign Creditors provide a range of services known as "ground handling services."  These services include, among other things, maneuvering the aircraft once it has landed, placing "chocks" when the aircraft has reached its parking location, providing power to the aircraft while it is parked, as well as the supply of ramps, stairways, and any other equipment necessary to service the aircraft. Notably, ground handling services also include the loading and unloading of cargo from the Debtors' aircraft.  At the majority of international airports used by the Debtors, ground handling services are provided by one or a limited number of vendors.  Failure to pay ground handling service providers would significantly impede the Debtors ability to operate in airports throughout the world, which would result in substantial injury to the Debtors businesses.

(d)    *Flight Communications and Data*.  To sustain their complex international flight operations, the Debtors require timely communication with their aircraft and access to critical data, including air traffic, weather patterns, and other information affecting the ability to safely and effectively navigate and communicate with their aircraft.  These services are often provided by foreign third parties, which, if not paid, may refuse to provide these critical services going forward.

(e)    *Foreign Taxes and Fees*.  The Debtors withhold and incur, on behalf of foreign governmental authorities, an assortment of foreign taxes, fees, and other charges.  The Debtors are obligated to timely collect, withhold, incur, and remit foreign taxes to the applicable foreign authorities.  Failure to pay certain foreign taxes may result in foreign taxing authorities

40

taking actions that could severely disrupt the Debtors' operations and potentially impose

significant additional and unnecessary costs on the Debtors' estates.

83.     In the event of nonpayment, certain Foreign Creditors may stop providing

goods and services to the Debtors, cease performance under supply contracts, or otherwise

disrupt the Debtors' operations.  An interruption in the flow of goods and/or services could have

disastrous consequences on the operations of the Debtors' businesses due to the lack of

alternative suppliers or the amount of time needed to locate and convert to alternative supply

sources.  Without the continuance of necessary supplies and services, the Debtors will be unable

to operate their businesses efficiently and effectively, which will substantially diminish the value

of the Debtors' assets.

84.     Many of the Foreign Creditors lack minimum contacts with the United

States and, therefore, are not likely to be subject to the jurisdiction of this Court or provisions of

the Bankruptcy Code that otherwise protect the Debtors' assets and business operations.  Based

on the substantial experience of the Debtors' personnel in the air cargo industry, and their

knowledge of the Foreign Creditors, the Debtors believe there is a risk that Foreign Creditors

holding claims against the Debtors may consider themselves to be beyond the jurisdiction of this

Court, disregard the automatic stay, and/or engage in conduct that disrupts the Debtors'

operations.  Most importantly, foreign entities that believe the automatic stay does not govern

their actions may exercise self-help (if permitted under local law), which could include

grounding or seizing aircraft or terminating the Debtors' access to essential airspace and airports.

85.     Foreign Creditors may also sue one or all of the Debtors in a foreign court

to recover prepetition amounts owed to them.  If they are successful in obtaining a judgment

against the Debtors, the Foreign Creditors may exercise post-judgment remedies, including

US_ACTIVE:\44081904\12\71907.0006

withholding vital supplies and services from the Debtors, and, in turn, threatening the Debtors' ability to operate.  In this scenario, the Debtors would have limited, if any, effective and timely recourse and no practical ability to remedy this situation (absent payment of amounts sought), their businesses would be irreparably harmed to the detriment of their estates and their creditors.

86.    By this Critical Vendors Motion, the Debtors request entry of an interim and a final order authorizing, but not directing, the Debtors, in the reasonable exercise of their business judgment and to the extent consistent with the DIP Credit Agreement, to pay and honor certain prepetition obligations due to Foreign Creditors in an aggregate amount not to exceed $2.4 million on an interim basis and an additional $2.4 million on a final basis.

87.    Possessory Lien Holders.  In the ordinary course of business, the Debtors engage a number of maintenance service providers to repair, maintain, and improve the Debtors' aircraft.  While the Debtors employ a certain number of maintenance service providers, it is neither feasible nor practical to keep employees at every airport in each of the countries the Debtors service.  Accordingly, the Debtors often utilize third-party maintenance service providers (the "Outside Maintenance Providers").  Many of the Outside Maintenance Providers are in possession of aircraft, engines, and/or other equipment that are vital to the Debtors' operations and may assert possessory liens and refuse to redeliver these items to the Debtors until they are paid prepetition amounts.

88.    The Outside Maintenance Providers are essential to the Debtors' ability to make on-the-spot repairs.  Without the ability to make on-the-spot repairs in remote locations, aircraft would be stranded until the Debtors could transport their own maintenance service providers to repair the aircraft.  The adverse impact of such a situation on the Debtors' business operations and revenues is self-evident.  At this stage of the Debtors' restructuring efforts,

US_ACTIVE:\44081904\12\71907.0006

switching Outside Maintenance Providers will risk the uninterrupted operation of the Debtors' businesses.  In addition, the options for switching Outside Maintenance Providers is extremely limited and, in some instances, nonexistent.  The relief requested in this motion is essential to the maintenance of the Debtors' safe, uninterrupted, and efficient operations.

89.    The estimated value of the Debtors' property in the possession of Possessory Lien Holders is approximately $1.7 million.  By this Motion, the Debtors request authority to pay the outstanding prepetition Possessory Lien Holders in an amount not to exceed $400,000 on an interim basis and an additional $400,000 on a final basis.

90.    <u>Priority Vendors</u>.  Certain of the Debtors' vendors have delivered goods to the Debtors in the ordinary course of business within 20 days before the Petition Date and are thus entitled to administrative expense priority under sections 503(b)(9) and 507(a)(2) of the Bankruptcy Code (the "<u>Priority Vendors</u>").  As administrative claims incurred in the ordinary course of the Debtors' business, the Debtors believe they are authorized, but not required, to pay the Priority Vendors pursuant to section 363(c)(1) of the Bankruptcy Code.

91.    The Debtors wish to pay the administrative expense claims of Priority Vendors that agree to continue offering normal trade terms to the Debtors because normalized trade terms will improve the Debtors' liquidity during these cases and will facilitate the Debtors' access to needed goods and services.  The Debtors believe paying the Priority Vendors will enable them to maintain their positive trade terms with their vendors and continue receiving the vital goods that they require from the Priority Vendors to continue being successful as reorganized entities.  As a result, the Debtors submit that payment of the Priority Vendor Claims is necessary and appropriate, is in the best interests of their estates and creditors, and should be granted in all respects.

US_ACTIVE:\44081904\12\71907.0006

92.     The Debtors believe paying the Priority Vendors in an amount not to exceed $400,000 will enable them to maintain their positive trade terms with their vendors and continue receiving the vital goods from the Priority Vendors and request that $200,000 be made available to the Debtors immediately to prevent a disruption in operations before a final hearing is held on the relief requested in the motion.

93.     Based on the foregoing, I believe that the relief requested in the Critical Vendor Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

**F.      Motion of Debtors for Entry of Interim and Final Orders (I) For Authority to Pay (A) Certain Employee Obligations And (B) Prepetition Claims of Independent Contractors, and (III) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations Pursuant to Sections 105(a), 363(b), and 507(a) of the <u>Bankruptcy Code</u>**

94.     By this Motion, (the "<u>Employee and Independent Contractor Motion</u>") the Debtors request, pursuant to sections 105(a), 363(b), and 507(a) of the Bankruptcy Code entry of (a) an interim order authorizing the Debtors to (i) pay outstanding prepetition Wage Obligations and Employee Reimbursement Obligations, subject to the Prepetition Wage Cap, (ii) pay all prepetition amounts due on account of Payroll Taxes, the Health and Welfare Plans, the Optional Enrollment Plans, and Union Dues, (iii) pay all prepetition claims of Independent Contractors, and (iv) continue to honor their Wage Obligations, Employee Reimbursement Obligations, Payroll Taxes, Health and Welfare Plans, Optional Enrollment Plans, Union Dues, and payment of any fee or cost associated with the foregoing in the ordinary course of business during the period prior to the entry of a final order; and (b) a final order authorizing the Debtors to (i) pay outstanding prepetition Wage Obligations and Employee Reimbursement Obligations, (ii) honor prepetition Severance Obligations, (iii) continue existing business practices with respect to

44

payment of Severance Obligations incurred postpetition, and (iv) compensate Employees terminated or furloughed postpetition for accrued and unused vacation days in accordance with the Debtors' prepetition practices and policies.

95.    <u>Employees</u>.  As of the Petition Date, the Debtors employ approximately 611 Employees.  The majority of these Employees are retained by Southern Air, with a handful of executives having entered into employment agreements with Holdings.  All Employees, however, are compensated by and receive benefits from Southern Air.  Among the Employees, 349 are aircraft pilots and flight engineers (the "<u>Crewmembers</u>") and 262 are non-crewmembers working on various other aspects of the Debtors' businesses (the "<u>Non-Crewmembers</u>").  Employees are essential to the continued operation of the Debtors' businesses and, thus, payment of Employee wages and related obligations is critical to the Debtors' reorganization efforts.

96.    Accordingly, to maintain the morale of their workforce, ensure the stability of such workforce, and minimize the personal hardship that Employees would suffer if not paid when due, the Debtors seek authority to pay certain Employee-related obligations, whether incurred prepetition or postpetition, including:  Wage Obligations, Employee Reimbursement Obligations, Payroll Taxes, Employee Benefit Plan Obligations, Union Dues, Severance Obligations, and payment of any fee or cost associated with the foregoing (each addressed below).

97.    <u>Wage Obligations</u>.  In the ordinary course of their businesses, the Debtors pay Employees' wages, salary, and related compensation on a semi-monthly basis ("<u>Wage Obligations</u>").  In the 2011 calendar year, the Debtors' Wage Obligations totaled approximately $55,806,742.  Crewmembers are compensated pursuant to the collective bargaining agreement between Southern Air and the Southern Air Crew Group, dated as of August 1, 2006, as

45

subsequently amended (the "CBA"), which establishes payment structures based on seniority. Non-Crewmembers, on the other hand, are categorized as salaried employees, hourly employees, or salaried non-exempt employees.  Both Crewmembers and Non-Crewmembers may be entitled to overtime payments.  In addition, both Crewmembers and Non-Crewmembers required to travel in connection with performing their responsibilities are entitled to supplemental per-diem payments in an amount of $60 per day spent traveling.

98.    The Debtors estimate that, as of the Petition Date, approximately four (4) Crewmembers are individually owed Wage Obligations in excess of $11,725 (the "Prepetition Wage Cap").  The Debtors' aggregate liability to such Crewmembers for Wage Obligations in excess of $11,725 is approximately $7,700, the majority of which is attributable to accrued overtime.  Payment of the Crewmembers' Wage Obligations, including amounts in excess of $11,725, is of vital importance to the Debtors because they are currently in the process of renegotiating the terms of the CBA with the Crewmembers' union, the United Brotherhood of Teamsters Local 1224 (the "Union").  The inability to satisfy all of the Crewmembers' Wage Obligations could irreparably harm the Debtors' businesses and their reorganization efforts by disrupting negotiations with the Union and creating upheaval in the Debtors' relationship with the Union.

99.    Employee Reimbursement Obligations.  In addition to Wage Obligations, the Debtors customarily reimburse their Employees for business expenses incurred in the ordinary course of their employment, including, without limitation, business-related travel, lodging, and other similar expenses ("Employee Reimbursement Obligations").  Employees incur these business expenses with the understanding and expectation that they will be reimbursed.  It is difficult to determine the precise amount of Employee Reimbursement

Obligations at any moment in time because Employees are often entitled to reimbursements that they have not yet submitted to the Debtors.  Nevertheless, the Debtors estimate that, as of the Petition Date, approximately $15,000 in Employee Reimbursement Obligations is outstanding.

100.    *Payroll Taxes*.  During each pay period, the Debtors make deductions from the wages paid to all Employees for obligations such as city and state income taxes, federal income taxes, social security, and Medicare contributions (collectively, the "Payroll Taxes"). The Debtors then remit the Payroll Taxes to the applicable governmental authority.  The Debtors submit that deductions made on account of Payroll Taxes constitute property held *in trust* for the applicable governmental authority, and, therefore, are not property of the Debtors' estates and not available for satisfaction of creditors' claims.  As of the Petition Date, the Debtors have remitted all Payroll Taxes for the payroll period ended September 30, 2012.

101.    Employee Benefit Plan Obligations.  In accordance with applicable laws and regulations and in connection with their business practices, the Debtors have established various benefit plans and policies for the benefit of their Employees, including, without limitation:  (a) certain paid time off benefits, which include:  vacation days, sick days, personal days, and holidays (collectively, the "PTO Plans"); (b) certain insurance benefits, which include: (i) medical and prescription drug plans, (ii) a stop loss policy for the medical and prescription drug plans, (iii) benefits relating to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), (iv)  an employee assistance program, (v) dental insurance, (vi) vision insurance, (vii) basic life insurance, (viii) accidental death and dismemberment insurance, (ix) certain supplemental life insurance policies, and (x) disability benefits (collectively, the "Health and Welfare Plans"); and (c) the option to enroll in a 401(k) plan and in two flexible spending accounts (the "Optional Enrollment Plans" and together with the PTO

47

Plans and the Health and Welfare Plans, the "Employee Benefit Plan Obligations"). The Employee Benefit Plan Obligations are discussed in more detail in the Employee and Independent Contractor Motion.

102.    Union Dues. All Crewmembers are members of and owe dues to the Union. As part of their prepetition business practices, the Debtors withhold approximately 1.56% of each Crewmember's paycheck per month to pay union dues to the Union (the "Union Dues") on behalf of the Crewmember, which totals approximately $30,000 per month. The Debtors remit the withheld funds to the Union the first week of the month following the withholding. The Debtors estimate that, as of the Petition Date, they hold and have not remitted approximately $31,000 in Union Dues.

103.    Severance Obligations. The Debtors also provide severance benefits to certain Non-Crewmembers (the "Severance Obligations"). Per the Debtors' prepetition practices, a terminated Non-Crewmember may be offered severance under a Separation and Release Agreement ("Severance Agreement") pursuant to which the Non-Crewmember (a) releases all claims against Southern Air and its affiliates and (b) agrees not to disclose any confidential or proprietary information learned or acquired while employed by Southern Air, in exchange for an amount equal to four (4) weeks of such Non-Crewmembers' current wages. A number of Non-Crewmembers are employed pursuant to employment contracts containing severance provisions. The aforementioned Severance Obligations do not include severance paid pursuant to Non-Crewmember employment contracts and are not provided to directors, officers, or individuals "in control" of the Debtors. The Debtors believe that the failure to honor prepetition Severance Obligations and inability to enter into postpetition Severance Agreements would depress Employee morale, result in reputational harm within their competitive

US_ACTIVE:\44081904\12\71907.0006

environment, and unnecessarily expose the Debtors to liability, all of which could irreparably harm the Debtors' value as a going concern.

104.    As of the Petition Date, the Debtors owe approximately $93,600 on account of prepetition Severance Obligations.  Moreover, several terminated Non-Crewmembers have been provided Severance Agreements, but did not execute such agreements prior to the Petition Date.  If permitted to enter into Severance Agreements, such Employees would receive approximately $55,300 in the aggregate on account of prepetition Severance Obligations.  The Debtors believe that no Employee will be entitled to an amount greater than $11,725 on account of prepetition Severance Obligations.

105.    In connection with their ongoing reduction in force, the Debtors intend to terminate a number of Employees during the pendency of these chapter 11 cases.  In addition to Severance Obligations, such Non-Crewmembers may also be entitled to Wage Obligations, Employee Reimbursement Obligations, and/or compensation for unused vacation days.

106.    <u>Independent Contractors</u>.  In addition to retaining Employees, as part of their business practices and policies, the Debtors utilize third-party contractors to perform services necessary for the operation of their businesses (the "<u>Independent Contractors</u>").  The Independent Contractors are either contracted individually or through agencies that provide the Debtors with additional labor services.  As of the Petition Date, Southern Air contracts with approximately thirty-five Independent Contractors individually and obtains the balance of their Independent Contractors through various agencies.  The Independent Contractors provide key maintenance, operational, or administrative services.  The Debtors will contract Independent Contractors if, in the exercise of their business judgment, they determine it would be more

efficient and/or cost-effective to have Independent Contractors, rather than Employees, perform certain jobs and/or services.

107.    The Debtors seek to make payments to those Independent Contractors or the agencies providing the Independent Contractors that they believe are necessary or appropriate to assure the continuation of the critical services they provide (collectively, the "Independent Contractor Obligations").  The satisfaction of Independent Contractor Obligations is vital to the Debtors' reorganization efforts.  As noted above, the Debtors heavily depend on the expertise of the Independent Contractors to, among other things, keep the Debtors' aircraft within permissible center of gravity limits throughout flights, perform specialized maintenance on the aircraft, and assist with quality control.  The Debtors also use the Independent Contractors to assist them in meeting the requirements imposed under operating leases or applicable laws and regulations.  Considering the nature of their jobs, Independent Contractors are integral to the safe and reliable performance of the Debtors' aircraft, which is very important in the Debtors' businesses.

108.    The Debtors also believe it would be difficult to replace their Independent Contractors (whether contracted individually or through an agency).  Much time was spent searching for Independent Contractors who understand the Debtors' business practices and policies and who are familiar with applicable aviation regulations.  The Debtors believe that replacing the Independent Contractors would take, at a minimum, several weeks, which would disrupt their operations and harm reorganization efforts.

109.    Additionally, as much as the Debtors depend on Independent Contractors, the Independent Contractors also depend on the Debtors.  Many of these individuals rely on payments received from the Debtors for income.  The Independent Contractors will likely be exposed to financial difficulties if the Debtors are not permitted to continue honoring the

US_ACTIVE:\44081904\12\71907.0006

Independent Contractor Obligations, which may sever certain of Debtors' business relationships and potentially impair the Debtors' abilities to contract reliable personnel going forward.

110.    Based upon the foregoing, I believe that the relief requested in the Employee and Independent Contractor Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects

**G.    Motion of the Debtors for Authority to Honor Prepetition Obligations and Otherwise Continue Performing under Civil Reserve Air Fleet Agreements and Prepaid Contracts Pursuant to Sections 105(a), 362, and 363(b) of the Bankruptcy Code**

111.    By this Motion (the "Industry Agreements Motion"), the Debtors request, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, authority to honor prepetition obligations and otherwise continue performing under the CRAF Agreements and the Prepaid Contracts.  In addition, to the extent that the Patriot Team Leader's administration of certain payment and commission provisions in accordance with the Patriot Team Allocation Agreements for FY12 and FY13 constitutes a violation of the automatic stay, the Debtors also seek authority to modify the automatic stay imposed by section 362 of the Bankruptcy Code for this limited purpose.

112.    Governmental Industry Agreements.  As described above, the Debtors provide air cargo transportation services to the United States government through their participation in the CRAF program, in which commercial air carriers pledge aircraft to the DOD for times of national emergency in exchange for government airlift contracts in times of peace. The government places CRAF participants into one or more "segments" based on the characteristics and capability of the participant's fleet.  CRAF participants typically form cooperative teams with other commercial air carriers to diversify fleet characteristics and

US_ACTIVE:\44081904\12\71907.0006

capabilities and pool MV points, which allows them to bid on government contracts more efficiently and effectively.  The Debtors belong to the "Patriot Team."

113.    The Debtors participate in the CRAF program pursuant to a set of agreements that are negotiated and entered into among the members of the Patriot Team, and between the Patriot Team and the USTC – a unified command of the Department of Defense. Specifically, these agreements are:  (a) a Contractor Team Arrangement and Operating Agreement (the "Patriot Team Arrangement Agreement"); (b) a Contractor Team Arrangement Allocation and Fee Agreement (the "Patriot Team Allocation Agreement"); and (c) an award/contract with the USTC (the "USTC Contract" and together with the Patriot Team Arrangement Agreement and the Patriot Team Allocation Agreement, the "CRAF Agreements").

114.    The Debtors currently perform governmental air cargo transportation services pursuant to a USTC Contract for the contract period ending September 30, 2012 ("FY12"), and Southern Air is party to a Patriot Team Arrangement Agreement and a Patriot Team Allocation Agreement for FY12.  Southern Air is also party to a Patriot Team Arrangement Agreement and a Patriot Team Allocation Agreement for the fiscal year ending September 30, 2013 ("FY13"); however, the Patriot Team has not yet been awarded a USTC Contract for FY13.  For the avoidance of doubt, the relief requested in this motion applies to all of the Debtors' CRAF Agreements for FY12 and FY13.[5]

115.    The Patriot Team Arrangement Agreement establishes the members of the Patriot Team and defines the team members' obligations with respect to the solicitation of and, once awarded, performance under a contract with the USTC.  The Debtors would jeopardize

---

[5] The CRAF Agreements are subject to confidentiality provisions that restrict the Debtors' disclosure of the terms and conditions thereof.  Upon the Court's request, the Debtors will provide the Court with copies of the relevant CRAF Agreements.

their participation in the CRAF program for FY13 if they do not honor their obligations under

the Patriot Team Arrangement Agreement.

116.    The Debtors generate revenue from government services through the

fulfillment of missions.  The number of missions awarded to the Patriot Team depends on the

amount of MV points credited to the team under the USTC Contract, which directly corresponds

to the total number and type of aircraft the Patriot Team has committed to the CRAF program.

Missions awarded to the Patriot Team under the USTC Contract are allocated to individual team

members in accordance with the Patriot Team Allocation Agreement.  The CRAF Agreements

designate one team member as the "lead" for the Patriot Team (the "Patriot Team Leader"),

responsible for the performance of various administrative services under the agreements.

117.    The CRAF Agreements are a critical component of the Debtors'

governmental air cargo business, which accounted for approximately 43.5% of the Debtors'

revenue for the twelve months ended July 31, 2012.  Uninterrupted performance under the USTC

Contract is essential to the Debtors' continued participation in the CRAF program and the

preservation of the Debtors' beneficial relationship with USTC.  Moreover, the USTC Contract

is predicated on existence of the Patriot Team and the cooperation of its members, making the

preservation of Debtors' relationship with the Patriot Team, as reflected in the Patriot Team

Arrangement Agreement and the Patriot Team Allocation Agreement, equally important to the

preservation of the Debtors' businesses.

118.    To the extent the payment and commission provisions under the Patriot

Team Allocation Agreements for FY12 and FY13 call for an act to obtain possession of or to

exercise control over property of the Debtors' estates, the Debtors seek authority, under section

362(d) of the Bankruptcy Code, to permit the Patriot Team Leader to perform its duties in

53

accordance with the Patriot Team Allocation Agreements.  The Debtors believe cause exists to

modify the Automatic Stay because staying the operation of the payment and commission

provisions in accordance with the Patriot Team Allocation Agreements could have a detrimental

effect on the Debtors' relationship with the Patriot Team.  As discussed above, the USTC

Contract is predicated on the existence of the Patriot Team and the cooperation of its members,

making the preservation of Debtors' relationship with the Patriot Team critical to the

preservation of the Debtors' governmental air cargo business.

      119.   <u>Commercial Industry Agreements</u>.  As described above, the Debtors

provide the bulk of their commercial services pursuant to ACMI Contracts.  The Debtors also

provide commercial services under CMI Contracts and Charter Contracts.  Customers often

prepay the Debtors for the services it renders under ACMI Contracts, CMI Contracts, and

Charter Contracts.

      120.   The Debtors have received payments under certain ACMI Contracts, CMI

Contracts, and Charter Contracts before the Petition Date for services they had not yet provided

as of the Petition Date (the "<u>Prepaid Contracts</u>").  The counterparties to the Prepaid Contracts

fully expect the Debtors to render full performance on Prepaid Contracts, notwithstanding the

commencement of these chapter 11 cases.  Any failure by the Debtors to fulfill the Prepaid

Contracts will result in a significant loss of goodwill with certain key customers, which would

jeopardize the Debtors' restructuring.  As of the Petition Date, the Debtors estimate that they

have received approximately $3.23 million under Prepaid Contracts for which they have not yet

provided services.  The Debtors request the authority to honor their obligations under the Prepaid

Contracts.

US_ACTIVE:\44081904\12\71907.0006

121.    Based upon the foregoing, I believe that the relief requested in the Industry Agreements Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

**H.    Motion of Debtors for Authority to Pay Certain Prepetition Taxes and Assessments Pursuant to Sections 105(a), 363(b), and 541 of the Bankruptcy Code**

122.    By this motion (the "Tax Motion"), the Debtors seek authority to pay, in their sole discretion, Franchise Taxes and Transportation Taxes (the "Taxes and Assessments") (each as defined and further explained in the Tax Motion).

123.    The Debtors estimate that, as of the Petition Date, they owe approximately $175,000 in Franchise Taxes and $48,875 in Transportation Taxes.  Failure to pay the aforementioned Taxes and Assessments may cause the Taxing Authorities to take precipitous action, including, without limitation, preventing the Debtors from conducting business in the applicable jurisdictions and subjecting the Debtors' officers and directors to civil and/or criminal liability, all of which would disrupt the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors' estates and their creditors.  Moreover, the failure to pay outstanding Franchise Taxes may impact the Debtors' businesses and business relationships.

124.    As more fully described in the Tax Motion, the Debtors submit that ample cause exists to authorize payment of the Taxes and Assessments, including that: (a) Transportation Taxes are not property of the Debtors' estates and must be remitted to the applicable Taxing Authority; (b) Transportation Taxes may be entitled to priority status pursuant to section 507(a)(8) of the Bankruptcy Code and, therefore, payments of prepetition amount only affects timing of payment; (c) failure to pay Transportation Taxes may subject the Debtors' responsible officers and directors to civil and/or criminal liability during the pendency of  these chapter 11 cases; (d) notwithstanding the operation of section 525 of the Bankruptcy Code, the

US_ACTIVE:\44081904\12\71907.0006

Delaware Secretary of State may seek to prevent the Debtors from conducting business in the State of Delaware if they fail to pay the Franchise Taxes; and (e) the Court has authority pursuant to sections 105(a) and 363(b) of the Bankruptcy to grant the relief sought.  Based on the foregoing, I believe that the relief requested in the Tax Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

I.       **Motion of Debtors for Interim and Final Orders (I) Prohibiting Any Utility Company from Altering, Refusing, Or Discontinuing Service, (II) Approving the Debtors' Proposed Adequate Assurance, and (III) Establishing Procedures to Determine Additional Adequate Assurance of Payment Pursuant to Sections 105(a) and 366 of the Bankruptcy Code**

125.    By this motion (the "Utilities Motion"), the Debtors request, pursuant to sections 105(a) and 366 of the Bankruptcy Code, (a) entry of an interim order (i) prohibiting any Utility Company (defined below) from altering, refusing, or discontinuing services on account of prepetition amounts outstanding, or on account of any perceived inadequacy of the Debtors' Proposed Adequate Assurance (defined below) pending entry of a final order, (ii) approving the Debtors' Proposed Adequate Assurance, (iii) establishing procedures for determining additional adequate assurance of payment, and (iv) scheduling a hearing to consider the relief requested on a final basis (the "Final Hearing"); and after the Final Hearing (b) entry of a final order granting the relief requested on a final basis.

126.    In connection with the operation of their businesses, the Debtors obtain electricity, natural gas, oil, water, refuse, telecommunications, and/or other similar utility services (collectively, the "Utility Services") from a number of utility companies or their brokers (collectively, the "Utility Companies") in the ordinary course of business. In the twelve month period before the Petition Date, the Debtors paid an average of approximately $105,000 per month on account of Utility Services.  Historically, the Debtors have had a good payment record with the Utility Companies.  Moreover, to the best of their knowledge, there are few, if any,

US_ACTIVE:\44081904\12\71907.0006

defaults or arrearages of any significance with respect to the Debtors' undisputed invoices for Utility Services.  This does not include any payment interruptions that may have been caused by the commencement of these chapter 11 cases.  The Debtors believe that, as of the Petition Date, no Utility Company holds a deposit.  Based on their previous monthly average, the Debtors estimate that their cost for Utility Services during the next thirty (30) days will be approximately $105,000.

127.    The Debtors intend to timely pay all postpetition obligations owed to the Utility Companies and expect that the cash flow from their operations and postpetition debtor-in-possession financing will be more than sufficient to pay all such obligations.  Nevertheless, to provide adequate assurance of payment to the Utility Companies pursuant to sections 366(b) and 366(c), the Debtors propose to deposit cash in an amount equal to two (2) weeks' payment for Utility Services, calculated as half of the historical monthly average during the past twelve (12) months (the "Adequate Assurance Deposit")[6] into a newly-created segregated account (the "Utility Deposit Account").  The Adequate Assurance Deposit will be placed into the Utility Deposit Account within three (3) business days after entry of an interim order granting the relief requested (the "Interim Order").  The Adequate Assurance Deposit will be held for the benefit of the Utility Companies during the pendency of these chapter 11 cases.  A Utility Company will be eligible to receive payment from the Adequate Assurance Deposit if (a) the Utility Company does not already hold a deposit equal to, or greater than, two (2) weeks of Utility Services and (b) such Utility Company is not currently paid in advance for its Utility Services.  Based on the

---

[6] The Adequate Assurance Deposit may be adjusted by the Debtors if the Debtors terminate any of the Utility Services provided by a Utility Company, make other arrangements with certain Utility Companies with respect to adequate assurance of payment, determine that an entity listed on the Utility Service List is not a utility company within the scope of section 366 of the Bankruptcy Code, or supplement the Utility Service List to include additional Utility Companies.

US_ACTIVE:\44081904\12\71907.0006

foregoing calculation, for those Utility Companies on the Utility List, the Debtors estimate that the total amount of the Adequate Assurance Deposit will be approximately $53,000.

128.    In the Utilities Motion, the Debtors request that, all amounts in the Utility Deposit Account shall remain, at all times, property of the Debtors' estates, subject to the prepetition and postpetition liens of the agent under the Debtors' prepetition credit facility and the DIP Credit Agreement, and that upon confirmation of any plan of reorganization in these chapter 11 cases, and without further order of the Court, such amounts shall be immediately available for the Debtors' use in their sole discretion.

129.    The Debtors submit that the Adequate Assurance Deposit, together with the Debtors' ability to pay for future Utility Services in the ordinary course of business (collectively, the "Proposed Adequate Assurance") constitutes sufficient adequate assurance to Utility Companies.  If, however, a Utility Company is not satisfied with the Proposed Adequate Assurance, the Utility Company may request additional assurance pursuant to the Utility Procedures described below.  The Debtors propose the establishment of the following Utility Procedures:

(a)    Within two (2) business days after entry of the Interim Order, the Debtors will mail a copy of the Interim Order to the Utility Companies on the Utility Service List.

(b)    If a Utility Company is not satisfied with the assurance of future payment provided by the Debtors, the Utility Company must serve a written request (a "Request") so that it is received within thirty (30) days after entry of the Interim Order by proposed counsel to the Debtors:  (i) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York  10156 (Attn: Brian S. Rosen, Esq.) and (ii) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware  19801 (Attn:  Jaime Luton Chapman, Esq.), and the Request must set forth the location(s) for which Utility Services are provided, the account number(s) for such location(s), the outstanding balance for each account, a summary of the Debtors' payment history on each account, and an explanation of

58

why the Adequate Assurance Deposit is not adequate assurance of payment.

(c)    Without further order of the Court, the Debtors may enter into agreements granting additional adequate assurance to a Utility Company serving a Request, if the Debtors, in their sole discretion, determine that the request is reasonable or otherwise negotiate alternative consensual provisions for such additional adequate assurance.

(d)    If the Debtors believe that a Request is unreasonable, then they shall, within thirty (30) days after receipt of the Request, file a motion (the "Determination Motion") pursuant to section 366(c)(3) of the Bankruptcy Code seeking a determination from the Court that the Adequate Assurance Deposit, plus any additional consideration offered by the Debtors, constitutes adequate assurance of payment.  Pending notice and a hearing on the Determination Motion, the Utility Company that is the subject of the unresolved Request may not alter, refuse, or discontinue services to the Debtors.

(e)    The Adequate Assurance Deposit shall be deemed adequate assurance of payment for any Utility Company that fails to make a Request.

130.    The relief requested in the Utilities Motion is necessary to avoid interruptions in Utility Services, which may jeopardize the Debtors' ongoing businesses, operations, and the success of these chapter 11 cases.  The relief requested in the Utilities Motion will ensure that the Debtors' operations will not be disrupted by the termination of vital Utility Services or the requests by the Utility Companies of unnecessarily large deposits that could endanger the Debtors' liquidity.  If a disruption occurs, the impact on the Debtors' business operations and revenues would be extremely harmful to the Debtors' estates and all other parties in interest.  Without the requested relief, any interruption in services by the Utility Companies could bring the Debtors' businesses grinding to a halt.  Even if the Utility Companies did not suspend or interrupt services, without the requested relief the Debtors could be forced to address numerous requests by Utility Companies in a disorganized manner during a critical period in these chapter 11 cases and during a time when their efforts could be more productively focused on a speedy emergence from bankruptcy.  Based upon the foregoing, I believe that the relief

59

requested in the Utilities Motion is in the best interests of the Debtors, their estates, and all

parties in interest and should be granted in all respects.

J.    **Motion of Debtors for (I) Authority to (A) Continue Their Workers'
Compensation, Liability, Property, and Other Insurance Programs and (B)
Pay All Obligations In Respect Thereof and (II) Entry of an Order
Authorizing and Directing Financial Institutions to Honor and Process
Checks and Transfer Related to Such Obligations Pursuant to Sections
105(a), 363(d), and 363(b) of the Bankruptcy Code**

131.    By this motion (the "Insurance Motion"), the Debtors request, pursuant to

sections 105(a), 362(d), and 363(b) of the Bankruptcy Code authority to (a) continue their

Workers' Compensation Programs and General Insurance Programs (both as defined below) on

an uninterrupted basis and (b)  pay, in their sole discretion, all undisputed premiums, deductibles,

administrative fees, broker fees, and other prepetition obligations arising under or in relation to

the Insurance Programs (the "Insurance Obligations").  To the extent any of the Debtors'

employees hold valid claims under their Workers' Compensation Programs, the Debtors also

seek authority to modify the Automatic Stay to permit these employees to proceed with their

claims under the Workers' Compensation Programs.  This request for modification of the

Automatic Stay pertains solely to claims under the Workers' Compensation Programs.  Any

claims relating to any of the General Insurance Programs will remain subject to the Automatic

Stay.

132.    The Debtors further seek entry of an order authorizing and directing the

Banks to receive, honor, process, and pay any prepetition check or electronic fund transfer

request from the Debtors' accounts to the extent that such checks or electronic fund transfers

relate to any of the Insurance Obligations, whether such checks or electronic fund transfer

requests were presented before or after the Petition Date.  The Debtors also seek authority to

issue new postpetition checks or effect new electronic fund transfers on account of the Insurance

Obligations to replace any prepetition checks or electronic fund transfer requests that may have been dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases. The Debtors further request that the Banks and any party receiving payment from the Debtors be authorized and directed to rely upon the representations of the Debtors as to which payments are allowed by the requested relief.

133.    In connection with the operation of their businesses, the Debtors participate in various insurance programs through several insurance carriers (the "Insurance Carriers"), including, without limitation, (a) two types of workers' compensation programs (the "Workers' Compensation Programs") and (b) the following general insurance programs ("General Insurance Programs" and, together with the Workers' Compensation Programs, the "Insurance Programs"):  (i) the Hull & Liability Policies (as defined and discussed in more detail in the Insurance Motion); (ii) FAA War Risk Insurance (as defined and discussed in more detail in the Insurance Motion); (iii) an owned and leased automobile collision policy, which includes coverage for vehicles not located on airport property; (iv) a commercial foreign package policy, which provides coverage for hired and non-owned vehicles overseas and employees traveling overseas; (v) general property insurance, which covers the Debtors' real property located in Norwalk, Connecticut; (vi) Mexican liability insurance, which is required by the Mexican government for the Debtors to operate in or out of Mexico; (vii) kidnap and ransom insurance; and (viii) an insurance policy covering liability pertaining to directors and officers, employment practices, fiduciary duties, and criminal activity.  A complete list of Insurance Programs and respective Insurance Carriers is attached to the Insurance Motion as Exhibit A.[7]

---

[7] In addition to Insurance Carriers listed on Exhibit A, the Debtors maintain numerous insurance programs with respect to employee health, dental, disability, and life insurance benefits.  These policies are addressed in the Employee and Independent Contractor Motion.

US_ACTIVE:\44081904\12\71907.0006

134.     The Debtors are required to pay premiums under the Insurance Programs based upon fixed rates established by the applicable Insurance Carrier.  The annual premiums for these policies aggregate approximately $5,649,221.  In most instances, the Debtors pay these premiums directly to the Insurance Carriers at the commencement of the respective policies.  In addition to annual premiums, pursuant to certain of the Insurance Programs, the Debtors are required to pay various deductibles for claims asserted under the policies.  The Debtors currently have contracts with three insurance brokers to assist them with the procurement and negotiation of the Insurance Programs.

135.     The nature of the Debtors' businesses and the extent of their operations make it essential for the Debtors to maintain their Insurance Programs on an ongoing and uninterrupted basis.  The nonpayment of any premiums, deductibles, or related fees under one of the Insurance Programs could result in the Insurance Carriers attempting to terminate existing policies, declining to renew existing policies at competitive rates, or refusing to enter into new insurance agreements with the Debtors.  If the Insurance Programs are not renewed, the Debtors could be exposed to substantial liability for damages resulting to persons and property of the Debtors and others, which exposure could have an extremely negative impact on the Debtors' ability to reorganize successfully.  Furthermore certain of the Insurance Programs are mandatory under the laws, regulations, aircraft operating leases, and/or contracts that govern the Debtors' commercial and/or governmental operations; failure to maintain these programs could lead to costly penalties or fines and jeopardize the Debtors' operations under their aircraft leases.

136.     As of the Petition Date, the Debtors are not aware of any prepetition claims owed to the Insurance Carriers or to the brokers on account of the Insurance Programs but out of an abundance of caution, by the Insurance Motion, the Debtors request to pay, in their sole

US_ACTIVE:\44081904\12\71907.0006

discretion, any prepetition Insurance Obligation that may arise in an amount not to exceed $20,000.  Based upon the foregoing, I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

US_ACTIVE:\44081904\12\71907.0006

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____
Daniel J. McHugh

**Exhibit 1**

**Plan Support Agreement**

## SUPPORT AGREEMENT

SUPPORT AGREEMENT (the "Agreement"), dated as of September 27, 2012, by and among (a) Southern Air Holdings, Inc. ("Holdings"), Cargo 360, Inc. ("Cargo"), and Southern Air Inc. ("SAI"), on behalf of themselves and their affiliates set forth on Exhibit "A" hereto (collectively, the "Southern Entities"), (b) Oak Hill Capital Partners II, L.P. ("OHCP"), OH Aircraft Acquisition, LLC ("OHAA") and Oak Hill Cargo 360, LLC ("OH Cargo" and, collectively with OHCP and OHAA, the "Oak Hill Entities") and (c) each of the undersigned lenders (collectively, the "Consenting Lenders"), each of which now or hereafter serves as the nominee, investment manager or advisor for beneficial holders for certain indebtedness of the Southern Entities incurred pursuant to that certain Credit Agreement, dated as of September 6, 2007, between Canadian Imperial Bank of Commerce, New York Branch ("CIBC"), as Administrative Agent (the "Agent"), the lenders party thereto, Cargo and the guarantors thereto, as amended (the "Credit Agreement"). The Southern Entities, the Oak Hill Entities and the Consenting Lenders are sometimes hereinafter collectively referred to as the "Parties".

## RECITALS

A.     The Southern Entities provide air cargo transportation services to a variety of customers, including, without limitation, the United States government and DHL Worldwide Express.

B.     SAI leases, among other aircraft, four (4) Boeing 777F aircraft (the "777 Aircraft") pursuant to that certain (1) Aircraft Operating Lease Agreement, dated as of February 5, 2010, between SAI, as Lessee, and Wells Fargo Bank Northwest, N.A. ("Wells Fargo"), as Owner Trustee, with respect to Serial Number 37986, (2) Aircraft Operating Lease Agreement, dated as of February 5, 2010, between SAI, as Lessee, and Wells Fargo, as Owner Trustee, with respect to Serial Number 37987, (3) Aircraft Operating Lease Agreement, dated as of August 5, 2011, between SAI, as Lessee, and Wells Fargo, as Owner Trustee, with respect to Serial Number 37988, and (4) Aircraft Operating Lease Agreement, dated as of August 5, 2011, between SAI, as Lessee, and Wells Fargo, as Owner Trustee, with respect to Serial Number 37989 (collectively, the "777 Leases"). OHAA is the beneficial owner of two of the 777 Aircraft and manages (and, upon the satisfaction of certain conditions, has the option to purchase, the membership interests in) the entity that holds the beneficial interests in the other two 777 Aircraft.

C.     OHCP owns (1) 97.95% of Holdings' issued and outstanding common stock and (2) 100% of Holdings' issued and outstanding Series A and Series B preferred stock.

D.     As of the date hereof, (i) reservations of rights letters, dated August 20, 2012 and September 10, 2012, with respect to defaults or events of default under the Credit Agreement have been delivered to the Southern Air Entities and (2) the principal amount of indebtedness outstanding under the Credit Agreement (the "Senior Debt") is approximately Two Hundred Eighty-Eight Million Dollars ($288,000,000.00).

E.    As of the date hereof, the Parties and their representatives have engaged in arm's-length good faith negotiations regarding restructuring of the Southern Entities' indebtedness, including, lease obligations, in accordance with the terms and conditions of this Agreement, the term sheet annexed hereto as Exhibit "B" (the "Plan Term Sheet"), and each of the other exhibits annexed hereto (collectively, the "Restructuring"), all of which are incorporated herein by reference as though set forth in full.

F.    The Southern Entities are contemplating, and the Parties intend, that the Restructuring will be effected through (i) the commencement of cases by the Southern Entities (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), (2) the solicitation (the "Solicitation") of acceptances to a chapter 11 plan of reorganization (the "Plan") on the terms and conditions set forth in the Plan Term Sheet or such other terms and conditions acceptable to the Southern Entities, the Consenting Lenders and the Oak Hill Entities accompanied by a disclosure statement (the "Disclosure Statement") in accordance with section 1125 of the Bankruptcy Code and (3) confirmation of the Plan in accordance with the provisions of section 1129 of the Bankruptcy Code.

G.    CIBC, as Agent, and certain of the Consenting Lenders (collectively, the "DIP Lenders") have agreed to provide the Southern Entities with a postpetition debtor in possession credit facility (the "DIP Financing") on the terms and conditions set forth in the agreement annexed hereto as Exhibit "C".

H.    The Oak Hill Entities have agreed to participate in the Restructuring through, among other things, certain modifications to the 777 Leases, which modifications shall be effective upon SAI's emergence from chapter 11, and to the extent of the modifications to the 777 Leases, subject to OHAA obtaining the requisite consent from its lenders, and the making of certain payments to the Southern Entities (the "OHAA Payments") in exchange for making certain concessions and receiving certain consideration (including, without limitation, equity interests in Holdings, as reorganized, the principal terms of which are memorialized in the Plan Term Sheet, the DIP Agreement, as defined below and the Stipulation annexed hereto as Exhibit "D" (the "1110 Stipulation").

I.    The Parties have agreed that the equity interests (including the equity interests to be issued pursuant to the exercise of warrants, if any, (the "Warrants")) issued pursuant to the Restructuring shall be in form and substance acceptable to the Requisite Lenders and the Oak Hill Entities and subject to certain terms, conditions and governance documents, as set forth in the Plan Term Sheet and shall be reflected in the Plan and the documents incorporated therein pursuant to a supplement thereto (the "Plan Supplement"), including, without limitation, the Warrant Agreement, Amended and Restated Articles of Incorporation, By-laws, a Shareholder Agreement and certain other governance documentation.

2

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties, on a several but not joint basis, agrees as follows:

**AGREEMENT**

## ARTICLE I

### THE RESTRUCTURING PROCESS

Section 1.1.    Bankruptcy Process.

(a)    <u>Commencement of the Chapter 11 Cases</u>. The Southern Entities agree that, subject to the execution and delivery of the Debtor in Possession Credit Agreement (the "<u>DIP Agreement</u>") by the DIP Lenders and the Southern Entities, on terms and conditions consistent with the DIP Financing, each of the Southern Entities shall, as soon as reasonably practicable, but in no event later than five (5) Business Days from the date hereof, file with the Bankruptcy Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code, and any other documents necessary to commence the Chapter 11 Cases (the date of such filing, the "<u>Petition Date</u>").

(b)    <u>DIP Agreement</u>. On the Petition Date, the Southern Entities shall file with the Bankruptcy Court a motion (the "<u>DIP Motion</u>") seeking interim and final approval of the DIP Agreement and granting approval of the treatment of the Secured Oak Hill Payment Obligations, as defined in the 1110 Stipulation, and a proposed form of interim order (the "<u>Interim Order</u>"), each in form and substance satisfactory to the Requisite Lenders party to the DIP Agreement and the Oak Hill Entities.

(c)    <u>1110 Stipulation</u>. On the Petition Date, and subject to the execution and delivery of the 1110 Stipulation by the Oak Hill Entities, Wells Fargo and the Southern Entities, the Southern Entities shall file with the Bankruptcy Court a motion, in form and substance satisfactory to the Oak Hill Entities and the Requisite Lenders, seeking approval of the 1110 Stipulation (the "<u>1110 Motion</u>") on an expedited basis.

(d)    <u>The Plan and Disclosure Statement</u>. The Southern Entities agree to (1) file the Plan, together with the Disclosure Statement with the Bankruptcy Court as soon as reasonably practicable following the Petition Date, but in no event later than ten (10) Business Days thereafter, (2) seek (i) approval of the Disclosure Statement in accordance with section 1125 of the Bankruptcy Code and (ii) confirmation of the Plan in accordance with section 1129 of the Bankruptcy Code, each as soon as reasonably practicable following the Petition Date, (3) not amend, modify or withdraw the Plan without the prior written consent of the Oak Hill Entities and the Requisite Lenders, and (4) take such other actions as may be reasonably necessary and appropriate in furtherance of confirmation the Plan and consummating the Restructuring as soon as practicable, but in all events in accordance with, and within the timeframes set forth in, this Agreement and in the DIP Agreement.

3

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES

Section 2.1.    <u>Representation and Warranties of Consenting Lenders</u>.  Each of the Consenting Lenders hereby represents and warrants for itself, as follows:  (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it; and (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 2.2.    <u>Representations of the Consenting Lenders as to Senior Debt</u>. Each of the Consenting Lenders hereby represents and warrants for itself, as follows:  (a) with regard to claims arising from or related to the Credit Agreement (the "<u>Senior Debt Claims</u>" or "<u>Prepetition Lender Claims</u>"), as of the date hereof, it has not assigned, sold, participated, granted, conveyed, or otherwise transferred, in whole or in part, the Senior Debt Claims referenced on the signature pages hereto, and, as of the date hereof, and except as disclosed, in writing, to the Southern Entities prior to the date hereof, it is not a party to any agreement to assign, sell, participate, grant, convey or otherwise transfer, and has not entered into any other agreement to assign, sell, participate, grant or otherwise transfer, in whole or in part, any portion of its right, title or interests in the Senior Debt Claims except to the extent such agreement is in accordance with the terms hereof, and it has good title thereto, free and clear of all liens, security interests and other encumbrances of any kind; (b) as of the date hereof, either it (i) is the sole beneficial owner of the principal amount of the Senior Debt Claims set forth below its signature hereto or (ii) has sole investment or voting discretion with respect to the principal amount of the Senior Debt Claims set forth below its signature hereto and has the power and authority to bind the beneficial owner(s) of such Senior Debt Claims to the terms of this Agreement; (c) it, or the holder for whom it acts as investment adviser or manager, is an "Accredited Investor" (as such term is defined in Rule 501 of Regulation D promulgated under the Securities Act); and (d) there are no claims for brokerage commissions, finders' fees, or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement binding upon the Parties.

Section 2.3.    <u>Representation and Warranties of the Southern Entities</u>.  Each of the Southern Entities hereby represents and warrants for itself, as follows:  (a) it is duly organized and validly existing under the laws of the jurisdiction of organization with all requisite power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions

4

contemplated hereby; (b) subject to entry of the Confirmation Order with respect to consummation of the Plan, it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreement specifically applicable to it; (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder and (d) as of the date hereof, there are not pending agreements, oral or written, understandings or negotiations with respect to any plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or equity interests or restructuring (other than the Restructuring) involving the Southern Entities or any of their respective assets, properties or businesses (an "Alternative Proposal").

Section 2.4.    Representations and Warranties of the Oak Hill Entities.  Each of the Oak Hill Entities hereby represents and warrants as follows:  (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and, except for the need to obtain the consent of its lenders with respect to certain modifications to the 777 Leases as set forth in the 1110 Stipulation (but not with respect to the payments to be made by the Oak Hill Entities pursuant to the 1110 Stipulation), with all requisite power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate (or cause Wells Fargo to consummate, as the case may be) the transactions contemplated hereby; (b) except for the need to obtain the consent of its lenders with respect to certain modifications to the 777 Leases as set forth in the 1110 Stipulation (but not with respect to the payments to be made by the Oak Hill Entities pursuant to the 1110 Stipulation), it has full requisite power and authority to execute and deliver (or to cause Wells Fargo to execute and deliver, as the case may be) and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it (or Wells Fargo, as the case may be) in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it; (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder and (d) except with regard to claims arising from or related to the 777 Leases, it does not hold any claims against the Southern Entities, known or unknown, whether asserted or unasserted.

Section 2.5.    Representations of the Parties as to this Agreement.  Each Party represents and acknowledges that (a) in executing this Agreement, it does not rely, and has not relied, upon any representation of statement made by any other Party or any of such other Party's representative, agents or attorneys, with regard to the subject matter, basis or effect of this Agreement or otherwise, other than as may be stated specifically in this Agreement, (b) in executing this Agreement, it has relied entirely upon its own

US_ACTIVE:\44097748\9\71907.0006

judgment, beliefs and interest and the advice of its counsel and that it has had a reasonable period of time to consider the terms of this Agreement before entering into it, and (c) it has reviewed this Agreement and that it fully understands and voluntarily accepts all of the provisions contained herein.  Each Party further represents, acknowledges and agrees that this Agreement was the product of negotiations among the Parties and that any rule of construction as to ambiguities being resolved against the drafting party shall not apply in the interpretation of this Agreement.

## ARTICLE III

## COVENANTS

Section 3.1.    <u>Covenants of Consenting Lenders</u>.  Each of the Consenting Lenders hereby covenants and agrees, as follows:

(a)        None of the Consenting Lenders shall sell, transfer, pledge, hypothecate or assign any of the Senior Debt Claims or any voting rights or participations or other interests with respect to such Senior Debt Claims during the period from the date hereof up to and including the Effective Date; <u>provided</u>, <u>however</u>, that, prior to the Effective Date, the Consenting Lenders may enter into one or more agreements to sell, transfer, pledge, hypothecate or assign the Senior Debt or any voting rights or participations or other interests with respect to such Senior Debt Claims to any third party (a "<u>Proposed Transferee</u>") provided that (i) any Consenting Lender desirous of selling, transferring, pledging, hypothecating or assigning any of the Senior Debt Claims or any voting rights or participations or other interests therein during the period from and after the date hereof, shall inform, in writing, any purchaser, agent or other entity with respect thereto of the agreements set forth herein and (ii) such Proposed Transferee executes a letter agreement, in the form annexed hereto as Exhibit "E" providing for, among other things, binding the Proposed Transferee to the terms and conditions of this Agreement to the same extent as the transferring Consenting Lender is bound herein.

(b)        None of the Consenting Lenders shall, to the extent the Agent files a proof of claim on behalf of the Consenting Lenders, except as expressly provided herein, (i) file with the Bankruptcy Court any claims or proofs of claim against any of the Southern Entities with respect to the Senior Debt Claims (including secured, unsecured, administrative, priority or substantial contribution claims); <u>provided</u>, <u>however</u>, that nothing contained herein shall preclude CIBC, as Agent, from filing a proof of claim on behalf of all of the Consenting Lenders in accordance with its duties and obligations under the Credit Agreement; (ii) file any claims, commence or prosecute any pending or additional litigation, proceeding, action or matter or seek to recover damages or to seek any other type of relief against any of the Southern Entities or (iii) directly or indirectly aid any person in taking any action with respect to any action that is prohibited by this Section 3.1(b).

(c)        Provided that the Definitive Financing Documents, as defined below, and 1110 Stipulation are consistent with the terms of this Agreement, each of the Consenting Lenders shall not (i) object, on any grounds, to the terms, conditions, nature

6

or amount of the DIP Financing or the entry of an order of the Bankruptcy Court approving the 1110 Stipulation or (ii) encourage any person or entity to so object.

(d)    Each of the Consenting Lenders shall (i) support, and otherwise take no action to impede or preclude, the administration of the Chapter 11 Cases, the approval of the Disclosure Statement, the entry of the Confirmation Order or the consummation, implementation and administration of the Plan provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) are consistent with the terms herein and the Plan Term Sheet, and (ii) in accordance with the provisions of Article IV hereof, (A) not consent to or vote for any modification of the Plan unless such modification is proposed or supported by the Southern Entities and the Oak Hill Entities and otherwise consistent with the terms herein, (B) not withdraw or revoke its tender, consent or vote with respect to the Plan and the Plan Term Sheet, (C) not mark its ballot to indicate its refusal to grant the releases provided for in the Plan and the Plan Term Sheet and (D) not vote for or support any chapter 11 plan not proposed or supported by the Southern Entities and the Oak Hill Entities.

(e)    The Agent and the other Consenting Lenders shall negotiate in good faith and use their best efforts to document the balance of the transactions contemplated by the Restructuring, including, without limitation, the Warrants, the Warrant Agreement, a Shareholder Agreement, Amended and Restated Articles of Incorporation, By Laws and certain other governance documentation, and the other documents to be included in the Plan Supplement, each such document reasonably satisfactory to the Requisite Lenders, so that the Plan Supplement can be filed with the Bankruptcy Court no later than ten (10) Business Days prior to the deadline to submit acceptances and rejections pursuant to the Solicitation.

(f)    The Consenting Lenders consent to the terms of the DIP Financing, the Secured OHAA Payment Obligations and to the use of cash collateral, and have agreed to, and shall take no action to otherwise impede, their prepetition liens and claims from being primed pursuant to the terms of the DIP Agreement, the Interim Order and the Final DIP Order.

Section 3.2.    Covenants of the Oak Hill Entities.  Each of the Oak Hill Entities covenants and agrees as follows:

(a)    Provided that the Definitive Financing Documents are consistent with the terms of this Agreement, the Oak Hill Entities shall not (i) object, on any grounds to the terms, conditions, nature or amount of the DIP Financing or (ii) encourage any person or entity to so object.

(b)    The Oak Hill Entities shall support, and otherwise take no action to impede or preclude, the administration of the Chapter 11 Cases, the approval of the Disclosure Statement, the entry of the Confirmation Order or the consummation, implementation and administration of the Plan provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration)

7

are consistent with the terms herein, and (ii) in accordance with the provisions of Article IV hereof, (A) not consent to or vote for any modification of the Plan unless such modification is proposed or supported by the Southern Entities and the Requisite Lenders and otherwise consistent with the terms herein, (B) not withdraw or revoke its tender, consent or vote with respect to the Plan, (C) not mark its ballot to indicate its refusal to grant the releases provided for in the Plan, and (D) not vote for or support any chapter 11 plan not proposed or supported by the Southern Entities and the Consenting Lenders.

(c)     The Oak Hill Entities shall negotiate in good faith and use their best efforts to document the balance of the transactions contemplated by the Restructuring, including, without limitation, the Warrants, the Warrant Agreement, a Shareholder Agreement, Amended and Restated Articles of Incorporation, By Laws and certain other governance documentation, and the other documents to be included in the Plan Supplement, each such document reasonably satisfactory to the Oak Hill Entities, so that the Plan Supplement can be filed with the Bankruptcy Court no later than ten (10) Business Days prior to the deadline to submit acceptances and rejections pursuant to the Solicitation.

(d)     From the date hereof until the earlier to occur of (i) the termination of this Agreement pursuant to Article V hereof and (ii) the Effective Date, each Oak Hill Entity shall not, and shall cause Oak Hill Affiliates not to, (x) sell, pledge, hypothecate or otherwise transfer any Southern Air Stock or (y) consent to the sale, pledge, hypothecation or other transfer of equity interests in any of the Oak Hill Entities or Oak Hill Affiliates by any person that (applying the applicable constructive ownership rules) owns five percent (5%) or more of Southern Air Stock or would by reason of such sales, pledge, hypothecation or other transfer own five percent (5%) or more of Southern Air Stock without the consent of the Holdings, which consent shall not be unreasonably withheld and shall be based solely on whether such transfer might result in an "ownership change" under section 382 of the Tax Code. Each Oak Hill Entity agrees to cooperate, and to cause any of Oak Hill Affiliates to cooperate, with reasonable information requests from the Holdings in connection with the determination whether to consent to a proposed transfer. For purposes of this Agreement, "Southern Air Stock" shall mean Common Stock, Series A Preferred Stock, Series B Preferred Stock of Holdings, and any option or warrants to acquire any of such stock (including any derivative or other transaction or upper level transfer of interests in any entity, in each case, that may be treated for U.S. federal income tax purposes as a direct or indirect transfer of Southern Air Stock) and "Oak Hill Affiliates" shall mean OHCP MGP II, LLC, OHCP GenPar II, L.P., Oak Hill Capital Management Partners II, L.P., OHCMP II Cargo 360, LLC, and OH Cargo.

Section 3.3.    Covenants of the Southern Entities. The Southern Entities covenant and agree as follows:

(a)     The Southern Entities agree to support and, subject to their fiduciaries obligations, complete the Restructuring and all transactions contemplated in the Plan Term Sheet and the Restructuring Documents, as defined below.

(b)        In addition to the provisions set forth in Articles I and II hereof, the Southern Entities shall use their reasonable best efforts to obtain (i) interim and final approval of the Bankruptcy Court of the DIP Financing, through entry of an Interim Order and the Final DIP Order, as defined below, (ii) entry of the Disclosure Statement Order, as defined below, in accordance with section 1125 of the Bankruptcy Code, (iii) confirmation of the Plan in accordance with section 1129 of the Bankruptcy Code and entry of the Confirmation Order, as defined below, and (iv) approval of the Bankruptcy Court of the 1110 Stipulation through entry of the 1110 Order, as defined below.

(c)        The Southern Entities shall negotiate in good faith and use their best efforts to document the balance of the transactions contemplated by the Restructuring, including, without limitation, the Warrants, the Warrant Agreement, a Shareholder Agreement, Amended and Restated Articles of Incorporation, By Laws and certain other governance documentation, and the other documents to be included in the Plan Supplement, so that the Plan Supplement can be filed with the Bankruptcy Court no later than ten (10) Business Days prior to the deadline to submit acceptances and rejections pursuant to the Solicitation.

(d)        The Southern Entities shall use their reasonable best efforts to timely obtain any and all required regulatory and/or third-party approvals for the transactions contemplated by the Restructuring and the Plan.

(e)        The Southern Entities shall continue to operate their business in ordinary course based on historic practices and the operations contemplated pursuant to their business plan, taking into account the Restructuring and the commencement of the Chapter 11 Cases, including, without limitation, the jurisdiction of the Bankruptcy Court and the application of the Bankruptcy Code.

(f)        Subject to the Southern Entities' fiduciary duties, including, without limitation, as a debtor in possession, the Southern Entities shall not, and shall cause their agents and representatives to not, directly or indirectly, take any action to solicit, initiate, encourage or assist the submission of an Alternative Proposal. If the Southern Entities receive an unsolicited proposal or expression of interest with respect to an Alternative Proposal, the Southern Entities shall promptly notify the Consenting Lenders and the Oak Hill Entities of the receipt of any oral or written offer, indication of interest, proposal or inquiry relating to an Alternative Proposal, with such notice to include the material terms thereof, including the identity of the person or group of persons involved. The Southern Entities shall promptly furnish the Consenting Lenders and the Oak Hill Entities with copies of any written offer that they receive relating to an Alternative Proposal and, subject to their fiduciary obligations, shall keep the Consenting Lenders and the Oak Hill Entities informed on a current basis of any negotiations, amendments, modifications or other changes to such offer.

(g)        Subject to the terms of existing non-disclosure agreements among the Parties, the Southern Entities shall permit and facilitate any and all due diligence reasonably necessary to consummate the Restructuring, including, but not limited to,

9

(i) reasonably cooperating fully with the Consenting Lenders and the Oak Hill Entities and causing the Southern Entities' officers, directors, employees, and advisors to reasonably cooperate in furnishing non-privileged information as and when reasonably requested by the Consenting Lenders and the Oak Hill Entities, including with respect to the financial affairs, finances, financial condition, business and operations, and (ii) authorizing representatives of the Consenting Lenders or the Oak Hill Entities to meet and/or have discussions with any of the Southern Entities' officers, directors, employees and advisors from time to time as reasonably requested to discuss any non-privileged matters regarding the Southern Entities' financial affairs, finances, financial condition, business and operations.

Section 3.4.    Covenants of the Parties as to this Agreement.  Without limiting the applicability of Sections 3.1(e), 3.2(c) and 3.3(c) hereof, each of the Southern Entities, the Consenting Lenders and the Oak Hill Entities hereby covenants and agrees to (1) negotiate in good faith each of the documents implementing and relating to the Restructuring, including, without limitation, (i) all first-day motions and applications (the "First Day Motions"), (ii) the 1110 Motion and the proposed order approving the 1110 Stipulation (the "1110 Order"), (iii) the DIP Motion, the Interim Order, the proposed order approving the DIP Financing on a final basis (the "Final DIP Order," and, together with the DIP Agreement, Interim Order, and all other documents related to the DIP Financing, the "Definitive Financing Documents"), (iv) the Plan, (v) the Disclosure Statement, ballots, and other solicitation materials in respect of the Plan (collectively, the "Plan Solicitation Materials"), (vi) the motion to approve the Disclosure Statement and seeking confirmation of the Plan, (vii) the proposed order approving the Plan Solicitation Materials (the "Disclosure Statement Order") and the proposed order confirming the Plan (the "Confirmation Order"), and (viii) the Plan Supplement (collectively, the "Restructuring Documents"), which Restructuring Documents shall contain terms and conditions consistent in all material respects with this Agreement, the Plan Term Sheet and the other attachments hereto (and no other provisions materially adverse to the Requisite Lenders or the Oak Hill Entities) and shall otherwise be in form and substance reasonably acceptable to the Requisite Lenders and the Oak Hill Entities.

## ARTICLE IV

## PLAN AND PLAN SUPPORT

Section 4.1.    Plan Support Commitment.  From and after the date hereof, and provided that (a) this Agreement has not been terminated, (b) the Restructuring Documents are consistent with the terms of this Agreement and (c) without the prior written consent of the Consenting Lenders and the Oak Hill Entities, neither the Disclosure Statement nor the Plan has been amended or modified in a manner adverse to the Consenting Lenders and the Oak Hill Entities, the Consenting Lenders and the Oak Hill Entities shall (i) take any and all actions reasonably requested by the Southern Entities to support (A) approval of the Disclosure Statement in accordance with section 1125 of the Bankruptcy Code and (B) confirmation of the Plan in accordance with section 1129 of the Bankruptcy Code, (ii) not consent to or vote for any modification of the Plan unless such modification is not adverse to the Consenting Lenders and the Oak Hill

10

Entities, in their sole and absolute discretion, and (iii) not vote for or support any chapter 11 plan not proposed or supported by the Southern Entities.

Section 4.2.    <u>Solicitation Required in Connection with Plan</u>.  Notwithstanding anything contained in this Article IV or elsewhere in this Agreement to the contrary, this Agreement is not, and shall not be deemed to be, a solicitation of acceptances of the Plan. The Southern Entities, the Consenting Leaders and the Oak Hill Entities acknowledge and agree that the acceptance of the Plan will not be solicited until the Bankruptcy Court has approved the Disclosure Statement and related ballots, and such Disclosure Statement and ballots have been transmitted to parties entitled to receive same.

Section 4.3.    <u>Participation in the Chapter 11 Cases</u>.  Notwithstanding anything contained herein to the contrary, nothing in this Agreement shall (a) prohibit any Party from (i) appearing as a party-in-interest in any matter in the Chapter 11 Cases so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement, the Restructuring Documents, the Restructuring or for the purpose of hindering, delaying or preventing consummation of the Restructuring, or (ii) seeking to enforce this Agreement or the terms of any of the Restructuring Documents or (b) limit the ability of the Agent from exercising its duties or obligations under the Credit Agreement and, subject to the rights of the Southern Entities and the Oak Hill Entities to assert otherwise, any such exercise shall not be deemed to constitute a breach of the terms of this Agreement.

## ARTICLE V

## TERMINATION

Section 5.1.    <u>Consenting Lenders Termination Events</u>.  This Agreement may be terminated by the Requisite Lenders, by delivery to the Southern Entities and the Oak Hill Entities of a notice in accordance with Section 7.10 hereof, upon the occurrence and continuance of any of the following events:

(a)    the breach by the Southern Entities or the Oak Hill Entities, of any of their respective undertakings, representations, warranties or covenants set forth in this Agreement, which breach remains uncured for a period of seven (7) Business Days after the receipt by the breaching Party from the Requisite Lenders of written notice of such breach;

(b)    unless agreed to by the Requisite Lenders, the amendment, modification, or withdrawal of, or the filing of a pleading by the Southern Entities seeking to amend, modify, or withdraw, the Plan (including the exhibits thereto), the related Solicitation materials, or the Plan Supplement;

(c)    unless otherwise waived by the Requisite Lenders, during the period prior to consummation of the Plan, (i) an Event of Default, as defined in the DIP Agreement, has been declared, and (ii) notice thereof has been provided to the Southern Entities and the Oak Hill Entities with respect thereto; or

11

(d)     on the date that is ten (10) Business Days after the date hereof, unless the Southern Entities have commenced the Chapter 11 Cases.

Section 5.2.    <u>Oak Hill Termination Events</u>. This Agreement may be terminated by Oak Hill, by delivery to the Southern Entities and the Consenting Lenders of a notice in accordance with Section 7.10 hereof, upon the occurrence and continuance of any of the following events:

(a)     the breach by the Southern Entities or any Consenting Lenders of any of their respective undertakings, representations, warranties or covenants set forth in this Agreement which remains uncured for a period of seven (7) Business Days after the receipt of written notice of such breach;

(b)     unless agreed to by the Oak Hill Entities, the amendment, modification, or withdrawal of, or the filing of a pleading by the Southern Entities seeking to amend, modify, or withdraw, the Plan (including the exhibits thereto) or the related Solicitation materials, or the Plan Supplement;

(c)     unless otherwise waived by the Oak Hill Entities, during the period prior to consummation of the Plan, (i) an Event of Default, as defined in the 1110 Stipulation, has been declared, (ii) notice provided to the Southern Entities with respect thereto and (iii) the Oak Hill Entities have declared all amounts owing by the Southern Entities pursuant to the 1110 Stipulation to be due and payable; or

(d)     on the date that is ten (10) Business Days after the date hereof, unless the Southern Entities have commenced the Chapter 11 Cases.

Section 5.3.    <u>Southern Termination Events</u>. This Agreement may be terminated by the Southern Entities, by delivery to the Consenting Lenders and the Oak Hill Entities of a notice in accordance with Section 7.10 hereof, upon the occurrence and continuance of any of the following events:

(a)     the breach by any of the Consenting Lenders of any of the representations, warranties or covenants of such Consenting Lenders set forth in this Agreement which remains uncured for a period of seven (7)  Business Days after the receipt by the Consenting Lenders of notice of such breach;

(b)     the breach by the Oak Hill Entities of any of the representations, warranties or covenants of the Oak Hill Entities set forth in this Agreement which remains uncured for a period of seven (7) Business Days after the receipt by the Oak Hill Entities of notice of such breach;

(c)     if, after the DIP Agreement or the 1110 Stipulation becomes effective, there is a notice of acceleration under the DIP Agreement or termination under the 1110 Stipulation, respectively; or

(d)     on the date that is ten (10) Business Days after the date hereof, unless the Southern Entities have commenced the Chapter 11 Cases.

US_ACTIVE:\44097748\9\71907.0006

Section 5.4.    <u>Other Termination Events</u>. The obligations of all Parties hereunder may be terminated by any of the Southern Entities, Oak Hill or the Consenting Lenders by delivery of notice to the other Parties in accordance with Section 7.10 hereof, at any time on or after:

(a)    The date that is one hundred twenty (120) days after the Petition Date, if the Plan has not confirmed on or before such date;

(b)    the date that is one hundred fifty (150) days after the Petition Date, if the Confirmation Order has not been entered by the Bankruptcy Court on or before such date;

(c)    the date that the Chapter 11 Cases of any of Holdings, Cargo or SAI shall have been converted to a case under chapter 7 of the Bankruptcy Code, or such case shall have been dismissed by order of the Bankruptcy Court (unless caused by a default by any Consenting Lender or any Oak Hill Entity of its obligations hereunder, in which event the Consenting Lenders or the Oak Hill Entities, as the case may be, shall not have the right to terminate under this subsection);

(d)    the date that an order is entered by the Bankruptcy Court directing the appointment of an examiner with expanded powers or a trustee;

(e)    the date that (i) an order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Plan for the Southern Entities and (ii) the Southern Entities pursue confirmation of a chapter 11 plan of reorganization materially inconsistent with the terms set forth on Exhibit "B" hereto (unless caused by a default by any Oak Hill Entity or any Consenting Lender of its obligations hereunder, in which event the Oak Hill Entities or the Consenting Lenders, as the case may be, shall not have the right to terminate under this subsection);

(f)    the occurrence of the Effective Date; or

(g)    the date of the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final nonappealable ruling or order restraining, enjoining or otherwise prohibiting the consummation of the Restructuring;

<u>provided, however</u>, that any of the dates set forth in this Section 5.4 may be extended by agreement among the Southern Entities, the Oak Hill Entities and the Requisite Lenders.

Section 5.5.    <u>No Violation/Waiver of Automatic Stay</u>. The Southern Entities hereby agree, and to the extent applicable waive, the automatic stay set forth in section 362 of the Bankruptcy Code, which shall become extant upon the commencement of the Chapter 11 cases, solely for the purpose of the Consenting Lenders or the Oak Hill Entities taking any necessary steps to effectuate the terms of this Agreement, including the termination of this Agreement, including sending notices to the Southern Entities.

US_ACTIVE:\44097748\9\71907.0006

Section 5.6.    Effect of Termination.  Subject to the provisions of Section 7.8 hereof, upon termination of this Agreement, each Party shall be released from its commitments, covenants, undertakings and agreements under or related to this Agreement and shall have the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement.  Upon the occurrence of any termination of this Agreement, any and all consents tendered by the Consenting Lenders and the Oak Hill Entities prior to such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement.

## ARTICLE VI

### EFFECTIVENESS

Section 6.1.    Effectiveness; Amendments; Waivers.  This Agreement shall become effective and binding upon the delivery and execution of counterpart signature pages of this Agreement by each of the Parties; provided, however, that, unless otherwise waived by the Southern Entities and the Oak Hill Entities, this Agreement shall not become effective unless and until executed by Consenting Lenders holding, in the aggregate, at least two-thirds (2/3) of the outstanding principal amount of Senior Debt.  Upon effectiveness hereof, this Agreement may not be modified, amended, or supplemented (except as expressly provided herein or therein) except in writing signed by the Oak Hill Entities and the Consenting Lenders holding, at the time of measurement, more than fifty percent (50%) of the aggregate outstanding principal amount of the Senor Debt held by the Consenting Lenders (the "Requisite Lenders").  Except as otherwise provided in this Section 6.1, no claim of waiver, modification, consent, acquiescence or supplement of the terms with respect to any provision of this Agreement shall be made against any Party, except on the basis of a written instrument executed by or on behalf of such Party.

## ARTICLE VII

### MISCELLANEOUS

Section 7.1.    Further Assurances.  Subject to the other terms of this Agreement and, for the avoidance of doubt, without expanding any of the obligations of the Parties or limiting any of the other provisions of this Agreement, each of the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the Solicitation, the Plan and/or the Restructuring, as applicable, in each case, as soon as reasonably practicable.

14

Section 7.2.    Waiver.  If the transactions contemplated herein are not consummated, or following the occurrence of the termination of this Agreement, if applicable, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of these respective rights.

Section 7.3.    Termination Upon the Effective Date.  This Agreement shall terminate automatically without any further required action or notice upon the effectiveness of the transactions contemplated by the Plan.

Section 7.4.    Entire Agreement.  This Agreement, including, without limitation, the exhibits annexed hereto, constitutes the entire agreement of the Parties and supersedes all prior agreements, arrangements or understandings, whether written or oral, between the Parties with respect to the subject matter of this Agreement, except for any confidentiality agreement between the Parties, the provisions of which shall survive this Agreement and continue to be in full force and effect in accordance with its terms.

Section 7.5.    Governing Law.  This Agreement, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution, termination, performance or nonperformance of this Agreement (including the Exhibits), shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State, without regard to any conflict of laws principles thereof.  Each Party agrees that it shall bring any action or proceeding in respect of any claim based upon, arising out of, or related to this agreement, any provision hereof or any of the transactions contemplated hereby, in the United States District Court for the Southern District of New York or any New York State court sitting in New York County of New York City (the "Courts"), and solely in connection with claims arising under this Agreement or the transactions that are the subject of this Agreement (a) irrevocably submits to the exclusive jurisdiction of the Courts, (b) waives any objection to laying venue in any such action or proceeding in the Courts and (c) waives any objection that the Courts are an inconvenient forum or do not have jurisdiction over any Party; provided, however, that, upon the commencement of the Chapter 11 Cases, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising from or relating to this Agreement.  Each Party agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Section 7.6.    Counterparts.  This Agreement may be executed and delivered (by facsimile, email or otherwise) in any number of counterparts, each of which, when executed and delivered shall be deemed an original, and all of which together shall constitute the same agreement.

Section 7.7.    Parties; Successors and Assigns.  This Agreement shall be binding upon, and inure to the benefit of, the Parties and their respective successors, permitted assigns and representatives.  No rights or obligations of any Party under this Agreement may be assigned or transferred to any other person or entity except as provided in Section 3.1(a) hereof.  The agreements, representations and obligations of the Consenting Lenders under this Agreement are, in all respects, several and not joint.

Section 7.8.    <u>Survival</u>.  Notwithstanding the termination of this Agreement, the agreements and obligations of the Parties in this Article VII shall survive such termination and shall continue in full force and effect for the benefit of the Parties (and any third party beneficiaries, in accordance with Section 7.11 hereof) in accordance with the terms hereof.

Section 7.9.    <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any of the Parties hereto.  Upon any determination that any term or other provision is invalid, illegal, or incapable of being enforced, each party hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of this Agreement as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 7.10.    <u>Notices</u>.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (a) when delivered personally by hand (with written confirmation of receipt), (b) when sent by facsimile (with written confirmation of transmission), (c) five (5) days after being deposited with the United States Post Office, by registered or certified mail, postage prepaid, (d) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt) or (e) when sent by electronic mail (with acknowledgment received), in each case, at the following addresses and facsimile numbers (or to such other address or facsimile number as a Party may have specified by notice given to the other Party pursuant to this provision):

> (a) if to the Southern Entities, to:
>
> Southern Air Holdings, Inc.
> 117 Glover Avenue
> Norwalk, CT  06850
> Attention:  Daniel J. McHugh
> Facsimile:  203-840-3238
> Email:  dmchugh@southernair.com
>
> With a copy given in like manner, to:
>
> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, NY 10153
> Attention: Brian S. Rosen, Esq.
> Facsimile: 212-310-8007
> Email: brian.rosen@weil.com
>
> (b) if to the Consenting Lenders, to the address set for beneath such Consenting Lender's signature block.

16

(c) if to the Agent, to:

Canadian Imperial Bank of Commerce
New York Branch
425 Lexington Avenue
New York, NY 10017
Attention: E. Lindsay Gordon
Facsimile: 212-856-4135
Email: lindsay.gordon@us.cibc.com

With a copy given in like manner, to:

Milbank Tweed Hadley & McCloy LLC
1 Chase Manhattan Plaza
New York, NY 10005
Attention: Matthew Barr, Esq.
Facsimile: 212-530-5219
Email: mbarr@milbank.com

(d) if to the Oak Hill Entities, to:

Oak Hill Capital Management
65 East 55th Street
New York, NY 10022
Attention: Stratton Heath
Facsimile: 212-____ _____
Email: sheath@oakhillcapital.com

With a copy given in like manner, to:

Paul Weiss Rifkind Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attention:    Stephen J. Shimshak, Esq.
              Kelley A. Cornish, Esq.
Facsimile: 212-757-3990
Email: sshimshak@paulweiss.com
       kcornish@paulweiss.com

Section 7.11.  Third Party Beneficiaries.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third party beneficiary hereof or have any legal or equitable right, remedy or claim hereunder.

Section 7.12.  Representation by Counsel.  Each Party acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party hereto

17

with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties. None of the Parties shall have any term or provision construed against such Party solely by reason of such Party have drafted such term or provision.

Section 7.13. <u>Relationship Among Parties</u>. Notwithstanding anything herein to the contrary, the duties and obligations of the Parities under this Agreement shall be several, not joint. It is understood and agreed that any Party may trade in the equity, claims or debt of the Southern Entities, subject to Section 3.1 hereof of this Agreement. No Party shall have any responsibility for any such trading by any other entity (including any other Party) by virtue of this Agreement. No prior history, pattern or practice of sharing confidences among or between Parties shall in any way affect or negate this understanding and agreement. No Party shall, as a result of its entering into and performing its obligations under this Agreement, be deemed to be part of a "group" (as that term is used in Section 13(d) of the Securities Exchange act of 1934, as amended, and the rules and regulations promulgated thereunder) with any of the other Parties.

Section 7.14. <u>Specific Performance</u>. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to such specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

Section 7.15. <u>Public Disclosure</u>. The Southern Entities shall not (a) use the name of the Agent or the Consenting Lenders in any press release without the consent of the Agent, which consent may be granted or withheld in the sole and absolute discretion of the Agent and the Consenting Lenders, (b) use the name of any of the Oak Hill Entities in any press release without the consent of such Oak Hill Entity, which consent may be granted or withheld in the sole and absolute discretion of such Oak Hill Entity or (c) disclose to any person other than legal and financial advisors to the Southern Entities, the principal amount or percentage of any Senior Debt Claims held by any holder thereof or any of their respective subsidiaries; <u>provided</u>, <u>however</u>, that the Southern Entities shall be permitted to disclose at any time the aggregate principal amount of and aggregate percentage of Southern Entities Claims held by the holders thereof and the Southern Entities may publicly file a copy of this Agreement with the Bankruptcy Court or share a copy of this Agreement with a party in interest, provided that the signature pages and the principal amount or percentage of any Senior Debt Claims held by any holder thereof or any of their respective subsidiaries are redacted in all instances.

Section 7.16. <u>No Admission of Liability</u>. Each Party enters into this Agreement without admitting any liability or conceding any allegations not already expressly admitted. This Agreement and its provisions shall not be offered or received in

18

evidence in any action or proceeding as an admission or concession of liability or wrongdoing of any nature on the part of any Party except that it may be offered and received in evidence solely to enforce this Agreement.

   Section 7.17. <u>Headings/Other Interpretive Matters</u>. The headings of the Sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof. Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply: (i) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day; (ii) all Exhibits annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein; (iii) words imparting the singular number only shall include the plural and vice versa; (iv) the words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires; (v) the word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it; (vi) the division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement; (vii) all references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified; and (viii) "Business Day" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

   IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**SOUTHERN AIR HOLDINGS, INC.**

By:  _____
Name:  Daniel J. McHugh
Title:  President & Chief Executive Officer

**CARGO 360, INC.**

By:  _____
Name:  Daniel J. McHugh
Title:  President & Chief Executive Officer

19

evidence in any action or proceeding as an admission or concession of liability or wrongdoing of any nature on the part of any Party except that it may be offered and received in evidence solely to enforce this Agreement.

Section 7.17.    Headings/Other Interpretive Matters. The headings of the Sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof. Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply: (i) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day; (ii) all Exhibits annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein; (iii) words imparting the singular number only shall include the plural and vice versa; (iv) the words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires; (v) the word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it; (vi) the division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement; (vii) all references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified; and (viii) "Business Day" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**SOUTHERN AIR HOLDINGS, INC.**

By:
Name:    Daniel J. McHugh
Title:    President & Chief Executive Officer

**CARGO 360, INC.**

By:
Name:    Daniel J. McHugh
Title:    President & Chief Executive Officer

19

**SOUTHERN AIR INC.**

By: _____

Name:    Daniel J. McHugh

Title:     President & Chief Executive Officer

20

**OAK HILL CAPITAL PARTNERS II, L.P.**
  By:  OHCP GENPAR II, L.P., its General Partner
  By:  OHCP MGP II, LLC, its General Partner

By: _____

Name: _JOHN MINSKY_____

Title: _VP_____


**OH AIRCRAFT ACQUISITION, LLC**

By: _____

Name: _John Minsky_____

Title: _Authorized Signatory_____


**OAK HILL CARGO 360, LLC**

By: _____

Name: _KEVIN GLENN_____

Title: _VICE PRESIDENT_____

21

PHOENIX CLO II, LTD.,
as a Consenting Lender
By: ING Alternative Asset Management LLC,
    as its investment manager

By: _____

Name: _____

Title: **Kelly T. Byrne**
    **Vice President**

Address: _ING Investment Management Co._
    _7337 E. Doubletree Ranch Road_
    _Scottsdale, AZ  85258_

Principal Amount of Prepetition Lender Claims held

($) __

Date: _____9/24/12_____

[Signature Page to Plan Support Agreement]

PHOENIX CLO III, LTD.,
as a Consenting Lender
By: ING Alternative Asset Management LLC,
 as its investment manager

By: _____

Name:
Title: **Kelly T. Byrne**
 **Vice President**

Address: _ING Investment Management + Co._
_7337 E. Doubletree Road_
_Scottsdale, AZ 85258_

Principal Amount of Prepetition Lender Claims held

($) _____

Date: ____9/24/12_____

CARLYLE ARNAGE CLO, LTD,
as a Consenting Lender

By: _____

Name:

Title:

Address: _The Carlyle Group_

_520 madison Ave._

_New york NY 10022_

**Principal Amount of Prepetition Lender Claims held**

($) _____

Date: _9/21/12_

[Signature Page to Plan Support Agreement]

CARLYLE AZURE CLO LTD.,
as a Consenting Lender

By: _____

Name:
Title:

Address: _The Carlyle Group_
_520 Madison Ave._
_New York NY 10022_

Principal Amount of Prepetition Lender Claims held

($) _____

Date: _9/21/12_ _____

---

[Signature Page to Plan Support Agreement]

CARLYLE BRISTOL CLO, LTD,
as a Consenting Lender

By: _____

Name:

Title:

Address: _The Carlyle Group_

_570 Madison Av._

_New York, NY 10022_

Principal Amount of Prepetition Lender Claims held

($) _____

Date: _9/21/12_

[Signature Page to Plan Support Agreement]

CARLYLE DAYTONA CLO LTD,
as a Consenting Lender

By: _____

Name:

Title:

Address:  _The Carlyle Group_
_570 Madison Ave._
_New York, NY 10022_

Principal Amount of Prepetition Lender Claims held

($) _____

Date: _7/21/12_ _____

[Signature Page to Plan Support Agreement]

CARLYLE MCLAREN CLO, LTD.,
as a Consenting Lender

By:

Name:
Title:

Address: _The Cartyle Group_
_500 Madison Ave._
_NY NY 10022_

Principal Amount of Prepetition Lender Claims held

($) _____

Date: _9/21/12_

[Signature Page to Plan Support Agreement]

CARLYLE MODENA CLO, LTD,
as a Consenting Lender

By: _____

Name: _____

Title: _____

Address: _The Carlyle Group_

_520 Madison Ave_

_NY NY 10022_

Principal Amount of Prepetition Lender Claims held

($) _____

Date: _9/21/12_____

CARLYLE VANTAGE CLO, LTD,
as a Consenting Lender

By: _____

Name:

Title:

Address: _The Carlyle Group_

_500 Madison Ave._

_Ny Ny 10022_

Principal Amount of Prepetition Lender Claims held

($) _____

Date: _1/21/12_ _____

[Signature Page to Plan Support Agreement]

CARLYLE VEYRON CLO, LTD.,
as a Consenting Lender

By: _____

Name:

Title:

Address: _The Carlyle Group_
_500 Madison Ave._
_NY NY 10022_

Principal Amount of Prepetition Lender Claims held

($) _____

Date: _9/21/12_

[Signature Page to Plan Support Agreement]

MOUNTAIN CAPITAL IV, LTD,
as a Consenting Lender

By: _____

Name: _____

Title: _____

Address: _The Carlyle Group_
_570 Madison Ave._
_NY NY 10022_

Principal Amount of Prepetition Lender Claims held

($) _____

Date: _9/21/12_

---

[Signature Page to Plan Support Agreement]

MOUNTAIN CAPITAL V, LTD,
as a Consenting Lender

By: _____

Name:

Title:

Address: _The Carlyle Group_

_520 Madison Ave._

_Ny Ny  10022_

Principal Amount of Prepetition Lender Claims held

($) _____

Date: _9/21/12_ _____

MOUNTAIN CAPITAL VI. LTD,
as a Consenting Lender

By: _____

Name:

Title:

Address: _The Carlyle Group_

_570 Madison Ave._

_NY NY 10022_

Principal Amount of Prepetition Lender Claims held

(S) _____

Date: _9/21/12_

STANFIELD CARRERA CLO, LTD,
as a Consenting Lender

By: _____

Name: _____

Title: _____

Address: _The Carlyle Group_
_520 Madison Ave._
_NY NY 10022_

Principal Amount of Prepetition Lender Claims held

($) _____

Date: _9/21/12_ _____

---

[Signature Page to Plan Support Agreement]

CREDIT SUISSE LOAN FUNDING LLC,
as a Consenting Lender

By: _____
Name:  Michael Wotanowski
Title:  Authorized Signatory

Address:  One Madison Ave.
New York NY 10010
Attn: Ashwinee Sawh

*Robert Healey*
*Authorized Signatory*

Principal Amount of Prepetition Lender Claims held

($)

Date:  9/24/12

VALINOR CAPITAL PARTNERS, L.P.,
as a Consenting Lender

By: _____
Name: David Angstreich
Title: Chief Financial Officer

Address: _510 Madison Avenue, 25th Fl_
_____New York, NY 10022_____
_____

Principal Amount of Prepetition Lender Claims held

($)

Date: _9/21/12_____

[Signature Page to Plan Support Agreement]

VALINOR CAPITAL PARTNERS
OFFSHORE MASTER FUND, L.P.,
as a Consenting Lender

By: _____

     Name: David Angstreich
     Title: Chief Financial Officer

Address:    C/o VALINOR MANAGEMENT LLC
           510 MADISON AVE , 25TH FL
           NEW YORK , NY 10022

Principal Amount of Prepetition Lender Claims held

($)

Date: 9/21/12

CHURCHILL FINANCIAL CAYMAN LTD.,
as a Consenting Lender

By: _____

Name: _Alan Wilder_

Title: _MD_

Address: _520 Madison_____
_New York NY_____
_10022_

Principal Amount of Prepetition Lender Claims held

($)

Date: _9/24/12_____

*credit*

VALINOR ~~CAPITAL~~ PARTNERS MASTER
FUND, L.P.,
as a Consenting Lender

By: _____
Name:  David Angstreich
Title:  CFO

Address:    510 Madison Ave, 25th Floor, New York,
NY 10022

_____

_____

Principal Amount of Prepetition Lender Claims held

($)

Date: 9/26/2012

[Signature Page to Plan Support Agreement]

WATERSHED CAPITAL PARTNERS, L.P.,
as a Consenting Lender
By: WS Partners L.L.C., Its General Partner

By: _____

Name: Q. Munir Alam
Title: Managing Member

Address: _One Maritime Plaza_
_Suite 1525_
_San Francisco, CA 9411_

Principal Amount of Prepetition Lender Claims held

($) _____

Date: _9-22-12_____

WATERSHED CAPITAL PARTNERS II, L.P.,
as a Consenting Lender
By: WS Partners L.L.C., Its General Partner

By: _____
Name: Q. Munir Alam
Title: Managing Member

Address:  One Maritime Plaza
          Suite 1525
          San Francisco, CA 94111

Principal Amount of Prepetition Lender Claims held

($)

Date: 9-22-12

[Signature Page to Plan Support Agreement]

WATERSHED CAPITAL INSTITUTIONAL
PARTNERS, L.P.,
as a Consenting Lender
By: WS Partners L.L.C., Its General Partner

By: _____

Name: Q. Munir Alam
Title: Managing Member

Address:  One Maritime Plaza

Suite 1525

San Francisco, CA 94111

Principal Amount of Prepetition Lender Claims held

($)

Date: 9·22·12

[Signature Page to Plan Support Agreement]

WATERSHED CAPITAL INSTITUTIONAL
PARTNERS II, L.P.,
as a Consenting Lender
By: WS Partners L.L.C., Its General Partner

By: _____

Name: Q. Munir Alam
Title: Managing Member

Address: _One  Maritime  Plaza_
_Suite  1535_
_San  Francisco,  CA  94111_

Principal Amount of Prepetition Lender Claims held

($)

Date: _9·22-12_

[Signature Page to Plan Support Agreement]

WATERSHED CAPITAL PARTNERS
(OFFSHORE) MASTER FUND, L.P.,
as a Consenting Lender
By: WS Partners L.L.C., Its General Partner

By: _____

Name: Q. Munir Alam
Title: Managing Member

Address: _One Maritime Plaza_
_Suite 1525_
_San Francisco, CA 94111_

Principal Amount of Prepetition Lender Claims held

($)

Date: _9-22-12_ _____

[Signature Page to Plan Support Agreement]

WATERSHED CAPITAL PARTNERS
(OFFSHORE) MASTER FUND II, L.P.,
as a Consenting Lender
By: WS Partners L.L.C., Its General Partner

By: _____

      Name: Q. Munir Alam
      Title: Managing Member

Address:   One Maritime Plaza
          Suite 1525
          San Francisco, CA  94111

Principal Amount of Prepetition Lender Claims held

($)

Date: _9-22-12_____

    [Signature Page to Plan Support Agreement]

ANCHORAGE CAPITAL MASTER
OFFSHORE, LTD.,
as a Consenting Lender
By: Anchorage Capital Group, L.L.C., its
Investment Manager

By: _____

    Name:   Daniel Allen
    Title:    Senior Portfolio Manager

Address:   c/o Anchorage Capital Group, L.L.C.
            610 Broadway, 6th Floor
            New York, NY 10012

Principal Amount of Prepetition Lender Claims held

($)

Date: __25. 9. 12_____

    [Signature Page to Plan Support Agreement]

GRF MASTER FUND, L.P.,
as a Consenting Lender
By: Anchorage Capital Group, L.L.C., its
Investment Manager

By: _____

Name:       Daniel Allen
Title:        Senior Portfolio Manager

Address:    C/o Anchorage Capital Group, L.L.C.
            610 Broadway, 16th Floor
            New York, NY 10012

Principal Amount of Prepetition Lender Claims held

($)

Date: _____25 · 9 · 12_____

CIBC INC.,
as a Consenting Lender

By: _____

Name: Lindsay Gordon
Title: Agent

Address: _____ 425 Lexington Avenue _____
_____ New York, NY 10017 _____

Principal Amount of Prepetition Lender Claims held

($) _____

Date: _____ 9/24/12 _____

[Signature Page to Plan Support Agreement]

GOLUB CAPITAL PARTNERS
FUNDING 2007-1, LTD.,
as a Consenting Lender
By: Golub Capital Incorporated, as Servicer

By: _____

Name: Gregory W. Cashman
Title: Senior Managing Director

Address: _____ Golub Capital _____
_150 South Wacker Drive, Suite 800_
_____ Chicago, IL 60606 _____

Principal Amount of Prepetition Lender Claims held

($)

Date: _____ September 24, 2012 _____

[Signature Page to Plan Support Agreement]

GOLUB INTERNATIONAL LOAN LTD. 1,
as a Consenting Lender
By: GOLUB CAPITAL INTERNATIONAL
MANAGEMENT LLC, as Collateral
Manager

By: _____

Name: Gregory W. Cashman
Title: Senior Managing Director

Address: _____ _Golub Capital_____
         _____ 150 South Wacker Drive Suite 800__
         _____ Chicago , IL 60606_____

Principal Amount of Prepetition Lender Claims held

($)

Date: _September 24, 2012_____

[Signature Page to Plan Support Agreement]

GOLUB CAPITAL PARTNERS 2007-2 Ltd,
as a Consenting Lender
By: GC Investment Management LLC, its
Manager

By: _____

Name: Kevin P. Falvey
Title: Authorized Signatory

Address: _____ Golub Capital

_____ 150 South Wacker Drive, Suite 800

_____ Chicago, IL 60606

Principal Amount of Prepetition Lender Claims held

($)

Date: September 24, 2012

EXHIBIT A

## LIST OF SOUTHERN ENTITIES

Southern Air Holdings, Inc.
Cargo 360, Inc.
Southern Air Inc.
Air Mobility Inc.
21110 LLC
21111 LLC
21221 LLC
21550 LLC
21576 LLC
21590 LLC
21787 LLC
21832 LLC
23138 LLC
24067 LLC
46914 LLC
CF6-50 LLC
Aircraft 21380 LLC
Aircraft 21255 LLC

US_ACTIVE:\44097748\9\71907.0006

EXHIBIT B


PLAN TERM SHEET

US_ACTIVE:\44097748\9\71907.0006

This term sheet (the "Term Sheet") sets forth the principal terms of a consensual "prearranged" joint plan of reorganization (the "Plan") to be filed in connection with the commencement of cases by Southern Air Holdings, Inc. ("Holdings") and its subsidiaries (collectively, the "Debtors," or "Southern Air"), including, without limitation, Southern Air Inc. ("SAI"), under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Chapter 11 Cases"). This Term Sheet is subject to (a) execution and delivery of definitive documentation, in form and substance satisfactory to the parties hereto setting forth the provisions contained herein, (b) approval of the Board of Directors of Holdings and each of its subsidiaries of the agreements contained herein, and (c) execution and delivery of a support agreement (the "SA") in form and substance satisfactory to those signing Prepetition Lenders (as defined below), the Debtors, and Oak Hill Capital Partners II, L.P. ("OHCP"), OH Aircraft Acquisition, LLC ("OHAA") and Oak Hill Cargo 360, LLC ("OH Cargo" and, collectively with OHCP and OHAA, "Oak Hill").

**This Term Sheet is for discussion purposes only. This Term Sheet does not contain all of the terms of any proposed Plan and shall not be construed as (i) an offer capable of acceptance, (ii) a binding agreement of any kind, (iii) a commitment to enter into, or offer to enter into, any agreement or (iv) an agreement to file any chapter 11 plan or disclosure statement or to consummate any transaction. This Term Sheet is confidential and may not be released to any other party without the prior written consent of counsel to the Required Prepetition Lenders.** [1]

THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. THIS TERM SHEET AND ALL RELATED COMMUNICATIONS ARE PROFFERED IN THE NATURE OF AND SHALL CONSTITUTE A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS, AND SHALL BE ENTITLED TO THE PROTECTIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES, RULES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL INFORMATION AND INFORMATION EXCHANGED IN THE CONTEXT OF SETTLEMENT DISCUSSIONS. FURTHER, NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR DEEMED BINDING ON THE DIP LENDERS, THE PREPETITION LENDERS, THE DEBTORS OR ANY OTHER PARTY IN INTEREST. ALL PARTIES RESERVE THEIR RIGHTS TO ASSERT OR SUPPORT A DIFFERENT PLAN OF REORGANIZATION AND ALL PARTIES RESERVE THEIR RESPECTIVE

---

[1] Required Prepetition Lenders shall be defined as Prepetition Lenders holding 50.01% of the outstanding obligations under the Prepetition Credit Agreement.

**RIGHTS TO CONTEST OR SUPPORT ANY PLAN, INCLUDING, THE PLAN CONTEMPLATED BY THIS TERM SHEET OR ANY OTHER PLAN.**

**THIS TERM SHEET REMAINS SUBJECT TO ONGOING REVIEW BY ALL PARTIES.**

Capital Structure:  On the effective date of the Plan (the "Effective Date"), the claims and equity interests of the Debtors shall be treated as follows:

**$25 Million Debtor-in-Possession Financing:**

Subject to the terms of that certain DIP Credit Agreement annexed as Exhibit "C" to the Support Agreement pursuant to which, among other things, certain Prepetition Lenders (previously offered to all Prepetition Lenders to participate pro-rata) will be providing the Debtors with $25 million of postpetition financing (the "DIP"), with a "roll up" of $37.5 million of the approximately $288 million of loans outstanding under the Prepetition Credit Agreement (as defined below) held by the participating Prepetition Lenders (the "DIP Lenders").  A cash payment equal to five percent (5%) of the total equity value of the reorganized Debtors shall be payable pursuant to the Plan (the "Equity Payment"), which shall be earned upon entry of the interim order approving the DIP (the "Interim Order") and payable to each initial DIP Lender pro rata based on the amount of such DIP Lenders' commitments as a super-priority administrative expense claim at the earliest of (i) confirmation of any plan of reorganization, in which case, the Equity Payment shall be deemed to be in an amount equal to the greater of (x) five percent (5%) of the total equity value of any confirmed chapter 11 plan and (y) five percent (5%) of what the total equity value of the reorganized Debtors would have been under the Plan; (ii) sale of all or substantially all of the Debtors' assets, in which case, the Equity Payment shall be deemed to be equal to the greater of (x) five percent (5%) of the new-money loans advanced under the DIP and (y) five percents (5%) of the sale proceeds, and shall in each case be payable only from sale proceeds and senior to all other DIP Obligations (as such term is defined in the DIP); and (iii) conversion of the Chapter 11 Case of Southern Air to a case under chapter 7 of the Bankruptcy Code, in which case, the Equity Payment shall be deemed to be equal to 5% of the new-money loans advanced under the DIP and shall be senior to the DIP Obligations; provided, however, that, notwithstanding the foregoing, in the case of confirmation of any plan of reorganization of the Debtors, at the election of the Debtors, and in their sole and absolute discretion, which election shall be announced prior to the commencement of the hearing to consider confirmation of such plan, such payment may be made in the form of reorganized common stock of Holdings equal to the Equity Payment.  The DIP documents and Interim Order / Final DIP Order shall expressly provide that the OHAA Payments (as defined below) actually received by the Debtors during the Chapter 11 Cases (the "Secured OHAA Payment Obligations") shall constitute super-priority administrative expense claims of OHAA against the Debtors, ratable with, and secured by the same collateral as, and with the same priority as, the DIP liens and claims under section 364 of the Bankruptcy Code.  Such amounts shall be "Secured Obligations" and OHAA shall be a "Secured Party," solely to the extent of OHAA Payments actually received by the Debtors during the Chapter 11 Cases, with such amounts entitled to receive a ratable distribution, *pari passu* with the DIP

Obligations, upon any realization of collateral in accordance with the terms of the DIP. Upon the Effective Date of the Plan, the Secured Obligations, including the Secured OHAA Payment Obligations, shall be extinguished. On the Effective Date, the DIP Facility shall be repaid as follows: (i) the new money loan and (ii) the roll-up loan shall be, at the election of the Debtors made prior to the confirmation of the Plan, (A) repaid in full, in cash, or (B) replaced with the Exit Facility (as defined below); provided, however, that, notwithstanding the foregoing, the Debtors shall use commercially reasonable efforts (commencing as of the commencement of the Chapter 11 Cases) to enter into an alternative facility so that the new-money loan, the roll-up loan, or both, are paid in cash on the Effective Date rather than through the issuance of the Exit Facility.

**Administrative Expense Claims**: On the Effective Date, or as soon thereafter as reasonably practicable, to the extent not otherwise paid in the ordinary course, holders of allowed claims entitled to administrative expense priority pursuant to sections 503 and 507(a)(2) of the Bankruptcy Code (the "Administrative Expense Claims") shall, unless they agree otherwise, be paid in full in cash, or receive such other treatment so as to render the holders of such claims as unimpaired under the Plan in accordance with applicable provisions of the Bankruptcy Code.

**Priority Non-Tax Claims**: To the extent not otherwise paid in the ordinary course, the holders of allowed claims entitled to priority treatment pursuant to section 507 of the Bankruptcy Code, other than the Priority Tax Claims (as defined below) and the Administrative Expense Claims (the "Priority Non-Tax Claims") shall be paid: (i) in full in cash on the later of (x) the Effective Date and (y) the date such claim becomes due and payable in the ordinary course of business; (ii) in cash on such other terms and conditions as may be agreed between the holder of each such claim, on the one hand, and the Debtors, in consultation with the Agent, on the other hand; or (iii) in deferred cash payments, to the extent permissible under the Bankruptcy Code.

**Priority Tax Claims**: On the Effective Date, or as soon thereafter as reasonably practicable, to the extent not otherwise paid in the ordinary course, the holders of allowed claims entitled to priority treatment pursuant to section 507(a)(8) of the Bankruptcy Code (the "Priority Tax Claims") shall be paid (i) in full, in cash, on or as soon as reasonably practicable following the later to occur of (a) the Effective Date and (b) the date on which such claim becomes allowed, (ii) at the election of the Debtors, in consultation with the Agent, in equal quarterly installments in accordance with section 1129(a)(9)(c) of the Bankruptcy Code or (iii) by mutual agreement of the Debtors, in consultation with the Agent, and the holder of such claim.

**Unsecured Claims:** To the extent that the class of holders of general unsecured claims other than the Administrative Expense Claims, the Priority Tax Claims, and the Priority Non-Tax Claims (the "General Unsecured Claims") vote to accept the Plan, the holders of such claims shall receive, in full and final satisfaction of such claims, their pro rata share of Two Million Dollars ($2,000,000.00) in cash (the "Lump Sum Payment"). Such General Unsecured Claims include, among others, (i) all non-critical vendors, (ii) aircraft

lessors with respect to rejected leases and (iii) real property lessors with respect to rejected real property leases (as capped).[2]

**Prepetition Lenders Claims**:  The lenders under that certain Credit Agreement, dated as of September 6, 2007, among Cargo 360, Inc., a Delaware corporation (the "Borrower"), and Canadian Imperial Bank of Commerce, New York Agency, as agent (in such capacity the "Prepetition Agent") for the lenders (in such capacity the "Prepetition Lenders") (as amended, supplemented and otherwise modified from time to time, and related definitive documentation, in each case as amended, supplemented or otherwise modified from time to time, and including all exhibits and other ancillary documentation in respect thereof, the "Prepetition Credit Agreement")), shall receive in full and final satisfaction of their secured claims under the Prepetition Credit Agreement (the "Prepetition Lenders Claims"), their pro rata share of (i) 82.5% of the reorganized common stock[3], subject to dilution by the Equity Payment (to the extent paid in reorganized common stock) and Management Equity (as defined below), and (ii) $17.5 million of new notes, issued under the Reorganized Term Loan.   To the extent any letters of credit remain issued and outstanding under the Prepetition Credit Agreement, as of the Petition Date, such letters of credit shall be rolled into the Revolving Exit Facility.

**OHAA Payments:**

- **12-Month Payments:**  On the date of the interim approval (the "Interim Approval Date") of the DIP in the Chapter 11 Cases and, thereafter, subject to final approval of the 1110 Stipulation (as defined below) and in accordance with the terms of the 1110 Stipulation, on the first business day of each of the successive 11 months, OHAA shall make a payment to Southern Air in an amount equal to $833,333.33 (each, a "12-Month Payment"), for a total of $10 million.  If final approval of the 1110 Stipulation is denied or final approval of the DIP is denied, OHAA shall have no obligation to make any further 12-Month Payments, and Southern Air shall immediately repay the initial 12-Month Payment made on the Interim Approval Date. Upon Southern Air's emergence from chapter 11, any unpaid 12-Month Payments shall be paid $833,333.33 per month on the first business day of each month in accordance with Southern Air's Plan to be filed to implement the provisions of this Term Sheet.  In addition to the 12-Month Payment made on the Interim Approval Date, five (5) months of 12-Month Payments (i.e., $4,166,667.00) will be funded into escrow (the "Escrow Account") by OHAA on the date of approval of the 1110 Stipulation, and such funds shall be applied to make the next four (4) 12-Month Payments coming due after approval of the 1110 Stipulation.  The Escrow Account

---

[2] If the class of holders of General Unsecured Claims votes to accept the Plan, the Prepetition Lenders will not share in the Lump Sum Payment, but will be entitled to their *pro rata* share of any distribution on account of any unencumbered assets.

[3] Allocation of classes of equity, voting and control arrangements among the Prepetition Lenders are subject to changes in accordance with DOT requirements on such terms as are acceptable to the Consenting Lenders in their sole discretion.

will at all times be funded through the 12-month period with no less than $833,333.33 (the "Minimum Amount"), and OHAA will promptly deposit additional funds necessary, if any, to maintain the Minimum Amount if amounts in the Escrow Account are drawn to pay any Additional Monthly Payments (as defined below), subject to the $10 million cap.  The Minimum Amount will be used to make the final 12-Month Payment of $833,333.33.

- OHAA Boeing Credit:  OHAA shall use its commercially reasonable efforts to assist Southern Air to utilize to the maximum extent OHAA's $1.925 million deposit with Boeing (the "Boeing Credit") in satisfaction and discharge of Southern Air obligations owed to Boeing; provided, however, that OHAA makes no representation as to, and assumes no liability with respect to, whether and to what extent Boeing may permit any such offset.

- Additional Monthly Payments:  From and after the commencement of Southern Air's chapter 11 cases (the "Petition Date") and for the five years thereafter, and each month only if Southern Air has made its current monthly lease payment in accordance with its leases of four (4) 777 aircrafts with OHAA (the "OHAA Leases"), OHAA shall four times monthly and ratably pay to Southern Air the aggregate amount of $2 million per year on account of the OHAA Leases up to an aggregate total amount of $10 million (the "Additional Monthly Payments" and, with the 12-Month Payments and the Boeing Credit, the "OHAA Payments").  Each Additional Monthly Payment will be made within one (1) business day of OHAA's receipt of confirmation that Southern Air has made the current monthly payment under the applicable OHAA Lease.  Southern Air may draw on the Escrow Account for any missed Additional Monthly Payments, but at all times OHAA shall maintain the Minimum Amount in the Escrow Account.

- Post-Effective Date Additional Monthly Payment Deposit:  On the Effective Date, OHAA shall create an escrow for the benefit of Southern Air containing $500,000 as security for the remaining Additional Monthly Payments (the "Additional Monthly Payment Deposit").  If Southern Air must draw upon the Additional Monthly Payment Deposit in respect of any unpaid Additional Monthly Payment, then OHAA will deposit additional funds in an amount equal to the Additional Monthly Payment Deposit.  The final Additional Monthly Payment shall be made from the Additional Monthly Payment Deposit.

- Reimbursement to OHAA: Southern Air acknowledges its obligation to reimburse OHAA for all other rent or scheduled maintenance payments made by OHAA on the 777 Leases during the period from September 21, 2012 through and including the date of entry of the Interim Order, including the monthly rent payment made by OHAA on September 21, 2012, in the amount of $1,616,996.26 in connection with the 777 Leases (the "Paid Rent", all payments collectively, the "Prepaid Amounts") and Southern Air shall repay to OHAA $1,572,829.60 in cash on account of the Paid Rent within one business day of approval of the Interim Order, plus all other Prepaid Amounts due and owing as of the date of the Interim Order.

5

- **1110 Stipulation and Motion**: Southern Air will enter into a section 1110 stipulation (the "1110 Stipulation") with, among others, OHAA, in form reasonably satisfactory to OHAA, the Required Prepetition Lenders, the Required DIP Lenders and Southern Air, that will, among other things, (i) provide assurance of payment of rent due in accordance with the OHAA Leases, including current payment of rent for the period sixty (60) days from and after the Petition Date, and (ii) set forth OHAA's agreement to make the OHAA Payments to be used by Southern Air.  Southern Air will file a motion for approval of the 1110 Stipulation on the Petition Date or as soon as practicable thereafter and seek an expedited hearing with respect thereto.  Other than the 12-Month Payment that OHAA is required to make upon entry of the Interim Order, the release of any OHAA Payments from escrow, the funding of the Additional Monthly Payments or obtaining the Boeing Credit shall be subject to the conditions precedent set forth in the 1110 Stipulation.

If any of the conditions precedent set forth in the 1110 Stipulation cannot be satisfied or OHAA terminates in accordance with the terms of the SA, OHAA's obligations to make any further OHAA Payments shall terminate and, in accordance with the terms of the SA, the aggregate amount of all OHAA Payments made during the Southern Air Chapter 11 Cases shall become due and payable in cash at the same time as the DIP is repaid.

Following the Effective Date, each OHAA Payment is conditioned upon no default or event of default under any of the OHAA Leases shall have occurred and be continuing, and Southern Air otherwise is in compliance with and performing under the OHAA Leases.

**OHAA Leases**:  OHAA shall cause the OHAA Leases to be amended to provide for the following modifications, effective as of Southern Air's emergence from chapter 11:

- Changes to certain provisions of the OHAA Leases (including the definition of "change of control") as more fully set forth on Schedule 1, hereto;

- Change lease term to five years commencing as of the Petition Date;

- Various technical amendments to account for shortened lease term; and

- Other amendments to the OHAA Leases reasonably required to implement the terms of this Term Sheet.

The OHAA Leases, as amended, shall be assumed in connection with the confirmation and consummation of the Plan.  If the transactions set forth in the SA are not consummated for any reason, except as provided in the 1110 Stipulation, the OHAA Leases shall not be amended as set forth above.

**Neff Leases**:  The Debtors shall file as soon as reasonably practicable after the Petition Date, but in no event later than thirty (30) days following the Petition Date, a motion seeking to reject those certain non-residential real property leases relating to the property located in Norwalk, Connecticut.

**Union**:  Southern Air shall use its reasonable best efforts to cause the negotiations of any collective bargaining agreement and/or similar union related agreements (the "CBA") to either (i) be extended by four years by mutual agreement of the Debtors and the respective union representative, and the CBA shall be assumed, as is, by the Reorganized Debtors on the Effective Date, or (ii) any modified collective bargaining agreement to be assumed by the Reorganized Debtors shall be on terms satisfactory to the Required Prepetition Lenders.

**Senior Exit Facility**:  On the Effective Date, Reorganized Holdings and its affiliates shall enter into a senior secured exit facility in the amount of $80,000,000 (the "Exit Term Loans"), which shall be used to, among other things, (i) satisfy the new money DIP loans and the roll-up DIP loans in full and in cash or provide the Reorganized Term Loan, as applicable, and (ii) $17.5 million of new loans to be issued to the Prepetition Lenders in partial satisfaction of the Prepetition Lender Claims (collectively, the "First Lien Notes"), in addition to a revolving credit facility of up to $20,000,000, which shall remain undrawn as of the Effective Date (the "Revolving Exit Facility," together with the Exit Term Loans, the "Exit Facility).  The prepetition letters of credit issued pursuant to the Prepetition Credit Agreement shall be rolled into the Revolving Exit Facility.

The definitive loan documents for the Exit Facility will contain such financial, affirmative and negative covenants by the Company, Holdings and their subsidiaries as are usual and customary for financings of this kind.  The Exit Term Loans shall mature on the fifth (5th) anniversary of the Effective Date.  The Exit Term Loans will bear interest, at the Company's option as follows:  (i) LIBOR plus 7.0% per annum, subject to a LIBOR floor of 2.0%; or (ii) Base Rate plus 6.0% per annum, subject to a Base Rate floor of 3.0%.  The Borrower will be required to pay interest on the Exit Term Loans entirely in cash; provided that at the Company's option (determined on the day prior to the beginning of each fiscal quarter by notice to the Agent), the Company may elect to reduce the cash interest required by 3.0% per annum for such fiscal quarter by increasing the principal amount of the Exit Term Loans through the issuance of additional promissory notes by an amount equal to 6.0% per annum for such fiscal quarter (such increase being referred to herein as "Exit Term Loans PIK Interest").

Notwithstanding the foregoing, the Debtors shall use commercially reasonable efforts (commencing as of the commencement of the Chapter 11 Cases) to enter into an alternative facility so that the new-money loan, the roll-up loan, or both, are paid in cash on the Effective Date rather than through the issuance of First Lien Notes.

**Reorganized Southern Air Equity:**

     A.    <u>Preferred Equity</u>.  All existing Preferred Equity Interests shall be extinguished.

     B.    <u>Common Equity Interests</u>:  Dissolved; assets rolled into SAI.

**Distribution of Primary Equity of Reorganized Southern Air:**

All reorganized equity issued to the Prepetition Lenders and OHAA shall be subject to ratable dilution by any equity provided to Southern Air's management under the Plan.

■ To OHAA: 17.5% (which (x) will not be subject to dilution by the Equity Payment (to the extent paid in reorganized common stock) and (y) will be subject to dilution by Management Equity, the "OHAA Reorganized Common Stock").

■ To the Prepetition Lenders:[4] 82.5% (subject to dilution by the Equity Payment (to the extent paid in reorganized common stock) and Management Equity, the "Prepetition Lenders' Common Stock"); provided, that the Prepetition Lenders' Common Stock shall be allocated between the Prepetition Lenders that are citizens of the United States as defined in 49 U.S.C. 40102(a) (the "U.S. Lenders") and those that are non-U.S. ("Foreign Lenders") in accordance with applicable requirements related to the ownership of U.S. airlines by citizens of the United States ("Foreign Ownership Limitations").

**OHAA Warrants:**

■ "Penny" warrants (the "Tranche 1 Warrants") for up to 7.5% of the common equity of Reorganized Southern Air (either in voting common stock or non-voting common stock, depending on the event with respect to which such Tranche 1 Warrants are exercised, as further described below) calculated as of the Effective Date (assuming the exercise of all Tranche 1 Warrants and Tranche 2 Warrants (as defined below), but excluding any management equity and not subject to dilution by the Equity Payment (to the extent paid in reorganized common stock)), which "penny" warrants shall have a nominal exercise price. The common equity received upon exercise of a Tranche 1 Warrant shall be (i) shares of a class of full voting common stock, if such Tranche 1 Warrant is exercised in connection with a Liquidity Event or a Second Valuation (each as defined below), or (ii) shares of a class of non-voting common stock (convertible into voting common stock solely in connection with and upon the consummation of a Liquidity Event or a Second Valuation), if such Tranche 1 Warrant is exercised in connection with the First Valuation (as defined below). The Tranche 1 Warrants shall not be exercisable for any common equity of Reorganized Southern Air if the aggregate equity value of Reorganized Southern Air is $80 million or less. If the aggregate equity value of Reorganized Southern Air is greater than $80 million, the Tranche 1 Warrants shall be exercisable for a percentage of common equity of Reorganized Southern Air determined on a straight-line basis beginning at an aggregate equity value of Reorganized Southern Air of $80 million up to a maximum of 7.5% of the common equity of Reorganized Southern Air if the

---

[4] Allocation of classes of equity, voting and control arrangements for the Prepetition Lenders are subject to changes in accordance with DOT requirements on such terms as are acceptable to the Consenting Lenders in their sole discretion. The Prepetition Lenders shall not be required to modify or reduce any of the rights provided herein in order to comply with DOT regulations unless such changes are acceptable to the Consenting Lenders in their sole discretion.

aggregate equity value of Reorganized Southern Air reaches $105 million. Tranche 1 Warrants shall expire on the 10 year anniversary of the Effective Date; provided that in the event of a bona fide transaction involving the sale of all of the equity interests or merger of Reorganized Southern Air, (i) if the consideration received by stockholders in such transaction consists solely of cash, any Tranche 1 Warrants that are in-the-money based on the equity valuation implied by such transaction shall automatically be cancelled as of the consummation of such transaction in exchange for the consideration the holder thereof would have received if such holder had effected a cashless exercise of such Tranche 1 Warrants as of the record date for such transaction, and any Tranche 1 Warrants that are not in-the-money shall be cancelled without consideration, and (ii) if the consideration received by stockholders in such transaction is other than solely cash, any Tranche 1 Warrants outstanding and unexercised as of the consummation of such transaction shall continue to be outstanding following such consummation but become exercisable for the same kind of consideration received in connection with such transaction by stockholders of record for such transaction.

- Additional warrants (the "Tranche 2 Warrants" and, together with the Tranche 1 Warrants, the "OHAA Warrants," and together with the OHAA Reorganized Common Stock, the "OHAA Consideration") equal to 7.5% of the voting common equity of Reorganized Southern Air calculated as of the Effective Date (assuming the exercise of all Tranche 1 Warrants and Tranche 2 Warrants, but excluding any management equity and not subject to dilution by the Equity Payment (to the extent paid in reorganized common stock)), which warrants shall be exercisable as defined below. Tranche 2 Warrants shall expire on the 10 year anniversary of the Effective Date; provided that in the event of a bona fide transaction involving the sale of all of the equity interests or merger of Reorganized Southern Air (i) if the consideration received by stockholders in such transaction consists solely of cash, any Tranche 2 Warrants that are in-the-money based on the equity valuation implied by such transaction shall automatically be cancelled as of the consummation of such transaction in exchange for the consideration the holder thereof would have received if such holder had effected a cashless exercise of such Tranche 2 Warrants as of the record date for such transaction, and any Tranche 2 Warrants that are not in-the-money shall be cancelled without consideration, and (ii) if the consideration received by stockholders in such transaction is other than solely cash, any Tranche 2 Warrants outstanding and unexercised as of the consummation of such transaction shall continue to be outstanding following such consummation but become exercisable for the same kind and amount of consideration received in connection with such transaction by stockholders of record for such transaction.

**Dilution:** The primary equity issued to OHAA and the Management Equity shall not be subject to dilution by the Tranche 1 or Tranche 2 Warrants. The Tranche 1 Warrants shall not be subject to dilution by the Tranche 2 Warrants. The Tranche 1 and Tranche 2 Warrants will also contain standard anti-dilution adjustments, including for splits, etc.

**Exercise of Warrants:**

Tranche 1 Warrants may be exercised in connection with  (a) a Qualified IPO (to be defined), (b) a stock-for-stock sale transaction for all of the outstanding shares of Reorganized Southern Air in exchange for shares of a publicly traded company listed on a national securities exchange (the events described in clauses (a) or (b), a "Liquidity Event"), (c) at any time following the 2nd anniversary of the Effective Date, a valuation of the aggregate equity value of the Reorganized Southern Air performed by a nationally recognized independent qualified investment bank or appraiser (a "Valuation") requested in writing by the holders of a majority of the Tranche 1 Warrants (the "First Valuation") or (d) if a Liquidity Event has not occurred within 60 days prior to the expiration of the term, a Valuation requested in writing by the holders of a majority of the Tranche 1 Warrants (the "Second Valuation"). In connection with the performance of a Valuation, the warrant agreement shall provide for mutually agreeable provisions with respect to the selection of the investment bank or appraiser, dispute resolution mechanisms and the payment of fees and expenses of experts.  Following either Valuation, the holders will have a reasonable amount of time after the completion of such Valuation (including, if necessary, by extension of the term of the Tranche 1 Warrant) to exercise the Tranche 1 Warrants on the basis of such Valuation (to the extent that the applicable aggregate equity value is met), which closing of such exercise may be extended to obtain any necessary regulatory approvals.  Exercise of Tranche 1 Warrants shall be made by either nominal payment in cash or by cashless exercise (to preserve 144 tacking).

Tranche 2 Warrants may be exercised as follows: (x) at any time prior to expiration of the term, by payment in cash of $9.4 million, which cash amount shall not accrue to OHAA, but instead shall accrue, on a pro rata basis, to all holders of Reorganized Southern Air equity other than OHAA or (y) on a cashless basis with a $9.4 million exercise price in connection with a Liquidity Event or a Valuation as contemplated in clauses (c) and (d) of the immediately preceding paragraph if the aggregate equity value of Reorganized Southern Air in connection with such Liquidity Event or Valuation is equal to or greater than $125 million, in which case a portion of the incremental equity value to OHAA attributable to such exercise equal to the value of the aggregate exercise price for the Tranche 2 Warrant shares shall not accrue to OHAA, but instead shall accrue, on a pro rata basis, to all holders of Reorganized Southern Air equity other than OHAA.  For the avoidance of doubt, the distributions to holders of Reorganized Southern Air equity other than OHAA set forth in the immediately preceding sentence shall not result in any antidilution adjustments or dividend adjustments or accruals under the OHAA Warrants.

Each warrantholder will be required, as a condition to receiving and holding any Reorganized Southern Air equity upon exercise of the Warrants, to enter into the Stockholders Agreement if not already party thereto.  The exercise of Warrants shall also be subject to the warrantholder's and Reorganized Southern Air's compliance with applicable securities and airline regulatory law, including the Foreign Ownership Limitations.  In no event shall the Warrants be exercisable unless (and only to the extent) the exercise is consistent with the Foreign Ownership Limitations.

**Transfers**:  Transfers of the Warrants (and underlying shares) shall be subject to providing reasonable advance written notice to Reorganized Southern Air of the terms thereof and (in the case of transfers of the underlying shares) joinder of the transferee to the Stockholders Agreement, as well as customary restrictions (i) to preserve the value of net operating losses and other tax attributes, (ii) to avoid the need to register and file reports and other information under the Securities Exchange Act of 1934 (which restriction shall provide the Board of Directors with flexibility to take appropriate actions to limit the number of stockholders of Reorganized Southern Air prior to statutory thresholds being  reached) and (iii) to ensure the transferee's and Reorganized Southern Air's compliance with applicable securities and airline regulatory law, including the Foreign Ownership Limitations.

**Dividends:**

All dividends paid on the common equity of Reorganized Southern Air (including any amounts placed in escrow as provided below) will reduce the aggregate equity value thresholds described above for both the Tranche 1 Warrants and the Tranche 2 Warrants on a dollar-for-dollar basis.

Dividends declared and paid on the common equity of Reorganized Southern Air shall not be paid on either the unexercised Tranche 1 or Tranche 2 Warrants.  However, in the case of Tranche 1 Warrants, Reorganized Southern Air shall, at the time of payment of such dividends, escrow an amount equal to the dividends that would have been payable to the holder of such Tranche 1 Warrants if the Tranche 1 Warrants had been fully exercised prior to the record date for such dividend, and upon the subsequent exercise of such Tranche 1 Warrants, Reorganized Southern Air shall release to OHAA from such escrow the aggregate amount of dividends accrued in respect of the equity actually received in connection with such exercise, and shall retain in escrow any remaining dividends until such remaining warrants are exercised, in which case such remaining escrowed dividends shall be released to OHAA in respect of the equity actually received in connection with such exercise.  If any such dividends relate to Tranche 1 Warrants that have expired without being exercised, then the escrowed dividends shall be released pro rata to the then existing stockholders of Reorganized Southern Air.

In the case of Tranche 2 Warrants, the exercise price of the Tranche 2 Warrants shall be appropriately adjusted to reflect the amount of such dividends that would have been payable to the holder of the Tranche 2 Warrants if the Tranche 2 Warrants had been fully exercised prior to the record date for such dividend; provided that to the extent that the exercise price of the Tranche 2 Warrants is reduced to zero as a result of the forgoing, all remaining dividends that would have otherwise reduced the exercise price of the Tranche 2 Warrants below zero shall be paid in cash to the holders of the Tranche 2 Warrants.

**Voting Rights:** The Tranche 1 and Tranche 2 Warrants shall not be entitled to voting rights until exercised.

11

**Amendments:**  The terms of each tranche of Warrants may be amended by a written instrument executed by (i) Reorganized Southern Air and (ii) holders holding a majority of the Warrants of such tranche.

**Governance:**

The President/CEO will be ___, a U.S. Citizen.

Five member Board of Directors of Reorganized Southern Air (3 Lender, 1 Management and 1 OHAA) (the "New Board").  Each of OHAA designee and at least one Lender designee to have the right to one seat on all committees, including ad hoc committees. Two business day minimum notice requirement for all board and committee meetings unless waived (before or after a meeting), and Board members will be able to participate telephonically in all such meetings.

Minority rights protection reasonably satisfactory to OHAA and the Lenders to be agreed upon, including the following protections:

■ Actions requiring consent of a supermajority of 75% of the outstanding common stock of Reorganized Southern Air:

   ■ Affiliate transactions (e.g. transaction fees for stockholders, etc.) involving aggregate liability or obligation of Reorganized Southern Air (i) of $3 million or less per year shall require the approval of at least a majority of the Board of Directors, other than the interested directors, and (ii) in excess of $3 million per year shall require supermajority consent; provided that such supermajority consent shall not be required for any affiliate transaction for which the Board of Directors has obtained the written opinion of a qualified advisor, selected by the Board of Directors, which advisor may be vetoed by a majority of the stockholders other than any stockholder which is an affiliate of a person who is participating in such transaction, that such affiliate transaction is on arm's length, market terms;

   ■ Changes in the charter, by-laws following the Effective Time (provided that any such changes having an adverse and disproportionate effect on a stockholder in relation to all of the other stockholders in respect of the shares held by them (including shares issuable to them upon conversion or exercise of convertible securities) will require the consent of such stockholder);

   ■ Creation of any new classes of senior equity following the Effective Time; and

   ■ Below-market issuances of equity following the Effective Time

■ Other Stockholder Agreement Terms

   ■ Transfers of equity subject to providing reasonable advance written notice to Reorganized Southern Air of the terms thereof and joinder of the transferee to the Stockholders Agreement, as well as restrictions to preserve the value of net

operating losses and other tax attributes, to avoid the need to register and file reports and other information under the Securities Exchange Act of 1934 (which restriction shall provide the Board of Directors with flexibility to take appropriate actions to limit the number of stockholders of Reorganized Southern Air prior to statutory thresholds being reached) and to ensure the transferee's and Reorganized Southern Air's compliance with applicable securities and airline regulatory law, including any restrictions on ownership and control of U.S. airlines by foreign persons;

- Standard information rights for minority stockholders (including right to meet with management for additional detail and questions);

- Preemptive Rights on debt and equity issuances (subject to customary exclusions) following the Effective Time;

- Stockholders are subject to drag-along rights in the case of a sale of all or substantially all of the assets of the Reorganized Southern Air or 50.1% of the capital stock of Reorganized Southern Air;

- Stockholders holding at least 3% of the outstanding equity of Reorganized Southern Air to have customary rights of first offer on proposed transfers of equity (the exercise mechanics (including the offer period) of which shall have reasonable terms so as not to unreasonably impair transfers) where the proposed transferee would, following such transfer, beneficially own more than 20% of the outstanding equity of Reorganized Southern Air; and

- Stockholders to have customary tag-along rights on transfers of equity which would result in a change of control of Reorganized Southern Air (to the extent drag-along rights have not been exercised in connection with such transfer).

- **Management**:  Subject to due diligence and consideration with respect to tax consequences, on the Effective Date, Management shall (i) enter into employment agreements for a period of 3 years from and after the Effective Date, each containing customary and standard non-competition provisions, on economic terms to be agreed upon by the Required Prepetition Lenders, the Required DIP Lenders, and members of Management, but in no event on terms less favorable than in existence on the date hereof, and (ii) (a) 4% of reorganized common stock, one percent (1%) of which shall be vested and delivered on the Effective Date and three percent (3%) of which shall vest and be delivered in three (3) equal installments on the first three (3) anniversaries of the Effective Date (the "Initial Grant") and (b) six percent (6%) of reorganized common stock, vesting in annual increments of two percent (2%) provided that operating results are realized in accordance with a business plan to be agreed upon between Management and the post-Effective Date Board of Directors ("Post Effective Date Grant", and with the Initial Grant, "Management Equity"); provided, however, that the allocations of equity issued pursuant to the Initial Grant shall be determined by the existing Board of Directors of Southern Air with recommendations made by the CEO and shall vest immediately in connection with a change of control or a sale

of substantially all of the assets of the Company and certain other enumerated events to be agreed upon. Allocations of the Post Effective Date Grant shall be determined by the New Board with recommendations made by the CEO and accelerated vesting of the Post Effective Date Grant shall be agreed upon by Management and the New Board.

**Releases:** Reciprocal releases solely relating to Southern Air among the Company, Oak Hill, the DIP Lenders, and the signing Prepetition Lenders, and the Plan shall provide for customary releases and exculpations, including the parties' members, partners, officers, directors, etc.

**Public Announcements:** Any public announcement of the Restructuring shall be subject to the approval in advance of the Debtors' Required Prepetition Lenders and OHAA.

**Tax Cooperation:** The Company agrees to cooperate with Oak Hill in good faith with respect to the tax reporting of the transactions contemplated by this Term Sheet to minimize reporting of current taxable income to Oak Hill as a result of such transactions, with due regard to the impact of any tax reporting position on the Company's current tax position.

Schedule 1

In each of the Leases:

(i)     The definition of "Agreed Expiry Date" shall be deleted in its entirety and

replaced with: "Agreed Expiry Date" means September __, 2017.

(ii)    The definition of Change of Control shall be deleted in its entirety and replaced
with:

"Change of Control" means any transaction which results in an entity
(other than an entity which, as of the date of this amendment, owns voting
share capital) owning, directly or indirectly, more than fifty percent (50%)
of the issued common stock of Southern Air Holdings (including voting
and nonvoting stock).

(iii)   The Event of Default described in Section 26.2(xii), "Change of
Control" shall be replaced in its entirety with the following:

"(xii)   Change of Control:  A Change of Control occurs without the prior
written consent of Lessor and as a result thereof the Lessee (x) has a net worth
lower than it had immediately prior to such change in control, (y) the Aircraft is
no longer capable of being registered on the "N" registry maintained by the
FAA, or (z) Southern Air, Inc. is no longer a citizen of the United States as
defined in 49 U.S.C. s. 40102(a)(15)."

(iv)    Section 10.12 shall be revised as follows:

the words "T = one hundred forty four (144) months" shall be replaced with "T
= months from Delivery through Agreed Expiry Date".

EXHIBIT C


DIP AGREEMENT

US_ACTIVE:\44097748\9\71907.0006

EXECUTION COPY

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
CREDIT AGREEMENT,

dated as of September 27, 2012,

among

CARGO 360, INC.,
as the Borrower, a Debtor and a Debtor-in-Possession,

VARIOUS FINANCIAL INSTITUTIONS AND OTHER PERSONS
FROM TIME TO TIME PARTIES HERETO,
as the Lenders, and

CANADIAN IMPERIAL BANK OF COMMERCE, NEW YORK AGENCY,
as the Administrative Agent.

# TABLE OF CONTENTS

**Page**

ARTICLE I        DEFINITIONS AND ACCOUNTING TERMS ............................................2

    SECTION 1.1    Defined Terms ...........................................................................2
    SECTION 1.2    Use of Defined Terms.............................................................27
    SECTION 1.3    Cross-References .....................................................................27
    SECTION 1.4    Accounting and Financial Determinations.............................27

ARTICLE II       COMMITMENTS, BORROWING PROCEDURES, NOTES AND
                  LETTERS OF CREDIT ..........................................................................27

    SECTION 2.1    Commitments...........................................................................27
    SECTION 2.2    Borrowing Procedure .............................................................28
    SECTION 2.3    Continuation and Conversion Elections.................................29
    SECTION 2.4    Funding ...................................................................................29
    SECTION 2.5    Register; Notes........................................................................29
    SECTION 2.6    Loan Proceeds Escrow Account .............................................30

ARTICLE III      REPAYMENTS, PREPAYMENTS, INTEREST AND FEES ......................31

    SECTION 3.1    Repayments and Prepayments; Application ...........................31
    SECTION 3.2    Interest Provisions..................................................................32
    SECTION 3.3    Other Payments.......................................................................33

ARTICLE IV     CERTAIN LIBO RATE AND OTHER PROVISIONS ...............................34

    SECTION 4.1    LIBO Rate Lending Unlawful ................................................34
    SECTION 4.2    Deposits Unavailable ..............................................................34
    SECTION 4.3    Increased LIBO Rate Loan Costs, etc.....................................34
    SECTION 4.4    Funding Losses .......................................................................35
    SECTION 4.5    Increased Capital Costs...........................................................35
    SECTION 4.6    Taxes.......................................................................................36
    SECTION 4.7    Payments, Computations; Proceeds of Collateral, etc. ..........39
    SECTION 4.8    Sharing of Payments ..............................................................40
    SECTION 4.9    Setoff......................................................................................40
    SECTION 4.10   Mitigation of Claims ..............................................................41
    SECTION 4.11   [Reserved]...............................................................................41
    SECTION 4.12   Defaulting Lenders.................................................................41

ARTICLE V       CONDITIONS TO CREDIT EXTENSIONS.............................................42

    SECTION 5.1    Initial Credit Extension...........................................................42
    SECTION 5.2    All Credit Extensions..............................................................45
    SECTION 5.3    Conditions to Withdrawals from the Loan Proceeds Escrow
                  Account ..................................................................................46

**TABLE OF CONTENTS**
**(cont'd)**

Page

ARTICLE VI     REPRESENTATIONS AND WARRANTIES.................................47

    SECTION 6.1     Organization, etc. ............................................47
    SECTION 6.2     Due Authorization, Non-Contravention, etc......................48
    SECTION 6.3     Government Approval, Regulation, Compliance with Law, etc....48
    SECTION 6.4     Validity, etc. ..............................................48
    SECTION 6.5     Financial Information........................................48
    SECTION 6.6     [Reserved] .................................................49
    SECTION 6.7     Litigation, Labor Controversies, etc. ......................49
    SECTION 6.8     Subsidiaries ...............................................49
    SECTION 6.9     Ownership of Properties ....................................49
    SECTION 6.10    Taxes ......................................................49
    SECTION 6.11    Pension and Multiemployer Plans ............................49
    SECTION 6.12    Environmental Warranties ...................................50
    SECTION 6.13    Accuracy of Information ....................................51
    SECTION 6.14    Regulations U and X ........................................51
    SECTION 6.15    Licenses, Patents, Copyrights, etc. ........................51
    SECTION 6.16    Material Contracts..........................................52
    SECTION 6.17    Collateral..................................................52
    SECTION 6.18    Regulatory Matters..........................................52
    SECTION 6.19    Use of Proceeds.............................................52

ARTICLE VII    COVENANTS .....................................................54

    SECTION 7.1     Affirmative Covenants.......................................54
    SECTION 7.2     Negative Covenants .........................................60

ARTICLE VIII   EVENTS OF DEFAULT .............................................68

    SECTION 8.1     Listing of Events of Default................................68
    SECTION 8.2     Remedies....................................................74

ARTICLE IX     THE ADMINISTRATIVE AGENT ......................................75

    SECTION 9.1     Actions.....................................................75
    SECTION 9.2     Funding Reliance, etc.......................................76
    SECTION 9.3     Exculpation ................................................77
    SECTION 9.4     Successor...................................................77
    SECTION 9.5     Loans by CIBC ..............................................78
    SECTION 9.6     Credit Decisions............................................78
    SECTION 9.7     Copies, etc.................................................78
    SECTION 9.8     Reliance by Administrative Agent............................78
    SECTION 9.9     Defaults....................................................79
    SECTION 9.10    Withholding Taxes...........................................79

ARTICLE X      ADDITIONAL PROVISIONS .........................................79

# TABLE OF CONTENTS
## (cont'd)

Page

SECTION 10.1    Waivers, Amendments, etc. ...................................................79
SECTION 10.2    Notices; Time...................................................................81
SECTION 10.3    Payment of Costs and Expenses ......................................82
SECTION 10.4    Indemnification .................................................................82
SECTION 10.5    Survival...............................................................................84
SECTION 10.6    Severability ........................................................................84
SECTION 10.7    Headings ............................................................................84
SECTION 10.8    Execution in Counterparts, Lender Addendums,
                    Effectiveness, etc. .............................................................85
SECTION 10.9    Governing Law; Entire Agreement...................................85
SECTION 10.10   Successors and Assigns.....................................................85
SECTION 10.11   Sale and Transfer of Credit Extensions; Participations in Credit
                    Extensions; Notes................................................................85
SECTION 10.12   Replacement of Lenders under Certain Circumstances ......................88
SECTION 10.13   Other Transactions.............................................................89
SECTION 10.14   Forum Selection and Consent to Jurisdiction ...................89
SECTION 10.15   Waiver of Jury Trial...........................................................90
SECTION 10.16   Confidentiality ...................................................................90
SECTION 10.17   USA Patriot Act Notice .....................................................91
SECTION 10.18   Parties Including Trustees; Bankruptcy Court Proceedings ...............91
SECTION 10.19   No Fiduciary Duty .............................................................91

ARTICLE XI      GRANT AND PERFECTION OF SECURITY INTEREST;
                  PRIORITY OF LIENS...........................................................92

SECTION 11.1    Super-Priority Nature of Obligations and Secured Parties'
                  Liens....................................................................................92
SECTION 11.2    Payment of Obligations.....................................................95
SECTION 11.3    No Discharge; Survival of Claims .....................................95
SECTION 11.4    Release ................................................................................96

# TABLE OF CONTENTS
## (cont'd)

| | | |
|---|---|---|
| SCHEDULE I | – | Disclosure Schedule |
| SCHEDULE II | – | Notice Information |
| | | |
| EXHIBIT A | – | Form of Term Note |
| EXHIBIT B | – | Form of Borrowing Request |
| EXHIBIT C | – | Form of Continuation/Conversion Notice |
| EXHIBIT D | – | Form of Lender Assignment Agreement |
| EXHIBIT E | – | [Reserved] |
| EXHIBIT F | – | Form of Subsidiary Guaranty |
| EXHIBIT G | – | Form of Security Agreement |
| EXHIBIT H | – | Form of Holdings Guaranty and Pledge Agreement |
| EXHIBIT I | – | Form of Prepayment Notice |
| EXHIBIT J | – | Form of Administrative Questionnaire |
| EXHIBIT K | – | Form of Aircraft Security Agreement |
| EXHIBIT L | – | Form of Loan Proceeds Escrow Agreement |
| EXHIBIT M | – | Form of Approved Budget |

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

THIS SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of September 27, 2012, is among CARGO 360, INC., a Delaware corporation, as Borrower, a Debtor and a debtor-in-possession, the various financial institutions and other Persons from time to time parties hereto (collectively, the "Lenders") and CANADIAN IMPERIAL BANK OF COMMERCE, NEW YORK AGENCY ("CIBC"), as administrative agent for the Lenders (in such capacity, the "Administrative Agent").

W I T N E S S E T H:

WHEREAS, on September 27, 2012 (the "Petition Date"), the Debtors commenced Chapter 11 cases (the "Chapter 11 Cases") by filing separate voluntary petitions for reorganization under Chapter 11, 11 U.S.C. 101 et seq. (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Borrower and Guarantors continue to operate their businesses and manage their properties as Debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, each of the Lenders (or such Lenders' designated affiliates) held interests in a loan (the "Pre-Petition Loan") pursuant to that certain Credit Agreement (the "Pre-Petition Credit Agreement") dated as of September 6, 2007, among the Borrower and Canadian Imperial Bank of Commerce, New York Agency, as agent (the "Pre-Petition Agent") for the lenders (in such capacity the "Pre-Petition Lenders") (as amended or otherwise modified prior to the Petition Date by the First Amendment to Credit Agreement, dated as of October 24, 2007, the Second Amendment and Waiver to Credit Agreement and First Amendment to Second Forbearance Agreement to Credit Agreement, dated as of August 12, 2009, the Third Amendment and Waiver to Credit Agreement and Second Amendment to Second Forbearance Agreement to Credit Agreement, dated as of October 15, 2009, the Fourth Amendment and Waiver to Credit Agreement, dated as of December 10, 2009, the Fifth Amendment to Credit Agreement, dated as of February 25, 2010 and the Sixth Amendment to Credit Agreement, dated as of September 30, 2011) (and as further amended, supplemented and otherwise modified from time to time), and related definitive documentation, in each case as further amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof;

WHEREAS, the Borrower has requested that the Lenders provide a senior secured, super-priority term loan facility to the Borrower of up to twenty-five million Dollars ($25,000,000) in the aggregate to fund the working capital, general corporate needs and financing requirements of the Borrower and the other Obligors as Debtors and debtors-in-possession, during the pendency of the Chapter 11 Cases and for the other purposes specified herein;

WHEREAS, the Lenders are willing to make certain loans to the Borrower of up to such amount upon the terms and conditions set forth herein, and in consideration, in part, for the constitution of a portion of the Pre-Petition Loan as administrative priority claims and secured by super-priority priming liens pursuant to the Interim Order and the Final Order effectuated

through a deemed exchange of a portion of the Pre-Petition Loans for Roll-Up Loans as more fully described herein;

WHEREAS, to provide security for the repayment of the Obligations of the Obligors, the Obligors will provide and grant to the Administrative Agent, for the benefit of the Secured Parties, certain security interests, liens, and other rights and protections pursuant to the terms hereof, and, in the case of the Debtors, security interests and liens pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, and super-priority administrative expense claims pursuant to Section 364(c)(1) of the Bankruptcy Code, and other rights and protections, as more fully described herein;

WHEREAS, the business of the Borrower and the Obligors is a mutual and collective enterprise and the Borrower believes that the consolidation of all loans and other financial accommodations under this Agreement will enhance the aggregate borrowing powers of the Borrower and facilitate the administration of the Chapter 11 Cases and its loan relationship with the Lenders, all to the mutual advantage of the Borrower and its Subsidiaries;

WHEREAS, the Lenders' willingness to extend financial accommodations to the Borrower, is done solely as an accommodation to the Borrower and at the Borrower's request and in furtherance of the mutual and collective enterprise of the Obligors; and

WHEREAS, the Lenders are willing, on the terms and subject to the conditions hereinafter set forth, to extend the Commitments and make Loans to the Borrower;

NOW, THEREFORE, the parties hereto agree as follows.

ARTICLE I
DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.1    Defined Terms.  The following terms (whether or not underscored) when used in this Agreement, including its preamble and recitals, shall, except where the context otherwise requires, have the following meanings (such meanings to be equally applicable to the singular and plural forms thereof):

"1110 Collateral" means all equipment, as such term is described in 11 U.S.C. §1110(a)(3), now operated by Southern Air, Inc. or any other Grantor in which another party is entitled to the benefits of Section 1110 of the Bankruptcy Code

"777 Aircraft" is defined in the Support Agreement.

"777 Leases" is defined in the Support Agreement.

"Acceptable Plan" means a plan of reorganization that (i) if no Plan Term Sheet Event has occurred, is (and all exhibits thereto, related documents (including any documentation of an exit facility), and plan supplements are) consistent in all respects with the Plan Term Sheet (as such term is defined in the Support Agreement) and is (and all exhibits thereto, related documents (including any documentation of an exit facility), and plan supplements are) otherwise in form and substance reasonably acceptable to the Administrative Agent and the

Required Lenders or (ii) provides for the payment in full in cash of all Obligations (other than the Secured OHAA Payment Obligations) on or before the effective date of such Plan.

"Account Withdrawal" is defined in Section 5.3.

"Act" means the Air Transportation Safety and System Stabilization Act, P.L. 107−42, as the same may be amended from time to time.

"Administrative Agent" is defined in the preamble and includes each other Person appointed as the successor Administrative Agent pursuant to Section 9.4.

"Administrative Questionnaire" means an Administrative Questionnaire substantially in the form of Exhibit J hereto.

"Affiliate" of any Person means any other Person which, directly or indirectly, controls, is controlled by or is under common control with such Person. "Control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management or policies of such Person (whether by voting, contract or otherwise).

"Agreement" means, on any date, this Senior Secured Super-Priority Debtor-in-Possession Credit Agreement as originally in effect on the Closing Date and as thereafter from time to time amended, supplemented, amended and restated or otherwise modified from time to time and in effect on such date.

"Aircraft Security Agreement" means the Aircraft Security Agreement executed and delivered by Authorized Officers of the Borrower and each of its Subsidiaries, substantially in the form of Exhibit K hereto,  as amended, supplemented, amended and restated or otherwise modified from time to time.

"Aircraft SPV" means a limited liability company or other special purpose vehicle that has been organized solely to own aircraft and assets directly related to the operation thereof (and is not engaged in any other business activity).

"Alternate Base Rate" means, on any date and with respect to all Base Rate Loans, a fluctuating rate of interest *per annum* equal to the highest of (a) the Base Rate in effect on such day, (b) the Federal Funds Rate in effect on such day plus ½ of 1% and (c) the sum of (x) the one-month LIBO Rate (Reserve Adjusted) (after giving effect to any LIBO Rate "floor") *plus* (y) 1.0% *per annum*. Changes in the rate of interest on that portion of any Loans maintained as Base Rate Loans will take effect simultaneously with each change in the Alternate Base Rate. The Administrative Agent will give notice promptly to the Borrower and the Lenders of changes in the Alternate Base Rate; provided that the failure to give such notice shall not affect the Alternate Base Rate in effect after such change.

"Applicable Margin" means (i) with respect to the Loans (other than the Roll-Up Loans), 7.0% per annum with respect to Base Rate Loans and 8.0% per annum with respect to LIBO Rate Loans and (ii) with respect to the Roll-Up Loans, 4.00% per annum with respect to Base Rate Loans and 5.00% per annum with respect to LIBO Rate Loans.

"Approved Budget" means (i) initially, the thirteen-week cash flow forecast for the thirteen-week period beginning on the Closing Date substantially in the form of Exhibit M attached hereto, and (ii) thereafter, the most recent Supplemental Budget to become an "Approved Budget" pursuant to Section 7.1.15(a), in each case, as the same may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with this Agreement or with the written consent of the Required Lenders.

"Approved Fund" means any Person (other than a natural Person) that (a) is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business, and (b) is administered or managed by a Lender, an Affiliate of a Lender or a Person or an Affiliate of a Person that administers or manages a Lender.

"Asset Sale/Insurance Escrow Account" means a segregated escrow account maintained in the name of the Administrative Agent by the Escrow Agent, which escrow account shall be maintained in accordance with the Asset Sale/Insurance Escrow Agreement.

"Asset Sale/Insurance Escrow Agreement" means an escrow agreement pursuant to which the Asset Sale/Insurance Account is maintained to be established no later than October 15, 2012 pursuant to documentation to be agreed among Oak Hill, the Administrative Agent and the Borrower.

"Authorized Officer" means, relative to any Obligor, those of its officers, general partners or managing members (as applicable) whose signatures and incumbency shall have been certified to the Administrative Agent and the Lenders pursuant to Section 5.1.1.

"Avoidance Actions" means all claims and causes of action under section 502(d), 544, 545, 547, 548, 549, 550, 553 or 724(a) of the Bankruptcy Code, and any other avoidance or similar action under the Bankruptcy Code or similar federal or state law.

"Bankruptcy Code" is defined in the recitals hereto.

"Bankruptcy Court" is defined in the recitals hereto.

"Base Rate" means, at any time, the rate of interest then most recently established by the Administrative Agent in New York as its base rate for Dollars loaned in the United States.  The Base Rate is not necessarily intended to be the lowest rate of interest determined by the Administrative Agent in connection with extensions of credit.

"Base Rate Loan" means a Loan bearing interest at a fluctuating rate determined by reference to the Alternate Base Rate.

"Borrower" means Cargo 360 Inc., a Delaware corporation, a Debtor and debtor-in-possession.

"Borrowing" means Loans of the same type and, in the case of LIBO Rate Loans, having the same Interest Period, made by all Lenders required to make such Loans on the same Business Day and pursuant to the same Borrowing Request in accordance with Section 2.2.

"Borrowing Request" means a Loan request and certificate duly executed by an Authorized Officer of the Borrower substantially in the form of Exhibit B hereto.

"Business Day" means (a) any day which is neither a Saturday or Sunday nor a legal holiday on which banks are authorized or required to be closed in New York, New York and (b) relative to the making, continuing, prepaying or repaying of any LIBO Rate Loans, any day which is a Business Day described in clause (a) and which is also a day on which dealings in Dollars are carried on in the London interbank eurodollar market.

"Capital Securities" means, with respect to any Person, all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of such Person's capital, whether now outstanding or issued after the Closing Date.

"Capitalized Lease Liabilities" means, with respect to any Person, all monetary obligations of such Person and its Subsidiaries under any leasing or similar arrangement which have been (or, in accordance with GAAP, should be) classified as capitalized leases, and for purposes of each Loan Document, the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP, and the stated maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a premium or a penalty.

"Carve-Out" shall have the meaning defined in the Interim Order or, when applicable, the Final Order.

"Carve-Out Account" is defined in Section 11.1(g).

"Carve-Out Cap" means $750,000.

"Carve-Out Trigger Notice" is defined in Section 11.1(g).

"Cash Collateral" shall have the meaning ascribed to such term in Section 363 of the Bankruptcy Code.

"Cash Equivalent Investment" means, at any time

(a)     any direct obligation of (or unconditionally guaranteed by) the United States or a State thereof (or any agency or political subdivision thereof, to the extent such obligations are supported by the full faith and credit of the United States or a State thereof) maturing not more than one year after such time;

(b)     commercial paper maturing not more than 270 days from the date of issue, which is issued by a corporation (other than an Affiliate of any Obligor) organized under the laws of any State of the United States or of the District of Columbia and rated A-1 or the equivalent thereof or higher by S&P or P-1 or the equivalent thereof or higher by Moody's;

(c)     any certificate of deposit, time deposit or bankers acceptance, maturing not more than one year after its date of issuance, which is issued by any bank organized

under the laws of the United States (or any State thereof) and which has (x) a credit rating of A2 or higher from Moody's or A or higher from S&P and (y) a combined capital and surplus greater than $500,000,000; and

(d)    solely with respect to clause (b) of Section 7.2.5 and in the case of Investments by any Foreign Subsidiary, other customarily utilized high quality Investments of the type set forth in clauses (a) through (c) above in the country where such Foreign Subsidiary is located.

"Casualty Event" means the damage, destruction or condemnation, as the case may be, of property of any Person or any of its Subsidiaries.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

"CERCLIS" means the Comprehensive Environmental Response Compensation Liability Information System List.

"Change in Control" means:

(a)    the failure of Holdings at any time to directly own, beneficially and of record on a fully diluted basis, 100% of the outstanding Capital Securities of the Borrower, such Capital Securities to be held free and clear of all Liens (other than Liens granted under a Loan Document); or

(b)    the failure of the Investors to directly or indirectly own, beneficially and of record on a fully diluted basis, a sufficient number of the issued and outstanding Capital Securities of Holdings to have and exercise voting power for the election of at least a majority of the board of directors or other managing body of Holdings, and in any event, at least 51% of the outstanding Capital Securities of Holdings, such Capital Securities to be held free and clear of all Liens.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case, pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"Chapter 11 Cases" is defined in the recitals.

"Chapter 11 Order" means any order entered in the Chapter 11 Cases.

"CIBC" is defined in the preamble.

"Closing Date" means the first date on which the conditions precedent set forth in Sections 5.1 and 5.2 shall have been satisfied or waived.

"Closing Date Certificate" means the closing date certificate executed and delivered by an Authorized Officer of the Borrower in form and substance satisfactory to the Administrative Agent.

"Closing Date Term Loan" is defined in Section 2.1.1(a).

"Closing Date Term Loan Commitment" means, as to any Lender, the obligation of such Lender, if any, to make a Closing Date Term Loan to the Borrower on the Closing Date in a principal amount not to exceed the percentage of the Closing Date Term Loan Commitment Amount set forth opposite such Lender's name under the heading "Closing Date Term Loan Commitment" on Schedule 1 to its Lender Addendum, or, as the case may be, in the Lender Assignment Agreement pursuant to which such Lender became a party to this Agreement.

"Closing Date Term Loan Commitment Amount" means $12,500,000.

"Code" means the Internal Revenue Code of 1986, and the regulations thereunder, in each case as amended, reformed or otherwise modified from time to time.

"Collateral" has the meaning given to such term in the Security Agreement.

"Commitment" means, with respect to each Lender, its Closing Date Term Loan Commitment and its Final Order Term Loan Commitment.

"Committee" means the official committee of unsecured creditors appointed in the Chapter 11 Cases.

"Committee Documents" is defined in Section 7.1.1(i).

"Committee Investigation Fund" is defined in Section 11.1(g).

"Committee's Professionals" is defined in Section 11.1(g).

"Competitor" means any Person that is not a commercial bank, insurance company, fund or other financial institution and that is primarily engaged in the same line of business as the Borrower, namely, a cargo airline specializing in long haul, heavy-lift operations for ACMI and charter customers.

"Contingent Liability" means any agreement, undertaking or arrangement by which any Person guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to, or otherwise to invest in, a debtor, or otherwise to assure a creditor against loss) the Indebtedness or other obligation of any other Person (other than by endorsements of instruments in the course of collection), or guarantees the payment of dividends or other distributions upon the Capital

Securities of any other Person or is liable to maintain the solvency or any balance sheet item, level of income or financial condition of any other Person for the purpose of assuring a creditor against loss.  The amount of any Person's obligation under any Contingent Liability shall (subject to any limitation set forth therein) be deemed to be the outstanding principal amount of the debt, obligation or other liability guaranteed thereby.

"Continuation/Conversion Notice" means a notice of continuation or conversion and certificate duly executed by an Authorized Officer of the Borrower, substantially in the form of Exhibit C hereto.

"Controlled Group" means all members of a controlled group of corporations and all members of a controlled group of trades or businesses (whether or not incorporated) under common control which, together with Holdings and/or the Borrower, are treated as a single employer under Section 414 of the Code or Section 4001 of ERISA.

"Court Documents" is defined in Section 7.1.1(g).

"Credit Extension" means the making of a Loan by a Lender.

"Debtor Relief Laws" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Debtors" means the Borrower and the Guarantors.

"Debtors' Professionals" is defined in Section 11.1(g).

"Default" means any Event of Default or any condition, occurrence or event which, after notice or lapse of time or both, would constitute an Event of Default.

"Defaulting Lender" means, subject to Section 4.12.2, any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent or in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon

receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 4.12.2) upon delivery of written notice of such determination to the Borrower and each Lender.

"DIP Facility" means the credit facility evidenced by this Agreement.

"Disclosure Schedule" means the Disclosure Schedule attached hereto as Schedule I, as it may be amended, supplemented, amended and restated or otherwise modified from time to time by the Borrower with the written consent of the Required Lenders.

"Disclosure Statement" is defined in Section 7.1.14(a).

"Disposition" (or similar words such as "Dispose") means any sale, transfer, lease (other than a sublease), contribution or other conveyance (including by way of merger) of, or the granting of options, warrants or other rights to, any of the Borrower's or its Subsidiaries' assets (including accounts receivable and Capital Securities of Subsidiaries) to any other Person (other than to another Obligor) in a single transaction or series of transactions.

"Disqualified Capital Securities" means any Capital Securities of Holdings, the Borrower or any Subsidiary that, either by their terms or by the terms of any security into which they are convertible or for which they are exchangeable, or upon the happening of any event or condition (including the passage of time), (a) mature or are mandatorily redeemable (other than solely for Qualified Capital Securities) pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the occurrence of the Termination Date), (b) are redeemable at the option of the holder thereof (other than solely for Qualified Capital Securities), in whole or in part, (c) provide for the scheduled payments of dividends in cash, or (d) are or become convertible into or exchangeable for Indebtedness, in each case, prior to the first anniversary of the Stated Maturity Date.

"Dollar" and the sign "$" mean lawful money of the United States.

"EBITDA" means, for any applicable period, the sum of (without duplication) (a) Net Income for such period, plus (b) to the extent deducted in determining Net Income, the sum of

(i) amounts attributable to amortization, (ii) income tax expense, (iii) interest expense, (iv) depreciation of assets, (v) any non-cash expenses, charges or losses (other than accruals or reserves for potential cash items in any future period), which are not expected to result in a cash charge or loss in such period or in a future period, (vi) any non-cash extraordinary losses, (vii) any non-cash non-recurring losses, (viii) any non-cash compensation charges or other non-cash expenses or charges arising from the grant of or issuance or repricing of stock, stock options or other equity-based awards to the directors, officers and employees of Holdings and its Subsidiaries, and (ix) any out-of-pocket litigation costs, expenses, judgments and settlements incurred by Holdings and its Subsidiaries with respect to any litigation in which Holdings and its Subsidiaries is the defendant (other than any workers compensation, EEO and other ordinary course disputes or controversies), minus (c) to the extent increasing Net Income, all non-cash non-recurring gains and other non-cash items, as determined in accordance with GAAP, minus (d) gains increasing Net Income attributable to any cancellation or extinguishment of Indebtedness, refinancing transaction or amendment or modification of any debt instrument (including any amendment or other modification of the Obligations and the Loans).

"Eligible Assignee" means (a) a Lender; (b) an Affiliate of a Lender; (c) an Approved Fund; or (d) any other Person (other than a natural Person, the Borrower, any Competitor or any other Person taking direction from, or working in concert with, the Borrower, any of the Borrower's Affiliates or any Competitor); provided that neither a Defaulting Lender nor any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute a Defaulting Lender or its Subsidiary shall be a "Eligible Assignee".

"Environmental Laws" means all applicable foreign, federal, state or local statutes, laws (including common law), ordinances, codes, rules and regulations (including consent decrees and administrative orders) relating to protection of the environment or public health and safety as it relates to environmental protection.

"Equity Payment" is defined in Section 3.3.3.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto of similar import, together with the regulations thereunder, in each case as in effect from time to time.  References to Sections of ERISA also refer to any successor Sections thereto.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Pension Plan (other than an event for which the thirty (30)-day notice period is waived), (b) the failure of any Pension Plan to meet the minimum funding standard applicable to the Pension Plan for a plan year under Section 412 of the Code or Section 302 of ERISA, whether or not waived, (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, (d) the incurrence by the Borrower or any member of a Controlled Group of any liability under Title IV of ERISA with respect to the termination of any Pension Plan, (e) the receipt by the Borrower or any member of a Controlled Group from the PBGC or a plan administrator of any notice relating to an intention to terminate any Pension Plan or Pension Plans or to appoint a trustee to administer any Pension Plan, (f) the incurrence by the Borrower or any member of a Controlled Group of any liability with respect to

the withdrawal or partial withdrawal from any Pension Plan or Multiemployer Plan, (g) the receipt by the Borrower or any member of a Controlled Group of any notice concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA or in critical or endangered status, within the meaning of Section 432 of the Code or Section 305 of ERISA, (h) the determination that any Pension Plan is in at-risk status, within the meaning of Section 430 of the Code of Section 303 of ERISA, (i) the incurrence by the Borrower or any member of a Controlled Group of any liability pursuant to Section 4063 or 4064 of ERISA or a cessation of operations with respect to a Pension Plan within the meaning of Section 4062(e) of ERISA, (j) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any member of a Controlled Group, (k) the engagement by the Borrower or any member of a Controlled Group in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA, (l) the imposition of a Lien with respect to a Pension Plan pursuant to Section 430(k) of the Code or Section 303(k) or 4068 of ERISA, or (m) making of an amendment to a Pension Plan that could result in the posting of a bond or security under Section 436(f)(1) of the Code.

"Escrow Accounts" means, collectively, the Loan Proceeds Escrow Account and the Asset Sale/Insurance Escrow Account.

"Escrow Agent" means Canadian Imperial Bank of Commerce, New York Agency or such other financial institution as the Administrative Agent shall approve in its sole discretion.

"Event of Default" is defined in Section 8.1.

"Exclusivity Periods" is defined in Section 7.2.17(e).

"Exemption Certificate" is defined in clause (e) of Section 4.6.

"Extraordinary Receipts" means (i) any gross cash proceeds received by the Holdings or any of its Subsidiaries not in the ordinary course of business (other than cash proceeds of Dispositions or Casualty Events), including, without limitation, (a) foreign, United States, state or local tax refunds, (b) pension plan reversions, (c) judgments, proceeds of settlements or arbitration or other consideration of any kind in connection with any cause of action, (d) indemnity payments, (e) any purchase price adjustment received in connection with any purchase agreement, (f) refunds from any Governmental Authority and (g) return of amounts otherwise held in escrow (other than in the Escrow Accounts) and maintenance reserves minus (ii) to the extent attributable to amounts accrued after the Closing Date, the sum of (x) all taxes actually paid or estimated by the Borrower or its Subsidiaries to be payable in cash within the next 12 months in connection therewith and (y) all reasonable and customary legal, investment banking, brokerage and accounting fees and expenses and recording and filing fees and other customary closing costs incurred in connection with such transaction.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official

interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal for each day during such period to (a) the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York; or (b) if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"Fee Letter" means the Fee Letter, dated September 27, 2012, from the Administrative Agent to the Borrower.

"Filing Statements" means all UCC financing statements or other similar financing statements and UCC (Form UCC-3) termination statements required pursuant to the Loan Documents.

"Final Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be substantially in the form of the Interim Order, provided that it shall specify that Roll-up Loans in an aggregate amount of $37,500,000 are deemed to be an administrative expense claim pari passu with the Loans and secured by a super-priority senior secured Lien on and interest in the Collateral and it shall otherwise be reasonably satisfactory in form and substance to the Administrative Agent at the direction of the Required Lenders, together with all extensions, modifications, amendments or supplements thereto, in each case in form and substance reasonably satisfactory to the Administrative Agent at the direction of the Required Lenders, which, among other matters but not by way of limitation, authorizes (i) the Obligors to obtain credit, incur (or guaranty) Indebtedness and grant Liens under this Agreement and the other Loan Documents, as the case may be, provides for the super-priority of all of the Administrative Agent's and the Lenders' claims and provides for the super-priority of the Roll-Up Loans and (ii) the Lenders to make available the Final Order Term Loans in an aggregate amount of $12,500,000 (in addition to the $12,500,000 of Closing Date Term Loans made available pursuant to the Interim Order) in accordance with the terms and conditions of this Agreement.

"Final Order Date" means the date on which the Final Order in entered by the Bankruptcy Court.

"Final Order Term Loan" is defined in Section 2.1.2(a).

"Final Order Term Loan Commitment" means, as to any Lender, the obligation of such Lender, if any, to make a Final Order Term Loan to the Borrower on the Final Order Date in a principal amount not to exceed the percentage of the Final Order Term Loan Commitment Amount set forth opposite such Lender's name under the heading "Final Order Term Loan

Commitment" on Schedule 1 to its Lender Addendum, or, as the case may be, in the Lender Assignment Agreement pursuant to which such Lender became a party to this Agreement.

"Final Order Term Loan Commitment Amount" means $12,500,000.

"First Day Orders" means all orders entered by the Bankruptcy Court in the Chapter 11 Cases pursuant to motions and applications filed by the Debtors on or within two (2) days after the Petition Date, in each case in form and substance, reasonably satisfactory to the Administrative Agent at the direction of the Required Lenders.

"Fiscal Quarter" means a quarter ending on the last day of March, June, September or December.

"Fiscal Year" means any period of twelve consecutive calendar months ending on December 31; references to a Fiscal Year with a number corresponding to any calendar year (e.g., the "2012 Fiscal Year") refer to the Fiscal Year ending on December 31 of such calendar year.

"Foreign Subsidiary" means any Subsidiary that is not a U.S. Subsidiary.

"F.R.S. Board" means the Board of Governors of the Federal Reserve System or any successor thereto.

"GAAP" is defined in Section 1.4.

"Governmental Authority" means the government of the United States, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other Person exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantor" means, collectively, Holdings and each Subsidiary Guarantor.

"Hazardous Material" means

(a)     any "hazardous substance", as defined by CERCLA;

(b)     any "hazardous waste", as defined by RCRA; or

(c)     any material, substance, waste, form of energy or pathogen regulated, classified or characterized as a "pollutant", "contaminant", "hazardous material", "hazardous chemical", or material, substance or waste that is characterized, defined or regulated within the meaning of any applicable Environmental Law.

Without limiting the generality of the foregoing, Hazardous Material shall include any substance that contains any asbestos, polychlorinated biphenyls, or petroleum, or substances that are flammable, explosive, radioactive or corrosive.

"Hedging Agreements" means currency exchange agreements, interest rate swap agreements, interest rate cap agreements, interest rate collar agreements, commodity price protection agreements and all other agreements or arrangements designed to protect a Person against fluctuations in interest rates, currency exchange rates or commodity prices.

"Hedging Obligations" means, with respect to any Person, all liabilities of such Person under Hedging Agreements.

"herein", "hereof", "hereto", "hereunder" and similar terms contained in any Loan Document refer to such Loan Document as a whole and not to any particular Section, paragraph or provision of such Loan Document.

"Holdings" means Southern Air Holdings, Inc., a Delaware corporation, a Debtor and a debtor-in-possession.

"Holdings Guaranty and Pledge Agreement" means the Holdings Guaranty and Pledge Agreement, dated as of the Closing Date, executed and delivered by an Authorized Officer of Holdings, substantially in the form of Exhibit H hereto, as amended, supplemented, amended and restated or otherwise modified from time to time.

"including" and "include" means including without limiting the generality of any description preceding such term, and, for purposes of each Loan Document, the parties hereto agree that the rule of ejusdem generis shall not be applicable to limit a general statement, which is followed by or referable to an enumeration of specific matters, to matters similar to the matters specifically mentioned.

"Indebtedness" of any Person means:

(a) all obligations of such Person for borrowed money or advances and all obligations of such Person evidenced by bonds, debentures, notes or similar instruments;

(b) all obligations, contingent or otherwise, relative to the face amount of all letters of credit (unless cash collateralized), whether or not drawn, and banker's acceptances issued for the account of such Person;

(c) all Capitalized Lease Liabilities of such Person;

(d) net Hedging Obligations of such Person;

(e) whether or not so included as liabilities in accordance with GAAP, all obligations of such Person to pay the deferred purchase price of property or services (excluding trade accounts payable in the ordinary course of business which are not overdue for a period of more than 90 days or, if overdue for more than 90 days, as to which collection is stayed by virtue of the Chapter 11 Cases or a dispute exists and adequate reserves in conformity with GAAP have been established on the books of such Person), and indebtedness secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien on property owned or being acquired by such Person (including indebtedness arising under conditional sales or

other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)     obligations arising under Synthetic Leases;

(g)     the outstanding amount of Disqualified Capital Securities; and

(h)     all Contingent Liabilities of such Person in respect of any of the foregoing.

The Indebtedness of any Person shall include the Indebtedness of any other Person (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such Person, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Liabilities" is defined in Section 10.4.

"Indemnified Parties" is defined in Section 10.4.

"Interest Payment Date" means (a) with respect to any Base Rate Loan, each Monthly Payment Date to occur while such Loan is outstanding; (b) with respect to any LIBO Rate Loan having an Interest Period of three months or less, the last day of such Interest Period; (c) with respect to any LIBO Rate Loan having an Interest Period longer than three months, on each one month anniversary of the commencement of such Interest Period and on the last day of such Interest Period; (d) as to any Loan, the date of any repayment or prepayment made in respect thereof; and (e) with respect to all Loans, the Stated Maturity Date for such Loan.

"Interest Period" means, relative to any LIBO Rate Loan, the period beginning on (and including) the date on which such LIBO Rate Loan is made or continued as, or converted into, a LIBO Rate Loan pursuant to Sections 2.2 or 2.3 and shall end on (but exclude) the day which numerically corresponds to such date one or three months (or, if such month has no numerically corresponding day, on the last Business Day of such month), as the Borrower may select in its relevant notice pursuant to Section 2.2 or 2.3; provided that

(a)     the Borrower shall not be permitted to select Interest Periods to be in effect at any one time which have expiration dates occurring on more than five different dates;

(b)     if such Interest Period would otherwise end on a day which is not a Business Day, such Interest Period shall end on the next following Business Day (unless such next following Business Day is the first Business Day of a calendar month, in which case such Interest Period shall end on the Business Day next preceding such numerically corresponding day); and

(c)     no Interest Period for any Loan may end later than the Stated Maturity Date for such Loan.

"Interim Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing and pursuant to the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law, which shall be reasonably satisfactory in form and substance to the Administrative Agent at the direction of the Required Lenders, together with all extensions, modifications, amendments and supplements thereto, in form and substance reasonably satisfactory to the Administrative Agent at the direction of the Required Lenders, which, among other matters but not by way of limitation, authorizes the Lenders to make available Closing Date Term Loans in an aggregate principal amount of $12,500,000 in accordance with the terms and conditions of this Agreement.

"Investment" means, relative to any Person,

(a)     any loan, advance or extension of credit made by such Person to any other Person, including the purchase by such Person of any bonds, notes, debentures or other debt securities of any other Person;

(b)     Contingent Liabilities in favor of any other Person; and

(c)     any Capital Securities held by such Person in any other Person.

The amount of any Investment shall be the original principal or capital amount thereof less all returns of principal or equity thereon and shall, if made by the transfer or exchange of property other than cash, be deemed to have been made in an original principal or capital amount equal to the fair market value of such property at the time of such Investment.

"Investors" means Oak Hill Cargo 360, LLC and its Affiliates.

"Lender Addendum" means, as to each Lender party hereto on the Closing Date, the Lender Addendum delivered on or before the Closing Date by such Lender to the Administrative Agent, in each case, in form and substance satisfactory to the Administrative Agent.

"Lender Assignment Agreement" means an assignment agreement substantially in the form of Exhibit D hereto.

"Lender's Environmental Liability" means any and all losses, liabilities (including any strict liabilities), obligations, penalties, claims, litigation, demands, defenses, costs, judgments, suits, proceedings, damages (including consequential damages), disbursements or expenses of any kind or nature whatsoever (including reasonable attorneys' fees at trial and appellate levels and experts' fees and disbursements and expenses incurred in investigating, defending against or prosecuting any litigation, claim or proceeding) which may at any time be imposed upon, incurred by or asserted or awarded against the Administrative Agent, any Lender or any of such Person's Affiliates, shareholders, directors, officers, employees, and agents in connection with or arising from:

(a)     any Hazardous Material alleged to be on, in, under or affecting all or any portion of any property of Holdings or any of its Subsidiaries, the groundwater thereunder, or, to the extent alleged to be caused by Releases from Holdings' or any of its

Subsidiaries' or any of their respective predecessors' properties, any surrounding areas thereof;

(b)    any misrepresentation, inaccuracy or breach of any warranty, contained or referred to in Section 6.12;

(c)    any violation or claim of violation by Holdings or any of its Subsidiaries of any Environmental Laws; or

(d)    the imposition of any lien for damages caused by or the recovery of any costs for the cleanup, release or threatened release of Hazardous Material by Holdings or any of its Subsidiaries, or in connection with any property owned or formerly owned by Holdings or any of its Subsidiaries.

"Lenders" is defined in the preamble.

"LIBO Rate" means, relative to any Interest Period for LIBO Rate Loans, the rate per annum determined on the basis of the rate for deposits in Dollars for a period equal to such Interest Period appearing on Reuters Screen LIBOR 01 as of 11:00 a.m., London time, two Business Days prior to the beginning of such Interest Period (as specified in the applicable Borrowing Request or Continuation/Conversion Notice); provided that, in the event that such rate does not appear on Reuters Screen LIBOR 01 (or otherwise on such screen), the "LIBO Rate" shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be selected by the Administrative Agent or, in the absence of such availability, by reference to the rate per annum at which the Administrative Agent is offering Dollar deposits of comparable amounts at or about 10:00 a.m., New York City time, two Business Days prior to the beginning of such Interest Period in the interbank eurodollar market where its eurodollar and foreign currency and exchange operations are then being conducted for delivery in immediately available funds on the first day of such Interest Period for the number of days comprised therein.

"LIBO Rate Loan" means a Loan bearing interest, at all times during an Interest Period applicable to such Loan, at a rate of interest determined by reference to the LIBO Rate (Reserve Adjusted).

"LIBO Rate (Reserve Adjusted)" means, relative to any Loan to be made, continued or maintained as, or converted into, a LIBO Rate Loan for any Interest Period, a rate per annum (rounded upwards, if necessary, to the nearest 1/100th of 1%) determined pursuant to the following formula:

$$\text{LIBO Rate (Reserve Adjusted)} = \frac{\text{LIBO Rate}}{1.00 - \text{LIBOR Reserve Percentage}}$$

The LIBO Rate (Reserve Adjusted) for any Interest Period for LIBO Rate Loans will be determined by the Administrative Agent on the basis of the LIBOR Reserve Percentage in effect two Business Days before the first day of such Interest Period. Notwithstanding the foregoing, the LIBO Rate (Reserve Adjusted) shall at no time be less than (i) with respect to the Loans

(other than the Roll-Up Loans), 2.5% per annum and (ii) with respect to the Roll-Up Loans, 1.0% per annum.

"LIBOR Office" means, with respect to each Lender, the office of such Lender designated as its "LIBOR Office" in its Administrative Questionnaire or such other office designated from time to time by notice from such Lender to the Borrower and the Administrative Agent, whether or not outside the United States, which shall be making or maintaining the LIBO Rate Loans of such Lender.

"LIBOR Reserve Percentage" means, relative to any Interest Period for LIBO Rate Loans, the reserve percentage (expressed as a decimal) equal to the maximum aggregate reserve requirements (including all basic, emergency, supplemental, marginal and other reserves and taking into account any transitional adjustments or other scheduled changes in reserve requirements) specified under regulations issued from time to time by the F.R.S. Board and then applicable to assets or liabilities consisting of or including "Eurocurrency Liabilities", as currently defined in Regulation D of the F.R.S. Board, having a term approximately equal or comparable to such Interest Period.

"License" means any authorization, permit, consent, franchise, ordinance, registration, certificate, license, agreement or other right filed with, granted by, or entered into by a Governmental Authority with respect to Holdings or its Subsidiaries.

"Lien" means any security interest, mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or otherwise), charge against or interest in property, or other priority or preferential arrangement of any kind or nature whatsoever, to secure payment of a debt or performance of an obligation.

"Liquidity Amount" means, at any time, unrestricted cash on hand and unrestricted Cash Equivalent Investments of the Borrower and the Subsidiary Guarantors at such time that is free of all Liens (other than Liens securing the Obligations).

"Loan Documents" means, collectively, this Agreement, the Notes, the Security Agreement, the Holdings Guaranty and Pledge Agreement, the Aircraft Security Agreement, the Fee Letter, the Loan Proceeds Escrow Agreement, the Asset Sale/Insurance Escrow Agreement and each other agreement pursuant to which the Administrative Agent is granted a Lien to secure the Obligations, the Subsidiary Guaranty and each other agreement, certificate, document or instrument executed and/or delivered in connection with any Loan Document, whether or not specifically mentioned herein or therein.

"Loan Proceeds Escrow Account" means a segregated escrow account maintained in the name of the Administrative Agent by the Escrow Agent, which escrow account shall be maintained in accordance with the Loan Proceeds Escrow Agreement.

"Loan Proceeds Escrow Agreement" means an escrow agreement, substantially in the form of Exhibit L hereto, pursuant to which the Escrow Account is maintained.

"Loans" means the Closing Date Term Loans, the Final Order Term Loans and the Roll-Up Loans.

"Material Adverse Effect" means a material adverse effect on (i) the business, results of operations, financial condition, assets, liabilities or properties of Holdings and its Subsidiaries, taken as a whole, (ii) the rights and remedies of any Secured Party under any Loan Document or (iii) the ability of any material Obligor to perform its material Obligations, in each case, other than as customarily would occur as a result of the filing of the Chapter 11 Cases or the effect of bankruptcy or those circumstances and events leading up thereto.

"Material Contract" means, with respect to the Borrower or any Subsidiary, each contract (other than the Loan Documents) to which such Person is a party involving aggregate consideration payable to or by such Person of $1,000,000 or more in any year or otherwise material to the business or operations of the Borrower and the Subsidiaries, taken as a whole.

"Material Customer Contracts" means, at any time, contracts between any of the Borrower and its Subsidiaries and customers of the Borrower and its Subsidiaries, so long as the customers for such contracts represent more than 20% of the revenues of the Borrower and its Subsidiaries, on a consolidated basis.

"Milestones" is defined in Section 7.1.14.

"Monthly Payment Date" means the last Business Day of each calendar month.

"Moody's" means Moody's Investors Service, Inc.

"Mortgage" means each mortgage, deed of trust or agreement executed and delivered by any Obligor in favor of the Administrative Agent for the benefit of the Secured Parties pursuant to the requirements of this Agreement, in each case in form and substance reasonably satisfactory to the Administrative Agent, under which a Lien is granted on the real property and fixtures described therein, in each case as amended, supplemented, amended and restated or otherwise modified from time to time.

"Multiemployer Plan" means a multiemployer plan, as such term is defined in Section 4001(a)(3) of ERISA.

"Net Casualty Proceeds" means, with respect to any Casualty Event, the amount of any insurance proceeds or condemnation awards received by the Borrower or any of its Subsidiaries in connection with such Casualty Event (net of all taxes, collection fees and expenses and, to the extent attributable to the period following the Closing Date, the cost of the repair or restoration of the affected property), but excluding any proceeds or awards required to be paid to (x) a creditor (other than the Lenders) which holds a first priority Lien permitted by clause (b) of Section 7.2.3 on the property which is the subject of such Casualty Event or (y) in the case of a leased property, to the lessor under the lease of such property.

"Net Debt Proceeds" means, with respect to the incurrence, sale or issuance by the Borrower or any of its Subsidiaries of any Indebtedness after the Closing Date which is not expressly permitted by Section 7.2.2, (a) the gross cash proceeds actually received by such Person from such incurrence, sale or issuance minus (b) all reasonable and customary arranging or underwriting fees and commissions, and all legal, investment banking, brokerage and accounting and other professional fees, sales commissions and disbursements and other

reasonable and customary closing costs and expenses, in each case actually incurred in connection with such incurrence, sale or issuance other than any such fees, commissions or disbursements paid to Affiliates of such Person in connection therewith.

"Net Disposition Proceeds" means, with respect to any Disposition by the Borrower or any of its Subsidiaries pursuant to clause (c) of Section 7.2.9, (a) the gross cash proceeds received by such Person from such Disposition and any cash payment received in respect of promissory notes or other non-cash consideration delivered to the Borrower or its Subsidiaries in respect thereof minus (b) the sum of (i) all reasonable and customary legal, investment banking, brokerage and accounting fees and expenses and recording and filing fees and other customary closing costs incurred in connection with such Disposition and (ii) payments made by the Borrower or its Subsidiaries to retire Indebtedness (other than the Credit Extensions) where payment of such Indebtedness is required in connection with such Disposition; provided that if the amount of any estimated taxes pursuant to clause (b)(ii) exceeds the amount of taxes actually required to be paid in cash in respect of such Disposition, the aggregate amount of such excess shall constitute Net Disposition Proceeds.

"Net Income" means, for any period, the aggregate of all amounts (including all amounts in respect of any extraordinary gains and extraordinary losses) which would be included as net income on the consolidated financial statements of Holdings and its Subsidiaries for such period.

"Net Liquidity" means the Liquidity Amount of the Borrower and its Subsidiaries plus the aggregate amount in the Loan Proceeds Escrow Account available for disbursement.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Non-Excluded Taxes" means any Taxes other than (a) net income Taxes and franchise Taxes (imposed in lieu of net income Taxes) and backup withholding Taxes, in each case imposed on or with respect to any Secured Party by the U.S. or any Governmental Authority under the laws of which such Secured Party is organized or in which its principal office is located or in which it maintains its applicable lending office or in which it is engaged in a trade or business or has current or former presence for tax purposes (other than solely by reason of the transactions pursuant to this Agreement), (b) any branch profits Taxes imposed by the U.S. or any similar Tax imposed by any other jurisdiction described in clause (a) above, (c) any withholding Taxes imposed on amounts payable to a Secured Party at the time such Secured Party becomes a party to this Agreement (or designates a new lending office), except to the extent that such Secured Party's assignor (if any) (or the Secured Party, in the case of the designation of a new lending office) was entitled, at the time of assignment (or designation of a new lending office), to receive additional amounts from the Borrower with respect to such Non-Excluded Taxes pursuant to clause (a) or (d) of Section 4.6, (d) any Taxes that are imposed as a result of any event occurring after the Secured Party becomes a Secured Party other than a change in law or regulation or the introduction of any law or regulation or a change in interpretation or administration of any law, or (e) any U.S. federal withholding Taxes imposed under FATCA.

"Non-U.S. Lender" means any Lender that is not a "United States person", as defined under Section 7701(a)(30) of the Code.

"Note" means a promissory note of the Borrower payable to any Lender, in the form of Exhibit A hereto (as such promissory note may be amended, endorsed or otherwise modified from time to time), evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from outstanding Loans, and also means all other promissory notes accepted from time to time in substitution therefor or renewal thereof.

"Oak Hill" means, collectively, OHAA, Oak Hill Cargo 360, LLC and Oak Hill Capital Partners II, L.P.

"Obligations" means all obligations (monetary or otherwise, whether absolute or contingent, matured or unmatured) of the Borrower and each other Obligor arising under or in connection with a Loan Document and the Orders, the Secured OHAA Payment Obligations, and the principal of and premium, if any, and interest (including interest accruing during the pendency of the Chapter 11 Cases) on the Loans.  For the avoidance of doubt, Obligations shall include the principal of, interest on and other amounts owing with respect to the Roll-Up Loans pursuant to the Orders.

"Obligor" means, as the context may require, the Borrower, Holdings, each Subsidiary Guarantor and each other Person (other than a Secured Party) obligated under any Loan Document.

"OHAA" means OH Aircraft Acquisition, LLC.

"Orders" means the Interim Order and the Final Order.

"Organic Document" means, relative to any Obligor, as applicable, its certificate of incorporation, by-laws, certificate of partnership, partnership agreement, certificate of formation, limited liability agreement, operating agreement and all shareholder agreements, voting trusts and similar arrangements applicable to any of such Obligor's Capital Securities.

"Other Taxes" means any and all stamp, documentary or similar Taxes, or any other excise or property Taxes or similar levies that arise on account of any payment made or required to be made under any Loan Document or from the execution, delivery, registration, recording or enforcement of any Loan Document.

"Participant" is defined in clause (e) of Section 10.11.

"Patriot Act" is defined in Section 10.17.

"PBGC" means the Pension Benefit Guaranty Corporation and any Person succeeding to any or all of its functions under ERISA.

"Pension Plan" means a pension plan subject to Title IV of ERISA (other than a Multiemployer Plan) and to which the Borrower or any corporation, trade or business that is, along with the Borrower, a member of a Controlled Group, may have liability.

"Percentage" means, relative to any Lender, the applicable percentage which such Lender's undrawn Commitment and Loans then constitutes of the aggregate undrawn Commitments and Loans as such percentage may be adjusted from time to time pursuant to Lender Assignment Agreements executed by such Lender and its assignee Lender and delivered pursuant to Section 10.11.

"Permitted Deviation" is defined in Section 7.1.15(b).

"Permitted Refinancing" means, with respect to any Person, any modification, refinancing, refunding, renewal or extension of any Indebtedness of such Person; provided that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except by an amount equal to a reasonable premium or other reasonable amount paid and reasonably satisfactory to the Administrative Agent, and fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension and by an amount equal to any existing commitments unutilized thereunder or as otherwise permitted pursuant to Section 7.2.2; (b) such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of the Indebtedness being modified, refinanced, refunded, renewed or extended; and (c) if the Indebtedness being modified, refinanced, refunded, renewed or extended is subordinated in right of payment to the Loans, such modification, refinancing, refunding, renewal or extension is subordinated in right of payment to the Loans on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed or extended.

"Person" means any natural person, corporation, limited liability company, partnership, joint venture, association, trust or unincorporated organization, Governmental Authority or any other legal entity, whether acting in an individual, fiduciary or other capacity.

"Petition Date" is defined in the recitals.

"Plan" is defined in Section 7.1.14(a).

"Plan Term Sheet Event" means that any of the following shall have occurred (unless waived by the Administrative Agent and the Required Lenders): (i) there shall be a breach or termination of any party's (other than a Lender's) obligations under the Support Agreement; (ii) any court of competent jurisdiction or other competent governmental or regulatory authority issues a ruling, determination, or order making illegal or otherwise restricting, enjoining, preventing or prohibiting the consummation of the restructuring substantially on the terms set forth in the Support Agreement, including, without limitation, an order of the Bankruptcy Court denying approval of the Support Agreement or confirmation of the Plan; or (iii) any law or order shall have been enacted, adopted or issued by any governmental entity that prohibits the implementation of the Plan or the transactions contemplated therein or by the other Plan supplements.

"Post-Petition" means the time period beginning immediately upon the filing of the Chapter 11 Cases.

"Pre-Petition" means the time period ending immediately prior to the Petition Date.

"Pre-Petition Agent" is defined in the recitals.

"Pre-Petition Credit Agreement" is defined in the recitals.

"Pre-Petition Indebtedness" means any and all Indebtedness of the Obligors incurred prior to and outstanding on the Petition Date.

"Pre-Petition Lenders" is defined in the recitals.

"Pre-Petition Liens" means any and all valid and perfected Liens granted pursuant to the Prepetition Credit Agreement in existence on the Petition Date.

"Pre-Petition Loan" is defined in the recitals.

"Pre-Petition Obligations" means the Obligations as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Security Agreement" means the "Security Agreement" and the "Holdings Guaranty and Pledge Agreement" as defined in the Pre-Petition Credit Agreement.

"Prepayment Notice" means a voluntary prepayment notice and certificate duly executed by an Authorized Officer of the Borrower substantially in the form of Exhibit I hereto.

"Primed Liens" is defined in Section 11.1(e).

"Qualified Capital Securities" means any Capital Securities that are not Disqualified Capital Securities.

"Rationalization Strategy" means the aircraft and equipment rationalization strategy developed by the Debtors and reasonably acceptable to the Required Lenders.

"RCRA" means the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., as amended.

"Register" is defined in clause (a) of Section 2.5.

"Regulations" means the regulations for Air Carrier Guarantee Loan Program issued pursuant to the Act, 14 C.F.R. Part 1300, as the same may be amended from time to time.

"Release" means a "release", as such term is defined in CERCLA.

"Released Parties" is defined in Section 11.4.

"Removal Effective Date" is defined in Section 9.4(b).

"Replacement Lender" is defined in clause (c) of Section 10.12.

"Requested Account Withdrawal Date" is defined in Section 5.3.

"Required Lenders" means, at any time, Lenders holding more than 50% of the Total Exposure Amount.  The outstanding principal amount of all Loans and the unfunded amount of the Commitments of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"Resignation Effective Date" is defined in Section 9.4(a).

"Restricted Payment" means, with respect to any Person, (a) the declaration or payment of any dividend (other than dividends payable solely in Capital Securities of such Person) on, or the making of any payment or distribution on account of, or the repurchase, redemption or other acquisition of, or setting apart assets for a sinking or other analogous fund for the purchase, redemption, defeasance, retirement or other acquisition of, any class of Capital Securities of the such Person or any warrants, options or other right or obligation to purchase or acquire any such Capital Securities, whether now or hereafter outstanding, (b) the making of any other distribution in respect of such Capital Securities, in each case either directly or indirectly, whether in cash, property or obligations of such Person or otherwise or (c) the payment of any management or similar fees and any expenses payable to the Investors.

"Roll-Up Loan" means the portion of the Pre-Petition Loan held by the Lenders or their respective Affiliates which are constituted as administrative priority claims and granted super-priority priming liens pursuant to the Orders.  The aggregate principal amount of the Roll-Up Loans shall be $37,500,000.  The principal amount of the Roll-Up Loans of each Lender shall be set forth opposite such Lender's name under the heading "Roll-Up Loan" on Schedule 1 to its Lender Addendum, or, as the case may be, in the Lender Assignment Agreement pursuant to which such Lender became a party to this Agreement.

"Rollover Debt" is defined in clause (b) of Section 7.2.2.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"Section 1110 Stipulation" means that certain Section 1110 Agreement and Order Under Sections 363 and 1110 of the Bankruptcy Code Regarding Section 1110 Compliance and Related Matters, filed with the Bankruptcy Court on September 27, 2012, among the Debtors, Wells Fargo Bank Northwest, N.A., in its capacity as Owner Trustee, and Oak Hill, as amended, supplemented, amended and restated or otherwise modified from time to time with the consent of the Required Lenders (such consent not to be unreasonably withheld).

"Secured OHAA Payment Obligations" means the obligations under the Section 1110 Stipulation to repay amounts actually received by the Debtors (or deemed received by the Debtors in the case of the Boeing Credit (as defined in the Section 1110 Stipulation)) from Oak Hill during the pendency of the Chapter 11 Cases pursuant to the terms of the Section 1110 Stipulation.

"Secured Parties" means, collectively, (i) the Lenders, the Administrative Agent and each of their respective successors, transferees and permitted assigns and (ii) solely, with respect to

the Secured OHAA Payment Obligations, Oak Hill.  For purposes of any determination to be made for purposes of <u>Section 4.1</u>, <u>4.2</u>, <u>4.3</u>, <u>4.4</u>, <u>4.5</u>, <u>4.6</u>, <u>4.7(a)</u>, <u>4.7(b)</u> (other than to the extent relating to the proceeds arising from the sale, liquidation or other disposition of, or the exercise of remedies against, Collateral), 4.9 and 4.10, "Secured Parties" shall refer to the parties in <u>clause (i)</u> only.

"<u>Security Agreement</u>" means the Pledge and Security Agreement executed and delivered by Authorized Officers of the Borrower, each of its U.S. Subsidiaries and Holdings, substantially in the form of <u>Exhibit G</u> hereto, as amended, supplemented, amended and restated or otherwise modified from time to time.

"<u>Senior Liens</u>" is defined in <u>Section 11.1(d)</u>.

"<u>Southern Air</u>" means Southern Air Inc., a Delaware corporation, a Debtor and debtor-in-possession.

"<u>Stated Maturity Date</u>" means the earliest to occur of (i) the date that is 180 days after the entry of the Interim Order, (ii) the date that is 45 days after the date of entry of the Interim Order if the Final Order has not been entered by such date, (iii) the date the Bankruptcy Court orders the conversion of any Chapter 11 Case of Holdings, the Borrower or Southern Air to a Chapter 7 liquidation or the dismissal of any Chapter 11 Case of Holdings, the Borrower or Southern Air, (iv) the acceleration of the Loans and the termination of the Commitments in accordance with the Loan Documents and (v) the effective date of any Chapter 11 plan of any Debtor that is confirmed pursuant to an order entered by the Bankruptcy Court.

"<u>Subsidiary</u>" means, with respect to any Person, any other Person of which more than 50% of the outstanding Voting Securities of such other Person (irrespective of whether at the time Capital Securities of any other class or classes of such other Person shall or might have voting power upon the occurrence of any contingency) is at the time directly or indirectly owned or controlled by such Person, by such Person and one or more other Subsidiaries of such Person, or by one or more other Subsidiaries of such Person.  Unless the context otherwise specifically requires, the term "Subsidiary" shall be a reference to a Subsidiary of the Borrower.

"<u>Subsidiary Guarantor</u>" means each Subsidiary that has executed and delivered to the Administrative Agent the Subsidiary Guaranty (including by means of a delivery of a supplement thereto).

"<u>Subsidiary Guaranty</u>" means the Subsidiary Guaranty executed and delivered by an Authorized Officer of each U.S. Subsidiary pursuant to the terms of this Agreement, substantially in the form of <u>Exhibit F</u> hereto, as amended, supplemented, amended and restated or otherwise modified from time to time.

"<u>Supplemental Budget</u>" is defined in <u>Section 7.1.15(a)</u>.

"<u>Support Agreement</u>" means the Support Agreement executed and delivered by Authorized Officers of each of the Debtors, Oak Hill and the consenting lenders party thereto as amended, supplemented, amended and restated or otherwise modified from time to time with the consent of the Required Lenders.

"Synthetic Lease" means, as applied to any Person, any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) (a) that is not a capital lease in accordance with GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for federal income tax purposes, other than any such lease under which that Person is the lessor.

"Taxes" means all income, franchise, stamp or other taxes, duties, levies, imposts, charges, assessments, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, and all interest, penalties or similar liabilities with respect thereto.

"Termination Date" means the date on which all Obligations (other than contingent indemnity obligations not then due and payable) have been paid in full in cash (or, in the case of the Secured OHAA Payment Obligations, have been otherwise provided for in accordance with the terms of the Section 1110 Stipulation or on other terms satisfactory to Oak Hill in its sole discretion) and all Commitments shall have terminated.

"Total Exposure Amount" means, on any date of determination (and without duplication), the outstanding principal amount of all Loans and the unfunded amount of the Commitments.

"type" means, relative to any Loan, the portion thereof, if any, being maintained as a Base Rate Loan or a LIBO Rate Loan.

"U.S. Subsidiary" means any Subsidiary that is incorporated or organized under the laws of the United States, a state thereof or the District of Columbia, other than any such entity wholly owned by a Foreign Subsidiary.

"U.S. Trustee" means the representative of the Office of the United States Trustee from time to time participating in the Chapter 11 Cases.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided that if, with respect to any Filing Statement or by reason of any provisions of law, the perfection or the effect of perfection or non-perfection of the security interests granted to the Administrative Agent pursuant to the applicable Loan Document is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than New York, then "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of each Loan Document and any Filing Statement relating to such perfection or effect of perfection or non-perfection.

"United States" or "U.S." means the United States of America, its fifty states and the District of Columbia.

"United States Citizen" is defined in Section 6.18(a).

"Variance Report" is defined in Section 7.1.15(a).

"Voting Securities" means, with respect to any Person, Capital Securities of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person.

"wholly owned Subsidiary" means any Subsidiary all of the outstanding Capital Securities of which (other than any director's qualifying shares or investments by foreign nationals mandated by applicable laws) is owned directly or indirectly by the Borrower.

"Withdrawal Certificate" means a certificate in the form attached to the Loan Proceeds Escrow Agreement or the Asset Sale/Insurance Escrow Agreement, as applicable.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.2    Use of Defined Terms.  Unless otherwise defined or the context otherwise requires, terms for which meanings are provided in this Agreement shall have such meanings when used in each other Loan Document and the Disclosure Schedule.

SECTION 1.3    Cross-References.  Unless otherwise specified, references in a Loan Document to any Article or Section are references to such Article or Section of such Loan Document, and references in any Article, Section or definition to any clause are references to such clause of such Article, Section or definition.

SECTION 1.4    Accounting and Financial Determinations.  Unless otherwise specified, all accounting terms used in each Loan Document shall be interpreted, and all accounting determinations and computations thereunder shall be made, in accordance with those generally accepted accounting principles ("GAAP") applied in the preparation of the financial statements delivered pursuant to the Pre-Petition Credit Agreement.  Unless otherwise expressly provided, all financial covenants and defined financial terms shall be computed on a consolidated basis for Holdings and its Subsidiaries, in each case without duplication.

ARTICLE II
COMMITMENTS, BORROWING
PROCEDURES, AND NOTES

SECTION 2.1    Commitments.  On the terms and subject to the conditions of this Agreement, the Lenders severally agree to make Credit Extensions as set forth below.

SECTION 2.1.1    Closing Date Term Loan Commitment.

(a)    In one Borrowing occurring on the Closing Date, each Lender that has a Closing Date Term Loan Commitment agrees that it will make loans (relative to such Lender, its "Closing Date Term Loans") to the Borrower equal to such Lender's Percentage of the aggregate amount of the Borrowing of Closing Date Term Loans requested by the Borrower to be made on such day. Each Lender's Closing Date Term Loan Commitment shall terminate immediately and without further action on the Closing Date after giving effect to the funding of such Lender's

Closing Date Term Loan Commitment on such date.  No amounts paid or prepaid with respect to Closing Date Term Loans may be reborrowed.

(b)     The proceeds of the Closing Date Term Loans shall be applied by Borrower to (i) the amounts to be paid on the Closing Date pursuant to the Approved Budget and (ii) fund the Loan Proceeds Escrow Account on the Closing Date.

SECTION 2.1.2    Final Order Term Loan Commitment.

(a)     In one Borrowing occurring on the Final Order Date, each Lender that has a Final Order Term Loan Commitment agrees that it will make loans (relative to such Lender, its "Final Order Term Loans") to the Borrower equal to such Lender's Percentage of the aggregate amount of the Borrowing of Final Order Term Loans requested by the Borrower to be made on such day. Each Lender's Final Order Term Loan Commitment shall terminate immediately and without further action on the Final Order Date after giving effect to the funding of such Lender's Final Order Term Loan Commitment on such date.  No amounts paid or prepaid with respect to Final Order Term Loans may be reborrowed.

(b)     The proceeds of the Final Order Term Loans shall be applied by Borrower on the Final Order Date to fund the Loan Proceeds Escrow Account.

(c)     On the Final Order Date, such Final Order Term Loans shall be coordinated with all other Closing Date Term Loans (including, without limitation, through an increase to the amount of any LIBO Rate Loan in respect of any then-outstanding Interest Period) such that each LIBO Rate Loan and each Base Rate Loan is allocated ratably among the Lenders in accordance with their then-outstanding Closing Date Term Loans.

SECTION 2.1.3    Roll-Up Loans.

On the terms and subject to the conditions contained in this Agreement and in the Orders, Prepetition Loans held by each Lender hereunder shall be substituted and deemed exchanged for (and deemed prepaid by) the Roll-Up Loans of such Lender in the amounts set forth on Schedule 1 to its Lender Addendum.

SECTION 2.2    Borrowing Procedure.  By delivering a Borrowing Request to the Administrative Agent on or before 12:00 noon New York City time on a Business Day, the Borrower may from time to time irrevocably request, on not less than one Business Day's notice in the case of Base Rate Loans, or three Business Days' notice in the case of LIBO Rate Loans, and in either case not more than five Business Days' notice, that a Borrowing be made, in the case of LIBO Rate Loans, in a minimum amount of $500,000 and an integral multiple of $100,000, in the case of Base Rate Loans, in a minimum amount of $100,000 and an integral multiple of $100,000 or, in either case, in the unused amount of the applicable Commitment; provided that all of the initial Loans shall be made either (x) as Base Rate Loans and may not be converted into LIBO Rate Loans until the date that is three Business Days following the Closing Date or (y) so long as the Borrower shall have delivered to the Administrative Agent notice thereof at least three Business Days in advance and a funding indemnity letter reasonably satisfactory to the Administrative Agent, LIBO Rate Loans having an Interest Period of one month.  On the terms and subject to the conditions of this Agreement, each Borrowing shall be

comprised of the type of Loans, and shall be made on the Business Day, specified in such Borrowing Request.  On or before 11:00 a.m. New York City time on such Business Day, each Lender that has a Commitment to make the Loans being requested shall deposit with the Administrative Agent same day funds in an amount equal to such Lender's Percentage of the requested Borrowing.  Such deposit will be made to an account which the Administrative Agent shall specify from time to time by notice to the Lenders.  To the extent funds are received from the Lenders, the Administrative Agent shall make such funds available to the Borrower by wire transfer to the accounts the Borrower shall have specified in its Borrowing Request.  No Lender's obligation to make any Loan shall be affected by any other Lender's failure to make any Loan.

SECTION 2.3    Continuation and Conversion Elections.  By delivering a Continuation/Conversion Notice to the Administrative Agent on or before 12:00 noon New York City time on a Business Day, the Borrower may from time to time irrevocably elect, (a) on not less than one Business Day's notice and not more than five Business Days' notice, that all or certain (in an aggregate minimum amount of $100,000 and an integral multiple of $100,000) of its outstanding LIBO Rate Loans be converted into Base Rate Loans or (b) on not less than three Business Day's notice and not more than five Business Days' notice, that all or certain (in an aggregate minimum amount of $500,000 and an integral multiple of $100,000) of its outstanding Base Rate Loans be converted into LIBO Rate Loans or any of its outstanding LIBO Rate Loans be continued as LIBO Rate Loans (in the absence of delivery of a Continuation/Conversion Notice with respect to any LIBO Rate Loan at least three Business Days' notice (but not more than five Business Days) before the last day of the then current Interest Period with respect thereto, such LIBO Rate Loan shall, on such last day, automatically convert to a Base Rate Loan); provided that (x) each such conversion or continuation shall be pro rated among the applicable outstanding Loans of all Lenders that have made such Loans, and (y) upon the occurrence and during the continuation of any Event of Default or any Default no portion of the outstanding principal amount of any Loans may be continued as, or be converted into, LIBO Rate Loans when any Default or Event of Default has occurred and is continuing.

SECTION 2.4    Funding.  Each Lender may, if it so elects, fulfill its obligation to make, continue or convert LIBO Rate Loans hereunder by causing one of its foreign branches or Affiliates (or an international banking facility created by such Lender) to make or maintain such LIBO Rate Loan; provided that such LIBO Rate Loan shall nonetheless be deemed to have been made and to be held by such Lender, and the obligation of the Borrower to repay such LIBO Rate Loan shall nevertheless be to such Lender for the account of such foreign branch, Affiliate or international banking facility.  In addition, the Borrower hereby consents and agrees that, for purposes of any determination to be made for purposes of Section 4.1, 4.2, 4.3 or 4.4, it shall be conclusively assumed that each Lender elected to fund all LIBO Rate Loans by purchasing Dollar deposits in its LIBOR Office's interbank eurodollar market.

SECTION 2.5    Register; Notes.  The Register shall be maintained on the following terms.

(a)    The Borrower hereby designates the Administrative Agent to serve as the Borrower's agent, solely for the purpose of this clause, to maintain a register (the "Register") on which the Administrative Agent will record each Lender's Commitment, the Loans made by

each Lender and any interest thereon, and each repayment in respect of the principal amount of the Loans or any interest, annexed to which the Administrative Agent shall retain a copy of each Lender Assignment Agreement delivered to the Administrative Agent pursuant to Section 10.11. Failure to make any recordation, or any error in such recordation, shall not affect any Obligor's Obligations.  The entries in the Register shall be conclusive, in the absence of manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person in whose name a Loan is registered (or, if applicable, to which a Note has been issued) as the owner thereof for the purposes of all Loan Documents, notwithstanding notice or any provision herein to the contrary. Any assignment or transfer of a Commitment or the Loans made pursuant hereto shall be registered in the Register only upon delivery to the Administrative Agent of a Lender Assignment Agreement that has been executed by the requisite parties pursuant to Section 10.11. No assignment or transfer of a Lender's Commitment or Loans shall be effective unless such assignment or transfer shall have been recorded in the Register by the Administrative Agent as provided in this Section.  The Administrative Agent is authorized to provide a copy of the Register to the Bankruptcy Court for the purpose of allowing the Bankruptcy Court to determine the Lenders of record for the purpose of determining the amount and identity of the holders of the Roll-Up Loan in accordance with the Final Order.

(b)     The Borrower agrees that, upon request to the Administrative Agent by any Lender, the Borrower will execute and deliver to such Lender a Note evidencing the Loans made by, and payable to the order of, such Lender in a maximum principal amount equal to such Lender's Loans, as the case may be.  The Borrower hereby irrevocably authorizes each Lender to make (or cause to be made) appropriate notations on the grid attached to such Lender's Note (or on any continuation of such grid), which notations, if made, shall evidence, inter alia, the date of, the outstanding principal amount of, and the interest rate and Interest Period applicable to the Loans evidenced thereby.  Such notations shall, to the extent not inconsistent with notations made by the Administrative Agent in the Register, be conclusive and binding on each Obligor absent manifest error; provided that the failure of any Lender to make any such notations shall not limit or otherwise affect any Obligations of any Obligor.

(c)     The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)     The entries made in the accounts maintained pursuant to paragraph (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein, provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement and the Pre-Petition Loan pursuant to the Final Order.

SECTION 2.6     Loan Proceeds Escrow Account.

(a)     On the Closing Date, the Administrative Agent, at the Borrower's express request and instruction (which request and instruction are evidenced by this Agreement) shall apply the

proceeds of the Closing Date Term Loans to the Loan Proceeds Escrow Account. On the Final Order Date, the Administrative Agent, at the Borrower's express request and instruction (which request and instruction are evidenced by this Agreement) shall apply the proceeds of the Final Order Term Loans to the Loan Proceeds Escrow Account.

(b)      The proceeds in the Loan Proceeds Escrow Account shall be released and applied in accordance with Section 6.19 as specified by Borrower in writing from time to time pursuant to the Loan Proceeds Escrow Agreement.

(c)      If the Stated Maturity Date occurs prior to the Final Order Date, all proceeds in the Loan Proceeds Escrow Account on the Stated Maturity Date shall be used to repay the Loans (other than the Roll-Up Loans) and, to the extent any amounts remain after application to the Loans, then to the Roll-Up Loans.

ARTICLE III
REPAYMENTS, PREPAYMENTS, INTEREST AND FEES

SECTION 3.1      Repayments and Prepayments; Application. The Borrower agrees that the Loans shall be repaid and prepaid pursuant to the following terms.

SECTION 3.1.1      Repayments and Prepayments. The Borrower shall repay in full the unpaid principal amount of each Loan upon the Stated Maturity Date therefor. Prior thereto, payments and prepayments of the Loans shall or may be made as set forth below.

(a)      From time to time on any Business Day, the Borrower may make a voluntary prepayment, in whole or in part, of the outstanding principal amount of any Loans, which shall be applied to the Loans (other than the Roll-Up Loans) and, to the extent the Loans (other than the Roll-Up Loans) have been paid in full, the Roll-Up Loans; provided that (A) any such prepayment shall be made pro rata among Loans of the same type and, if applicable, having the same Interest Period of all Lenders that have made such Loans and; (B) all such partial prepayments shall be, in the case of LIBO Rate Loans, in an aggregate minimum amount of $500,000 and an integral multiple of $100,000 and, in the case of Base Rate Loans, in an aggregate minimum amount of $100,000 and an integral multiple of $100,000; and (C) all such prepayments shall require delivery of a Prepayment Notice to the Administrative Agent on or before 12:00 noon New York City time, with respect to Base Rate Loans, one Business Day prior to such prepayment, and, with respect to LIBO Rate Loans, three Business Days prior to such prepayment.

(b)      Promptly following the receipt by the Borrower or any of its Subsidiaries of any Net Debt Proceeds, the Borrower shall apply 100% of such Net Debt Proceeds as set forth in Section 3.1.2 below.

(c)      Promptly following the receipt by the Borrower or any of its Subsidiaries of any Extraordinary Receipts, the Borrower shall apply 100% of such proceeds as set forth in Section 3.1.2 below.

(d)      Promptly following the receipt by the Borrower or any of its Subsidiaries of any Net Disposition Proceeds and Net Casualty Proceeds (other than proceeds of 1110 Collateral),

the Borrower shall apply 100% of such Net Disposition Proceeds and Net Casualty Proceeds as set forth in Section 3.1.2(c) below.

(e)     Immediately upon any acceleration of the Stated Maturity Date of any Loans pursuant to Section 8.2, the Borrower shall repay all the Loans, unless, pursuant to Section 8.2, only a portion of all the Loans is so accelerated (in which case the portion so accelerated shall be so repaid).

Each prepayment of any Loans made pursuant to this Section shall be without premium or penalty, except as may be required by Section 4.4.

SECTION 3.1.2   Application.  Amounts prepaid pursuant to Section 3.1.1 shall be applied as set forth in this Section.

(a)     Each prepayment or repayment of the principal of the Loans pursuant to clause (a) of Section 3.1.1 shall be applied, to the extent of such prepayment or repayment, first, to the principal amount thereof being maintained as Base Rate Loans, and second, subject to the terms of Section 4.4, to the principal amount thereof being maintained as LIBO Rate Loans.

(b)     All proceeds received pursuant to clauses (b) through (c) of Section 3.1.1 shall be deposited into the Loan Proceeds Escrow Account.  Such proceeds shall be released to the Borrower from the Loan Proceeds Escrow Account at the request of the Borrower in accordance with the Loan Proceeds Escrow Agreement, subject to the consent of the Required Lenders, in their sole discretion;

(c)     All proceeds received pursuant to clause (d) of Section 3.1.1 shall be deposited into the Asset Sale/Insurance Escrow Account.  Such proceeds shall be released to the Borrower from the Asset Sale/Insurance Escrow Account at the request of the Borrower in accordance with the Asset Sale/Insurance Escrow Agreement, subject to the consent of the Required Lenders (which shall include at least three Lenders), in their sole discretion.   If the Stated Maturity Date occurs prior to the Final Order Date, all proceeds in the Asset Sale/Insurance Escrow Account on the Stated Maturity Date shall be used to repay the Loans (other than the Roll-Up Loans) and the Secured OHAA Payment Obligations on a pro rata basis to the extent any amounts remain after such application, then to the Roll-Up Loans.

SECTION 3.2    Interest Provisions.  Interest on the outstanding principal amount of the Loans shall accrue and be payable in accordance with the terms set forth below.

SECTION 3.2.1   Rates.  Subject to Section 2.2, pursuant to an appropriately delivered Borrowing Request or Continuation/Conversion Notice, the Borrower may elect that the Loans comprising a Borrowing accrue interest at a rate per annum:

(a)     on that portion maintained from time to time as a Base Rate Loan, equal to the sum of (i) the Alternate Base Rate from time to time in effect plus (ii) the Applicable Margin; and

(b)    on that portion maintained as a LIBO Rate Loan, during each Interest Period applicable thereto, equal to the sum of (i) the LIBO Rate (Reserve Adjusted) for such Interest Period plus (ii) the Applicable Margin.

All LIBO Rate Loans shall bear interest from and including the first day of the applicable Interest Period to (but not including) the last day of such Interest Period at the interest rate determined as applicable to such LIBO Rate Loan.  Notwithstanding the foregoing, on any day that Base Rate Loans are outstanding, in no event shall the rate applicable to such Base Rate Loans be less than the rate applicable to LIBO Rate Loans borrowed on such day.

Unless expressly provided for herein, all payments required to be made under this Agreement shall be payable in cash.

SECTION 3.2.2    Default Rates.  Upon the occurrence and during the continuation of any Event of Default, the Borrower shall pay, but only to the extent permitted by law, interest (after as well as before judgment) on all monetary Obligations owed to Lenders then outstanding at a rate per annum equal to the rate of interest that otherwise would be applicable to such Obligations plus 2% per annum or, if there is no applicable interest rate, with respect to Obligations owed to Lenders, the Alternate Base Rate from time to time in effect, plus the Applicable Margin accruing interest at the Base Rate, plus a margin of 2% per annum.

SECTION 3.2.3    Payment Dates.  Interest accrued on each Loan shall be payable, without duplication, (a) on each Interest Payment Date, in arrears; and (b) on that portion of any Loans the Stated Maturity Date of which is accelerated pursuant to Section 8.2, immediately upon such acceleration.  Interest accrued on Loans or other monetary Obligations owed to Lenders after the date such amount is due and payable (whether on the Stated Maturity Date, upon acceleration or otherwise) shall be payable upon demand.

SECTION 3.3    Other Payments.

SECTION 3.3.1    The Borrower agrees to pay the fees in the amounts and on the dates set forth in the Fee Letter.

SECTION 3.3.2    As consideration for the Lenders providing their Loans and Commitments hereunder, the Borrower agrees to pay to the Administrative Agent, for the account of each of the Lenders on a pro rata basis in accordance with their Total Exposure Amount, a payment as compensation for the funding of such Lender's Closing Date Term Loans and Final Order Term Loan Commitments in an amount equal to 1.5% of the stated principal amount of such Lender's Closing Date Term Loans and Final Order Term Loan Commitments, payable to such Lender out of the proceeds of its Closing Date Term Loans as and when funded on the Closing Date.

SECTION 3.3.3    A cash payment equal to five percent (5%) of the total equity value of the reorganized Debtors shall be payable pursuant to the Plan (the "Equity Payment"), which shall be earned upon entry of the Interim Order approving the DIP Facility (the "Interim Order") and payable to each initial DIP Lender pro rata based on the amount of such DIP Lenders' Lender's Closing Date Term Loans and Final Order Term Loan Commitments as a super-priority administrative expense claim at the earliest of (i) confirmation of any plan of reorganization, in

which case, the Equity Payment shall be deemed to be in an amount equal to the greater of (x) five percent (5%) of the total equity value of any confirmed Chapter 11 plan and (y) five percent (5%) of what the total equity value of the reorganized Debtors would have been under the Plan; (ii) sale of all or substantially all of the Debtors' assets, in which case, the Equity Payment shall be deemed to be equal to the greater of (x) five percent (5%) of the Loans (other than the Roll-Up Loans) and (y) five percent (5%) of the sale proceeds, and shall in each case be payable only from sale proceeds and senior to all other Obligations; and (iii) conversion of the Chapter 11 Case of Southern Air to a case under Chapter 7 of the Bankruptcy Code, in which case, the Equity Payment shall be deemed to be equal to 5% of the Loans (other than the Roll-Up Loans) and shall be senior to the Obligations; provided, however, that, notwithstanding the foregoing, in the case of confirmation of any plan of reorganization of the Debtors, at the election of the Debtors, and in their sole and absolute discretion, which election shall be announced prior to the commencement of the hearing to consider confirmation of such plan, such payment may be made in the form of reorganized common stock of Holdings equal to the Equity Payment.

ARTICLE IV
CERTAIN LIBO RATE AND OTHER PROVISIONS

SECTION 4.1    LIBO Rate Lending Unlawful.  If any Lender shall determine (which determination shall, upon notice thereof to the Borrower and the Administrative Agent, be conclusive and binding on the Borrower) that the introduction of or any change in the interpretation of any law makes it unlawful, or any Governmental Authority asserts that it is unlawful, for such Lender to make or continue any Loan as, or to convert any Loan into, a LIBO Rate Loan, the obligations of such Lender to make, continue or convert any such LIBO Rate Loan shall, upon such determination, forthwith be suspended until such Lender shall notify the Administrative Agent that the circumstances causing such suspension no longer exist, and all outstanding LIBO Rate Loans payable to such Lender shall automatically convert into Base Rate Loans at the end of the then current Interest Periods with respect thereto or sooner, if required by such law or assertion.

SECTION 4.2    Deposits Unavailable.  If the Administrative Agent shall have determined that (a) Dollar deposits in the relevant amount and for the relevant Interest Period are not available to it in its relevant market; or (b) by reason of circumstances affecting its relevant market, adequate means do not exist for ascertaining the interest rate applicable hereunder to LIBO Rate Loans; then, upon notice from the Administrative Agent to the Borrower and the Lenders, the obligations of all Lenders under Section 2.2 and Section 2.3 to make or continue any Loans as, or to convert any Loans into, LIBO Rate Loans shall forthwith be suspended until the Administrative Agent shall notify the Borrower and the Lenders that the circumstances causing such suspension no longer exist.

SECTION 4.3    Increased LIBO Rate Loan Costs, etc.  The Borrower agrees to reimburse each Secured Party for any increase in the cost to such Secured Party of, or any reduction in the amount of any sum receivable by such Secured Party in respect of, such Secured Party's Commitments and the making of Credit Extensions hereunder (including the making, continuing or maintaining (or of its obligation to make or continue) any Loans as, or of converting (or of its obligation to convert) any Loans into, LIBO Rate Loans) that arise in connection with any Change in Law (other than with respect to increased capital costs and Taxes

which are governed by Sections 4.5 and 4.6, respectively).  Each affected Secured Party shall promptly notify the Administrative Agent and the Borrower in writing of the occurrence of any such event, stating the reasons therefor and the additional amount required fully to compensate such Secured Party for such increased cost or reduced amount.  Such additional amounts shall be payable by the Borrower directly to such Secured Party within five days of its receipt of such notice, and such notice shall, in the absence of manifest error, be conclusive and binding on the Borrower; provided that the Borrower shall not be responsible for costs under this Section 4.3 arising more than 180 days prior to receipt by the Borrower of the demand from the affected Secured Party pursuant to this Section 4.3; provided further that if such change in or in the interpretation of any law or regulation giving rise to such increased cost is retroactive, then the 180-day period referred to in the previous proviso shall be extended to include the period of retroactive effect thereof.

SECTION 4.4    Funding Losses.  In the event any Lender shall incur any loss or expense (including any loss or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Lender to make or continue any portion of the principal amount of any Loan as, or to convert any portion of the principal amount of any Loan into, a LIBO Rate Loan) as a result of

(a)    any conversion or repayment or prepayment of the principal amount of any LIBO Rate Loan on a date other than the scheduled last day of the Interest Period applicable thereto, whether pursuant to Article III or otherwise;

(b)    any Loans not being made as LIBO Rate Loans in accordance with the Borrowing Request therefor; or

(c)    any Loans not being continued as, or converted into, LIBO Rate Loans in accordance with the Continuation/Conversion Notice therefor;

then, upon the written notice of such Lender to the Borrower (with a copy to the Administrative Agent), the Borrower shall, within five days of its receipt thereof, pay directly to such Lender such amount as will (in the reasonable determination of such Lender) reimburse such Lender for such loss or expense (but excluding any lost profit or margin).  Such written notice shall, in the absence of manifest error, be conclusive and binding on the Borrower.

SECTION 4.5    Increased Capital Costs.  If any Change in Law (other than with respect to Taxes which shall be governed solely by Section 4.6) affects or would affect the amount of capital required or expected to be maintained by any Secured Party or any Person controlling such Secured Party, and such Secured Party determines (in good faith but in its sole and absolute discretion) that the rate of return on its or such controlling Person's capital as a consequence of the Commitments or the Credit Extensions made, by such Secured Party is reduced to a level below that which such Secured Party or such controlling Person could have achieved but for the occurrence of any such circumstance, then upon notice from time to time by such Secured Party to the Borrower, the Borrower shall within five days following receipt of such notice pay directly to such Secured Party additional amounts sufficient to compensate such Secured Party or such controlling Person for such reduction in rate of return.  A statement of such Secured Party as to any such additional amount or amounts shall, in the absence of manifest

error, be conclusive and binding on the Borrower.  In determining such amount, such Secured Party may use any method of averaging and attribution that it (in its sole and absolute discretion) shall deem applicable; provided that the Borrower shall not be responsible for costs under this Section 4.5 arising more than 180 days prior to receipt by the Borrower of the demand from the affected Lender pursuant to this Section 4.5; provided further that if such change in or in the interpretation of any law or regulation giving rise to such increased cost is retroactive, then the 180-day period referred to in the previous proviso shall be extended to include the period of retroactive effect thereof.

SECTION 4.6    Taxes.  The Borrower covenants and agrees as follows with respect to Taxes:

(a)    Any and all payments by or on behalf of any Obligor under each Loan Document shall be made free and clear of, and without deduction or withholding for or on account of, any Non-Excluded Taxes.  In the event that any Taxes are imposed and required to be deducted or withheld from any payment required to be made by or on behalf of any Obligor to or on behalf of any Secured Party under any Loan Document, then:

(i)    subject to clause (f), if such Taxes are Non-Excluded Taxes, the amount of such payment shall be increased as may be necessary so that such payment is made, after withholding or deduction for or on account of such Non-Excluded Taxes, in an amount that is not less than the amount provided for in such Loan Document; and

(ii)    the Borrower or applicable withholding agent shall withhold the full amount of such Taxes from such payment (as increased pursuant to clause (a)(i)) and shall pay such amount to the Governmental Authority imposing such Taxes in accordance with applicable law.

(b)    In addition, the Borrower shall pay all Other Taxes imposed to the relevant Governmental Authority imposing such Other Taxes in accordance with applicable law.

(c)    As promptly as practicable after the payment of any Taxes or Other Taxes, and in any event within 60 days of any such payment being due, the Borrower shall furnish to the Administrative Agent an official receipt (or a certified copy thereof or other evidence of such payment reasonably satisfactory to the Administrative Agent) evidencing the payment of such Taxes or Other Taxes.  The Administrative Agent shall make copies thereof available to any Lender upon request therefor.

(d)    Subject to clause (f), the Borrower shall indemnify each Secured Party for any Non-Excluded Taxes and Other Taxes levied, imposed or assessed on and paid by or with respect to such Secured Party on or with respect to any payment by the Borrower or any Guarantor under any Loan Document whether or not such Non-Excluded Taxes or Other Taxes are correctly or legally asserted by the relevant Governmental Authority.  Promptly upon having received written notice, including a certificate as to the amount of the liability from any Secured Party that any such Non-Excluded Taxes or Other Taxes have been levied, imposed or assessed, the Borrower shall pay such Non-Excluded Taxes or Other Taxes directly to the relevant Governmental Authority.  For the avoidance of doubt, the Borrower shall indemnify each Secured Party for any

incremental Taxes that may become payable by such Secured Party to the extent resulting from any failure of the Borrower to deliver to the Administrative Agent, pursuant to <u>clause (c)</u>, documentation evidencing the payment of Non-Excluded Taxes or Other Taxes. With respect to indemnification for Non-Excluded Taxes and Other Taxes actually paid by any Secured Party or the indemnification provided in the immediately preceding sentence, such indemnification shall be made within 30 days after the date such Secured Party makes written demand therefor which demand shall include a certificate as to the amount of such payment or liability. The Borrower acknowledges that any payment made to any Secured Party or to any Governmental Authority in respect of the indemnification obligations of the Borrower provided in this clause shall constitute a payment in respect of which the provisions of <u>clause (a)</u> and this clause shall apply. The indemnity provided for herein and all of the obligations of the Secured Parties set forth in this <u>Section 4.6</u> shall survive the payment of the Obligations and termination of this Agreement.

(e)    (A)    Each Non-U.S. Lender, on or prior to the date on which such Non-U.S. Lender becomes a Lender hereunder (and from time to time thereafter as is prescribed by applicable law or upon the request of the Borrower or the Administrative Agent, but only for so long as such Non-U.S. Lender is legally entitled to do so), shall deliver to the Borrower and the Administrative Agent either (i) two original duly completed copies of either (x) Internal Revenue Service Form W-8BEN claiming eligibility of the Non-U.S. Lender for benefits of an income tax treaty to which the United States is a party, (y) Internal Revenue Service Form W-8ECI claiming that the payments are effectively connected with the conduct of its U.S. trade or business, or (z) Internal Revenue Service Form W-8IMY of the Lender, accompanied by a Form W-8ECI, W-8BEN, Exemption Certificate, Form W-9 (or other successor forms) or any other required information from each beneficial owner, as applicable, in each case an applicable successor form; or (ii) in the case of a Non-U.S. Lender that is not legally entitled to deliver either form listed in <u>clause (e)(i)</u>, (x) a certificate to the effect that such Non-U.S. Lender is not (I) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (II) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (III) a controlled foreign corporation receiving interest from a related person within the meaning of Section 881(c)(3)(C) of the Code (referred to as an "<u>Exemption Certificate</u>") and (y) two original duly completed copies of Internal Revenue Service Form W-8BEN or applicable successor form, and (iii) any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction required to be made. Each Non-U.S. Lender shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide any previously delivered form or forms and/or Exemption Certificate to the Borrower (or an applicable successor form).

(B)    Any Lender that is a "United States person," as defined in Section 7701(a)(30) of the Code shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent, but only if such Lender is legally entitled to do so) two duly completed original signed copies of Internal Revenue Service Form W-9, or any successor form that such

Lender is entitled to provide at such time in order to comply with United States backup withholding requirements.

(C)     If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (C), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(f)     The Borrower shall not be obligated to pay any additional amounts to any Lender pursuant to clause (a)(i), or to indemnify any Lender pursuant to clause (d), in respect of any U.S. federal withholding taxes or U.S. federal backup withholding taxes imposed as a result of (i) the failure of such Lender to deliver to the Borrower the form or forms and/or an Exemption Certificate, as applicable to such Lender, pursuant to clause (e), (ii) such form or forms and/or Exemption Certificate not establishing a complete exemption from U.S. federal withholding tax or U.S. federal backup withholding taxes or the information or certifications made therein by the Lender being untrue or inaccurate on the date delivered in any material respect, or (iii) the Lender designating a successor lending office at which it maintains its Loans which has the effect of causing such Lender to become obligated for Tax payments in excess of those in effect immediately prior to such designation; provided that the Borrower shall be obligated to pay additional amounts to any such Lender pursuant to clause (a)(i), and to indemnify any such Lender pursuant to clause (d), in respect of United States federal withholding taxes and U.S. federal backup withholding taxes if (A) any such failure to deliver a form or forms or an Exemption Certificate or the failure of such form or forms or Exemption Certificate to establish a complete exemption from U.S. federal withholding tax or U.S. federal backup withholding taxes or inaccuracy or untruth contained therein resulted from a change in any applicable statute, treaty, regulation or other applicable law or any interpretation of any of the foregoing occurring after the Closing Date (or, in the case of an assignment, after the date of the assignment), which change rendered such Lender (I) no longer legally entitled to deliver such form or forms or Exemption Certificate or (II) otherwise ineligible for a complete exemption from U.S. federal withholding tax U.S. federal backup withholding taxes, (B) the redesignation of the Lender's lending office was made at the request of the Borrower or (C) the obligation to pay any additional amounts to any such Lender pursuant to clause (a)(i) or to indemnify any such Lender pursuant to clause (d) is with respect to a Person that becomes a Lender as a result of an assignment made at the request of the Borrower.

(g)     If a Secured Party shall become aware that it is entitled to claim a refund from a Governmental Authority in respect of Non-Excluded Taxes or Other Taxes as to which it has

been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 4.6, it promptly shall notify the Borrower of the availability of such refund claim and shall use reasonable efforts to make a timely claim to such Governmental Authority for such refund at the Borrower's expense; provided that such Secured Party shall have no obligation to use such reasonable efforts if either (i) it is in an excess foreign tax credit position or (ii) it believes in good faith, in its sole discretion, that claiming a refund would cause material adverse tax consequences to it. If a Secured Party receives a refund (including pursuant to a claim) of any Non-Excluded Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 4.6, it shall within 30 days from the date of such receipt pay over the amount of such refund to the Borrower, net of all reasonable out-of-pocket expenses of such Secured Party (including any Taxes imposed on such refund) and without interest (other than interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrower, upon the request of such Secured Party, agrees to repay the amount paid over to the Borrower (plus penalties, interest or other reasonable charges) to such Secured Party in the event such Secured Party is required to repay such refund to such Governmental Authority. Nothing contained in this clause (g) shall require a Secured Party to disclose or detail the basis of its calculation of the amount of any tax benefit or any other amount or the basis of its determination referred to in the proviso to the first sentence of this clause (g) or otherwise make its tax returns or other information it deems confidential available to the Borrower or any other party.

SECTION 4.7    Payments, Computations; Proceeds of Collateral, etc.  (a)Unless otherwise expressly provided in a Loan Document, all payments by the Borrower pursuant to each Loan Document shall be made by the Borrower to the Administrative Agent for the pro rata account of the Secured Parties entitled to receive such payment. All payments shall be made without setoff, deduction or counterclaim not later than 12:00 noon New York City time on the date due in same day or immediately available funds to such account as the Administrative Agent shall specify from time to time by notice to the Borrower. Funds received after that time shall be deemed to have been received by the Administrative Agent on the next succeeding Business Day. The Administrative Agent shall promptly remit in same day funds to each Secured Party its share, if any, of such payments received by the Administrative Agent for the account of such Secured Party. All interest (including interest on LIBO Rate Loans) and fees shall be computed on the basis of the actual number of days (including the first day but excluding the last day) occurring during the period for which such interest or fee is payable over a year comprised of 360 days (except in the case of interest on a Base Rate Loan calculated at the Base Rate, which shall be payable over a year comprised of 365 days or, if appropriate, 366 days). Payments due on a day other than a Business Day shall (except as otherwise required by clause (c) of the definition of "Interest Period") be made on the next succeeding Business Day and such extension of time shall be included in computing interest and fees in connection with that payment.

(b)    All amounts received as a result of the exercise of remedies under the Loan Documents (including from the proceeds of collateral securing the Obligations) or under applicable law, or any other realization of Collateral following the occurrence of any Event of Default, shall be applied upon receipt to the Obligations as follows: (i) first, to the payment of all Obligations owing to the Administrative Agent, in its capacity as the Administrative Agent (including the reasonable and documented fees and out-of-pocket expenses of counsel to the

Administrative Agent), (ii) second, after payment in full in cash of the amounts specified in clause (b)(i), to the ratable payment of all interest (including interest accruing after the commencement of a proceeding in bankruptcy, insolvency or similar law, whether or not permitted as a claim under such law) and fees owing under the Loan Documents, and all costs and expenses owing to the Secured Parties pursuant to the terms of the Loan Documents, until paid in full in cash, (iii) third, after payment in full in cash of the amounts specified in clauses (b)(i) and (b)(ii), to the ratable payment of the principal amount of the Loans then outstanding and amounts owing to Secured Parties under the Secured OHAA Payment Obligations, (iv) fourth, after payment in full in cash of the amounts specified in clauses (b)(i) through (b)(iii), to the ratable payment of all other Obligations, other than the Roll-Up Loans, owing to the Secured Parties, (v) fifth, after payment in full in cash of the amounts specified in clauses (b)(i) through (b)(iv), subject to the Final Order, to interest then due and payable on the Roll-Up Loans, (vi) sixth, after payment in full in cash of the amounts specified in clauses (b)(i) through (b)(v), subject to the Final Order, to repay the Roll-Up Loans until paid in full, and (vii) seventh, after payment in full in cash of the amounts specified in clauses (b)(i) through (b)(vi), to each applicable Obligor or any other Person lawfully entitled to receive such surplus; provided that notwithstanding the foregoing, any proceeds in the Loan Proceeds Escrow Account shall be applied solely to the payment of the Obligations (other than the Secured OHAA Payment Obligations).

SECTION 4.8    Sharing of Payments. If any Secured Party shall obtain any payment or other recovery (whether voluntary, involuntary, by application of setoff or otherwise) on account of any Credit Extension (other than pursuant to the terms of Section 4.3, 4.4, 4.5 or 4.6) in excess of its pro rata share of payments obtained by all Secured Parties, such Secured Party shall purchase from the other Secured Parties such participations in Credit Extensions made by them as shall be necessary to cause such purchasing Secured Party to share the excess payment or other recovery ratably (to the extent such other Secured Parties were entitled to receive a portion of such payment or recovery) with each of them; provided that if all or any portion of the excess payment or other recovery is thereafter recovered from such purchasing Secured Party, the purchase shall be rescinded and each Secured Party which has sold a participation to the purchasing Secured Party shall repay to the purchasing Secured Party the purchase price to the ratable extent of such recovery together with an amount equal to such selling Secured Party's ratable share (according to the proportion of (a) the amount of such selling Secured Party's required repayment to the purchasing Secured Party to (b) total amount so recovered from the purchasing Secured Party) of any interest or other amount paid or payable by the purchasing Secured Party in respect of the total amount so recovered. The Borrower agrees that any Secured Party purchasing a participation from another Secured Party pursuant to this Section may, to the fullest extent permitted by law, exercise all its rights of payment (including pursuant to Section 4.9) with respect to such participation as fully as if such Secured Party were the direct creditor of the Borrower in the amount of such participation. If under any applicable bankruptcy, insolvency or other similar law any Secured Party receives a secured claim in lieu of a setoff to which this Section applies, such Secured Party shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of the Secured Parties entitled under this Section to share in the benefits of any recovery on such secured claim.

SECTION 4.9    Setoff. Each Secured Party shall, upon the occurrence and during the continuance of any Event of Default, have the right to appropriate and apply to the payment of

the Obligations owing to it (whether or not then due), and (as security for such Obligations) the Borrower hereby grants to each Secured Party a continuing security interest in, any and all balances, credits, deposits, accounts or moneys of the Borrower then or thereafter maintained with such Secured Party; provided that any such appropriation and application shall be subject to the provisions of Section 4.8. Each Secured Party agrees promptly to notify the Borrower and the Administrative Agent after any such appropriation and application made by such Secured Party; provided that the failure to give such notice shall not affect the validity of such setoff and application. In the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 4.12.2 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Secured Party under this Section are in addition to other rights and remedies (including other rights of setoff under applicable law or otherwise) which such Secured Party may have.

SECTION 4.10    Mitigation of Claims. Each Secured Party agrees that if it makes any demand for payment under Section 4.3, 4.5 or 4.6, or if any adoption or change of the type described in Section 4.1 shall occur with respect to it, such Secured Party will use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions and so long as such efforts would not be disadvantageous to it, as determined in its sole discretion) to designate a different lending office if the making of such a designation would reduce or obviate the need for the Borrower to make payments under Section 4.3, 4.5, or 4.6, or would eliminate or reduce the effect of any adoption or change described in Section 4.1.

SECTION 4.11    [Reserved].

SECTION 4.12    Defaulting Lenders.

SECTION 4.12.1 Defaulting Lender Adjustments. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(a)    Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders.

(b)    Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VII or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 4.9 shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such

Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *third*, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; *fourth*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fifth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; underline{provided} that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in underline{Section 5.2} were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this underline{Section 4.12.1(b)} shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

SECTION 4.12.2  underline{Defaulting Lender Cure}.  If the Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held pro rata by the Lenders in accordance with the Commitments, whereupon such Lender will cease to be a Defaulting Lender; underline{provided} that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and underline{provided}, underline{further}, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

ARTICLE V
CONDITIONS TO CREDIT EXTENSIONS

SECTION 5.1    underline{Initial Credit Extension}.  The obligations of the Lenders to make the initial Credit Extension shall be subject to the prior or concurrent satisfaction of each of the conditions precedent set forth in this Article.

SECTION 5.1.1    underline{Resolutions, etc.}  The Administrative Agent shall have received from each Obligor, as applicable, (i) a copy of a good standing certificate, dated a date reasonably

close to the Closing Date, for each such Person and (ii) a certificate, dated as of the Closing Date, duly executed and delivered by such Person's Secretary or Assistant Secretary, managing member or general partner, as applicable, as to

> (a)    resolutions of each such Person's Board of Directors (or other managing body, in the case of other than a corporation) then in full force and effect authorizing, to the extent relevant, the execution, delivery and performance of each Loan Document to be executed by such Person and the transactions contemplated hereby and thereby;

> (b)    the incumbency and signatures of those of its officers, managing member or general partner, as applicable, authorized to act with respect to each Loan Document to be executed by such Person; and

> (c)    the full force and validity of each Organic Document of such Person and certified copies thereof;

upon which certificates each Secured Party may conclusively rely until it shall have received a further certificate of the Secretary, Assistant Secretary, managing member or general partner, as applicable, of any such Person canceling or amending the prior certificate of such Person.

SECTION 5.1.2    Closing Date Certificate.  The Administrative Agent shall have received the Closing Date Certificate, dated as of the Closing Date and duly executed and delivered by an Authorized Officer of the Borrower, in which certificate the Borrower shall agree and acknowledge that the statements made therein shall be deemed to be true and correct, in all material respects, representations and warranties of the Borrower as of such date, and, at the time such certificate is delivered, such statements shall in fact be true and correct in all material respects.  All documents and agreements required to be appended to the Closing Date Certificate shall be in form and substance reasonably satisfactory to the Administrative Agent, shall have been executed and delivered by the requisite parties, and shall be in full force and effect.

SECTION 5.1.3    Delivery of Notes.  The Administrative Agent shall have received, for the account of each Lender that has requested a Note, such Lender's Notes duly executed and delivered by an Authorized Officer of the Borrower.

SECTION 5.1.4    Guarantees and Security Agreement.  The Administrative Agent shall have received executed counterparts of the Holdings Guaranty and Pledge Agreement, the Subsidiary Guaranty and the Security Agreement, each dated as of the date hereof, duly executed and delivered by an Authorized Officer of each Obligor party thereto, together with:

> (a)    in the case of Capital Securities that are securities (as defined in the UCC), certificates (to the extent such securities are certificated) evidencing all of the issued and outstanding Capital Securities owned by each Obligor in its Subsidiaries (subject to the limitations, if any, of the Voting Securities provided for in Section 7.1.9), which certificates shall be accompanied by undated instruments of transfer duly executed in blank;

(b)    Filing Statements naming Holdings, the Borrower and each Subsidiary Guarantor as a debtor and the Administrative Agent as the secured party;

(c)    copies of UCC searches, dated a date reasonably near to the Closing Date, listing all effective financing statements which name any Obligor (under its present name and any previous names during the last five years) as the debtor, together with copies of such financing statements (none of which shall, except with respect to Liens permitted by Section 7.2.3, evidence a Lien on any collateral described in any Loan Document).

SECTION 5.1.5    Insurance. The Administrative Agent shall have received certificates from one or more insurance companies reasonably satisfactory to the Administrative Agent, evidencing coverage required to be maintained pursuant to each Loan Document.

SECTION 5.1.6    Opinions of Counsel. The Administrative Agent shall have received opinions, each dated the Closing Date and addressed to the Administrative Agent and all Lenders, from Weil, Gotshal & Manges LLP, counsel to the Obligors, in form and substance reasonably satisfactory to the Administrative Agent.

SECTION 5.1.7    Funding Fees, Expenses, etc. The Administrative Agent shall have received, simultaneously with the initial funding of the Loans on the Closing Date, for its own account, or for the account of each Lender, as the case may be, all fees, costs and expenses due and payable pursuant to Section 3.3 and, if then invoiced, Section 10.3. All fees and expenses due and payable under the Fee Letter shall be paid to each Person due such fees and expenses thereunder in accordance with the terms thereof.

SECTION 5.1.8    Anti-Terrorism Laws. The Administrative Agent shall have received all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act, and requested from the Borrower prior to entry of the Interim Order.

SECTION 5.1.9    Governmental Approvals. Other than the Orders, there shall be no governmental or third party approvals necessary for the consummation of the facilities contemplated by this Agreement, the incurrence of debt and the granting of security interests contemplated thereby.

SECTION 5.1.10    Approved Budget. The Administrative Agent shall have received the Approved Budget.

SECTION 5.1.11    Chapter 11 Case Administration. (a) The Administrative Agent and Required Lenders shall have approved a motion in form and substance satisfactory to the Administrative Agent and the Required Lenders seeking approval of the Commitments and Loans made hereunder;

(b)    The Interim Order shall have been previously reviewed by the Required Lenders and shall be in form and substance satisfactory to the Required Lenders and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal;

(c)     The Interim Order shall have been entered by the Bankruptcy Court no later than October 1, 2012;

(d)     The Obligors shall be in compliance in all respects with the Interim Order;

(e)     No trustee, examiner or receiver with expanded powers pursuant to Section 1104(c) of the Bankruptcy Code, shall have been appointed or designated with respect to Borrower or any Debtor or their respective business, properties or assets, and no motion shall be pending seeking similar relief or any other relief, which, if granted, would result in a person other than the Debtors exercising control over the Debtors' assets;

(f)     All of the First Day Orders entered by the Bankruptcy Court and all related motions submitted to the Bankruptcy Court for approval (as applicable) at or about the time of the commencement of the Chapter 11 Cases shall be in form and substance satisfactory to the Required Lenders;

(g)     All orders entered by the Bankruptcy Court pertaining to cash management and adequate protection shall, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance satisfactory to the Administrative Agent and the Required Lenders in their sole discretion; and

(h)     All of the Liens described in Section 11.1 shall have been created and perfected upon entry of the Interim Order.

SECTION 5.1.12  Closing Date.  The Closing Date shall be no later than two Business Days after entry of the Interim Order.

SECTION 5.1.13  The Section 1110 Stipulation.  The Administrative Agent, the Required Lenders, the Pre-Petition Agent, and the Required Lenders (as defined in the Pre-Petition Credit Agreement), shall have received and approved of the Section 1110 Stipulation.

SECTION 5.1.14  Escrow Account.  The Borrower shall have established the Loan Proceeds Escrow Account and entered into the Loan Proceeds Escrow Agreement.

SECTION 5.2     All Credit Extensions.  The obligation of each Lender to make any Credit Extension shall be subject to the satisfaction of each of the conditions precedent set forth below.

SECTION 5.2.1   Compliance with Warranties, No Default, etc.  Both before and after giving effect to any Credit Extension (but, if any Default of the nature referred to in Section 8.1.5 shall have occurred with respect to any other Indebtedness, without giving effect to the application, directly or indirectly, of the proceeds thereof) the following statements shall be true and correct:

(a)     the representations and warranties set forth in each Loan Document shall, in each case, be true and correct (i) in the case of representations and warranties not qualified by references to "materiality" or a Material Adverse Effect, in all material

respects and (ii) otherwise, in all respects, in each case with the same effect as if then made (unless stated to relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date); and

(b)    no Default shall have then occurred and be continuing.

SECTION 5.2.2    Credit Extension Request, etc.  Subject to Section 2.2, the Administrative Agent shall have received a Borrowing Request.  The delivery of a Borrowing Request and the acceptance by the Borrower of the proceeds of such Credit Extension shall constitute a representation and warranty by the Borrower that on the date of such Credit Extension (both immediately before and after giving effect to such Credit Extension and the application of the proceeds thereof) the statements made in Section 5.2.1 are true and correct (unless stated to relate solely to an earlier date, in which case such representations and warranties shall be true and correct of such earlier date).

SECTION 5.2.3    Bankruptcy Matters.  At the time of the making of any Loan:

(a)    (i) with respect to any Loan made prior to the entry and effectiveness of the Final Order, the Interim Order shall be effective, shall not have terminated or expired and shall not have been stayed, reversed, vacated, amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent and (ii) with respect to any Loan made after entry and effectiveness of the Final Order, the Final Order shall be effective, shall not have terminated or expired and shall not have been stayed, reversed, vacated, amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent;

(b)    the Obligors shall be in compliance with the Orders in all material respects;

(c)    all First Day Orders and any "second day" orders shall be in form and substance satisfactory to the Administrative Agent;

(d)    the Administrative Agent and the Lenders shall have received when due (and after giving effect to any applicable grace periods) all periodic updates required with respect to the Approved Budget, including any Variance Reports; and

(e)    the Obligors shall be in compliance with Section 7.1.15 (including after giving effect to the proposed Borrowing and the use of proceeds thereof).

SECTION 5.3    Conditions to Withdrawals from the Loan Proceeds Escrow Account. The Borrower shall have the right to make withdrawals from the Loan Proceeds Escrow Account (an "Account Withdrawal") for the purposes set out in Section 6.19 in the manner set forth in the Loan Proceeds Escrow Agreement (unless otherwise agreed to by Borrower and the Administrative Agent) and the Administrative Agent shall direct the Escrow Agent to make such Account Withdrawal, subject to the satisfaction of the following conditions precedent on or prior to the date of each such proposed withdrawal (such date, the "Requested Account Withdrawal Date"):

SECTION 5.3.1   <u>Compliance with Warranties, No Default, etc.</u>  Both before and after giving effect to any Account Withdrawal (but, if any Default of the nature referred to in <u>Section 8.1.5</u> shall have occurred with respect to any other Indebtedness, without giving effect to the application, directly or indirectly, of the proceeds thereof) the following statements shall be true and correct:

(a)     the representations and warranties set forth in each Loan Document shall, in each case, be true and correct (i) in the case of representations and warranties not qualified by references to "materiality" or a Material Adverse Effect, in all material respects and (ii) otherwise, in all respects, in each case with the same effect as if then made (unless stated to relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date);

(b)     no Default shall have then occurred and be continuing;

(c)     after giving effect to such Account Withdrawal and the use of proceeds thereof the aggregate cash and Cash Equivalent Investments of the Borrower and its Guarantor Subsidiaries will not exceed $5,000,000; and

(d)     the Account Withdrawal shall be in accordance with the Approved Budget.

SECTION 5.3.2   <u>Withdrawal Certificate</u>.  The Administrative Agent shall have received a fully executed Withdrawal Certificate signed by an Authorized Officer of Borrower in accordance with the Loan Proceeds Escrow Agreement and the Borrower shall use commercially reasonable efforts to promptly confirm by telephone the Administrative Agent's receipt of such Withdrawal Certificate.  The delivery of a Withdrawal Certificate and the acceptance by the Borrower of the proceeds of such Account Withdrawal shall constitute a representation and warranty by the Borrower that on such account Withdrawal Date (both immediately before and after giving effect to such Account Withdrawal and the application of the proceeds thereof) the statement made in <u>Section 5.3.1</u> are true and correct on such date (unless stated to relate solely to an earlier date, in which case such representations and warranties shall be true and correct of such earlier date).

ARTICLE VI
REPRESENTATIONS AND WARRANTIES

In order to induce the Lenders to enter into this Agreement and to make Credit Extensions hereunder, the Borrower represents and warrants to each Lender as set forth in this Article.

SECTION 6.1   <u>Organization, etc.</u>  Subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, each Obligor is validly organized and existing and in good standing under the laws of the state or jurisdiction of its incorporation or organization, is duly qualified to do business and is in good standing as a foreign entity in each jurisdiction where the nature of its business requires such qualification, except where the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect, and has full power and authority and holds all requisite governmental licenses, permits and other

approvals to enter into and perform its Obligations under each Loan Document to which it is a party, to own and hold under lease its property and to conduct its business substantially as currently conducted by it, except where the failure to obtain such licenses, permits or approvals could not reasonably be expected to have a Material Adverse Effect.

SECTION 6.2   Due Authorization, Non-Contravention, etc.   Subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, the execution, delivery and performance by each Obligor of each Loan Document executed or to be executed by it and each Obligor's participation in the transactions contemplated hereby are within such Person's powers, have been duly authorized by all necessary action, and do not (a) contravene any (i) Obligor's Organic Documents, (ii) material court decree or order binding on or affecting any Obligor or (iii) material law or governmental regulation binding on or affecting any Obligor; or (b) result in (i) or require the creation or imposition of, any Lien on any Obligor's properties (except as permitted by this Agreement) or (ii) a default under any material contractual restriction binding on or affecting any Obligor, except to the extent enforcement of such contractual restriction is stayed by virtue of the Chapter 11 Cases.

SECTION 6.3   Government Approval, Regulation, Compliance with Law, etc.   Except for the approval of the Bankruptcy Court, no material authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or other Person (other than those that have been, or on the Closing Date will be, duly obtained or made and which are, or on the Closing Date will be, in full force and effect) is required for the due execution, delivery or performance by any Obligor of any Loan Document to which it is a party, in each case by the parties thereto.  Neither the Borrower nor any of its Subsidiaries is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.  Subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, each of Holdings, the Borrower and their respective Subsidiaries is in compliance, in all material respects, with all laws, rules, regulations and orders applicable to the conduct of its businesses or the ownership of its properties, except as disclosed in Item 6.3 of the Disclosure Schedule.

SECTION 6.4   Validity, etc.   Subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, each Loan Document, in each case to which any Obligor is a party, constitutes the legal, valid and binding obligations of such Obligor, enforceable against such Obligor in accordance with their respective terms (except, in any case, as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally and by principles of equity).

SECTION 6.5   Financial Information.   The financial statements of Holdings and its Subsidiaries furnished to the Administrative Agent and each Lender pursuant to the Pre-Petition Credit Agreement have been prepared in accordance with GAAP consistently applied, and present fairly the consolidated financial condition of the Persons covered thereby as at the dates thereof and the results of their operations for the periods then ended.  All balance sheets, all statements of income and of cash flow and all other financial information of each of Holdings and its Subsidiaries furnished pursuant to Section 7.1.1 have been and will for periods following the Closing Date be prepared in accordance with GAAP consistently applied (other than the unaudited financial statements furnished pursuant to Section 7.1.1, which have been and will be prepared consistently with the financial statements delivered pursuant to the Pre-Petition Credit

Agreement), and do or will present fairly the consolidated financial condition of the Persons covered thereby as at the dates thereof and the results of their operations for the periods then ended.

SECTION 6.6     [Reserved].

SECTION 6.7     Litigation, Labor Controversies, etc.  Other than the Chapter 11 Cases, there is no pending or, to the knowledge of the Borrower or any of its Subsidiaries, threatened litigation, action, proceeding or labor controversy affecting the Borrower, any of its Subsidiaries or any other Obligor, or any of their respective properties, businesses, assets or revenues, which (a) could reasonably be expected to have a Material Adverse Effect; or (b) purports to affect the legality, validity or enforceability of any Loan Document or the transactions contemplated hereby.

SECTION 6.8     Subsidiaries.  The Borrower has no Subsidiaries, except those Subsidiaries which are identified in Item 6.8 of the Disclosure Schedule, or which are permitted to have been organized or acquired in accordance with Sections 7.2.5 or 7.2.8.

SECTION 6.9     Ownership of Properties.  The Borrower and each of its Subsidiaries has (a) in the case of owned real property, good and indefeasible fee title to, (b) in the case of owned personal property, good and valid title to, or (c) in the case of leased real or personal property, valid and enforceable leasehold interests (as the case may be) in, all of its material properties and assets, tangible and intangible, of any nature whatsoever, free and clear in each case of all Liens or claims, except for Liens permitted pursuant to Section 7.2.3.  The real property listed in Item 6.9 of the Disclosure Schedule constitutes, as of the Closing Date, all of the real property owned or leased by the Borrower and its Subsidiaries as of the Closing Date.

SECTION 6.10     Taxes.  The Borrower and each of its Subsidiaries has filed or caused to be filed all material Tax returns and reports required by it and has paid all material Taxes that it is required to pay to the extent due, except any such Taxes which are being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books.

SECTION 6.11     Pension and Multiemployer Plans.

(a)     Neither the Borrower nor any of its Subsidiaries has maintained, contributed to, or has any liability with respect to, a Pension Plan.

(b)     No ERISA Event has occurred, which could reasonably be expected to result in a Material Adverse Effect.  No condition exists or event or transaction has occurred with respect to any Pension Plan or Multiemployer Plan which might result in an ERISA Event, which could reasonably be expected to result in a Material Adverse Effect.

(c)     As of the most recent valuation date for each Multiemployer Plan, the potential Withdrawal Liability of the Borrower or any member of the Controlled Group for a complete or partial withdrawal from such Multiemployer Plan could not reasonably be expected to result in a Material Adverse Effect.

SECTION 6.12    Environmental Warranties.  Except as set forth in Item 6.12 of the Disclosure Schedule.

(a)    The Borrower and its Subsidiaries, and their operations, are in material compliance with all Environmental Laws and have been for the past five years except for noncompliance that would not reasonably be expected to result in the Borrower or its Subsidiaries incurring material liability;

(b)    there are no material pending or to Borrower's knowledge threatened (i) claims, complaints, notices or requests for information received by the Borrower or any of its Subsidiaries with respect to any alleged violation of any Environmental Law, or (ii) written complaints, notices or inquiries to the Borrower or any of its Subsidiaries regarding potential material liability under any Environmental Law;

(c)    there have been no Releases of Hazardous Materials at, on or under any property now or, to the extent related to any acts or omissions of the Borrower or any of its Subsidiaries, previously owned, operated or leased by the Borrower or any of its Subsidiaries that have, or could reasonably be expected to have, a Material Adverse Effect;

(d)    the Borrower and its Subsidiaries have obtained and are in material compliance with all permits, certificates, approvals, licenses and other authorizations relating to environmental matters that are necessary for their businesses as currently conducted;

(e)    no property now or, to the Borrower's knowledge, previously owned, operated or leased by the Borrower or any of its Subsidiaries is listed or proposed for listing (with respect to owned property only) on the National Priorities List pursuant to CERCLA, on the CERCLIS or on any similar state or foreign list of sites to be investigated or cleaned-up, that individually or in the aggregate, have, or could reasonably be expected to have, a Material Adverse Effect;

(f)    neither Borrower nor any of its Subsidiaries has assumed by contract or operation of law any liabilities of any other person under Environmental Law, that individually or in the aggregate, have, or could reasonably be expected to have, a Material Adverse Effect;

(g)    neither the Borrower nor any Subsidiary has disposed or arranged for the disposal of any Hazardous Material or waste at any location that is listed or proposed for listing on the National Priorities List pursuant to CERCLA, on the CERCLIS or on any similar state or foreign list, or that is the subject of governmental or private enforcement actions or other investigations which may lead to material claims against the Borrower or such Subsidiary under Environmental Law, including any claim for remedial work, damage to natural resources, personal injury, or cost recovery under CERCLA in each case that individually or in the aggregate could reasonably be expected to have a Material Adverse Effect;

(h)    neither the Borrower nor any of its Subsidiaries has used any polychlorinated biphenyls or asbestos in a manner that, singly or in the aggregate, has or could reasonably be expected to have, a Material Adverse Effect and no such materials are present at any property owned, operated, or leased by Borrower or any of its Subsidiaries that, singly or in the aggregate, have or could reasonably be expected to have, a Material Adverse Effect; and

(i)    to Borrower's knowledge no conditions exist at, on or under any property now or previously owned or leased by the Borrower which, with the passage of time, or the giving of notice or both, would give rise to material liability under any Environmental Law.

SECTION 6.13    Accuracy of Information.  None of the factual information heretofore or contemporaneously furnished in writing to any Secured Party by or on behalf of any Obligor in connection with any Loan Document or any transaction contemplated hereby, when taken as a whole, contains any untrue statement of a material fact, or omits to state any material fact necessary to make any information not misleading, and no other factual information hereafter furnished in connection with any Loan Document by or on behalf of any Obligor to any Secured Party will contain any untrue statement of a material fact or will omit to state any material fact necessary to make any information, when taken as a whole with all information previously furnished, not misleading on the date as of which such information is dated or certified.  The Approved Budget made available to the Administrative Agent and the Lenders by Holdings prior to the Closing Date with respect to the Borrower have been prepared in good faith based on assumptions believed by the Borrower and Holdings to be reasonable, it being understood that projections in the Approved Budget are not to be viewed as facts and are subject to significant uncertainties and contingencies, many of which are beyond the Borrower's control, that no assurance can be given that any particular financial projection will be realized, that actual results may differ and that such differences may be material.

SECTION 6.14    Regulations U and X.  No Obligor is engaged in the business of extending credit for the purpose of buying or carrying margin stock, and no proceeds of any Credit Extensions will be used to purchase or carry margin stock or otherwise for a purpose which violates, or would be inconsistent with, F.R.S. Board Regulation U or Regulation X. Terms for which meanings are provided in F.R.S. Board Regulation U or Regulation X or any regulations substituted therefor, as from time to time in effect, are used in this Section with such meanings.

SECTION 6.15    Licenses, Patents, Copyrights, etc.  Subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, the Borrower and each Subsidiary, as applicable, owns, holds, possesses or has the right to use all Licenses and all intellectual property rights, necessary to own and operate its properties and to carry on its business as presently conducted or as presently planned to be conducted except to the extent that the failure to own or have the right to use the same could not reasonably be expected to have a Material Adverse Effect.  Subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, each of the foregoing Licenses and intellectual property licenses is in full force and effect and in good standing and the Borrower and each Subsidiary is in compliance in all material respects with all the terms and conditions of each thereof, with no

known conflict with the rights of others except to the extent that such conflict could not reasonably be expected to have a Material Adverse Effect.

SECTION 6.16    Material Contracts.  Item 6.16 of the Disclosure Schedule (as it may be amended or supplemented from time to time) sets forth a complete and accurate list of all Material Contracts to which the Borrower or any of the Subsidiaries is a party showing the parties to such Material Contracts, the dates such Material Contracts were entered into, the subject matter of such Material Contracts and any other information useful to determine the materiality of such Material Contract to the business or operations of the Borrower or Subsidiary party thereto.

SECTION 6.17    Collateral.  Upon entry of the Interim Order (and when applicable, the Final Order) by the Bankruptcy Court, the Interim Order (and when applicable, the Final Order) the Security Agreement will create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof enforceable against the Obligors in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).  Upon entry of the Interim Order (and when applicable, the Final Order) by the Bankruptcy Court, the Interim Order (and when applicable, the Final Order), the Liens created by the Orders shall constitute fully perfected Liens on, and security interest in, all right, title and interest of the Obligors in such Collateral and the proceeds thereof (other than to the extent otherwise permitted under the Loan Documents) in each case with the priority set forth in Section 11.1 and the Orders (except as otherwise expressly set forth in this Agreement), in each case prior and superior in right to any other Person (except Liens permitted under Section 7.2.3 and the Carve-Out).

SECTION 6.18    Regulatory Matters.

(a)    Southern Air is an "air carrier" as defined in the U.S. Transportation Code (49 U.S.C. Section 40102(a)(2)) and holds a certificate or certificates issued under 49 U.S.C. Section 41102(a)(1) or 41103, or exemptions therefrom under 49 U.S.C. Section 40109.  Southern Air is engaged in operations as an "air carrier" is a "citizen of the United States" as defined in 49 U.S.C. Section 40102(a)(15) (a "United States Citizen") and holds an air carrier operating certificate issued pursuant to Chapter 447 of Title 49 for aircraft capable of carrying 10 or more individuals or 6,000 pounds or more of cargo.  Southern Air possess all necessary certificates, franchises, Licenses, permits, rights and concessions and consents which are material to the operation of the routes flown by it and the conduct of its business and operations as currently conducted.

(b)    The Borrower is an "eligible borrower" within the meaning of the Regulations; the Borrower does not have any outstanding delinquent Federal debt (including tax liabilities); and the Loan Documents and the transactions contemplated hereby comply with the requirements of the Act and the Regulations.

SECTION 6.19    Use of Proceeds.

(a)    The Borrower will use the proceeds of the Loans to pay related fees, commissions and expenses subject to and in a manner consistent with the Approved Budget, including to pay (i) all fees due to the Administrative Agent and the Lenders as provided under this Agreement or the other Loan Documents, (ii) all reasonable out-of-pocket professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by the Administrative Agent, including, without limitation, those incurred in connection with the preparation, negotiation, documentation and court approval of this Agreement and any other Loan Documents; (iii) all reasonable out-of-pocket costs and expenses, including professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses), incurred by the Pre-Petition Agent, in each case, as provided for in the Orders, (iv) Post-Petition and approved (by the Bankruptcy Court, with the express consent of the Administrative Agent at the direction of the Required Lenders) Pre-Petition operating expenses and other working capital, general corporate needs and financing requirements of the Borrower and its Subsidiaries, (v) certain other costs and expenses related to the administration of the Chapter 11 Cases, and (vi) professional fees and expenses of the Debtors and any official creditors' committee (if any) appointed by the Bankruptcy Court.  Notwithstanding anything to the contrary in this Agreement and subject to the limitations set forth in the Orders, no Loans, Cash Collateral, the Carve-Out proceeds or any other proceeds of any of the foregoing shall be used to:  (A) , except to the extent permitted in the Approved Budget, pay interest and principal with respect to any Indebtedness (other than Indebtedness incurred under this Agreement); provided, however, for the avoidance of doubt, nothing in this Section 6.19 shall limit the Debtors' ability to make payments in respect of adequate protection to the Pre-Petition Agent and the Pre-Petition Lenders, pursuant to the Orders, (B) finance in any way any adversary action, investigation, suit, arbitration, proceeding, application, motion or other litigation of any type relating to or in connection with the Pre-Petition Credit Agreement or instruments entered into in connection therewith, including, without limitation, any challenges to the Pre-Petition Credit Agreement or any instruments entered into in connection therewith, including, without limitation, any challenges to the Pre-Petition Obligations or the validity, perfection, priority, or enforceability of any Lien securing such claims or any payment made thereunder, (C) finance in any way any investigation, action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of the Administrative Agent, or the Lenders or their rights and remedies under this Agreement, the other Loan Documents, the Interim Order or the Final Order, (D) seek authorization for any party to use any of the Cash Collateral of the Secured Parties except as set forth in the Orders or (E) except as otherwise permitted hereunder, obtain Liens that are senior to, or *pari passu* with, the Liens of the Administrative Agent, the Lenders and the other Secured Parties in the Collateral or any portion thereof.

(b)    The Loans shall be used in compliance with the Orders.

ARTICLE VII
COVENANTS

SECTION 7.1    Affirmative Covenants.  The Borrower agrees with each Lender and the Administrative Agent that until the Termination Date (other than with respect to the Secured OHAA Payment Obligations) has occurred, the Borrower will, and will cause its Subsidiaries to, perform or cause to be performed the obligations set forth below.

SECTION 7.1.1    Financial Information, Reports, Notices, etc.  The Borrower will furnish each Lender and the Administrative Agent copies of the following financial statements, reports, notices and information:

      (a)    as soon as available and in any event within 45 days after the end of each Fiscal Quarter of each Fiscal Year, an unaudited consolidated balance sheet of Holdings and its Subsidiaries as of the end of such Fiscal Quarter and consolidated statements of income and cash flow of Holdings and its Subsidiaries for such Fiscal Quarter and for the period commencing at the end of the previous Fiscal Year and ending with the end of such Fiscal Quarter, and including (in each case), (i) in comparative form the figures for the corresponding Fiscal Quarter in, and year to date portion of, the immediately preceding Fiscal Year and (ii) the references to hours flown, in each case, certified as complete and correct by the chief financial or accounting Authorized Officer of the Borrower;

      (b)    as soon as possible and in any event within three Business Days after an officer of the Borrower or any other Obligor obtains knowledge of the occurrence of a Default, a statement of an Authorized Officer of the Borrower setting forth details of such Default and the action which the Borrower or such Obligor has taken and proposes to take with respect thereto;

      (c)    as soon as possible and in any event within five Business Days after an officer of the Borrower or any other Obligor (i) obtains knowledge of the commencement of any Material Adverse Effect, any litigation, action, proceeding or labor controversy of the type and materiality described in Section 6.7, notice thereof and, to the extent the Administrative Agent requests, copies of all documentation relating thereto and (ii) receives written notice that a customer to a Material Customer Contract will not perform any material obligations or payment obligations under any Material Customer Contract (without regard to any grace period in such contract or any amendment or waiver thereto);

      (d)    promptly upon becoming aware of the occurrence of an ERISA Event, a statement of an Authorized Officer of the Borrower setting forth details of such ERISA Event and the action which the Borrower or such Obligor has taken and proposes to take with respect thereto;

      (e)    such other financial and other information as any Lender through the Administrative Agent may from time to time reasonably request;

(f)    as soon as available, and in any event within 30 days after the end of each month of each Fiscal Year, commencing with the month in which the date hereof occurs, an unaudited consolidated balance sheet of Holdings and its Subsidiaries as of the end of such month and consolidated statements of income and cash flow of Holdings and its Subsidiaries for such month and for the period commencing at the end of the previous Fiscal Year and ending with the end of such month, and including (in each case), in comparative form the figures for the corresponding month in, and year to date portion of, the immediately preceding Fiscal Year and the corresponding figures from the consolidated budget prepared for the current Fiscal Year and (ii) a calculation of EBITDA as of the end of such month and a description of monthly hours flown by Holdings and its Subsidiaries as of the end of such month, in the case of each of clause (i) and (ii), certified as complete and correct by the chief financial or accounting Authorized Officer of the Borrower;

(g)    concurrently with the delivery of the financial statements required to be delivered pursuant to clauses (a) and (f) of this Section 7.1.1, a narrative report by the chief financial or accounting Authorized Officer of the Borrower describing the operations of Holdings and its Subsidiaries for the applicable month, Fiscal Quarter or Fiscal Year and for the period from the beginning of the then current Fiscal Year to the end of such period to which such financial statements relate;

(h)    as soon as practicable and in any event within two Business Days of the applicable filing, copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Debtors with the Bankruptcy Court or the U.S. Trustee in any Chapter 11 Cases that are not otherwise made publicly available by filings on the Electronic Case Filing System for such Chapter 11 Cases (the "Court Documents"); provided, however, that any such Court Documents filed under seal and/or subject to confidentiality and other restrictions prohibiting disclosure to the Administrative Agent shall not be provided to Administrative Agent;

(i)    as soon as practicable and in any event within two Business Days of the applicable filing, copies of any reports filed in any Chapter 11 Case and provided to any creditors' or other committee or the U.S. Trustee ("Committee Documents") that are not otherwise made publicly available by filings on the Electronic Case Filing System for such Chapter 11 Case; provided, however, that any such Committee Documents filed under seal and/or subject to confidentiality and other restrictions prohibiting disclosure to the Administrative Agent shall not be provided to Administrative Agent; and

(j)    as soon as practicable and in any event within 10 Business Days of the Petition Date, a schedule of all liabilities on the Petition Date of the type that would be required to be set forth on a consolidated balance sheet prepared in accordance with GAAP, except (i) the liabilities reflected on the balance sheet most recently delivered by the Borrower pursuant to the Pre-Petition Credit Agreement and (ii) liabilities incurred in the ordinary course of business since the date of such balance sheet (none of which results from or arises out of any breach of or default under any contract, breach of warranty, tort, infringement or violation of law).

SECTION 7.1.2    Maintenance of Existence; Compliance with Contracts, Laws, etc.  The Borrower will, and will cause each of its Subsidiaries to, (a) preserve and maintain its legal existence (except as otherwise permitted by Sections 7.2.7 and 7.2.8), (b) to the extent provided for in the Approved Budget (but subject to Section 7.1.15) and required under the Bankruptcy Code, perform in all material respects their obligations under material agreements to which the Borrower or a Subsidiary is a party, and (c) comply with all material applicable laws, rules, regulations and orders, including the payment (before the same become delinquent), to the extent provided for in the Approved Budget (but subject to Section 7.1.15) and permitted under the Bankruptcy Code, of all material Taxes, imposed upon the Borrower or its Subsidiaries or upon their property, except to the extent being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP have been set aside on the books of the Borrower or its Subsidiaries, as applicable.

SECTION 7.1.3    Maintenance of Properties and Licenses.  The Borrower will, and will cause each of its Subsidiaries to, consistent with Section 7.1.15, maintain, preserve, protect and keep its and their respective tangible properties and Licenses (which are necessary or useful in the proper conduct of its business) in good repair, working order and condition (ordinary wear and tear and casualty and condemnation excepted), and, consistent with Section 7.1.15, make necessary repairs, renewals and replacements so that the business carried on by the Borrower and its Subsidiaries may be properly conducted at all times, unless the Borrower or such Subsidiary determines in good faith that the continued maintenance of such property is no longer economically desirable, necessary or useful to the business of the Borrower or any of its Subsidiaries or the Disposition of such property is otherwise permitted by Section 7.2.8 or 7.2.9.

SECTION 7.1.4    Insurance.  The Borrower will, and will cause each of its Subsidiaries, to, consistent with Section 7.1.15, maintain (a) insurance on its property with financially sound and reputable insurance companies against loss and damage in at least the amounts (and with only those deductibles) customarily maintained, and against such risks as are typically insured against in the same general area, by Persons of comparable size engaged in the same or similar business as the Borrower and its Subsidiaries; and (b) all worker's compensation, employer's liability insurance or similar insurance as may be required under the laws of any state or jurisdiction in which it may be engaged in business.

Without limiting the foregoing, all insurance policies required pursuant to this Section shall name the Administrative Agent on behalf of the Secured Parties as loss payee (in the case of property insurance) or additional insured (in the case of liability insurance), as applicable, and provide that no cancellation of the policies will be made without thirty days' prior written notice to the Administrative Agent.  If a Casualty Event shall occur, and if the Borrower notifies the Administrative Agent as provided in clause (e) of Section 3.1.1 that it intends to apply the Net Casualty Proceeds attributable to such Casualty Event to the acquisition of property or the repair or restoration of the affected property, the Administrative Agent shall, so long as no Default then exists, following receipt of such Net Casualty Proceeds, pay the same over to the Borrower.

SECTION 7.1.5    Books and Records; Visitation.  The Borrower will, and will cause each of its Subsidiaries to, keep books and records in accordance with GAAP which accurately reflect all of its business affairs and transactions and permit the Lenders or any of their respective representatives, at reasonable times and intervals upon reasonable notice to the Borrower, to visit

each Obligor's offices, to discuss such Obligor's financial matters with its officers and employees, and its independent public accountants (and the Borrower hereby authorizes such independent public accountant to discuss each Obligor's financial matters with the Lenders or their representatives with the Borrower having the right to have a representative of such Obligor present) and to examine and make extracts from any of its books and records; provided that, unless an Event of Default has occurred or is occurring, the Lenders (other than the Administrative Agent) shall be limited to one such visit per Fiscal Year (for all Lenders and coordinated through the Administrative Agent), each such visit to be at a reasonable interval and upon reasonable notice as provided above.  The Borrower shall pay any fees of such independent public accountant incurred in connection with any Lender's exercise of its rights pursuant to this Section.

SECTION 7.1.6   Financial Consultant.  The Borrower shall continue to retain, on terms and conditions reasonably acceptable to the Lenders and at the sole cost and expense of the Borrower, Zolfo Cooper or such other business consultant as is reasonably acceptable to the Administrative Agent to, among other things, advise the Borrower in connection with the management and operation of its business and to assist the Borrower with preparation of the Approved Budget and the other financial and collateral reporting required to be delivered to the Administrative Agent pursuant to this Agreement (it being understood that the terms and conditions of the engagement of Zolfo Cooper that have been provided to the Administrative Agent are satisfactory to the Administrative Agent).  In the event Zolfo Cooper ceases for any reason to act in that capacity, the Borrower shall engage a successor consultant acceptable to the Administrative Agent within thirty days (or such later date agreed to by the Administrative Agent) of such event.

SECTION 7.1.7   Environmental Law.  The Borrower will, and will cause each of its Subsidiaries to, (a) use and operate all of its and their facilities and properties in material compliance with all Environmental Laws, keep all material permits, approvals, certificates, licenses and other authorizations relating to environmental matters in effect and remain in material compliance therewith, handle all Hazardous Materials in material compliance with all applicable Environmental Laws, and exercise due care by undertaking response activities as necessary to mitigate material unacceptable exposure to Hazardous Materials released at or from its or their facilities and properties; (b) promptly notify the Administrative Agent and provide copies upon receipt of all material written claims, complaints, notices or inquiries relating to the condition of its facilities and properties in respect of, or as to compliance with, Environmental Laws; (c) use commercially reasonable efforts to promptly resolve any material non-compliance with or material liability under Environmental Laws; and (d) keep its owned and their owned or leased property free of any Lien imposed by any Environmental Law.

SECTION 7.1.8   Use of Proceeds.  The Borrower will use the proceeds of the Loans only for the purposes set forth in Section 6.19.

SECTION 7.1.9   Future Guarantors, Security, etc.  The Borrower will, and will cause each U.S. Subsidiary to, execute any documents, Filing Statements, agreements and instruments, and take all further action (including filing Mortgages) that may be required under applicable law, or that the Administrative Agent may reasonably request, in order to effectuate the transactions contemplated by the Loan Documents and in order to grant, preserve, protect and

perfect the validity and first priority (subject to Liens permitted by Section 7.2.3) of the Liens created or intended to be created by the Loan Documents and the Orders.  The Borrower will cause any subsequently acquired or organized U.S. Subsidiary to execute a supplement (in form and substance reasonably satisfactory to the Administrative Agent) to the Subsidiary Guaranty and each other applicable Loan Document in favor of the Secured Parties.  In addition, from time to time, the Borrower will, at its cost and expense, promptly secure the Obligations by pledging or creating, or causing to be pledged or created, perfected Liens with respect to such of its assets and properties as the Administrative Agent shall designate, it being agreed that it is the intent of the parties that the Obligations shall be secured by, among other things, substantially all the assets of the Borrower and its U.S. Subsidiaries (including real and personal property acquired subsequent to the Closing Date); provided that neither the Borrower nor any of its Subsidiaries shall be required to pledge more than 65% of the Voting Securities of any Foreign Subsidiary. Such Liens will be created under the Loan Documents in form and substance reasonably satisfactory to the Administrative Agent, and the Borrower shall deliver or cause to be delivered to the Administrative Agent all such instruments and documents (including legal opinions, title insurance policies and lien searches) as the Administrative Agent shall reasonably request to evidence compliance with this Section.

SECTION 7.1.10  Material Contracts.  The Borrower will, and will cause each of its Subsidiaries to, to the extent provided for in the Approved Budget (but subject to Section 7.1.15), perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, maintain each Material Contract in full force and effect, enforce each Material Contract in accordance with its terms, take all such action to such end as may be from time to time requested by the Administrative Agent and, upon request of the Administrative Agent, make to each other party to each Material Contract such demands and requests for information and reports or for action as the Borrower or any of its Subsidiaries is entitled to make under such Material Contract, except, in any case, where the failure to do so, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

SECTION 7.1.11  Federal Aviation Administration Matters; Citizenship.  Southern Air shall be an "air carrier" as defined in U.S. Transportation Code (49 U.S.C. Section 40102(a)(2)) and hold a certificate or certificates issued under 49 U.S.C. Section 41102(a)(1) or 49 U.S.C. Section 41103, or exemptions therefrom under 49 U.S.C. Section 40109, as currently in effect or as may be amended or recodified from time to time.  The Borrower will cause Southern Air to be a United States Citizen holding an air carrier operating certificate issued pursuant to Chapter 447 of Title 49 for aircraft capable of carrying 10 or more individuals or 6,000 pounds or more of cargo.  The Borrower will cause Southern Air to possess and maintain all necessary consents, franchises, licenses, permits, rights, authorities and concessions and consents which are material to the operation of the routes flown by it and the conduct of its business and operations from time to time.

SECTION 7.1.12  [RESERVED].

SECTION 7.1.13  Bankruptcy Related Matters.  The Borrower shall provide the Administrative Agent and the Secured Parties with reasonable access to non-privileged information (including historical information) and relevant personnel regarding strategic

planning, cash and liquidity management, operational and restructuring activities, in each case subject to customary confidentiality restrictions.

SECTION 7.1.14  Compliance with Milestones.  Unless otherwise waived by the Required Lenders in their sole discretion, each Obligor shall achieve the events as set forth below (the "Milestones") by the dates specified therein (or such later date as may be agreed to by the Administrative Agent at the direction of the Required Lenders in their sole discretion):

(a)      filing of a plan of reorganization (the "Plan") and a disclosure statement with respect to such Plan satisfactory to the Administrative Agent and the Required Lenders in all respects (the "Disclosure Statement"), on or prior to the date that is fifteen (15) Business Days after the Petition Date;

(b)      obtaining an order from the Bankruptcy Court approving the Disclosure Statement, which order is satisfactory to the Administrative Agent and the Required Lenders in all respects, on or prior to the date that is forty –five (45) days after filing of the Disclosure Statement;

(c)      obtaining an order from the Bankruptcy Court confirming the Plan, which order is satisfactory to the Administrative Agent and the Required Lenders in all respects, on or prior to the date that is sixty (60) days after the date on which the Disclosure Statement is approved; provided that the Borrower shall use all commercially reasonable efforts to refinance the DIP Facility as promptly as practicable following the Petition Date;

(d)      filing a motion on or prior to the date that is thirty (30) days after the Petition Date to reject certain non-residential real property leases relating to property located in Norwalk, Connecticut as soon as practicable;

(e)      delivery of the Rationalization Strategy to the Administrative Agent on or prior to the date that is fourteen (14) calendar days after the Petition Date;

(f)      entry of the Final Order approving this Agreement by 45 days after the date of entry of the Interim Order;

(g)      delivery to the Administrative Agent, on or prior to December 15, 2012, of a business plan for the Borrower and its Subsidiaries in form and substance reasonably satisfactory to the Required Lenders, which shall (i) take into consideration the uncertainty related to the revised collective bargaining agreements and any remaining uncertainties relating to rationalization of the airplane fleet, (ii) demonstrate the basis on which the Borrower and its Subsidiaries are able to achieve such business plan and (iii) describe a strategy for the Debtors to conclude their Chapter 11 Cases, whether by sale, plan of reorganization or otherwise;

(h)      the occurrence of the date that is one hundred twenty (120) days after the Petition Date, if the Plan has not been confirmed on or before such date; and

(i)      entry of an order of the Bankruptcy Court confirming the Plan shall have occurred by the date that is 150 days after the Petition Date.

SECTION 7.1.15  Maximum Budget Variance.

(a)      Attached hereto as Exhibit M is the Approved Budget as of the Closing Date. Beginning on Monday, October 8, 2012 (by 6:00 p.m. New York City time), and every Monday thereafter (by 6:00 p.m. New York City time), the Debtors shall deliver (i) an updated thirteen-week cash flow budget (each such updated budget, a "Supplemental Budget") and (ii) a narrative report by the chief financial or accounting Authorized Officer of the Borrower describing such Supplemental Budget.  Beginning on Monday, October 8, 2012 and on the first Monday of each calendar month thereafter, if and only if the Required Lenders approve the Supplemental Budget delivered on such date, with such approval not to be unreasonably withheld where such Supplemental Budget is reasonably consistent with the then-existing Approved Budget (after taking into consideration the Debtors' actual performance relative to the then-existing Approved Budget and any reasonably expected improvements in such performance), then such Supplemental Budget shall automatically become the Approved Budget.  On the Monday of each week (by 6:00 p.m. New York City time), the Borrower shall provide a variance report (a "Variance Report") with respect to the (a) immediately prior week setting forth actual cash receipts and disbursements for the prior week and setting forth any variances, on a line-item basis, from the amount set forth for such week in the Approved Budget and (b) from the Closing Date to the date of such Variance Report, and including explanations of all material variances.  Each such report shall be certified by the Chief Financial Officer of the Borrower as being (i) prepared in good faith and fairly presenting in all material respects the information set forth therein and (ii) in compliance with Section 7.2.4 as of the last day of the relevant period.

(b)      Commencing on Monday, October 8, 2012, and thereafter, tested by reference to the Variance Report each week, (i) the aggregate expenditures and disbursements by the Obligors for each line item in the Approved Budget for each rolling four-week period shall not exceed $500,000 of the corresponding line item expenditures budgeted for such time period and (ii) the aggregate expenditures by the Obligors in the Approved Budget for each rolling four-week period shall not exceed 110% of the corresponding aggregate expenditures budgeted for such time period (after giving effect to a 2-week carryover with respect unused aggregate permitted amount) (such percentages, the "Permitted Deviation").

SECTION 7.1.16  Post-Petition Obligations.  The Borrower shall pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its Post-Petition obligations of whatever nature, except (a) where such payment, discharge or satisfaction is prohibited by the Bankruptcy Code or an order of the Bankruptcy Court or by this Agreement or would not be in compliance with the Approved Budget (subject to Section 7.1.15), or (b) where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of the Borrower.

SECTION 7.2  Negative Covenants.  The Borrower covenants and agrees with each Lender and the Administrative Agent that until the Termination Date (other than with respect to the Secured OHAA Payment Obligations) has occurred, the Borrower will, and will cause its Subsidiaries to, perform or cause to be performed the obligations set forth below.

SECTION 7.2.1   <u>Business Activities</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, engage in any business activity except those business activities engaged in on the date of this Agreement and activities reasonably incidental or related thereto.

SECTION 7.2.2   <u>Indebtedness</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Indebtedness, other than

      (a)     Indebtedness in respect of the Obligations;

      (b)     Indebtedness existing as of the Closing Date (the "<u>Rollover Debt</u>") which is identified in <u>Item 7.2.2(b)</u> of the Disclosure Schedule;

      (c)     unsecured Indebtedness (i) constituting trade payables incurred in the ordinary course of business of the Borrower and its Subsidiaries (including open accounts extended by suppliers on normal trade terms in connection with purchases of goods and services which are not overdue for a period of more than 90 days or, if overdue for more than 90 days, as to which a dispute exists and adequate reserves in conformity with GAAP have been established on the books of the Borrower or such Subsidiary) and (ii) in respect of performance, surety or appeal bonds provided in the ordinary course of business, but excluding (in each case), Indebtedness incurred through the borrowing of money or Contingent Liabilities in respect thereof;

      (d)     Indebtedness (i) in respect of industrial revenue bonds or other similar governmental or municipal bonds, (ii) evidencing the deferred purchase price of newly acquired property or incurred to finance the acquisition of assets of the Borrower and its Subsidiaries (pursuant to purchase money mortgages or otherwise, whether owed to the seller or a third party) used in the ordinary course of business of the Borrower and its Subsidiaries (<u>provided</u> that such Indebtedness is incurred within 180 days of the acquisition of such property) and (iii) in respect of Capitalized Lease Liabilities; <u>provided</u> that the aggregate amount of all Indebtedness outstanding pursuant to this clause shall not at any time exceed $100,000 and shall be incurred in accordance with the Approved Budget;

      (e)     Indebtedness of any Subsidiary owing to the Borrower or any other Subsidiary, which Indebtedness shall, if payable to the Borrower or a Subsidiary Guarantor and in a principal amount in excess of $100,000, be evidenced by one or more promissory notes in form and substance reasonably satisfactory to the Administrative Agent, duly executed and delivered in pledge to the Administrative Agent pursuant to a Loan Document, and shall not be forgiven or otherwise discharged for any consideration other than payment in full or in part in cash (<u>provided</u> that only the amount repaid in part shall be discharged);

      (f)     Permitted Refinancings of Indebtedness permitted by this <u>Section 7.2.2</u>;

      (g)     Indebtedness incurred pursuant to the Pre-Petition Credit Agreement; and

      (h)     Indebtedness contemplated by the Approved Budget or the Rationalization Strategy;

provided that (i) no Indebtedness otherwise permitted by clauses (d) and (i) shall be assumed, created or otherwise incurred if a Default has occurred and is then continuing or would result therefrom, (ii) the Indebtedness permitted under this Section shall be deemed to include Contingent Liabilities in respect thereof and (iii) no Indebtedness shall be permitted to be incurred by a Foreign Subsidiary.

Notwithstanding the foregoing, and except for the Carve-Out or as otherwise provided in Section 11.2 or the Orders, no Indebtedness under clauses (b) through (i) shall be permitted to have an administrative expense claim or super-priority status under the Bankruptcy Code senior to or *pari passu* with the super-priority administrative expense claims of the Administrative Agent and the Lenders (or the adequate protection claims of the Pre-Petition Agent) as set forth herein and in the Orders.

SECTION 7.2.3   Liens.   The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or permit to exist (i) any administrative expense, unsecured claim, or other super-priority claim or Lien that is *pari passu* with or senior to the claims of the Lenders under the Loan Documents, or apply to the Bankruptcy Court for authority to do so, or (ii) any obligation to make adequate protection payments, or otherwise provide adequate protection, other than as provided in the Order, upon any of its property (including Capital Securities of any Person), revenues or assets, whether now owned or hereafter acquired, except

(a)     Liens securing payment of the Obligations;

(b)     (i) Liens existing as of the Closing Date and perfected on the Petition Date and disclosed in Item 7.2.3(b)-1 of the Disclosure Schedule and (ii) Liens existing as of the Closing Date and perfected subsequent to the Petition Date and disclosed in Item 7.2.3(b)-2 of the Disclosure Schedule, and modifications, renewals, extensions or refinancings of any Indebtedness secured by such Liens; provided that (i) no such Lien shall encumber any additional property (other than (x) after-acquired property affixed or incorporated into the property covered by such Lien or financed by Indebtedness permitted under Section 7.2.2 and (y) proceeds and products thereof), (ii) in the case of Liens that existed on the Closing Date, the principal amount of Indebtedness secured by such Lien is not increased from that existing on the Closing Date (as such Indebtedness may have been permanently reduced subsequent to the Closing Date) and (iii) in the case of each of the Liens on such schedule referred to collectively as the "Aircraft and Wet Lease Liens", the amount of Indebtedness (if any) secured by such Lien is not increased from that reflected in the applicable Capitalized Lease Liability (as in effect on the effective date thereof) (as such Indebtedness may have been permanently reduced subsequent to such date);

(c)     Liens securing Indebtedness of the type permitted under clause (d) of Section 7.2.2; provided that (i) such Lien is granted within 180 days after such Indebtedness is incurred and (ii) such Lien only covers the assets that are the subject of the Indebtedness referred to in such clause;

(d)     Liens in favor of carriers, warehousemen, mechanics, materialmen and landlords granted in the ordinary course of business for amounts not more than 45 days

overdue or being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books;

(e)    Liens incurred or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance or other forms of governmental insurance or benefits, or to secure performance of tenders, statutory obligations, bids, leases or other similar obligations (other than for borrowed money) entered into in the ordinary course of business or to secure obligations on surety and appeal bonds or performance bonds;

(f)    judgment Liens in existence for less than 45 days after the entry thereof or with respect to which execution has been stayed or nonpayment of the obligations secured thereby is permitted by the Bankruptcy Code or the payment of which is covered in full (subject to a customary deductible) by insurance maintained with responsible insurance companies and which do not otherwise result in an Event of Default under Section 8.1.6;

(g)    easements, rights-of-way, zoning restrictions, restrictive covenants, conditions, encroachments, survey defects, minor defects or irregularities in title and other similar encumbrances not interfering in any material respect with the value or use of the property to which such Lien is attached;

(h)    Liens for Taxes not at the time delinquent or thereafter payable without penalty or being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books;

(i)    Liens granted pursuant to the Pre-Petition Credit Agreement;

(j)    Liens granted pursuant to the Orders to secure the Obligations; and

(k)    Liens contemplated by the Approved Budget or the Rationalization Strategy;

provided that no Liens shall be permitted to be incurred by a Foreign Subsidiary other than the Liens described in clauses (g) and (h) above.

SECTION 7.2.4    Net Liquidity.  The Borrower will not permit actual Net Liquidity at any time during the most recently ended weekly period to be less than the Required Percentage of Net Liquidity as shown in the most recent Approved Budget for the corresponding weekly period and fails to maintain the required Net Liquidity shall be reported on 2 or more consecutively delivered Supplemental Budgets.  The "Required Percentage" shall mean (i) from the Closing Date to and including the Final Order Date, 85.0% and (ii) after the Final Order Date, 80.0%.

SECTION 7.2.5    Investments.  The Borrower will not, and will not permit any of its Subsidiaries to, purchase, make, incur, assume or permit to exist any Investment in any other Person, except:

        (a)    Investments existing on the Closing Date and identified in Item 7.2.5(a) of the Disclosure Schedule;

        (b)    Cash Equivalent Investments; provided that the Cash Equivalent Investments of any Subsidiary that is not a Guarantor Subsidiary shall not exceed $100,000 at any time;

        (c)    Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

        (d)    Investments by way of contributions to capital or purchases of Capital Securities (i) by the Borrower in any Subsidiaries or by any Subsidiary in other Subsidiaries; or (ii) by any Subsidiary in the Borrower;

        (e)    Investments constituting (i) accounts receivable arising, (ii) trade debt granted or (iii) deposits made in connection with the purchase price of goods or services, in each case in the ordinary course of business in accordance with the Approved Budget; and

        (f)    Investments that are consistent with the Approved Budget or the Rationalization Strategy;

provided that any Investment which when made complies with the requirements of the definition of the term "Cash Equivalent Investment" may continue to be held notwithstanding that such Investment if made thereafter would not comply with such requirements.  In addition, to the extent that the Cash and Cash Equivalent Investments of any Subsidiary that is not a Guarantor Subsidiary exceeds $100,000 at any time, such excess shall be promptly paid as a dividend or distribution on the Capital Stock of such Subsidiary that is not a Guarantor Subsidiary to the Borrower or a Guarantor Subsidiary.

SECTION 7.2.6    Restricted Payments, etc.  The Borrower will not, and will not permit any of its Subsidiaries to, declare or make a Restricted Payment, or make any deposit for any Restricted Payment, other than (a) Restricted Payments to Holdings for the purpose of paying, so long as all proceeds are promptly used by Holdings to pay, (i) operating expenses incurred in the ordinary course of business (including reasonable fees for audit, legal and similar administrative services, but excluding management fees and other amounts covered by clause (iv) below), (ii) without duplication of amounts paid under clause (iv) below, any income tax liability of Holdings attributable to the income of the Borrower and its Subsidiaries (provided that payments pursuant to this clause (ii) in any Fiscal Year shall not be in excess of the amount that the Borrower and its consolidated subsidiaries would be required to pay in respect of income taxes for such Fiscal Year were the Borrower to pay such taxes as a stand-alone taxpayer), and (iii) franchise or similar taxes and other similar taxes, fees and expenses required to maintain

Holdings' corporate existence, and (b) Restricted Payments made by Subsidiaries to Holdings, the Borrower, Subsidiary Guarantors or Subsidiaries of the Borrower or Subsidiary Guarantors.

SECTION 7.2.7    Issuance of Capital Securities.  The Borrower will not, and will not permit any of its Subsidiaries to, issue any Capital Securities (whether for value or otherwise) to any Person, in the case of Subsidiaries, other than to the Borrower or another wholly owned Subsidiary.

SECTION 7.2.8    Consolidation, Merger; etc.  The Borrower will not, and will not permit any of its Subsidiaries to, except as contemplated by the Plan, liquidate or dissolve, consolidate with, or merge into or with, any other Person, or purchase or otherwise acquire all or a substantial portion of the assets of any Person (or any division thereof), except any Subsidiary may liquidate or dissolve voluntarily into, and may merge with and into, the Borrower or any other Subsidiary (provided that a Subsidiary Guarantor may only liquidate or dissolve into, or merge with and into, the Borrower or another Subsidiary Guarantor or a Person who becomes a Subsidiary Guarantor simultaneously therewith), and the assets or Capital Securities of any Subsidiary may be purchased or otherwise acquired by the Borrower or any other Subsidiary (provided that the assets or Capital Securities of any Subsidiary Guarantor may only be purchased or otherwise acquired by the Borrower or another Subsidiary Guarantor or a Person who becomes a Subsidiary Guarantor simultaneously therewith); provided further that in no event shall any Subsidiary consolidate with or merge with and into any other Subsidiary unless after giving effect thereto, the Administrative Agent shall have a perfected pledge of, and security interest in and to, which security interest shall be maintained or created in accordance with the provisions of Section 7.1.13, at least the same percentage of the issued and outstanding interests of Capital Securities (on a fully diluted basis) and other assets of the surviving Person as the Administrative Agent had immediately prior to such merger or consolidation in form and substance satisfactory to the Administrative Agent and its counsel, pursuant to such documentation and opinions as shall be necessary in the opinion of the Administrative Agent to create, perfect or maintain the collateral position of the Secured Parties therein.

SECTION 7.2.9    Permitted Dispositions.  The Borrower will not, and will not permit any of its Subsidiaries to, except as contemplated by the Plan, the Approved Budget or the Rationalization Strategy, Dispose of any of the Borrower's or such Subsidiaries' assets (including accounts receivable and Capital Securities of Subsidiaries) to any Person in one transaction or series of transactions unless such Disposition is (a) inventory or obsolete, damaged, worn out or surplus property Disposed of in the ordinary course of its business, (b) permitted by Section 7.2.8, (c)(i) for fair market value and the consideration received consists solely of cash, (ii) the Net Disposition Proceeds received from such Disposition, together with the Net Disposition Proceeds of all other assets Disposed of pursuant to this clause during the consecutive twelve month period in which such Disposition was made, does not exceed (individually or in the aggregate) $10,000,000 and (iii) the Net Disposition Proceeds from such Disposition are applied pursuant to Section 3.1.1, (d) Dispositions of accounts (as such term is defined in Section 9-102 of the UCC) for collection in the ordinary course of business, (e) Dispositions of assets caused by Casualty Events, or (f) Dispositions in the ordinary course of business of securities received in connection with work-outs of accounts (as such term is defined in Section 9-102 of the UCC) in the ordinary course of business, provided that in each case, the

Net Disposition Proceeds from such Disposition are for fair market value and the consideration received consists of cash and the Net Disposition Proceeds are applied pursuant to <u>Section 3.1.1</u>.

SECTION 7.2.10  <u>No Prepayment of Debt</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, except as otherwise permitted by this Agreement or the First Day Orders, make any payments or transfer, or agree to any setoff or recoupment, with respect to any Pre-Petition claim, Pre-Petition Lien or Pre-Petition Indebtedness of any Obligors, except (x) to the extent authorized by any First Day Orders or the Orders, or (y) as otherwise permitted by applicable law or order of the Bankruptcy Court.

Furthermore, neither the Borrower nor any Subsidiary will incur, create, assume, suffer to exist or permit any super-priority administrative claim which is *pari passu* with or senior to the super-priority claims under the Loan Documents, except as set forth in this Agreement or the other Loan Documents, the Orders or the First Day Orders.

SECTION 7.2.11  <u>Modification of Certain Agreements</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, except as contemplated by the Plan, consent to any amendment, supplement, waiver or other modification of, or enter into any forbearance from exercising any rights with respect to the terms or provisions contained in (a) any Organic Document of the Borrower or any of its Subsidiaries, if the result would have an adverse effect on the rights or remedies of any Secured Party; or (b) the Pre-Petition Credit Agreement, the Orders or the First Day Orders without the written consent of the Administrative Agent at the direction of the Required Lenders.

SECTION 7.2.12  <u>Transactions with Affiliates</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, except as contemplated by the Plan, enter into or cause or permit to exist any arrangement, transaction or contract (including for the purchase, lease or exchange of property or the rendering of services) with any of its other Affiliates, other than the Service Agreement, dated as of April 1, 2012, between Southern Air GmbH and Southern Air Inc. or unless such arrangement, transaction or contract (a) is on fair and reasonable terms no less favorable to the Borrower or such Subsidiary than it could obtain in an arm's-length transaction with a Person that is not an Affiliate and (b) is of the kind which would be entered into by a prudent Person in the position of the Borrower or such Subsidiary with a Person that is not one of its Affiliates.

SECTION 7.2.13  <u>Restrictive Agreements, etc.</u>  The Borrower will not, and will not permit any of its Subsidiaries to, enter into any agreement prohibiting

    (a)    the creation or assumption of any Lien upon its properties, revenues or assets, whether now owned or hereafter acquired;

    (b)    the ability of any Obligor to amend or otherwise modify any Loan Document; or

    (c)    the ability of any Subsidiary to make any payments, directly or indirectly, to the Borrower, including by way of dividends, advances, repayments of loans, reimbursements of management and other intercompany charges, expenses and accruals or other returns on investments.

The foregoing prohibitions shall not apply to restrictions or conditions (i) contained in any Loan Document, (ii) in the case of clause (a), (A) contained in any agreement governing any Indebtedness permitted by clause (c) of Section 7.2.2 as to the assets financed with the proceeds of such Indebtedness, and (B) customary provisions in leases, licenses, subleases and sublicenses and other contracts restricting the assignment thereof to the extent such restrictions or conditions do not apply to Liens created or assumed under any Loan Documents or Liens permitted to be created or assumed under any Loan Documents, (iii) imposed by law and (iv) customarily contained in agreements relating to the sale of a Subsidiary or any assets of the Borrower or any Subsidiary pending such sale (provided such restrictions and conditions apply only to the Subsidiary or assets that are to be sold and such sale is permitted hereunder).

SECTION 7.2.14  Sale and Leaseback.  The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly enter into any agreement or arrangement providing for the sale or transfer by it of any property (now owned or hereafter acquired) to a Person and the subsequent lease or rental of such property or other similar property from such Person, unless such Disposition and any Indebtedness incurred thereby are permitted hereunder.

SECTION 7.2.15  Change to Fiscal Year.  The Borrower will not change its Fiscal Year.

SECTION 7.2.16  Boeing 777F Lease Condition.  Neither the Borrower nor any Subsidiary thereof may lease a B777F from OH Aircraft Acquisition, LLC (or its Affiliate that is a special purpose vehicle established for the purpose of leasing aircraft) unless it shall have executed a wet lease contract for such aircraft that the Borrower believes, acting in good faith, will provide the Borrower with cash earnings in excess of the incremental cash costs, including lease payments, crew costs, maintenance costs and insurance costs, of operating such aircraft for the twelve months following delivery of such aircraft.

SECTION 7.2.17  Certain Bankruptcy Matters.  The Obligors shall not at any time:

(a)    except as otherwise allowed herein or pursuant to the Orders, incur, create, assume, suffer to exist or permit any Lien or other super-priority administrative claim which is *pari passu* with or senior to the Liens or claims of the Administrative Agent and the Lenders against the Obligors, or the adequate protection Liens or claims of the Pre-Petition Agent against the Obligors, in each case, subject to the Carve-Out;

(b)    make (i) any payments on account of any creditor's Pre-Petition unsecured claims, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code, or (iii) payments under any management incentive plan or on account of claims or expenses arising under Section 503(c) of the Bankruptcy Code, except in each case in amounts and on terms and conditions that (A) are approved by order of the Bankruptcy Court and (B) are in accordance with any Approved Budget satisfactory to the Required Lenders;

(c)    make any adequate protection payments on account of any Pre-Petition Indebtedness, except as set forth herein or in the Interim Order (or, as applicable, the Final Order) in respect of the Obligations (as defined in the Pre-Petition Credit

Agreement) or in any other order of the Bankruptcy Court that is consented to by the Required Lenders;

(d)     make or permit to be made any change, amendment or modification, or make an application or motion for any change, amendment or modification, to any Chapter 11 Order which could reasonably be expected to have a Material Adverse Effect in each case, without the prior written consent of the Required Lenders;

(e)     except as otherwise permitted hereunder, contemplated by an Plan or consented to by the Required Lenders, consent to termination or reduction of the Debtors' exclusive plan filing and plan solicitation periods under section 1121 of the Bankruptcy Code (the "Exclusivity Periods") or fail to object to any motion by a party-in-interest (other than a Lender, the Administrative Agent or Pre-Petition Agent) seeking to terminate or reduce the Exclusivity Periods, in each case other than a motion filed by or with the consent of the Required Lenders;

(f)     assert any right of subrogation or contribution against any other Obligor until all borrowings under this Agreement and the Loan Documents are paid in full and the Commitments hereunder are terminated; or

(g)     challenge or fail to support, in either case directly or indirectly, the Liens in favor of the Lenders or the Administrative Agent.

SECTION 7.2.18  No Foreign Subsidiaries.  No Obligor shall, nor shall it permit any of its Subsidiaries to, create, acquire or otherwise own directly or indirectly any Foreign Subsidiary, other than Southern Air GmbH.

ARTICLE VIII
EVENTS OF DEFAULT

SECTION 8.1     Listing of Events of Default.  Each of the following events or occurrences described in this Article shall constitute an "Event of Default".

SECTION 8.1.1     Non-Payment of Obligations.  The Borrower shall default in the payment or prepayment when due of:

(a)     any principal of any Loan; or

(b)     any interest on any Loan or fee described in Article III or any other monetary Obligation owed to the Lenders, and such default shall continue unremedied for a period of three days after such amount was due.

SECTION 8.1.2     Breach of Warranty.  Any representation or warranty of any Obligor made or deemed to be made in any Loan Document (including any certificates delivered pursuant to Article V) is or shall be incorrect in any material respect when made or deemed to have been made.

SECTION 8.1.3    <u>Non-Performance of Certain Covenants and Obligations</u>.  The Borrower shall default in the due performance or observance of any of its obligations under <u>Section 6.19</u>, <u>clauses (a) and (f)</u> of <u>Section 7.1.1</u>, <u>Section 7.1.8</u>, <u>Section 7.1.14</u>, <u>Section 7.1.15</u>, or <u>Section 7.2</u> or any Obligor shall default in the due performance or observance of its obligations under Article IV of the Subsidiary Guaranty (with respect to the covenants set forth in <u>Section 7.2</u>, as such covenants apply to each Subsidiary Guarantor), <u>Section 4.1.4</u> of the Security Agreement, <u>Section 5.3</u> or <u>5.12</u> of the Holdings Guaranty and Pledge Agreement or any corresponding provision contained in any Mortgage.

SECTION 8.1.4    <u>Non-Performance of Other Covenants and Obligations</u>.  Any Obligor shall default in the due performance and observance of any other agreement contained in any Loan Document executed by it, and such default shall continue unremedied for a period of ten (10) days after the earlier to occur of (a) notice thereof given to the Borrower by the Administrative Agent or any Lender or (b) the date on which any Obligor has knowledge of such default.

SECTION 8.1.5    <u>Default on Other Indebtedness</u>.  Other than a default by a Borrower or a Guarantor the enforcement of which is stayed by virtue of the filing of the Chapter 11 Cases, a default shall occur in the payment of any amount when due (subject to any applicable grace period), whether by acceleration or otherwise, of any principal or stated amount of, or interest or fees on, any Indebtedness (other than Indebtedness described in <u>Section 8.1.1</u>) of the Borrower or any of its Subsidiaries or any other Obligor having a principal or stated amount, individually or in the aggregate, in excess of $200,000, or a default shall occur in the performance or observance of any obligation or condition with respect to such Indebtedness if the effect of such default is to accelerate the maturity of any such Indebtedness or such default shall continue unremedied for any applicable period of time sufficient to permit the holder or holders of such Indebtedness, or any trustee or agent for such holders, to cause or declare such Indebtedness to become due and payable or to require such Indebtedness to be prepaid, redeemed, purchased or defeased, or require an offer to purchase or defease such Indebtedness to be made, prior to its expressed maturity.

SECTION 8.1.6    <u>Judgments</u>.  Other than a judgment by a Borrower or a Guarantor the enforcement of which is stayed by virtue of the filing of the Chapter 11 Cases, any judgment or order for the payment of money individually or in the aggregate in excess of $200,000 (exclusive of any amounts fully covered by insurance (less any applicable deductible) and as to which the insurer has acknowledged its responsibility to cover such judgment or order) shall be rendered against the Borrower or any of its Subsidiaries or any other Obligor and such judgment shall not have been vacated, discharged, stayed, satisfied or bonded pending appeal within 30 days after the entry thereof or enforcement proceedings shall have been commenced by any creditor upon such judgment or order.

SECTION 8.1.7    <u>Pension Plans</u>.  Other than an ERISA Event the enforcement of which is stayed by virtue of the filing of the Chapter 11 Cases, any ERISA Event shall have occurred that, when taken together with all other ERISA Events, could reasonably be expect to result in a liability or obligation in excess of $200,000.

SECTION 8.1.8    <u>Change in Control</u>.  Any Change in Control shall occur.

SECTION 8.1.9    Impairment of Security, etc.  Any Loan Document or any Lien granted thereunder or under the Orders shall (except in accordance with its terms), in whole or in part, terminate, cease to be effective or cease to be the legally valid, binding and enforceable obligation of any Obligor party thereto; any Obligor or any other party shall, directly or indirectly, contest in any manner such effectiveness, validity, binding nature or enforceability; or, except as permitted under any Loan Document or the Orders any Lien securing any Obligation shall, in whole or in part, cease to be a perfected Lien with the priority described in Section 11.1.

SECTION 8.1.10    Loss of Licenses.  Any loss, suspension or revocation of Southern Air's (a) certificate(s) issued under 49 U.S.C. Section 41102(a)(i) or 49 U.S.C. Section 41103, or exemptions therefrom under 49 U.S.C. Section 40109, or (b) air carrier operating certificate issued pursuant to Chapter 447 of Title 49 which is not reinstated within 5 days, unless such loss, suspension or revocation would not materially impair the ability of the Borrower, or any of its Subsidiaries, from conducting their operations as then conducted.

SECTION 8.1.11    The Chapter 11 Cases.

(a)    The bringing of a motion, application or other pleading by any Obligor, or the entry of an order, pleading or ruling (which has not been withdrawn, dismissed or reversed):  (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code which is not otherwise permitted pursuant to this Agreement (unless such financing is proposed to refinance and pay in full in cash the Obligations with the termination of all related lending commitments thereunder); (B) to grant any Lien other than Liens permitted under Section 7.2.3 upon or affecting any Cash Collateral without the prior written consent of the Administrative Agent and the Required Lenders; or (C) except as provided in the Orders, to use Cash Collateral of the Administrative Agent or the Pre-Petition Agent under Section 363(c) of the Bankruptcy Code without the prior written consent of the Administrative Agent and the Required Lenders;

(b)    (i) the filing by any Obligor of any plan of reorganization or disclosure statement attendant thereto that is not an Acceptable Plan, or any direct or indirect amendment to an Acceptable Plan or disclosure statement, that is not satisfactory to the Administrative Agent and the Required Lenders, and which is not withdrawn, dismissed or denied within 5 Business Days; or (ii) the entry of an order confirming a plan of reorganization that is not an Acceptable Plan;

(c)    prior to the entry of the Final Order, the Interim Order shall (i) no longer be in full force and effect or (ii) be reversed, vacated, stayed, amended, supplemented or otherwise modified, in each case without the written consent of the Administrative Agent and the Required Lenders;

(d)    the entry of an order in the Chapter 11 Cases amending, supplementing, staying, vacating, reversing or otherwise modifying the Final Order in a manner adverse to the Lenders without the written consent of the Administrative Agent and the Required Lenders;

(e) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents without the written consent of the Administrative Agent and the Required Lenders;

(f) the entry of an order appointing an interim or permanent trustee, a receiver or an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of such Obligor (or any Obligor seeks or acquiesces in such relief);

(g) the dismissal of the Chapter 11 Cases, or the conversion of the Chapter 11 Cases of Holdings, the Borrower or Southern Air from cases under Chapter 11 to cases under Chapter 7 of the Bankruptcy Code (except as consented to by the Administrative Agent and the Required Lenders) or any Obligor shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases of Holdings, the Borrower or Southern Air under Section 1112 of the Bankruptcy Code, conversion of such Chapter 11 Cases or otherwise;

(h) the entry of a final non-appealable order (other than the Orders and the First Day Orders with respect to Fuel Supply, Industry Agreements and Insurance) by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor to proceed against any material asset or assets of any Obligor;

(i) other than the Carve-Out and except as otherwise provided by the Orders or this Agreement, the entry of an order in the Chapter 11 Cases granting any other super-priority administrative claim or Lien equal or superior to that granted to the Administrative Agent, on behalf of itself and/or the Secured Parties pursuant to this Agreement, the Loan Documents and the Orders and the Pre-Petition Agent, on behalf of itself and/or the Pre-Petition Lenders pursuant to the Pre-Petition Credit Agreement, the Pre-Petition Security Agreement and the Orders;

(j) any Obligor files a motion or does not oppose a motion filed by any party in interest seeking to achieve any of the action in clauses (e) through (j) above which is not withdrawn, dismissed or denied within 15 days after such filing;

(k) any Obligor shall pay any Pre-Petition Indebtedness other than (i) as permitted by the Orders, (ii) as otherwise permitted by this Agreement or the Approved Budget (subject to Section 7.1.15), (iii) as otherwise ordered by the Bankruptcy Court and agreed in writing by the Administrative Agent or (iv) as authorized by the Bankruptcy Court (A) in accordance with the First Day Orders or "second day" orders entered into on or prior to the Closing Date or other orders of the Bankruptcy Court entered with the consent of (or non-objection by) Administrative Agent, (B) in connection with the assumption of executory contracts and unexpired leases with the consent of (or non-objection by) Administrative Agent, or (C) in respect of accrued payroll and related expenses and employee benefits as of the date of the filing of the Chapter 11 Cases;

(l)  any Debtor shall fail to comply with the terms and conditions of any Chapter 11 Order and such failure could reasonably be expected to have a Material Adverse Effect;

(m)  any Obligor files a motion or does not oppose a motion filed by any party in interest seeking, or an order that is entered and permitting, the sale, without the Administrative Agent's and the Required Lenders' written consent, of all or substantially all of the assets of the Obligors pursuant to Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization (other than an Acceptable Plan) in the Chapter 11 Cases, or otherwise that does not provide for payment in full in cash of the Obligations and termination of Lenders' Commitment;

(n)  any Collateral becoming subject to surcharge or marshalling;

(o)  subject to the Final Order, the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Administrative Agent, any Lender or any of the Collateral, against the Pre-Petition Agent or any Collateral (as defined in the Pre-Petition Security Agreement), or against the rights and remedies of such parties under the Loan Documents or any Chapter 11 Order;

(p)  the filing, public announcement or execution of any writing to another party-in-interest by any Obligor of its intention to file, or to support any other person's filing of any motion to disallow in whole or in part the Lenders' claim in respect of the Loan or to challenge the validity and enforceability of the liens in favor of the Administrative Agent or contest any material provision of any Loan Document;

(q)  the violation of any term, provision or condition of the Orders;

(r)  any default or event of default under the Section 1110 Stipulation shall have occurred and be continuing that is not waived by the parties thereto (other than the Lenders) after the expiration of any applicable grace period; or any other default or event of default under the Section 1110 Stipulation shall have occurred and be continuing that has been declared, is not waived by the parties thereto (other than the Lenders) after the expiration of any applicable grace period and the parties thereto (other than the Lenders) shall not have accelerated termination of the Section 1110 Stipulation within ten (10) days of the conclusion of any applicable grace period;

(s)  termination by any party of the Support Agreement or the Section 1110 Stipulation;

(t)  other than a default by a Borrower or a Guarantor the enforcement of which is stayed by virtue of the filing of the Chapter 11 Cases, (i) the occurrence of a continuing event of default under any Material Contract that shall have resulted in the right of the other parties to such Material Contract to terminate such Material Contract or exercise remedies against an Obligor, (ii) any Obligor has moved for, or the Bankruptcy Court shall have entered, an order authorizing or directing the assumption or rejection of any Material Contract or any Material Contract is rejected, terminated or materially modified, without the consent of the Required Lenders or (iii) any Obligor

has entered into any Material Contract or any material settlements, without the prior written consent of the Administrative Agent;

(u) failure to obtain any necessary regulatory or administrative approvals or consents with respect to the transactions contemplated in the Loan Documents, the Support Agreement or any related document;

(v) the loss of the 777 Leases or the loss or material limitation on the use or any ability or right to operate any of the 777 Aircraft;

(w) any holder of claims arising under the Prepetition Credit Agreement shall have foreclosed on any material assets of the Debtors or any non-Debtor Affiliates;

(x) entry by the Bankruptcy Court invalidating or disallowing, as applicable (i) the enforceability, priority, or validity of the liens securing the obligations owed under the Prepetition Credit Agreement, or (ii) the claims in respect of the Prepetition Credit Agreement;

(y) any Obligor files a motion or pleading or fails to object to any motion or pleading with the Bankruptcy Court that is not consistent in any material respect with the Support Agreement and such motion or pleading has not been withdrawn within two (2) Business Days;

(z) any court of competent jurisdiction or other competent governmental or regulatory authority issues a ruling, determination, or order making illegal or otherwise restricting, enjoining, preventing or prohibiting the consummation of the restructuring substantially on the terms set forth in the Support Agreement, including, without limitation, an order of the Bankruptcy Court denying approval of the Support Agreement or confirmation of the Plan, and such ruling, determination, or order shall not have been vacated, overturned or stayed within 30 days after the entry thereof; or

(aa) any law or order shall have been enacted, adopted or issued by any governmental entity that prohibits the implementation of the Plan or the transactions contemplated therein or by the other Plan supplements, and such law or order shall not have been vacated, overturned or stayed within 30 days after the entry thereof;

then, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, by notice to Borrower and subject to the terms of the Orders, take any of the following actions, at the same or different times: (i) terminate forthwith the Commitment; (ii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued fees and all other Obligations of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower and the Guarantors, anything contained herein or in any other Loan Document to the contrary notwithstanding and in

any event, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and any unpaid accrued fees and all other Obligations of the Borrower accrued hereunder and under any other Loan Document, shall automatically become due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower and the Guarantors, anything contained herein or in any other Loan Document to the contrary notwithstanding; (iii) enter onto the premises of any Obligor in connection with an orderly liquidation of the Collateral; or (iv) exercise any rights and remedies provided to the Administrative Agent under this Agreement, the other Loan Documents, the Orders or applicable law, including all remedies provided under the Bankruptcy Code and, pursuant to the Interim Order and the Final Order, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated to permit the Administrative Agent and the Lenders to exercise their remedies under this Agreement, the Loan Documents and the Orders without further notice, application or motion to, hearing before, or order from, the Bankruptcy Court.

SECTION 8.2    Remedies.

(a)    At any time an Event of Default exists or has occurred and is continuing, the Administrative Agent and the Lenders shall have all rights and remedies provided in this Agreement, the other Loan Documents, the Orders, the Bankruptcy Code, the UCC and other applicable law, all of which rights and remedies may be exercised without notice to or consent by the Borrower and without further order of or application to the Bankruptcy Court, except as such notice or consent is expressly provided for hereunder, under the Orders or required by applicable law; provided, however, that prior to the first enforcement of any liens or other remedies with respect to the Collateral (but not any enforcement action taken thereafter), the Administrative Agent or the Lenders shall provide to the Borrower (with copies to the Committee) five (5) Business Days' prior written notice; provided further, however, that, upon receipt of any such notice, Borrower may only make distributions with respect to the Carve-Out or as consented to by the Required Lenders, but may not make any other disbursements; provided further, however, that, in any hearing after the giving of such notice, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing.  All rights, remedies and powers granted to the Administrative Agent and the Lenders hereunder, under any of the other Loan Documents, the Orders, the Bankruptcy Code, the UCC or other applicable law, are cumulative, not exclusive and enforceable, in the Administrative Agent's discretion, alternatively, successively, or concurrently on any one or more occasions, and shall include, without limitation, the right to apply to a court of equity for an injunction to restrain a breach or threatened breach by the Borrower of this Agreement or any of the other Loan Documents.  Subject to Article IX hereof and the notice provisions described in the proviso to the first sentence of this clause (a), the Administrative Agent may, and at the direction of the Required Lenders shall, at any time or times, proceed directly against the Borrower to collect the Obligations without prior recourse to the Collateral.

(b)    For the purpose of enabling the Administrative Agent to exercise the rights and remedies hereunder, each Obligor hereby grants to the Administrative Agent, to the extent assignable, an irrevocable, non-exclusive license (exercisable at any time an Event of Default shall exist or have occurred and for so long as the same is continuing but subject to the notice provisions in clause (a) above) without payment of royalty or other compensation to such

Obligor, to use, assign, license or sublicense any of the trademarks, service-marks, trade names, business names, trade styles, designs, logos and other source of business identifiers and other intellectual property and general intangibles now owned or hereafter acquired by such Obligor, wherever the same may be located, including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout thereof.

(c)     At any time an Event of Default exists or has occurred and is continuing, and without further authorization of the Bankruptcy Court, but subject to the notice provisions in clause (a) above, the Administrative Agent, after receiving instructions from Required Lenders, may apply the cash proceeds of Collateral actually received by the Administrative Agent from any sale, lease, foreclosure or other disposition of the Collateral to payment of the Obligations, in whole or in part and in accordance with the terms hereof, whether or not then due or may hold such proceeds as Cash Collateral for the Obligations. Each Obligor shall remain liable to the Administrative Agent and Lenders for the payment of any deficiency with interest at the highest rate provided for herein and all costs and expenses of collection or enforcement, including attorneys' fees and expenses.

(d)     Without limiting the foregoing, upon the occurrence of an Event of Default, the Administrative Agent (at the direction of the Required Lenders) shall, without notice, (i) refuse to make a Loan and/or (ii) terminate any provision of this Agreement providing for any future Loans to be made by the Administrative Agent and Lenders to Borrower.

In addition, the automatic stay provided in section 362 of the Bankruptcy Code shall, as provided in the Interim Order or the Final Order, as the case may be, be deemed automatically vacated without further action or order of the Bankruptcy Court and the Administrative Agent and the Lenders shall be entitled to exercise all of their respective rights and remedies with respect to the Collateral (including all rights and remedies specified hereunder and under the UCC). In addition to the remedies set forth above, the Administrative Agent may exercise any other remedies provided for by the Loan Documents and the Orders in accordance with the terms hereof and thereof or any other remedies provided by applicable law.

ARTICLE IX
THE ADMINISTRATIVE AGENT

SECTION 9.1     Actions. Each Lender hereby appoints CIBC as its Administrative Agent under and for purposes of each Loan Document. Each Lender authorizes the Administrative Agent to act on behalf of such Lender under each Loan Document and, in the absence of other written instructions from the Required Lenders received from time to time by the Administrative Agent (with respect to which the Administrative Agent agrees that it will comply, except as otherwise provided in this Section or as otherwise advised by counsel in order to avoid contravention of applicable law), to exercise such powers hereunder and thereunder as are specifically delegated to or required of the Administrative Agent by the terms hereof and thereof, together with such powers as may be incidental thereto (including the release of Liens on assets Disposed of in accordance with the terms of the Loan Documents). Each Lender hereby indemnifies (which indemnity shall survive any termination of this Agreement) the Administrative Agent, pro rata according to such Lender's proportionate Total Exposure

Amount, from and against any and all liabilities, obligations, losses, damages, claims, costs or expenses of any kind or nature whatsoever which may at any time be imposed on, incurred by, or asserted against, the Administrative Agent in any way relating to or arising out of any Loan Document (including attorneys' fees), and as to which the Administrative Agent is not reimbursed by the Borrower; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, claims, costs or expenses which are determined by a court of competent jurisdiction in a final proceeding to have resulted from the Administrative Agent's gross negligence or willful misconduct; provided further that each Lender shall be severally liable for the entire portion of any indemnity to the Administrative Agent pursuant to this sentence that relates to (i) any Indemnified Taxes attributable to such Lender (ii) any Taxes attributable to such Lender's failure to comply with the provisions of clause (g) of Section 10.11 relating to the maintenance of a register of Participants and (iii) any Taxes other than Non-Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. The Administrative Agent shall not be required to take any action under any Loan Document, or to prosecute or defend any suit in respect of any Loan Document, unless it is indemnified hereunder to its satisfaction. If any indemnity in favor of the Administrative Agent shall be or become, in the Administrative Agent's determination, inadequate, the Administrative Agent may call for additional indemnification from the Lenders and cease to do the acts indemnified against hereunder until such additional indemnity is given. The Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law. Without limiting the generality of the foregoing, each Lender hereby authorizes the Administrative Agent to consent, on behalf of each Lender, to the Interim Order and the Final Order.

    SECTION 9.2    Funding Reliance, etc. Unless the Administrative Agent shall have been notified in writing by any Lender by 3:00 p.m. New York City time on the Business Day prior to a Borrowing that such Lender will not make available the amount which would constitute its Percentage of such Borrowing on the date specified therefor, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent and, in reliance upon such assumption, make available to the Borrower a corresponding amount. If and to the extent that such Lender shall not have made such amount available to the Administrative Agent, such Lender and the Borrower severally agree to repay the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date the Administrative Agent made such amount available to the Borrower to the date such amount is repaid to the Administrative Agent, at the interest rate applicable at the time to Loans comprising such Borrowing (in the case of the Borrower) and (in the case of a Lender),

at the Federal Funds Rate (for the first two Business Days after which such amount has not been repaid), and thereafter at the interest rate applicable to Loans comprising such Borrowing.

SECTION 9.3    Exculpation.  Neither the Administrative Agent nor any of its directors, officers, employees or agents shall be liable to any Secured Party for any action taken or omitted to be taken by it under any Loan Document, or in connection therewith, except for its own willful misconduct or gross negligence, nor responsible for any recitals or warranties herein or therein, nor for the effectiveness, enforceability, validity or due execution of any Loan Document, nor for the creation, perfection or priority of any Liens purported to be created by any of the Loan Documents, or the validity, genuineness, enforceability, existence, value or sufficiency of any collateral security, nor to make any inquiry respecting the performance by any Obligor of its Obligations.  Any such inquiry which may be made by the Administrative Agent shall not obligate it to make any further inquiry or to take any action.  The Administrative Agent shall be entitled to rely upon advice of counsel concerning legal matters and upon any notice, consent, certificate, statement or writing which the Administrative Agent believes to be genuine and to have been presented by a proper Person.

SECTION 9.4    Successor.

(a)    The Administrative Agent may resign upon prior notice to the Borrower and all Lenders at any time such resigning Administrative Agent determines such resignation necessary or advisable because of legal or regulatory restrictions or requirements.  If the Administrative Agent at any time shall resign, the Required Lenders may appoint another Lender as a successor Administrative Agent which shall thereupon become the Administrative Agent hereunder.  If no successor Administrative Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, then the resigning Administrative Agent shall (x) use commercially reasonable efforts to appoint, on behalf of the Lenders, a successor Administrative Agent, which shall be one of the Lenders or a commercial banking institution organized under the laws of the United States (or any State thereof) or a United States branch or agency of a commercial banking institution, and having a combined capital and surplus of at least $250,000,000 and (y) shall remain as Administrative Agent for a commercially reasonable period of time until such successor Administrative Agent replaces the Administrative Agent; provided that if such retiring Administrative Agent is unable to find a commercial banking institution or financial institution which is willing to accept such appointment and which meets the qualifications set forth above within such time period, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective (such date, the "Resignation Effective Date").

(b)    If the Person serving as Administrative Agent is a Defaulting Lender pursuant to clause (d) of the definition thereof, the Required Lenders may, to the extent permitted by applicable law, by notice in writing to the Borrower and such Person remove such Person as Administrative Agent and, in consultation with the Borrower, appoint a successor.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders) (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(c)     With effect from the Resignation Effective Date or the Removal Effective Date (as applicable), the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor as provided for above.

(d)     Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, such successor Administrative Agent shall be entitled to receive from the retiring Administrative Agent such documents of transfer and assignment as such successor Administrative Agent may reasonably request, and shall thereupon succeed to and become vested with all rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under the Loan Documents. After any retiring Administrative Agent's resignation or removal hereunder as the Administrative Agent, the provisions of this Article shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under the Loan Documents, and Section 10.3 and Section 10.4 shall continue to inure to its benefit.

SECTION 9.5     Loans by CIBC. CIBC shall have the same rights and powers with respect to (x) the Credit Extensions made by it or any of its Affiliates, and (y) the Notes held by it or any of its Affiliates as any other Lender and may exercise the same as if it were not the Administrative Agent. CIBC and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of business with the Borrower or any Subsidiary or Affiliate of the Borrower as if CIBC were not the Administrative Agent hereunder.

SECTION 9.6     Credit Decisions. Each Lender acknowledges that it has, independently of the Administrative Agent and each other Lender, and based on such Lender's review of the financial information of the Borrower, the Loan Documents (the terms and provisions of which being satisfactory to such Lender) and such other documents, information and investigations as such Lender has deemed appropriate, made its own credit decision to extend its Commitments. Each Lender also acknowledges that it will, independently of the Administrative Agent and each other Lender, and based on such other documents, information and investigations as it shall deem appropriate at any time, continue to make its own credit decisions as to exercising or not exercising from time to time any rights and privileges available to it under the Loan Documents.

SECTION 9.7     Copies, etc. The Administrative Agent shall give prompt notice to each Lender of each notice or request required or permitted to be given to the Administrative Agent by the Borrower pursuant to the terms of the Loan Documents (unless concurrently delivered to the Lenders by the Borrower). The Administrative Agent will distribute to each Lender each document or instrument received for its account and copies of all other communications received by the Administrative Agent from the Borrower for distribution to the Lenders by the Administrative Agent in accordance with the terms of the Loan Documents.

SECTION 9.8     Reliance by Administrative Agent. The Administrative Agent shall be entitled to rely upon any certification, notice or other communication (including any thereof by telephone, telecopy, telegram or cable) reasonably believed by it to be genuine and correct and to have been signed or sent by or on behalf of the proper Person, and upon advice and statements of legal counsel, independent accountants and other experts reasonably selected by the

Administrative Agent. As to any matters not expressly provided for by the Loan Documents, the Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, thereunder in accordance with instructions given by the Required Lenders or all of the Lenders as is required in such circumstance, and such instructions of such Lenders and any action taken or failure to act pursuant thereto shall be binding on all Secured Parties. For purposes of applying amounts in accordance with this Section, the Administrative Agent shall be entitled to rely upon Oak Hill for a determination (which such Secured Party agrees to provide or cause to be provided upon request of the Administrative Agent) of the outstanding Obligations owed to such Secured Party under the Secured OHAA Payment Obligations.

SECTION 9.9    Defaults. The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of a Default unless the Administrative Agent has received a written notice from a Lender or the Borrower specifying such Default and stating that such notice is a "Notice of Default". In the event that the Administrative Agent receives such a notice of the occurrence of a Default, the Administrative Agent shall give prompt notice thereof to the Lenders. The Administrative Agent shall (subject to Section 10.1) take such action with respect to such Default as shall be directed by the Required Lenders; provided that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default as it shall deem advisable in the best interest of the Secured Parties except to the extent that this Agreement expressly requires that such action be taken, or not be taken, only with the consent or upon the authorization of the Required Lenders or all Lenders.

SECTION 9.10    Withholding Taxes. To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax. If the Internal Revenue Service or any other Governmental Authority asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding tax ineffective or for any other reason, such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.

ARTICLE X
ADDITIONAL PROVISIONS

SECTION 10.1    Waivers, Amendments, etc. The provisions of each Loan Document may from time to time be amended, modified or waived, if such amendment, modification or waiver is in writing and consented to by the Borrower and the Required Lenders; provided that no other such amendment, modification or waiver shall:

(a)    modify clause (b) of Section 4.7, Section 4.8 (as it relates to sharing of payments) or this Section, in each case, without the consent of each Lender directly affected thereby;

(b)     increase the aggregate amount of any Credit Extensions required to be made by a Lender pursuant to its Commitments (it being understood that a waiver of an Event of Default, the waiver of any condition precedent to the making of a Credit Extension, mandatory prepayments or mandatory reduction of the Commitments shall not constitute an increase of any Commitment of any Lender), extend the final Stated Maturity Date for any Lender's Loan, in each case without the consent of such Lender directly affected thereby (it being agreed, however, that any vote to rescind any acceleration made pursuant to Section 8.2 of amounts owing with respect to the Loans and other Obligations owed to the Lenders shall only require the vote of the Required Lenders);

(c)     reduce (by way of forgiveness) the principal amount of or reduce the rate of interest on any Lender's Loan, reduce any fees described in Article III payable to any Lender, waive payment Defaults, or extend the scheduled date on which principal, interest or fees are payable in respect of such Lender's Loans, in each case without the consent of such Lender directly affected thereby; provided that the vote of Required Lenders shall be sufficient to waive the payment, or reduce the increased portion, of interest accruing under Section 3.2.2;

(d)     reduce the percentage set forth in the definition of "Required Lenders" or modify any requirement hereunder that any particular action be taken by all Lenders without the consent of each Lender directly affected thereby;

(e)     except as otherwise expressly provided in a Loan Document, release (i) the Borrower from its Obligations owed to the Lenders or any Guarantor from its obligations under a Subsidiary Guaranty or the Holdings Guaranty and Pledge Agreement, as applicable, or (ii) all or substantially all of the collateral under the Loan Documents, in each case without the consent of each Lender directly affected thereby;

(f)     affect adversely the interests, rights or obligations of the Administrative Agent (in its capacity as the Administrative Agent), unless consented to by the Administrative Agent;

(g)     modify clause (b) of Section 3.1.2, without the consent of each Lender directly affected thereby;

(h)     waive an Event of Default under Section 8.1.1, without the consent of each Lender directly affected thereby; or

(i)     (i) amend, modify or supplement (or have the effect of amending, modifying or supplementing) (A) the definitions of "Obligations", "OHAA", "Oak Hill", "Secured OHAA Payment Obligations", "Secured Parties", "Section 1110 Stipulation" or "Termination Date"; (B) Sections 3.1.1(d) (*Repayments and Prepayments*), 3.1.2(c) (*Application*), or 4.7(b) (*Payments, Computations; Proceeds of Collateral, etc.*) in each case to the extent relating to the Secured OHAA Payment Obligations; (C) any provisions of Section 7.2.9 (Permitted Dispositions), or any related definitions, in any manner if the effect of such amendment, modification or supplement

is to make such covenant less restrictive, (D) any provisions of Article XI (*Grant and Perfection of Security Interest; Priority of Liens*) or any related definitions, or any other provision of any Loan Document if the effect of such amendment, modification or supplement is to subordinate, prime or otherwise directly and adversely affect the priority, status or enforceability of the superpriority claims on account of, or the liens securing, the Secured OHAA Payment Obligations; or (E) this Section 10.01(i) (*Waivers, Amendments, etc.*); or (ii) except as expressly provided in a Loan Document as in effect on the date hereof, release (a) the Borrower from its Obligations owed to Oak Hill or any Guarantor from its obligations under a Subsidiary Guaranty or the Holdings Guaranty and Pledge Agreement, as applicable, or (b) all or substantially all of the Collateral under the Loan Documents, in each case without the prior written consent of Oak Hill;

provided further that Administrative Agent may, with the consent of the Borrower only, amend, modify or supplement this Agreement or any other Loan Document to cure any ambiguity, omission, defect or inconsistency (as reasonably determined by Administrative Agent), so long as such amendment, modification or supplement does not adversely affect the rights of any Lender or Oak Hill or the Lenders and Oak Hill shall have received at least five Business Days' prior written notice thereof and Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment.

No failure or delay on the part of any Secured Party in exercising any power or right under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right. No notice to or demand on any Obligor in any case shall entitle it to any notice or demand in similar or other circumstances. No waiver or approval by any Secured Party under any Loan Document shall, except as may be otherwise stated in such waiver or approval, be applicable to subsequent transactions. No waiver or approval hereunder shall require any similar or dissimilar waiver or approval thereafter to be granted hereunder.

SECTION 10.2   Notices; Time. All notices and other communications provided under each Loan Document shall be in writing or by facsimile and addressed, delivered or transmitted, if to the Borrower or the Administrative Agent, to the applicable Person at its address or facsimile number set forth on Schedule II hereto, or, in the case of any Lender, as set forth in such Lender's Administrative Questionnaire, or in the case of Oak Hill in its capacity as a Secured Party, to the address set forth in the Section 1110 Stipulation, or at such other address or facsimile number as may be designated by such party in a notice to the other parties. Any notice, if mailed and properly addressed with postage prepaid or if properly addressed and sent by pre-paid courier service, shall be deemed given when received; any notice, if transmitted by facsimile, shall be deemed given when the confirmation of transmission thereof is received by the transmitter. Electronic mail and Internet and intranet websites may be used only to distribute routine communications by the Administrative Agent to the Lenders, such as financial statements and other information as provided in Section 7.1.1 and for the distribution and execution of Loan Documents for execution by the parties thereto, and the use thereof for any other purpose shall not constitute effective notice under this Agreement or the other Loan Documents. The parties hereto agree that delivery of an executed counterpart of a signature page to this Agreement and

each other Loan Document by facsimile (or electronic transmission) shall be effective as delivery of an original executed counterpart of this Agreement or such other Loan Document. Unless otherwise indicated, all references to the time of a day in a Loan Document shall refer to New York time.

SECTION 10.3    <u>Payment of Costs and Expenses</u>.  The Borrower agrees to pay on demand all expenses of the Administrative Agent and each Lender (including the fees and out-of-pocket expenses of Milbank, Tweed, Hadley & McCloy LLP, counsel to the Administrative Agent, and of Department of Transportation counsel, Federal Aviation Administration counsel and local counsel, if any, who may be retained by or on behalf of the Administrative Agent in connection with any restructuring, including the Chapter 11 Cases) in connection with

(a)    the negotiation, preparation, execution and delivery of each Loan Document, including schedules and exhibits, and any amendments, waivers, consents, supplements or other modifications to any Loan Document as may from time to time hereafter be required, whether or not the transactions contemplated hereby or thereby are consummated;

(b)    the filing or recording of any Loan Document (including the Filing Statements) and all amendments, supplements, amendment and restatements and other modifications to any thereof, searches made following the Closing Date in jurisdictions where Filing Statements (or other documents evidencing Liens in favor of the Secured Parties) have been recorded and any and all other documents or instruments of further assurance required to be filed or recorded by the terms of any Loan Document; and

(c)    the preparation and review of the form of any document or instrument relevant to any Loan Document.

The Borrower further agrees to pay, and to save each Secured Party harmless from all liability for, any stamp or Other Taxes or notarial fees which may be payable in connection with the execution or delivery of each Loan Document, the Credit Extensions or the issuance of the Notes.  The Borrower also agrees to reimburse the Administrative Agent and the Lenders upon demand for all out-of-pocket expenses (including attorneys' fees and legal expenses of counsel to the Administrative Agent and the Lenders) incurred by the Administrative Agent and the Lenders in connection with (x) the negotiation of any restructuring or "work-out" with the Borrower, whether or not consummated, of any Obligations owed to the Lenders and (y) the enforcement of any Obligations owed to the Lenders.

SECTION 10.4    <u>Indemnification</u>.  In consideration of the execution and delivery of this Agreement by each Lender, the Borrower hereby indemnifies, exonerates and holds each Lender and each of their respective officers, partners, trustees, members, shareholders, directors, employees, agents and Affiliates (collectively, the "<u>Indemnified Parties</u>") free and harmless from and against any and all actions, causes of action, suits, losses, claims, costs, liabilities and damages, and expenses incurred in connection therewith (irrespective of whether any such Indemnified Party is a party to the action for which indemnification hereunder is sought), including attorneys' fees and disbursements, whether incurred in connection with actions

between or among the parties hereto or the parties hereto and third parties (collectively, the "Indemnified Liabilities"), incurred by the Indemnified Parties or any of them as a result of, or arising out of, or relating to

    (a)    any transaction financed or to be financed in whole or in part, directly or indirectly, with the proceeds of any Credit Extension, including all Indemnified Liabilities arising in connection with the transactions contemplated hereby;

    (b)    the entering into and performance of any Loan Document by any of the Indemnified Parties (including any action brought by or on behalf of the Borrower as the result of any determination by the Required Lenders pursuant to Article V not to fund any Credit Extension; provided that any such action is resolved in favor of such Indemnified Party);

    (c)    any investigation, litigation or proceeding related to any acquisition or proposed acquisition by any Obligor or any Subsidiary thereof of all or any portion of the Capital Securities or assets of any Person, whether or not an Indemnified Party is party thereto;

    (d)    any investigation, litigation or proceeding related to any environmental cleanup, audit, compliance or other matter relating to the protection of the environment or the Release by any Obligor or any Subsidiary thereof of any Hazardous Material;

    (e)    the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission, discharging or releases from, any real property owned or operated by any Obligor or any Subsidiary thereof of any Hazardous Material (including any losses, liabilities, damages, injuries, costs, expenses or claims asserted or arising under any Environmental Law), regardless of whether caused by, or within the control of, such Obligor or Subsidiary; or

    (f)    each Lender's Environmental Liability (the indemnification herein shall survive repayment of the Obligations and any transfer of the property of any Obligor or its Subsidiaries by foreclosure or by a deed in lieu of foreclosure for any Lender's Environmental Liability, regardless of whether caused by, or within the control of, such Obligor or such Subsidiary);

except for Indemnified Liabilities determined in a final judgment by a court of competent jurisdiction as (i) arising for the account of a particular Indemnified Party primarily by reason of the relevant Indemnified Party's gross negligence or willful misconduct, or (ii) with respect to clauses (d), (e) and (f), having been caused solely by the affirmative action of a particular Indemnified Party, or a party to which such Indemnified Party has transferred or leased the property, as an owner or operator of property transferred through foreclosure or a deed in lieu of foreclosure. Each Obligor and its successors and assigns hereby waive, release and agree not to make any claim or bring any cost recovery action against, any Indemnified Party under CERCLA or any state equivalent, or any similar law now existing or hereafter enacted. It is expressly understood and agreed that except as otherwise provided herein, to the extent that any Indemnified Party is strictly liable under any Environmental Laws, each Obligor's obligation to

such Indemnified Party under this indemnity shall likewise be without regard to fault on the part of any Obligor with respect to the violation or condition which results in liability of an Indemnified Party. If and to the extent that the foregoing undertaking may be unenforceable for any reason, each Obligor agrees to make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law. This Section 10.4 shall not apply to Taxes, which shall be governed exclusively by Section 4.6.

To the extent permitted by applicable law, no Obligor shall assert, and each Obligor hereby waives, any claim against each Lender, the Administrative Agent and their respective Affiliates, directors, employees, attorneys, agents or sub-agents, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any Loan Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and the Borrower hereby waives, releases and agrees not to sue upon any such claim or any such damages, whether or not accrued and whether or not known or suspected to exist in its favor

SECTION 10.5    Survival. The obligations of the Borrower under Sections 4.3, 4.4, 4.5, 4.6, 10.3 and 10.4, and the obligations of the Lenders under Sections 4.6, 9.1 and 10.16, shall in each case survive any assignment from one Lender to another (in the case of Sections 10.3 and 10.4) and the occurrence of the Termination Date. The representations and warranties made by each Obligor in each Loan Document shall survive the execution and delivery of such Loan Document.

SECTION 10.6    Severability. Any provision of any Loan Document which is prohibited or unenforceable in any jurisdiction shall, as to such provision and such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of such Loan Document or affecting the validity or enforceability of such provision in any other jurisdiction.

SECTION 10.7    Headings. The various headings of each Loan Document are inserted for convenience only and shall not affect the meaning or interpretation of such Loan Document or any provisions thereof.

SECTION 10.8    Execution in Counterparts, Lender Addendums, Effectiveness, etc. This Agreement may be executed by the parties hereto in several counterparts, each of which shall be an original and all of which shall constitute together but one and the same agreement. By executing a Lender Addendum, a Person (other than the Administrative Agent and the Borrower) (a) becomes a "Lender" under this Agreement with the same force and effect as if it were an original signatory hereto, (b) shall be bound by and comply with all of the terms and provisions of this Agreement applicable to it as a "Lender", (c) shall benefit from all of the rights and remedies of a "Lender" under this Agreement and the other Loan Documents and (d) shall have the Commitments as of the Closing Date set forth in Schedule 1 to such Lender Addendum. This Agreement shall become effective when counterparts hereof executed on behalf of the Borrower, the Administrative Agent and each Lender shall have been received by the Administrative Agent.

SECTION 10.9    Governing Law; Entire Agreement.  EACH LOAN DOCUMENT WILL EACH BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING FOR SUCH PURPOSE SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK) AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE, EXCEPT TO THE EXTENT THAT THE PERFECTION, EFFECT OF PERFECTION OR NONPERFECTION, AND PRIORITY OF A SECURITY INTEREST UNDER ANY LOAN DOCUMENT, OR REMEDIES UNDER ANY LOAN DOCUMENT, IN RESPECT OF ANY PARTICULAR COLLATERAL ARE GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.  The Loan Documents constitute the entire understanding among the parties hereto with respect to the subject matter thereof and supersede any prior agreements, written or oral, with respect thereto (other than any agreement referenced in Section 3.3).

SECTION 10.10    Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided that the Borrower may not assign or transfer its rights or obligations hereunder without the consent of all Lenders.

SECTION 10.11    Sale and Transfer of Credit Extensions; Participations in Credit Extensions; Notes.  Each Lender may assign, or sell participations in, its Loans and Commitments to one or more other Persons in accordance with the terms set forth below.

(a)    Subject to clause (b), any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under the Loan Documents (including all or a portion of its Commitments and the Loans at the time owing to it); provided that

(i)    except in the case of (A) an assignment of the entire remaining amount of the assigning Lender's Commitments and the Loans at the time owing to it, or (B) an assignment to a Lender, an Affiliate of a Lender or an Approved Fund with respect to a Lender, the aggregate amount of the Commitments (which for this purpose includes Loans outstanding thereunder) or principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Lender Assignment Agreement with respect to such assignment is delivered to the

Administrative Agent) shall not be less than $1,000,000, unless the Administrative Agent otherwise consents (such consent not to be unreasonably withheld or delayed);

(ii)    for the avoidance of doubt, each assignment shall cover the same percentage of such Lender's Closing Date Term Loans, Final Order Term Loans and Roll-Up Loans;

(iii)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans and the Commitments assigned; and

(iv)    the parties to each assignment shall execute and deliver to the Administrative Agent a Lender Assignment Agreement, together with a processing and recordation fee of $3,500 (except in the case of an assignment to an Affiliate of the assigning Lender or an Approved Fund of an assigning Lender, the processing and recordation fee shall be $500) and if the Eligible Assignee is not already a Lender, an Administrative Questionnaire and original applicable tax forms.

(b)    Any assignment proposed pursuant to clause (a) to any Person (other than a Lender, an Affiliate of a Lender or an Approved Fund) shall be subject to the prior written approval of the Administrative Agent (not to be unreasonably withheld).

(c)    Subject to acceptance and recording thereof by the Administrative Agent pursuant to clause (d), from and after the effective date specified in each Lender Assignment Agreement, (i) the Eligible Assignee thereunder shall (if not already a Lender) be a party hereto and, to the extent of the interest assigned under such Lender Assignment Agreement, have the rights and obligations of a Lender under the Loan Documents, and (ii) the assigning Lender thereunder shall (subject to Section 10.5) be released from its obligations under the Loan Documents, to the extent of the interest assigned under such Lender Assignment Agreement (and, in the case of a Lender Assignment Agreement covering all of the assigning Lender's rights and obligations under the Loan Documents, such Lender shall cease to be a party hereto, but shall (as to matters arising prior to the effectiveness of the Lender Assignment Agreement) continue to be entitled to the benefits of any provisions of the Loan Documents which by their terms survive the termination of this Agreement); provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with the terms of this Section shall be treated for purposes of the Loan Documents as a sale by such Lender of a participation in such rights and obligations in accordance with clause (e).

(d)    The Administrative Agent shall record each assignment made in accordance with this Section in the Register pursuant to clause (a) of Section 2.5.  The Register shall be available for inspection by the Borrower, at any reasonable time upon reasonable prior notice to the Administrative Agent.

(e)    Any Lender may, without the consent of, or notice to, any Person, sell participations to one or more Persons (other than individuals, the Borrower, any Competitor or any other Person taking direction from, or working in concert with, the Borrower, any of the Borrower's Affiliates or any Competitor) (a "<u>Participant</u>") in all or a portion of such Lender's rights or obligations under the Loan Documents (including all or a portion of its Commitments or the Loans owing to it); <u>provided</u> that (i) such Lender's obligations under the Loan Documents shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under the Loan Documents. Any agreement or instrument pursuant to which a Lender sells a participation shall provide that such Lender shall retain the sole right to enforce the rights and remedies of a Lender under the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents; <u>provided</u> that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, take any action of the type described in <u>clauses (a)</u> through <u>(d)</u> or <u>clause (f)</u> of <u>Section 10.1</u> with respect to Obligations participated in by that Participant. Subject to <u>clause (f)</u>, the Borrower agrees that each Participant shall be entitled to the benefits of <u>Sections 4.3</u>, <u>4.4</u>, <u>4.5</u>, <u>4.6</u>, <u>7.1.1</u>, <u>10.3</u> and <u>10.4</u> to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to <u>clause (c)</u>. To the extent permitted by law, each Participant also shall be entitled to the benefits of <u>Section 4.9</u> as though it were a Lender, but only if such Participant agrees to be subject to <u>Section 4.8</u> as though it were a Lender.

(f)    A Participant shall not be entitled to receive any greater payment under <u>Section 4.3</u>, <u>4.4</u>, <u>4.5</u>, <u>4.6</u>, <u>10.3</u> or <u>10.4</u> than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. A Participant that would be a Non-U.S. Lender if it were a Lender shall not be entitled to the benefits of <u>Section 4.6</u> unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with the requirements set forth in <u>Section 4.6</u> as though it were a Lender. Any Lender that sells a participating interest in any Loan, Commitment or other interest to a Participant under this Section shall indemnify and hold harmless the Borrower and the Administrative Agent from and against any taxes, penalties, interest or other costs or losses (including reasonable attorneys' fees and expenses) incurred or payable by the Borrower or the Administrative Agent as a result of the failure of the Borrower or the Administrative Agent to comply with its obligations to deduct or withhold any Taxes from any payments made pursuant to this Agreement to such Lender or the Administrative Agent, as the case may be, which Taxes would not have been incurred or payable if such Participant had been a Non-U.S. Lender that was entitled to deliver to the Borrower, the Administrative Agent or such Lender, and did in fact so deliver, an original duly completed and valid Form W-8BEN or W-8ECI or Exemption Certificate (or applicable successor form), or if such Participant had been a U.S. Lender that was entitled to deliver to the Borrower, the Administrative Agent or such Lender, and did in fact so deliver, an original duly completed and valid Form W-9 (or applicable successor form) entitling such Participant to receive payments under this Agreement without deduction or withholding of any United States federal taxes.

(g)    Each Lender having sold a participation of its rights and obligations to a Participant under this Agreement, acting solely for this purpose as agent for the Borrower, shall

maintain a register for the recordation of the names and addresses of each Participant (and each change thereto, whether by assignment or otherwise) and the rights, interests or obligation of such Participants in any right or obligation hereunder; provided that such Lender shall have no obligation to make such register or the information thereto available to the Borrower or its Affiliates, except to the extent that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.

(h)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(i)    In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent and each other Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with its Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

SECTION 10.12    Replacement of Lenders under Certain Circumstances. If at any time (a) the Borrower becomes obligated to pay additional amounts described in Section 4.3, 4.5 or 4.6 as a result of any condition described in such Sections or any Lender ceases to make LIBO Rate Loans, (b) any such Lender becomes a Defaulting Lender, or (c) any Lender becomes a "Non-Consenting Lender" (as defined below in this Section 10.12), Borrower may, on one Business Day's prior written notice to the Administrative Agent and such Lender, replace such Lender by causing such Lender to (and such Lender shall be obligated to) assign pursuant to Section 10.11 all of its rights and obligations under this Agreement to a Lender or other entity (a "Replacement Lender") selected by Borrower and reasonably acceptable to the Administrative Agent (such consent not to be unreasonably withheld or delayed; provided that no consent shall be required if the Replacement Lender is an existing Lender) for a purchase price equal to the outstanding principal amount of such Lender's Commitments and all accrued interest and fees and other amounts payable hereunder; provided that (i) neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a Replacement Lender or other such entity and (ii) in no event shall the Lender hereby replaced be required to pay or surrender to such Replacement Lender or other entity any of the fees received by such Lender hereby

replaced pursuant to this Agreement.  In the case of a replacement of a Lender to which the Borrower becomes obligated to pay additional amounts to such Lender prior to such Lender being replaced, the payment of such additional amounts shall be a condition to the replacement of such Lender.  Each Lender agrees that if it is replaced pursuant to this Section 10.12, it shall execute and deliver to the Administrative Agent a Lender Assignment Agreement to evidence such sale and purchase and shall deliver to the Administrative Agent any Note (if the assigning Lender's Loans are evidenced by Notes) subject to such Lender Assignment Agreement; provided that the failure of any Lender replaced pursuant to this Section 10.12 to execute a Lender Assignment Agreement shall not render such sale and purchase (and the corresponding assignment) invalid.  In the event that (x) the Borrower or the Administrative Agent has requested the Lenders to consent to a departure from, modification of or waiver of any provisions of the Loan Documents or to agree to any amendment thereto, (y) the consent, waiver or amendment in question requires the agreement of all or all affected Lenders in accordance with the terms of Section 10.1, all the Lenders with respect to a certain class of the Loans or a super-majority of the Lenders in accordance with clause (d) of Section 10.1 and (z) Required Lenders have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "Non-Consenting Lender".  The Borrower's right to replace a Defaulting Lender pursuant to this Section 10.12 is, and shall be, in addition to, and not in lieu of, all other rights and remedies available to the Borrower against such Defaulting Lender under this Agreement, at law, in equity, or by statute.

SECTION 10.13    Other Transactions.  Nothing contained herein shall preclude the Administrative Agent or any Lender from engaging in any transaction, in addition to those contemplated by the Loan Documents, with the Borrower or any of its Affiliates in which the Borrower or such Affiliate is not restricted hereby from engaging with any other Person.

SECTION 10.14    Forum Selection and Consent to Jurisdiction.  EACH OBLIGOR HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE BANKRUPTCY COURT, OR IN THE EVENT THE BANKRUPTCY COURT DOES NOT HAVE OR DOES NOT EXERCISE JURISDICTION, THEN TO THE COURTS OF THE STATE OF NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK; PROVIDED THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT THE ADMINISTRATIVE AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND.  THE BORROWER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY REGISTERED MAIL, POSTAGE PREPAID, OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF NEW YORK AT THE ADDRESS FOR NOTICES SPECIFIED IN SECTION 10.2.  THE BORROWER HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  TO THE EXTENT THAT THE BORROWER HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE,

ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, THE BORROWER HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THE LOAN DOCUMENTS.

SECTION 10.15  Waiver of Jury Trial.  THE ADMINISTRATIVE AGENT, EACH LENDER, AND THE BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, EACH LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE ADMINISTRATIVE AGENT, SUCH LENDER OR THE BORROWER IN CONNECTION THEREWITH.  THE BORROWER ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION (AND EACH OTHER PROVISION OF EACH OTHER LOAN DOCUMENT TO WHICH IT IS A PARTY) AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE ADMINISTRATIVE AGENT AND EACH LENDER ENTERING INTO THE LOAN DOCUMENTS.

SECTION 10.16  Confidentiality.  The Administrative Agent and each Lender shall ensure that financial statements or other information relating to the Borrower and its Subsidiaries which may be delivered to it pursuant to this Agreement and which are not publicly filed or otherwise made available to the public generally (other than through a breach of a confidentiality undertaking known to the Administrative Agent or the Lenders) will, except to the extent required by law to be disclosed, be treated confidentially by the Administrative Agent and each Lender (in accordance with its own procedures for keeping such information confidential) and will not, except with the consent of the Borrower, be distributed or otherwise made available by the Administrative Agent or any Lender to any Person other than its directors, officers, employees, authorized agents, counsel or other representatives (provided the other representatives have agreed or are under a duty to keep all information confidential) required, in the reasonable opinion of the Lender, to have such information for purposes of the Loan Documents.  The Administrative Agent and each Lender is authorized to deliver a copy of any financial statement or any information which may be delivered to it pursuant to this Agreement (a) to any actual or potential Participant or Eligible Assignee which has agreed in writing, in favor of such Lender and the Borrower, to maintain such information in confidence; (b) to any Governmental Authority having jurisdiction over the Lender in order to comply with any applicable laws (with a request for confidential treatment); (c) to any Affiliate of the Lender required, in the reasonable opinion of the Lender, to have such information, solely in connection with the Loans contemplated by the Loan Documents (provided that such Lender remains liable for the maintenance of confidentiality of such information); (d) to the Administrative Agent or any other Lender; and (e) to any nationally recognized rating agency that requires access to information about such Lender's investment portfolio in connection with ratings issued with respect to such Lender, and which has agreed in writing, in favor of such Lender and the Borrower, to maintain such information in confidence.

SECTION 10.17  USA Patriot Act Notice.  Each Lender that is subject to the Patriot Act (as defined below) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower in accordance with the Patriot Act.

SECTION 10.18  Parties Including Trustees; Bankruptcy Court Proceedings.  Upon entry of the Interim Order (or when applicable, the Final Order), this Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon each Obligor, the bankruptcy estate of each Obligor, and any trustee, other bankruptcy estate representative or any successor in interest of any Obligor in the Chapter 11 Cases or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code.  This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Administrative Agent and the Lenders and their respective assigns, transferees and endorsees.  The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any of the Chapter 11 Cases or any other bankruptcy case of any Obligor to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any of the Chapter 11 Cases or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Administrative Agent files financing statements or otherwise perfect its Liens under applicable law.  No Obligor may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written consent of the Administrative Agent and each Lender.  Any such purported assignment, transfer, hypothecation or other conveyance by any Obligor without the prior express written consent of the Administrative Agent and each Lender shall be void.  The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of each Obligor, the Administrative Agent and each Lender with respect to the transactions contemplated hereby and no Person (other than Oak Hill to the extent relating to the Secured OHAA Payment Obligations) shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

SECTION 10.19  No Fiduciary Duty.  Each Agent, each Lender and their Affiliates (collectively, solely for purposes of this paragraph, the "Lenders"), may have economic interests that conflict with those of the Obligors, their stockholders and/or their affiliates.  Each Obligor agrees that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and such Obligor, its stockholders or its affiliates, on the other.  The Obligors acknowledge and agree that (i) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Obligors, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of any Obligor, its stockholders or its affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is

currently advising or will advise any Obligor, its stockholders or its Affiliates on other matters) or any other obligation to any Obligor except the obligations expressly set forth in the Loan Documents and (y) each Lender is acting solely as principal and not as the agent or fiduciary of any Obligor, its management, stockholders, creditors or any other Person. Each Obligor acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. Each Obligor agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Obligor, in connection with such transaction or the process leading thereto.

ARTICLE XI
GRANT AND PERFECTION OF SECURITY INTEREST; PRIORITY OF LIENS

SECTION 11.1    <u>Super-Priority Nature of Obligations and Secured Parties' Liens</u>. Each Obligor represents, warrants, covenants and agrees that:

(a)    The priority of the Administrative Agent's and Secured Parties' Liens on the Collateral owned by the Borrower shall be set forth in the Interim Order (or, when applicable, the Final Order).

(b)    Upon entry of the Interim Order (or, when applicable, the Final Order), subject only to the Carve-Out, pursuant to Section 364(c)(1) of the Bankruptcy Code, the Obligations shall at all times constitute allowed super-priority administrative expenses of each of the Obligors in the Chapter 11 Cases having priority over any and all administrative expenses, diminution claims and all other claims against each of the Obligors, now existing or hereafter arising, including, without limitation, of the kind specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c) (upon entry of the Final Order), 507(b), 546(c), 726,1114 or any other section of the Bankruptcy Code, shall at all times be senior to the rights of the Obligors, the estates of the Obligors, and any successor trustee or estate representative in the Chapter 11 Cases or any subsequent proceeding or case under the Bankruptcy Code, and shall be payable in accordance with the terms of the Orders.

(c)    Upon entry of the Interim Order (or, when applicable, the Final Order) and subject to the Carve-Out, pursuant to section 364(c)(2) of the Bankruptcy Code, the Obligations shall be secured by a valid, perfected, binding, continuing, enforceable, non-avoidable, first priority Lien on all unencumbered Collateral, including, without limitation, but subject to entry of the Final Order, the Debtors' Avoidance Actions and the proceeds thereof, whether received by judgment, settlement or otherwise.

(d)    Upon entry of the Interim Order (or, when applicable, the Final Order) and subject to the Carve-Out, pursuant to section 364(c)(3) of the Bankruptcy Code, the Obligations shall be secured by a valid, perfected, binding, continuing, enforceable, non-avoidable, junior Lien upon all Collateral that is subject to (x) valid, enforceable, non-avoidable and perfected Liens in existence on the Petition Date and which are disclosed in <u>Item 7.2.3(b)-1</u> of the Disclosure Schedule, and are senior to the Liens securing the obligations of the Obligors under the Pre-Petition Credit Agreement, after giving effect to any intercreditor or subordination

agreement, and (y) valid, enforceable and non-avoidable Liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code and which are disclosed in Item 7.2.3(b)-2 of the Disclosure Schedule, and are senior to the Liens securing the obligations of the Obligors under the Pre-Petition Credit Agreement, after giving effect to any intercreditor or subordination agreement, in each case, other than Liens which are expressly stated to be primed by the Liens to be granted to the Administrative Agent and the Secured Parties described in clause (e) below (subject to such exception, the "Senior Liens").

(e)    Except as otherwise expressly permitted herein, upon entry of the Interim Order (or, when applicable, the Final Order) and subject to the Carve-Out, pursuant to section 364(d)(1) of the Bankruptcy Code, the Obligations shall be secured by a valid, perfected, binding, continuing, enforceable, non-avoidable senior priming Lien on all Collateral (including, without limitation, Cash Collateral), which Liens shall be senior to (x) the Liens securing the obligations of the Obligors under the Pre-Petition Credit Agreement, and (y) except for the Senior Liens, any other Liens in favor of any other Person, including, without limitation, all Liens junior to the Liens securing any or all of the obligations of the Obligors under the Pre-Petition Credit Agreement (the Liens referenced in clauses (x) and (y), collectively, the "Primed Liens"), which Primed Liens, together with any Liens granted on or after the Petition Date to provide adequate protection in respect of any Primed Liens, shall be primed by and made subject and subordinate to the first priority senior priming Liens securing the Obligations granted pursuant to this clause (e).

(f)    Except as set forth herein or in the Interim Order (or, as applicable, the Final Order), no other claim or Lien having a priority superior or *pari passu* to that granted to the Administrative Agent and the Secured Parties by the Interim Order (or, as applicable, the Final Order) shall be granted or approved while any Obligations under this Agreement remain outstanding without the prior written consent of the Administrative Agent (acting at the direction of the Required Lenders). Except for the Carve-Out, no costs or expenses of administration shall be imposed against the Secured Parties or any of the Collateral or the secured parties pursuant to the Pre-Petition Credit Agreement or any of the Collateral (as defined in the Pre-Petition Security Agreement) under Sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, and the Obligors hereby waive for themselves and on behalf of each of their estates in bankruptcy, any and all rights under sections 105, 506(c) (upon entry of the Final Order) or 552, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against the Secured Parties or the lenders holding Pre-Petition Loans.

(g)    The Liens and claims granted in respect of the Obligations pursuant to this Section 11.1 shall be subject and subordinate to the Carve-Out. The term "Carve-Out Trigger Notice" means a written notice delivered by the Administrative Agent or its counsel to the Obligors' lead counsel, the U.S. Trustee, counsel to the Pre-Petition Agent, counsel to OHAA and lead counsel to any statutory committee appointed in the Chapter 11 Cases, which notice may be delivered at any time following the occurrence and during the continuation of any Event of Default, expressly stating that the Carve-Out is invoked. Following delivery of the Carve-Out Trigger Notice or termination of the DIP Facility and the Obligors' authority to use Cash Collateral (as defined in the Orders), but only if such termination occurs prior to the effective date of any plan of liquidation, the Obligors shall immediately fund into a segregated account

established by the Obligors (the "Carve-Out Account") an amount equal to the aggregate amount accrued under the Carve-Out prior to the delivery of the Carve-Out Trigger Notice, plus the amount of the Carve-Out Cap.  If there are insufficient funds on the date the Carve-Out Trigger Notice is delivered to fund the full amount of the Carve-Out, including the Carve-Out Cap, into the Carve-Out Account, any additional cash proceeds thereafter received by the Obligors, from whatever source, shall be transferred by the Obligors into the Carve-Out Account prior to making any distributions to creditors.  All funds in the Carve-Out Account shall be used first to pay (i) all unpaid fees required to be paid in the Chapter 11 Cases under 28 U.S.C. § 1930 and 31 U.S.C. § 3717, whether arising prior to or after the delivery of the Carve-Out Trigger Notice and (ii) after the occurrence and during the continuance of an Event of Default (A) all reasonable and documented unpaid fees, costs, disbursements and expenses of professionals retained by the Obligors in the Chapter 11 Cases (collectively, the "Debtors' Professionals") that are incurred and earned prior to the first Business Day after the delivery by the Administrative Agent of a Carve-Out Trigger Notice, are allowed by the Bankruptcy Court under sections 105(a), 328, 330 or 331 of the Bankruptcy Code or otherwise (whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice) and remain unpaid after application of any retainers and any available funds remaining in the Obligors' estates for such creditors and (B) all reasonable and documented unpaid fees and expenses of professionals retained by any statutory committee appointed in the Chapter 11 Cases (collectively, the "Committee's Professionals") that are incurred and earned prior to the first Business Day after the delivery by the Administrative Agent of a Carve-Out Trigger Notice, are allowed by the Bankruptcy Court under sections 105(a), 330 or 331 of the Bankruptcy Code or otherwise (whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice) and remain unpaid after application of any available funds remaining in the Obligors' estates for such creditors, and then, to pay all reasonable and documented unpaid fees, costs, disbursements and expenses of the Debtors' Professionals and Committee's Professionals that are incurred and earned on or after the first Business Day after the delivery by the Lenders of a Carve-Out Trigger Notice, that are allowed by the Bankruptcy Court under sections 105(a), 328, 330 or 331 of the Bankruptcy Code or otherwise and remain unpaid after application of any retainers and any available funds remaining in the Obligors' estates for such creditors and in an aggregate amount not to exceed the Carve-Out Cap (plus all unpaid fees, costs, disbursements and expenses of the Debtors' Professionals and Committee's Professionals allowed by the Bankruptcy Court at any time that were incurred on or prior to the first Business Day following the delivery of the Carve-Out Trigger Notice); provided that, nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (A) and (B) above.  All amounts deposited in the Carve-Out Account shall continue to be subject to the Liens pursuant to the Loan Documents and the Liens pursuant to the Pre-Petition Credit Agreement such that, upon final payment of all allowed amounts due and owing under the Carve-Out, including the Carve-Out Cap, as determined by further order of the Bankruptcy Court, any funds remaining in the Carve-Out Account shall be remitted to the Debtors and governed by the terms of this Agreement.  Notwithstanding anything to the contrary in this Agreement, all liens and claims granted pursuant to the Interim Order, as well as all liens and claims granted pursuant to any Obligations (as defined in the Pre-Petition Credit Agreement), shall be subject to the Carve-Out.

Notwithstanding the foregoing, so long as the Carve-Out Trigger Notice has not been delivered, the Borrower shall be permitted to pay, as the same may become due and payable, fees

and expenses allowed and payable under 11 U.S.C. § 330 and § 331, and the same shall not reduce the Carve-Out Cap.

No portion of the Carve-Out, any Collateral (including, without limitation, any Cash Collateral) proceeds or proceeds of the Loans may be used for the payment of the fees and expenses of any person incurred challenging, or in relation to the challenge of, (i) any of the Administrative Agent's or the Secured Parties' Liens or claims, or the initiation or prosecution of any claim or action against any of the Administrative Agent or Secured Parties; (ii) any claims or causes of actions (including any claims or causes of action under Chapter 5 of the Bankruptcy Code) against the Pre-Petition Agent or the Pre-Petition Lenders, their respective advisors, agents and sub-agents, including formal discovery proceedings in anticipation thereof, and/or challenging any Lien of the Pre-Petition Agent and the Pre-Petition Lenders; (iii) any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations against Released Parties; or (iv) stipulations made by the Obligors with respect to the Pre-Petition Credit Agreement and approved by the Interim Order; provided, however, that the Carve-Out, Collateral (including, without limitation, any Cash Collateral), and proceeds of the Loans may be used only in an amount up to $25,000 in the aggregate (the "Committee Investigation Fund") for the payment or reimbursement of any fees or disbursements of the Committee incurred in connection with making any such investigation (and such funds shall only be payable with respect to the payment or reimbursement of Committee fees or disbursements).

For the avoidance of doubt, any and all claims (i) incurred by the Committee in excess of the Committee Investigation Fund or (ii) incurred by any professional persons or any party on account of professional fees and expenses that exceed the applicable amounts set forth in the Approved Budget shall not constitute an allowed administrative expense claim for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, and such claims shall not be satisfied by the Carve-Out, Collateral (including, without limitation, any Cash Collateral), or proceeds of the Loans and shall be satisfied solely from unencumbered assets reducing recoveries to the holders of unsecured claims (other than any deficiency claim held by the Pre-Petition Lenders).

SECTION 11.2    Payment of Obligations.  Subject to the Orders and Section 8.1 hereof, upon the Stated Maturity Date (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents or Pre-Petition Credit Agreement pursuant to the Final Order, the Administrative Agent and the Lenders shall be entitled to immediate payment in full in cash of such Obligations without further application to or order of the Bankruptcy Court.

SECTION 11.3    No Discharge; Survival of Claims.  The Obligors agree that unless the Obligations have been indefeasibly paid in full in cash at such time (a) the Obligations hereunder shall not be discharged by the entry of an order confirming any plan of reorganization in any Chapter 11 Case (and the Obligors pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waive any such discharge) and (b) the super-priority administrative expense claim granted to the Secured Parties pursuant to the Orders and described in Section 11.1 and the Liens granted to Secured Parties pursuant to the Orders and described in Section 11.1 shall not be affected in any manner by the entry of an order confirming any plan of reorganization in any Chapter 11 Case.

SECTION 11.4    Release.  The Obligors hereby acknowledge effective upon entry of each Order, that the Obligors have no defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Obligors' liability to prepay or repay the Administrative Agent or any Lender as provided in this Agreement or other Loan Documents or the Pre-Petition Credit Agreement pursuant to the Final Order or to seek affirmative relief or damages of any kind or nature from the Administrative Agent or any Lender.  The Obligors, in their own right, on behalf of each of their bankruptcy estates, hereby, effective upon entry of, and subject to, the Final Order, fully, finally and forever release and discharge the Administrative Agent and the Lenders and all of Administrative Agent's and Lenders' past and present officers, directors, agents, attorneys, assigns, heirs, parents, subsidiaries, and each person acting for or on behalf of any of them (collectively, the "Released Parties") of and from any and all past and present actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based solely on acts, facts, events or omissions or other matters, causes or things occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Loan Documents, the Orders and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing; provided, that nothing herein shall be deemed to be a release of any Released Party from its obligations under the Loan Documents, the Orders or any order of the Bankruptcy Court applicable to such Person, provided, further, that nothing contained herein shall be deemed to limit or modify the rights granted to third parties under the Orders.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to he executed by their respective officers thereunto duly authorized as of the day and year first above written.

CARGO 360, INC.

By: _____
    Name:
    Title:

CANADIAN IMPERIAL BANK OF
COMMERCE, NEW YORK AGENCY, as the
Administrative Agent

By:_____
    Name:
    Title:

EXHIBIT D


FORM OF 1110 STIPULATION

US_ACTIVE:\44097748\9\71907.0006

EXECUTION COPY

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------x
|  |  |
|---|---|
| *In re* | Chapter 11 |
| **SOUTHERN AIR HOLDINGS, INC.,** *et al.*, | Case No. 12-_____ (   ) |
| **Debtors.**[1] | **Joint Administration Requested** |

-------------------------------------------------x

## STIPULATION PURSUANT TO SECTIONS 363 AND 1110 OF THE BANKRUPTCY CODE REGARDING OAK HILL ENTITIES AND 777 AIRCRAFT

Southern Air Inc., as debtor in possession ("Southern Air"), Wells Fargo Bank Northwest, N.A., solely in its capacity as Owner Trustee (the "Owner Trustee"), and OH Aircraft Acquisition, LLC ("OHAA"), Oak Hill Capital Partners II, L.P. ("OHCP"), and Oak Hill Cargo 360, LLC ("OH Cargo", and, collectively with OHAA and OHCP, the "Oak Hill Entities"), hereby stipulate as follows:

RECITALS

A.      On September 27, 2012, Southern Air and certain of its affiliated entities (collectively, the "Debtors") commenced cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") by filing petitions for relief with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  (i) Southern Air Holdings, Inc., 6605; (ii) Cargo 360, Inc., 4233; (iii) Southern Air Inc., 2187; (iv) Air Mobility Inc., 3824; (v) 21110 LLC, 3761; (vi) 21111 LLC, 8100; (vii) 21221 LLC, 1567; (viii) 21550 LLC, 8103; (ix) 21576 LLC, 6341; (x) 21590 LLC, 8105; (xi) 21787 LLC, 0617; (xii) 21832 LLC, 7893; (xiii) 23138 LLC, 7192; (xiv) 24067 LLC, 6360; (xv) 46914 LLC, 0322; (xvi) Aircraft 21255, LLC, 5500; (xvii) Aircraft 21380, LLC, 1753; and (xviii) CF6-50, LLC, 9733.  The address for all Debtors is 117 Glover Avenue, Norwalk, Connecticut 06850.

B.      As of the date hereof, the Debtors continue to operate the businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.      Southern Air holds an air carrier operating certificate, issued pursuant to chapter 447 of title 49 of United States Code, for aircraft capable of carrying ten (10) or more individuals or six thousand (6,000) pounds or more of cargo, and is engaged in domestic and international air cargo transportation.

D.      Southern Air leases, among other aircraft, four (4) Boeing 777F aircraft (the "777 Aircraft") pursuant to that certain (1) Aircraft Operating Lease Agreement, dated as of February 5, 2010, between Southern Air, as Lessee, and Owner Trustee, as Lessor, with respect to Serial Number 37986, (2) Aircraft Operating Lease Agreement, dated as of February 5, 2010, between Southern Air, as Lessee, and Owner Trustee, as Lessor, with respect to Serial Number 37987, (3) Aircraft Operating Lease Agreement, dated as of August 5, 2011, between Southern Air, as Lessee, and Owner Trustee, as Lessor, with respect to Serial Number 37988, and (4) Aircraft Operating Lease Agreement, dated as of August 5, 2011, between Southern Air, as Lessee, and Owner Trustee, as Lessor, with respect to Serial Number 37989 (collectively, the "777 Leases"). OHAA is the beneficial owner of two of the 777 Aircraft and manages (and, upon the satisfaction of certain conditions, has the option to purchase, the membership interests in) the entity that holds the beneficial interests in the other two 777 Aircraft.

E.      Pursuant to that certain Support Agreement (the "Support Agreement"), dated as of September 27, 2012, by and among the Debtors, the prepetition lenders party thereto, and the Oak Hill Entities, among other things, the Debtors and the Oak Hill Entities agreed to enter into this Stipulation (the "1110 Stipulation") and implement the transactions described herein,

2

including the agreement set forth in the term sheet attached hereto as Exhibit "A" (the "OHAA Term Sheet") and the Plan Term Sheet attached as Exhibit "B" to the Support Agreement, whereby, pursuant to section 363 of the Bankruptcy Code, the Oak Hill Entities shall provide the Debtors with certain payments (the "OHAA Payments") on the terms and conditions outlined in the OHAA Term Sheet and certain lease amendments to be effectuated following the Debtors' emergence from chapter 11 in exchange for the OHAA Consideration (as such term is defined in the Plan Term Sheet).  Pursuant to the Interim Order and, upon its entry by the Bankruptcy Court, the Final DIP Order (as each such term is defined in the OHAA Term Sheet), the OHAA Payments provided by (or deemed provided by) the Oak Hill Entities during the Chapter 11 Cases shall have certain protections under section 364 of the Bankruptcy Code on the terms set forth therein.

F.    As further contemplated by the Support Agreement, the Debtors and the Oak Hill Entities[2] have agreed that Southern Air shall make promptly an election pursuant to section 1110(a) of the Bankruptcy Code, with respect to the 777 Leases and the 777 Aircraft, including, without limitation, related engines, appliances, parts and equipment (collectively, with the 777 Aircraft, the "Aircraft Equipment").  The Aircraft Equipment constitutes "equipment" within the meaning of sections 1110(a)(3)(A)(i) and 1110(a)(3)(B) of the Bankruptcy Code and together with the Aircraft Agreements is subject to the provisions of section 1110 of the Bankruptcy Code.

G.    Southern Air represents that (a) the Aircraft Equipment has been in the possession of Southern Air, and Southern Air has continued to use the Aircraft Equipment in the operation

---

[2] The Oak Hill Entities and the Owner Trustee are sometimes hereinafter collectively referred to as the "Aircraft Creditors" and individually as an "Aircraft Creditor".

3

of its business since September 25, 2012, (b) the Aircraft Equipment is essential to the continued

operation of Southern Air and the viability of the Debtors, and (c) the Debtors believe that the

execution, delivery and performance of this Stipulation and the transactions set forth on the

OHAA Term Sheet are beneficial to and in the best interests of the Debtors, their creditors and

their chapter 11 estates.

H.    The Aircraft Creditors represent that they are entitled to the protections of section

1110 of the Bankruptcy Code with respect to the Aircraft Equipment and the 777 Leases.

NOW THEREFORE, the parties hereto do hereby agree as follows:

AGREEMENT

1.    Pursuant to section 1110(a)(2)(A) of the Bankruptcy Code, and upon

approval of this Stipulation by the Bankruptcy Court, Southern Air hereby agrees to (a) perform

all of its obligations under the 777 Leases, and (b) cure all defaults under the 777 Leases (other

than defaults of the kind specified in section 365(b)(2) of the Bankruptcy Code) within the times

prescribed in section 1110(a)(2)(B) of the Bankruptcy Code.  Notwithstanding the foregoing,

Southern Air shall cure such payment defaults on the later to occur of (y) October 5, 2012 and

(z) two (2) Business Days following entry of the Interim Order, as defined in the Support

Agreement.

2.    This Stipulation and the OHAA Term Sheet do not constitute an

assumption of the 777 Leases under section 365(a) of the Bankruptcy Code (to the extent such

section is applicable) and nothing contained herein shall be construed to constitute such an

assumption; provided, however, that the foregoing does not limit or otherwise affect the rights,

4

remedies or claims of the Aircraft Creditors or the Debtors under this Stipulation or section 1110 of the Bankruptcy Code.

3.      This Stipulation is an agreement within the meaning of section 1110(a)(2)(A) of the Bankruptcy Code.  In the event any Debtor fails to perform any of its obligations under this Stipulation or an event of default occurs under the relevant 777 Lease (other than a default of the kind specified in section 365(b)(2) of the Bankruptcy Code), such failure shall constitute an event of default hereunder and such 777 Lease unless cured in compliance with the terms of this Stipulation, if cure is permitted thereunder, or such 777 Lease. Upon the occurrence of such an event of default and failure to cure, and upon the issuance of notice required pursuant to the 777 Leases and this Stipulation, (a) the relevant Aircraft Creditor shall thereupon be permitted to exercise any and all rights, claims, and remedies with respect thereto as it may have under this Stipulation, the relevant Aircraft Agreement and the Bankruptcy Code as contemplated by this Stipulation or as permitted by the Bankruptcy Code and (b) upon written demand by the Aircraft Creditor, the Debtor shall surrender the relevant Aircraft Equipment (including its records and all related equipment) as required by section 1110 of the Bankruptcy Code.  Except as otherwise expressly provided in this Stipulation, nothing in this Stipulation shall modify, abridge or otherwise affect the rights of any Debtor or the Aircraft Creditors.

4.      Each Aircraft Creditor reserves its right to file any proof of claim and to apply to the Court for any order appropriate under the Bankruptcy Code, subject to any objection of any Debtor, the Official Committee of Unsecured Creditors or any other party in interest.

5.      This Stipulation shall be binding upon (a) the Debtors, and any trustee or examiner in the pending Chapter 11 Cases, or their respective successors and assigns, (b) the

US_ACTIVE:\44102092\3\71907.0006

Aircraft Creditor and its respective successors and assigns, (c) the trustee in the event that the above-captioned cases are converted to cases under chapter 7 of the Bankruptcy Code, and (d) all creditors and other parties in interest in these Chapter 11 Cases.

6.    This Stipulation is subject to the approval of the Court and, upon such approval, shall be effective as of September 27, 2012.

7.    This Stipulation may be executed in one or more counterparts, by facsimile or otherwise, each of which shall be deemed an original, and all of which, when taken together, shall constitute one and the same document.

8.    Unless otherwise specifically provided herein, all notices required or permitted by the terms of the 777 Leases or this Stipulation shall be in writing, and any such notice shall become effective upon receipt by the addressee of such notice by certified mail, return receipt requested, overnight courier service or facsimile to the following addresses:

(A)    If to the Debtors, to:

Southern Air Inc.
117 Glover Avenue
Norwalk, CT  06850
Fax: 203.847.9612
Attention:  Daniel J. McHugh
and

Weil Gotshal & Manges, LLP
767 Fifth Avenue
New York, NY  10153
Attention:  Brian S. Rosen, Esq.
Fax: 212.310.8007

(B)    If to the Aircraft Creditor, then as provided in the 777 Leases and to its counsel filing a Notice of Appearance in these Chapter 11 Cases.

6

9.     This Stipulation, the transactions and documentation contemplated by the OHAA Term Sheet, section 1110 of the Bankruptcy Code and the 777 Leases, as modified hereby, together contain the entire agreement between the Aircraft Creditors and the Debtors as to the subject matter hereof, and all previous understandings, agreements and communications prior to the date hereof, whether express or implied, oral or written, relating to the subject matter hereof are fully and completely extinguished and superseded by this Stipulation and the 777 Leases, as proposed to be modified following confirmation of the Debtors' plan of reorganization. This Stipulation shall not be altered, amended, modified or otherwise changed, and no right hereunder may be waived, except by a writing duly signed by the Aircraft Creditors and the Debtors.

10.    To the extent that there is an inconsistency between the terms of this Stipulation and any term of the Debtors' Motion with respect to the above-referenced Order, the terms of this Stipulation shall control.

Dated:  New York, New York
        September __, 2012

SOUTHERN AIR INC,
as Debtor In Possession

By:

Name: Daniel J. McHugh
Title: President and Chief Executive Officer

8

Dated:
By:

Jon Croasmun
Vice President

Wells Fargo Bank Northwest, N.A., solely in its capacity as Owner Trustee for the 37986 Trust

Dated:
By:

Jon Croasmun
Vice President

Wells Fargo Bank Northwest, N.A., solely in its capacity as Owner Trustee for the 37987 Trust

Dated:
By:

Jon Croasmun
Vice President

Wells Fargo Bank Northwest, N.A., solely in its capacity as Owner Trustee for the 37988 Trust

Dated:
By:

Jon Croasmun
Vice President

Wells Fargo Bank Northwest, N.A., solely in its capacity as Owner Trustee for the 37989 Trust

Dated: _____
By: _____
    Kevin G. Levy

OH Aircraft Acquisition, LLC, on behalf of
itself and as agent for certain of its affiliates
and managed entities

Dated: _____
By: _____
    Kevin G. Levy

Oak Hill Capital Partners II, L.P.
By: OHCP GENPAR II, L.P., its General
Partner
By: OHCP MGP II, LLC, its General Partner

Dated: _____
By: _____
    Kevin G. Levy

Oak Hill Cargo 360, LLC

**Exhibit A**

OHAA Term Sheet

US_ACTIVE:\44102092\3\71907.0006

**EXHIBIT A TO 1110 STIPULATION**
**OHAA TERM SHEET**

In connection with the Support Agreement, dated as of September 28, 2012 (the "Support Agreement"), among (i) Southern Air Holdings, Inc., Cargo 360, Inc., Southern Air, Inc. ("SAI"), on behalf of themselves and their affiliates set forth on Exhibit A to the Support Agreement (collectively, the "Company" or the "Debtors"), (ii) each of the prepetition lenders party thereto, and (iii) Oak Hill Capital Partners II, L.P. ("OHCP"), OH Aircraft Acquisition, LLC ("OHAA") and Oak Hill Cargo, LLC ("OH Cargo" and, collectively with OHAA and OHCP, "Oak Hill"), and in the event the Company commences chapter 11 cases ("Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court", the date of commencement of the cases is defined as the "Petition Date"), OHAA has agreed to the terms of the Plan Term Sheet attached to the Support Agreement as Exhibit B (such plan of reorganization, as may be amended, modified or supplemented with the consent of the Debtors, Oak Hill and the prepetition lenders who are party to the Support Agreement (the "Consenting Lenders") in accordance with the terms of the Support Agreement, the "Plan"). Capitalized terms used herein but not otherwise defined shall have the meaning ascribed thereto in the Support Agreement and all references herein to the Debtors shall be deemed to be to the reorganized Company if the relevant provision relates to circumstances from and after the effective date of the Plan (the "Effective Date").

In addition to the OHAA Payments (as defined below), the Company shall seek Bankruptcy Court authority to enter into that certain debtor in possession financing to be used to fund working capital during the pendency of the Chapter 11 Cases. The DIP Agreement, the Interim Order, the Final DIP Order and all of the loan documents, collateral documents, agreements, certificates or instruments delivered or executed in connection with the foregoing shall be referenced herein as the "DIP Documents". The terms "Obligations", "Secured OHAA Payment Obligations" and "Required Lenders" shall have the respective meanings ascribed thereto in the DIP Agreement as in effect as of entry by of the Interim Order by the Bankruptcy Court. The term "Requisite Lenders" means holders of a majority in amount of the Senior Debt Claims held by all Consenting Lenders that are, at any time of determination, party to the Support Agreement.

The terms and conditions set forth herein are mutually dependent on each other, shall be annexed to and become part of the 1110 Stipulation, which stipulation shall be subject to approval of the Bankruptcy Court. Except with respect to the Initial Payment, Oak Hill shall not be obligated hereunder unless and until the 1110 Stipulation is approved by the Bankruptcy Court with respect to such terms and conditions as a whole.

*THIS EXHIBIT DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, SHALL ONLY BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF BANKRUPTCY LAW.*

*THIS EXHIBIT DOES NOT CONSTITUTE A PLAN OF REORGANIZATION FOR THE*

*DEBTORS AND APPROVAL OF THE 1110 STIPULATION SHALL NEITHER (A) CONSTITUTE CONFIRMATION BY THE BANKRUPTCY COURT OF THE PLAN NOR (B) ASSUMPTION OF THE 777 LEASES IN ACCORDANCE WITH SECTION 365 OF THE BANKRUPTCY CODE.   DISTRIBUTIONS TO HOLDERS OF CLAIMS AND INTERESTS CONTEMPLATED BY THE RESTRUCTURING TERM SHEET SHALL BE SUBJECT TO CONFIRMATION OF THE PLAN IN COMPLIANCE WITH APPLICABLE PROVISIONS OF BANKRUPTCY LAW.*

| I. | **Escrow Agreement / Additional Monthly Payment Deposit** | A.    Oak Hill shall enter into an escrow agreement, in form and substance satisfactory to the Debtors, the Agent and Oak Hill, with Wells Fargo, N.A. ("Wells Fargo"), as escrow agent (the "Escrow Agent"), to establish an escrow account (the "Escrow Account") for the payments to be escrowed in accordance with the terms of this Exhibit.  The Escrow Agent shall maintain no right of setoff with respect to any funds deposited into the Escrow Account as a result of any claims or causes of action arising from transactions or actions relating to the period prior to the Petition Date, including, without limitation, that Wells Fargo serves as, among other things, Owner Trustee with respect to two (2) of the 777 Aircraft.  Oak Hill agrees to pay all administrative fees associated with the Escrow Account.

B.    Oak Hill shall deposit $4,166,667.00 into the Escrow Account within one (1) Business Day following entry by the Bankruptcy Court of an order approving the 1110 Stipulation (the "Approval Order").  Until the twelve (12) month anniversary of the Petition Date, the Escrow Account will at all times be funded with no less than $833,333.33 (the "Minimum Amount").

C.    Oak Hill shall deposit into the Escrow Account additional funds necessary, if any, to maintain the Minimum Amount if amounts in the Escrow Account are drawn to pay any Additional Monthly Payments (described below) payable prior to the Effective Date in accordance with Section V.

D.    On the first (1st) Business Day of each of the first four (4) months following entry of the Approval Order, the Debtors (or the reorganized Company, as applicable) shall deliver an executed certificate to the Escrow Agent and Oak Hill in the form attached to the Escrow Agreement (i) certifying that the conditions to release of escrow in Section VI (for requests prior to the Effective Date) or in Section VII (for requests from and after the Effective Date) have been satisfied as of such date and the Debtors (or the reorganized Company, as applicable) are otherwise in compliance with the terms of the 1110 Stipulation and (ii) requesting that the Escrow Agent release from the Escrow Account an amount equal to one (1) 12-Month Payment, and the Escrow Agent shall release such amount to |

|  |  | the Debtors (or the reorganized Company, as applicable) on the same Business Day.

E.    On the first (1st) Business Day following Oak Hill's failure to make an Additional Monthly Payment in accordance with Section V, the Debtors (or the reorganized Company, as applicable) shall deliver an executed certificate to the Escrow Agent and Oak Hill, in the form attached to the Escrow Agreement: (i) certifying that the conditions to release of escrow in Section VI (for requests prior to the Effective Date) or in Section VII (for requests from and after the Effective Date) as of such date and the Debtors (or the reorganized Company, as applicable) are otherwise in compliance with the terms of the 1110 Stipulation and (ii) requesting that the Escrow Agent release from the Escrow Account an amount equal to one (1) Additional Monthly Payment, and the Escrow Agent shall release such amount to the Debtors (or the reorganized Company, as applicable) on the same Business Day.

F.    On the Effective Date, Oak Hill shall create and fund an escrow for the benefit of the reorganized Company containing an amount equal to $500,000, as security for the remaining Additional Monthly Payments (the "Additional Monthly Payment Deposit"), pursuant to documentation to be agreed among Oak Hill and the Debtors prior to the Effective Date. If the reorganized Company utilizes the Additional Monthly Payment Deposit in respect of any unpaid Additional Monthly Payment, Oak Hill shall deposit additional funds in an amount necessary to maintain the deposit at $500,000. The final Additional Monthly Payment shall be made from the Additional Monthly Payment Deposit.

G.    Upon the earlier to occur of (i) three (3) Business Days following delivery of written notice to the Escrow Agent of any event that renders the Debtors (or the reorganized Company, as applicable) unable to satisfy any condition precedent set forth in Section VI (prior to the Effective Date) or in Section VII (from and after the Effective Date), (ii) mutual agreement of the Debtors (in consultation with the Agent) and Oak Hill, or (iii) Oak Hill's satisfaction of all obligations arising under this Exhibit, amounts on deposit, if any, in the Escrow Account shall be returned to Oak Hill.

| II. | **Initial Payment** | Within one (1) Business Day following entry of the Interim Order (that is in form and substance satisfactory to Oak Hill and the Requisite Lenders), Oak Hill shall pay $833,333.33 in cash to the Company (the "Initial Payment"). |

| III. | **12-Month** | A. Subject to entry of the Approval Order and satisfaction of the conditions precedent set forth in Section VI (prior to the Effective |

| | |
|---|---|
| **Payment** | Date) or in Section VII (from and after the Effective Date), and on the first (1st) Business Day of each of the successive 11 months following the Petition Date, Oak Hill shall make a payment to the Debtors (or the reorganized Company, as applicable) in an amount equal to $833,333.33 each month, and, together with the Initial Payment, the maximum aggregate payments made by Oak Hill shall not exceed $10,000,000 (each, a "<u>12-Month Payment</u>").<br><br>    B. If approval of the 1110 Stipulation is denied by the Bankruptcy Court, Oak Hill shall have no obligation to make any additional 12-Month Payments, and the Initial Payment shall become a Claim (as defined in the Bankruptcy Code) against the Debtors, immediately due and payable by the Debtors in cash in full.<br><br>    C. From and after the Effective Date, any remaining 12-Month Payments shall be paid $833,333.33 per month on the first (1st) Business Day of each successive month in accordance with the Plan.<br><br>    D. The Minimum Amount will be used to make the final 12-Month Payment of $833,333.33. |
| IV. **OHAA Boeing Credit** |     A.    Oak Hill shall use its commercially reasonable efforts to assist the Debtors to utilize to the maximum extent of OHAA's $1,925,000 deposit with Boeing (the "<u>Boeing Credit</u>") in satisfaction and discharge of the Debtors' obligations owed to Boeing; <u>provided, however</u>, that Oak Hill makes no representation as to, and assumes no liability with respect to, whether and to what extent Boeing may permit any such offset and Oak Hill's agreement to permit application of the Boeing Credit is subject to the Debtors (or the reorganized Company, as applicable) having satisfied the conditions precedent in Section VI (prior to the Effective Date) or in Section VII (from and after the Effective Date) hereof as of such date the Boeing Credit is to be applied.<br><br>    B.    The Boeing Credit shall be documented pursuant to an agreement among Oak Hill, the Debtors (or the reorganized Company, as applicable), in consultation with the Agent, and Boeing, without the need for further approval of the Bankruptcy Court. |
| V. **Additional Monthly Payments** |     A. From and after the Petition Date and until the fifth (5th) anniversary of the Petition Date (the "<u>Additional Monthly Payment Period</u>"), subject to the conditions precedent set forth in Section VI (prior to the Effective Date) or in Section VII (from and after the Effective Date) hereof, and if the Debtors (or the reorganized Company, as applicable) are then current in their monthly payments in accordance with the 777 Leases, Oak Hill shall pay to the Debtors |

(or the reorganized Company, as applicable) four monthly installments of $44,166.66 representing one installment per 777 Lease, in aggregate amount of $166,666.66 per month ($2,000,000 per year), up to an aggregate total amount of $10,000,000 during the Additional Monthly Payment Period (the aggregate amount paid, the "Additional Monthly Payments", each payment of $44,166.66, an "Additional Monthly Payment"). The 12-Month Payments, the amount of the Boeing Credit and the Additional Monthly Payments are collectively defined as the "OHAA Payments".

B. During the Additional Monthly Payment Period, Oak Hill shall make an Additional Monthly Payment to the Debtors (or the reorganized Company, as applicable) within one (1) Business Day following receipt by Oak Hill of confirmation that a monthly payment due under the applicable 777 Lease has been timely made by the Debtors (or the reorganized Company, as applicable).

C. The first Additional Monthly Payment ($44,166.66) to be made immediately following entry of the Approval Order shall be deemed paid by Oak Hill in accordance with the terms of the Interim Order.

D. If during the Additional Monthly Payment Period, Oak Hill fails to make any Additional Monthly Payments when due in accordance with clause (B), the Debtors (or the reorganized Company, as applicable) shall be entitled to request payment from the Escrow Account for payments prior to the Effective Date (or, from and after the Effective Date, the Additional Monthly Payment Deposit) in an amount not to exceed $44,166.66 for each missed Additional Monthly Payment in satisfaction of Oak Hill's obligation under clause (B) for the unpaid Additional Monthly Payment. If the Escrow Account for payments prior to the Effective Date (or, from and after the Effective Date, the Additional Monthly Payment Deposit) has insufficient funds to satisfy Oak Hill's obligation, the Escrow Agent (or depositary institution, as applicable) shall immediately apprise Oak Hill of such deficiency, and, by wire transfer of immediately available funds, on such date, Oak Hill shall pay any such deficiency to the Debtors (or the reorganized Company, as applicable). If Oak Hill remains in breach of its obligations under this Section V for more than one (1) Business Day, the Debtors (or the reorganized Company, as applicable) shall be entitled to assert all available rights and seek all available remedies as a result thereof. So long as prior to the Effective Date the Escrow Account (or, from and after the Effective Date, the Additional Monthly Payment Deposit) has sufficient funds for the Debtors to receive any missed Additional Monthly Payment, Oak Hill's failure to make such Additional Monthly Payments shall not constitute a breach of Oak

| | | Hill's obligations under the 1110 Stipulation. |
|---|---|---|
| VI. | **Conditions Precedent during Chapter 11 Cases** | Unless otherwise expressly waived or agreed in writing by Oak Hill, in its sole discretion, set forth below are the conditions to release of any 12-Month Payment from escrow (other than the Initial Payment, which payment shall be made upon entry of the Interim Order in accordance with Section II hereof), release of any Additional Monthly Payments from escrow, Oak Hill's funding of the Additional Monthly Payments and the Debtors' application of the Boeing Credit during the period from entry of the Approval Order up to and including the Effective Date:<br><br>1. no postpetition default or event of default (other than any default or event of default that results from or arises in connection with the filing of the Chapter 11 Cases) under any of the 777 Leases or the 1110 Stipulation shall have occurred and be continuing, and the Debtors are otherwise in compliance with and performing under the 777 Leases and the 1110 Stipulation;<br><br>2. no motion shall be pending that seeks rejection of any of the 777 Leases;<br><br>3. no motion of any Debtor shall be pending seeking to sell all or substantially all of the assets of the Debtors or seeking to assign any of 777 Leases without Oak Hill's consent;<br><br>4. (a) the 1110 Stipulation and the Approval Order shall (i) be in full force and effect, and (ii) not having been reversed, vacated, stayed, amended, supplemented or otherwise modified, and (b) the Interim Order (and the Final DIP Order, as applicable) shall be in full force and effect and no modification, amendment, reversal or stay of the Interim Order (or Final DIP Order, as applicable) that is materially adverse to Oak Hill shall have occurred or be in effect;<br><br>5. without the consent of Oak Hill, no application, motion or similar pleading shall have been filed by any of the Debtors, the Agent, DIP Lenders that constitute Required Lenders or Consenting Lenders that constitute Requisite Lenders, seeking to amend, supplement, stay, vacate or otherwise modify the 1110 Stipulation or the Approval Order, that is not resolved, denied or withdrawn on terms acceptable to Oak Hill, in its sole discretion, within 20 days from the date such pleadings is filed with the Bankruptcy Court;<br><br>6. without the consent of Oak Hill, no application, motion or similar pleading shall have been filed by any of the Debtors, the Agent, DIP Lenders that constitute Required |

Lenders or Consenting Lenders that constitute Requisite Lenders, seeking to amend, supplement, stay, vacate or otherwise modify Interim Order (or the Final DIP Order, as applicable) that would be, if approved by the Bankruptcy Court, materially adverse to Oak Hill, the 1110 Stipulation, the Approval Order or any of the 777 Leases, that is not resolved, denied or withdrawn on terms acceptable to Oak Hill, in its sole discretion, within 20 days from the date such pleading is filed with the Bankruptcy Court;

7.  no order shall have been entered by the Bankruptcy Court granting any pleading of the type described in (5) or (6) filed by any party-in-interest (other than the Debtors, the Agent, DIP Lenders that constitute Required Lenders or Consenting Lenders that constitute Requisite Lenders);

8.  no payment default or event of default under the DIP Documents shall have occurred and be continuing that is not waived by the Required Lenders (as defined in the DIP Agreement) after the expiration of any applicable grace period; and no other default or event of default under the DIP Documents shall have occurred and be continuing that has been declared, is not waived by the Required Lenders (as defined in the DIP Agreement) after the expiration of any applicable grace period and the Required Lenders shall not have accelerated repayment of all obligations under the DIP Agreement within ten (10) days of the conclusion of any applicable grace period;

9.  without the prior written consent of Oak Hill, no amendment, modification, waiver or forbearance of, or in respect of, any DIP Document that is materially adverse to Oak Hill shall have occurred or be in effect;

10. except for the liens and super-priority claims expressly permitted in the Interim Order (or Final DIP Order, as applicable), no lien or other super-priority administrative claim shall exist which is *pari passu* with or senior to the liens and claims in respect of the Secured OHAA Payment Obligations;

11. the aggregate amount of all Loans, together with all available Commitments, outstanding under the DIP Agreement do not exceed $62,500,000 in the aggregate plus any interest paid-in-kind to the extent expressly permitted in the Interim Order (or Final DIP Order, as applicable), it being understood that "Loans" and "Commitments" used in this clause shall have the definitions set forth in the DIP Agreement in effect as of entry of the Final DIP Order;

|  | |
|---|---|
|  | 12. at all times since the Petition Date, the Debtors shall have delivered to Oak Hill copies of all reporting and notices delivered to the Agent and DIP Lenders pursuant to the terms of the DIP Agreement, at the time set forth in the DIP Agreement (or such later date as agreed by the Required Lenders) and shall have also provided Oak Hill with reasonable access to non-privileged information (including historical information) and relevant personnel to the extent reasonably requested by Oak Hill, in each case, subject to appropriate confidentiality agreements; |
|  | 13. the Support Agreement shall be in full force and effect and no termination of any party's obligations under the Support Agreement shall have occurred; |
|  | 14. there shall be no plan of reorganization or disclosure statement attendant thereto filed with the Bankruptcy Court, or any direct or indirect amendment to such plan or disclosure statement, by any Debtor that is not consistent with the Plan Term Sheet; |
|  | 15. none of the Chapter 11 Cases (other than of an immaterial or dormant Debtor) shall have been converted to a case under chapter 7 of the Bankruptcy Code, nor shall any Chapter 11 Case (other than of an immaterial or dormant Debtor) have been dismissed by order of the Bankruptcy Court; and |
|  | 16. no order shall have been entered by the Bankruptcy Court directing the appointment of an examiner with expanded powers or a trustee. |
| VII. **Post Effective Date Conditions** | A.       Unless otherwise expressly waived or agreed in writing by Oak Hill, in its sole discretion, at all times from and after the Effective Date, release of any 12-Month Payment from escrow, release of any Additional Monthly Payments from the Additional Monthly Payment Deposit, Oak Hill's funding of the Additional Monthly Payments and the reorganized Company's application of the Boeing Credit, are subject to the following conditions:<br><br>1.       no Event of Default under Section IX shall have occurred and be continuing; and<br><br>2.       the reorganized Company is, and has at all times been, in compliance with, and performing under, the 777 Leases (as amended), except for any failure of compliance that shall have been expressly waived in writing by Oak Hill or cured by the reorganized Company in accordance with the terms of the 777 Leases. |

| VIII. **Default during Chapter 11 Cases** | A.    The occurrence and continuance of any of the following shall constitute an immediate event of default under this Exhibit (together with the events set forth in Section IX(A), "Events of Default", each an "Event of Default"):

1.    on the date that any condition precedent in Section VI cannot be satisfied, or any event occurs that results in the Debtors' failure to satisfy any condition precedent in Section VI, irrespective of whether or not the Debtors seek to obtain an OHAA Payment on such date; or

2.    on the date any of the Debtors breach their obligations under the 1110 Stipulation or the 777 Leases.

B.    Immediately upon the occurrence of any Event of Default prior to the Effective Date, Oak Hill's obligation to make any OHAA Payments from and after the date of such event of default shall be immediately suspended.  Following five (5) Business Days prior notice to the Debtors, the U.S. Trustee, and the Committee (as defined in the Interim Order), unless Oak Hill has agreed in writing and in its sole discretion to waive the occurrence of an Event of Default, Oak Hill's obligations to make any OHAA Payments hereunder shall be terminated and of no further force or effect and the aggregate amount of all OHAA Payments made or deemed made from and after the Petition Date shall constitute a Claim against each of the Debtors, payable in full in cash as a Secured OHAA Payment Obligation, or pursuant to such other treatment as expressly agreed by Oak Hill.

C.    The Debtors agree that upon an Event of Default prior to the Effective Date, unless all Secured OHAA Payment Obligations have been indefeasibly paid in full in cash, (a) the Secured OHAA Payment Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in any Chapter 11 Case (and the Debtors pursuant to section 1141(d)(4) of the Bankruptcy Code, hereby waive any such discharge) and (b) the super-priority administrative expense claim, and the liens granted, in respect of the Secured OHAA Payment Obligations shall not be affected in any manner by the entry of any order or the Bankruptcy Court, including an order confirming any plan of reorganization in any Chapter 11 Case. |
| IX.   **Default Post-Effective Date** | A.    Following the Effective Date, the occurrence and continuance of any of the following shall constitute an immediate Event of Default:

1.    on the date that any condition precedent in Section VII cannot be satisfied, or any event occurs that results in the |

|  | | reorganized Company's failure to satisfy any condition precedent in Section VII, irrespective of whether or not the reorganized Company seeks to obtain an OHAA Payment on such date; or |
|--|--|--|
|  | |       2.    on the date of any occurrence and continuance of a default or event of default under any of the 777 Leases, as amended as of the Effective Date. |
|  | |       B.    Immediately upon the occurrence of any Event of Default under clause (A), Oak Hill's obligation to make any OHAA Payments from and after such default shall be immediately terminated and of no further force or effect. |
|  | |       C.    No sooner than the fifth (5th) Business Day following a post-Effective Date Event of Default, Oak Hill shall deliver written notice to the reorganized Company, the Escrow Agent and the applicable depositary institution for the Additional Monthly Payment Deposit of the occurrence of a default and the inability of the reorganized Company to access the Escrow Account and the Additional Monthly Payment Deposit. |
| X. | **Claim Treatment** |       A.    In exchange for the OHAA Payments and the Lease Amendments, upon the Effective Date, Oak Hill shall receive the consideration described in, and pursuant to the terms of, the Plan Term Sheet (the "OHAA Consideration")<br><br>      B.    In the event the Secured OHAA Payment Obligations become due and payable in cash in full accordance with this Exhibit or the DIP Documents at any time prior to the Effective Date, neither the Agent, the DIP Lenders nor any other party-in-interest shall be entitled to compromise the Secured OHAA Payment Obligations or the liens and claims ascribed thereto, or the protections for the benefit of the Secured OHAA Payment Obligations set forth in the DIP Documents, without the prior written consent of Oak Hill and, following notice and a hearing, entry of an order by the Bankruptcy Court; provided, however, that in the event of confirmation of the Plan and occurrence of the Effective Date, such written consent shall be unnecessary. |
| XI. | **Protection of OHAA Payments under DIP Documents** | Oak Hill's obligations and agreements under this Exhibit are conditioned upon each DIP Document being in form and substance reasonably acceptable to Oak Hill and containing protections for repayment of the Secured OHAA Payment Obligations. |
| XII. | **Amendments** | Prior to the Effective Date and so long as the Chapter 11 Cases are continuing, this Exhibit shall not be amended, waived or otherwise modified except pursuant to a written agreement among the |

| | |
|---|---|
| | Debtors, Oak Hill and the Requisite Lenders. The Debtors are authorized to implement nonmaterial modifications to this Exhibit without Bankruptcy Court approval. |
| **XIII. Miscellaneous** | A.     Plan Supplement. Oak Hill and the Debtors shall cooperate in good faith to document the post-Effective Date agreements set forth in this Exhibit and cause such agreement to be filed as a Plan Supplement. Upon the Effective Date, this Exhibit shall terminate and be of no further force or effect and the agreements among the reorganized Company and Oak Hill shall be as set forth in the Plan Supplement. |

B.     Waiver. Upon or in connection with any Event of Default or termination of this Exhibit, if applicable, nothing shall be construed herein as a waiver by any of the Debtors or Oak Hill of any or all of such party's rights and each of the Debtors and Oak Hill expressly reserve any and all of these respective rights.

C.     Set-off. Upon the occurrence and during the continuance of any Event of Default, Oak Hill shall have the right to appropriate and apply to the payment of the OHAA Payments made or deemed made to the Debtors, whether or not then due, and (as security for such OHAA Payments) each Debtor hereby grants to Oak Hill a continuing security interest in, any and all balances, credits, deposits, accounts or moneys of the Debtors made solely with respect to this Exhibit, solely to the extent maintained by Oak Hill. Oak Hill agrees promptly to notify the Debtors after any such appropriation and application is made; provided, however that the failure to give such notice shall not affect the validity of such setoff and application. Oak Hill's rights hereunder are in addition to other rights and remedies (including other rights of setoff under applicable law or otherwise) which Oak Hill may have. The Debtors expressly waive any rights of setoff, recoupment, deduction or counterclaim of all amounts payable to Oak Hill with respect to the 1110 Stipulation. References in this clause to the "Debtors" shall be deemed to be the reorganized Company at all times from and after the Effective Date.

D.     Severability. If any term or other provision of this Exhibit is invalid, illegal or incapable of being enforced, all other terms and provisions of this Exhibit shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any of the Debtors (or the reorganized Company, as applicable) or Oak Hill. Upon any determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Debtors (or the reorganized Company, as applicable) and Oak Hill shall negotiate in good faith to modify this Exhibit so as to effect the original intent of this Exhibit as closely as possible in

a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

E.  Notices.  Notices required under this Exhibit to be delivered to the appropriate person as set forth in Section 7.10 of the Support Agreement.

F.  Governing Law.  This Exhibit, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Exhibit, or the negotiation, execution, termination, performance or nonperformance of this Exhibit, shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State, without regard to any conflict of laws principles thereof.  Each of the Debtors (or the reorganized Company, as applicable) and Oak Hill agrees that it shall bring any action or proceeding in respect of any claim based upon, arising out of, or related to this Exhibit, any provision hereof or any of the transactions contemplated hereby, in the United States District Court for the Southern District of New York or any New York State court sitting in New York County of New York City (the "Courts"), and solely in connection with claims arising under this Exhibit or the transactions that are the subject of this Exhibit (a) irrevocably submits to the exclusive jurisdiction of the Courts, (b) waives any objection to laying venue in any such action or proceeding in the Courts and (c) waives any objection that the Courts are an inconvenient forum or do not have jurisdiction over any Party; provided, however, that, upon the commencement of the Chapter 11 Cases, each of the Debtors (or the reorganized Company, as applicable) and Oak Hill agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising from or relating to this Exhibit.  Each of the Debtors (or the reorganized Company, as applicable) and Oak Hill agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

G.  Successors and Assigns.  This Exhibit shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided, however, that the Debtors (or the reorganized Company, as applicable) may not assign or transfer its rights or obligations hereunder without the express prior written consent of Oak Hill.

H.  Other Transactions.  Except as otherwise set forth in the Plan, nothing contained in this Exhibit shall preclude Oak Hill from engaging in any transaction, in addition to those contemplated by this Exhibit, with the Debtors (or the reorganized Company) or any of its affiliates in which the Debtors (or the reorganized Company) or such affiliate is not restricted hereby from engaging

with any other person.

I.       Parties Including Trustees; Bankruptcy Court Proceedings.  Upon Oak Hill having made the Initial Payment, this Exhibit and other rights and privileges created hereby or pursuant hereto or to any DIP Document shall be binding upon each Debtor, the bankruptcy estate of each Debtor, and any trustee, other bankruptcy estate representative or any successor in interest of any Debtor in the Chapter 11 Cases or any subsequent case commenced under chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code (except with respect to the 777 Leases).  The liens in favor of the Secured OHAA Payment Obligations created under the DIP Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any of the Chapter 11 Cases or any other bankruptcy case of any Debtor to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any of the Chapter 11 Cases or the release of any Collateral (as defined in the Interim Order) from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Administrative Agent files financing statements or otherwise perfect its Liens under applicable law.  No Debtor may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under this Exhibit without the prior express written consent of Oak Hill.  Any such purported assignment, transfer, hypothecation or other conveyance by any Debtor without the prior express written consent of Oak Hill shall be void.  The terms and provisions of this Exhibit are for the purpose of defining the relative rights and obligations of each Debtor and Oak Hill with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Exhibit.

J.       No Third Party Beneficiaries.  This Exhibit shall be solely for the benefit of the Debtors (or the reorganized Company, as applicable) and Oak Hill and no other person or entity shall be a third party beneficiary hereof or have any legal or equitable right, remedy or claim hereunder.

K.       Rules of Interpretation.  Unless otherwise expressly provided, for purposes of this Exhibit, the following rules of interpretation shall apply: (i) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Exhibit, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day; (ii) the words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Exhibit as a whole and not merely to a subdivision in which such

| | |
|---|---|
| | words appear unless the context otherwise requires; (iii) the word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it; (iv) the division of this Exhibit into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Exhibit; (vii) all references in this Exhibit to any "Section" are to the corresponding Section of this Exhibit unless otherwise specified; and (viii) "business day" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close. |
| | |
| | |

EXHIBIT E

FORM OF TRANSFER LETTER

       The undersigned ("Transferee") (a) hereby acknowledges that it has read and understands the Support Agreement, dated as of September 27, 2012 (the "Agreement"),[1] by and among Southern Air Holdings, Inc., its subsidiaries party thereto, and each of the Support Parties party thereto, (b) desires to acquire the Claims described below from one of the Support Parties (the "Transferor") and (c) hereby irrevocably agrees to be bound by the terms and conditions of the Agreement to the same extent Transferor was thereby bound, and shall be deemed a Support Party for all purposes under the Agreement.

---

[1]    Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

27

Additionally, the Transferee hereby specifically and irrevocably agrees (i) to be bound by the terms and conditions of the Credit Agreement and the Agreement, to the same extent applicable to the transferred Senior Debt Claims, (ii) to be bound by the vote of the Transferor if cast prior to the effectiveness of the transfer of the Senior Debt Claims, and (iii) that each of the Parties shall be an express third-party beneficiary of this Transfer Letter and shall have the same recourse against the Transferee under the Agreement as such Party would have had against the Transferor.

Date Executed: _____,

**Print name of Transferee**

**Name:**
**Title:**

**Address:**

**Attention:**
**Telephone:**
**Facsimile:**

| Principal Amount Held | |
|---|---|
| **Claim** | **Amount** |
| Claims (specify type) | |

28